# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| SUSAN E. JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-0321 (GK) |
| | ) | |
| MARGARET SPELLINGS, | ) | |
| Secretary of Education, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendant Margaret Spellings, in her official capacity as Secretary of the Department of Education, hereby moves this Court for an order granting summary judgment in her favor. The record in this case shows that no genuine issue as to any material fact exists as to the claims being made by plaintiff, and defendant is entitled to judgment as a matter of law.

In support of this motion, defendant respectfully refers the Court to the accompanying memorandum of points and authorities and to the accompanying statement of material facts as to which there is no genuine issue. A draft order reflecting the requested relief is also attached.

March 22, 2007                                Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSAN E. JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-0321 (GK) |
| | ) | |
| MARGARET SPELLINGS, | ) | |
| Secretary of Education, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant Margaret Spellings, in her official capacity as Secretary of the Department of Education, submits this statement of material facts as to which she contends there is no genuine dispute:

## FACTS

1. Plaintiff began her employment with the Department of Education on October 18, 1993 as a GS-318-5 Secretary in the Office of Chief Financial Officer ("OCFO"). Deposition of Susan Johnson 57:17-58:5 (Pltf's Depo") (attached as Exhibit 1). In this capacity, plaintiff performed clerical duties and was scheduled to work full time. Pltf's Depo. 58:18-59:1; 59:11-59:14. As a Secretary, plaintiff was permitted to come into work late and then work late to make up the missed time. Pltf's Depo. 59:19-59:22. She worked this alternative schedule approximately two times per week. Pltf's Depo. 60:1-60:4.

2. On May 12, 1996, plaintiff applied for, and received, a promotion to a GS-7 Accountant within OCFO. Pltf's Depo. 60:17-61:1. This GS-7 position was a career ladder position, meaning that it had promotion potential to the GS-12 level. Pltf's Depo. 70:1-70:7. On July 5, 1998, plaintiff received a career ladder promotion to the GS-9 level, after more than two

years as a GS-7.  Pltf's Depo. 144:10-144:12.  Plaintiff did not seek EEO counseling and allege that the fact that it took her two years to receive a career ladder promotion to the GS-9 level was discriminatory until August 2002.  Pltf's Depo. 144:19-145:6.

3.  After more than two years at the GS-9 level, plaintiff received a career ladder promotion to the GS-11 level on November 19, 2000.  Pltf's Depo. 145:20-145:22.  Plaintiff did not seek EEO counseling and allege that the fact that she did not receive her GS-11 promotion for more than two years until August 2002, more than a year and a half after the promotion. Pltf's Depo. 146:13-147:1.

4.  In approximately February 2002, plaintiff became eligible for a career ladder promotion to the GS-12 level.  Pltf's Depo. 148:7-148:11. Accordingly, she requested by email to her supervisor Mr. Lawrence that she receive her career ladder promotion.  Exhibit 2 (Feb. 22, 2002 Email to M. Lawrence & G. Wood from S. Johnson).  Plaintiff allegedly again requested her career ladder promotion on May 16, 2002 by email to Terry Bowie.  See Exhibit 3 (May 16, 2002 Email to T. Bowie from S. Johnson); Exhibit 4 (May 18, 2002 Letter to T. Bowie from S. Johnson); Pltf's Depo. 172:16-174:3 (acknowledging that the May 18 letter was attached to the May 16 email, but stating that the letter had a different date because plaintiff and her husband "must have changed the date slightly").

5.  Mr. Lawrence, as plaintiff's first line supervisor, determined that plaintiff should not receive a career ladder promotion to the GS-12 level because he did not believe that he had observed plaintiff's work enough during the past year to believe she was capable of performing at the GS-12 level.  Testimony of Mack Lawrence 84:22-85:10 (attached as Exhibit 5). Specifically, Mr. Lawrence testified that he believed it was "nearly impossible to do this job

2

unless you're here." Lawrence Testimony 84:4-84:6. Likewise, Mr. Lawrence stated that he had

not been able to actually observe that plaintiff was capable of performing the duties of the GS-12

level because "she's not here enough in order [move] to the next grade." Lawrence Testimony

85:7-85:10. Mr. Lawrence then explained that notwithstanding plaintiff's absences from work,

his section still had to make its deadlines and, therefore, her work had to be reassigned to other

employees. Lawrence Testimony 85:11;85:17. See also Lawrence Testimony 86:2-86:17

(stating that based upon plaintiff's attendance record, "it's hard for me to gauge" whether or not

plaintiff could work effectively at the next level and that when she did come to work, a large

portion of her time was spent trying to catch up).

    6. Plaintiff admitted in deposition that, between the time she was promoted to the GS-11

level and the time she requested her promotion to the GS-12 level, she "had a lot of absences."

Pltf's Depo. 148 12-148:14. Specifically, in that time, plaintiff had been out of the office for

approximately 169.25 hours of annual leave, 116.25 hours of sick leave and 302.25 hours of

LWOP. See Exhibit 6 (Complete Leave Audit for year 2000 pay period 01 through year 2004

pay period 10). See also Pltf's Depo. 182:18-184:4 (plaintiff admitting that the leave audit is

accurate).

    7. It was not until August 2002, that plaintiff initially sought counseling from a

Department of Education EEO Counselor. Pltf's Depo. 145:4-145:6.

    8. From the beginning of her employment with the Department, plaintiff was permitted

to work a "gliding schedule," meaning a delayed arrival had to be offset with a delayed departure

or covered with approved leave status. Meanwhile, a late arriving employee could still work late

and earn "credit hours."[1]  Pltf's Depo. 76:17-76:22.  As an Accountant, plaintiff's first

supervisor, Jan Steinbruck, granted plaintiff flexibility in coming in later than her set starting

times, and still allowed her to work eight and a half hours.  Pltf's Depo. 77:9-78:18.  In fact,

there were some days where plaintiff admittedly would come to work as late as between 5:00

and 7:00 p.m.  Pltf's Depo. 79:6-79:11.   On at least one occasion, after plaintiff came into work

at the end of the typical work day and then worked until midnight, she left a message for Cynthia

Logan, her team leader at the time, stating that she would not be able to work the next day due to

being so tired from working late the previous night.  Pltf's Depo. 81:8-81:14.

9.  Working a flexible schedule was the only accommodation plaintiff required to

perform her job between May 1996 and August 2004.   Pltf's Depo. 84:3-84:10.

10.  In 1998, after reading the Department of Education's Handbook on Reasonable

Accommodations, Cynthia Logan, plaintiff's team leader, informed plaintiff that plaintiff could

not simply work credit hours without approval.  Declaration of Cynthia Logan ("Logan Decl.")

(attached as Exhibit 7).  Accordingly, Ms. Logan informed plaintiff that she would need to

obtain prior approval for credit hours in the future and let Ms. Logan know what work plaintiff

would be doing for these credit hours.  Logan Decl.  Notably, Ms. Logan did not tell plaintiff

that plaintiff could no longer work credit hours, only that plaintiff needed approval to work

credit hours.  Logan Decl.  Plaintiff admitted she did not seek EEO counseling relating to Ms.

---

[1]  Under the Dept. of Education's Collective Bargaining Agreement with the union, an
employee must have a schedule that covers the core hours, which are 9:30 to 3 pm, may only
earn 2 credit hours per work day, which must be earned between 7:30 am and 6:30 pm, and no
more than 24 accumulated credit hours are subject to carryover to the next pay period.  Pltf's
Depo. 88:16-90:3.

Logan's requirement of preapproval for credit hours until August 2002, approximately four years after that requirement was imposed. Pltf's Depo. 145:4-145:6.

11. In deposition, plaintiff testified that the requirement imposed by Ms. Logan that plaintiff obtain approval for working credit hours was discriminatory because it was hard for plaintiff to guess ahead of time when she could do credit hours, and also because plaintiff had been permitted to work any hours she wanted under a prior supervisor. Pltf's Depo. 111:7-111:18. Plaintiff felt that, because of her disability (depressive disorder and anxiety disorder), she should be able to come into work when she wanted and leave work when she wanted, without any preapproval. Pltf's Depo. 118:3-118:8. Plaintiff never provided any note from a doctor or other physician stating that she should be permitted to work credit hours. Pltf's Depo. 132:19-133:1. Instead, plaintiff's doctor simply stated that plaintiff could benefit from a work schedule of less than eight hours a day from time to time, depending upon her overall condition. Pltf's Depo. 116:16-117:10. See also Exhibit 8 (Letter To Whom it May Concern from Dr. George James of 1/14/95).

12. On March 23, 2000, Mack Lawrence, who was now plaintiff's supervisor, sent plaintiff an email confirming the directions plaintiff had previously received from Ms. Logan. Exhibit 9 (Email chain). Specifically, Mr. Lawrence informed plaintiff that, "[y]ou may continue to work credit hours, but you must receive approval from your team leader (Cynthia) prior to preforming the work." Exhibit 9. In a response email to Mr. Lawrence, plaintiff objected to the requirement that she receive approval from Ms. Logan prior to working credit hours, stating "you modified the entire agreement." Exhibit 9. Again, the reason plaintiff objected to the requirement to get approval for credit hours was that she believed that she should

be permitted to come into work when she wanted and leave when she wanted without any supervision. Pltf's Depo. 118:3-118:8. Plaintiff did not seek EEO counseling relating to Mr. Lawrence's requirement of preapproval for credit hours until August 2002, more than two years after that requirement was imposed. Pltf's Depo. 145:4-145:6.

13. In 2002, plaintiff's absences from work began to increase. In total, for the pay year 2002, plaintiff used approximately 625 hours of LWOP, 118 hours of annual leave and 76 hours of sick leave. Exhibit 6 (Leave Audit). Accordingly, for the pay year 2002, plaintiff missed 819 of the approximately 2080 hours in a work year, or approximately 39% of the work year.

14. In 2003, plaintiff worked a combined 72 hours for the first four pay periods. Exhibit 6 (Leave Audit). Beginning February 14, 2003, plaintiff went on full-time LWOP status, not coming to work again until she was separated from employment with the Department of Education in August 2004. Pltf's Depo. 23:5-23:8; 194:17-194:20. In fact, in deposition, plaintiff admitted that her medical condition made it impossible for her to go to work and do her job. Pltf's Depo. 195:7-195:20.

15. On February 28, 2003, after plaintiff had not come to work for two weeks, and had been in a LWOP status for two weeks, she sent Mr. Lawrence an email requesting LWOP approval from March 18 to March 28. Pltf's Depo. 186:11-186:14; Exhibit 10. Plaintiff's email advised Mr. Lawrence that "with her doctor's support, [she is] going outside of the country during this time to recuperate." Pltf's Depo. 187:20-188:2. Plaintiff "needed" this time to recuperate so that she and her husband could take a ten day vacation to the Galapagos Islands. Pltf's Depo. 186:20-187:4.

16.  Mr. Lawrence responded to plaintiff's email on March 3 advising plaintiff to see him when she gets in regarding the request.  Exhibit 10.  Plaintiff never went to see Mr. Lawrence, Pltf's Depo. 189:8-189:16, believing the request to be "unreasonable."  Pltf's Depo. 192:17-193:5.  Instead, plaintiff responded by email and stated that she could not come to work and, therefore, wanted the matter handled by email.  Exhibit 10.  Plaintiff also advised Mr. Lawrence that he had all the information he needed to approve her request for LWOP in advance.  Exhibit 10.

17.  At the time plaintiff sent her request for the LWOP vacation, plaintiff had not provided Mr. Lawrence with any medical documentation, or any documentation at all from a physician stating that the vacation was necessary for medical reasons.  Pltf's Depo. 189:2-189:7; 191:13-191:21.

18.  Plaintiff's letter indicating that her vacation was being taken on the advice of a doctor and that this was for serious medical reasons caused Mr. Lawrence to send plaintiff a request for supporting medical information, which also contained a release to permit Department of Education personnel to speak with plaintiff's treating physicians and advised plaintiff of her rights under the Family Medical Leave Act.  Exhibit 11 (March 12, 2003 Request for Supporting Medical Documentation).

19.  Although the request for supporting medical documentation directed that plaintiff respond by March 17, 2003, plaintiff did not so respond.  Pltf's Depo. 212:17-212:22.  Plaintiff refused to respond to the request simply because she did not believe she had to, instead believing it was "unnecessary."  Pltf's Depo. 212:1-212:11; 213:1-213:2.  Additionally, although plaintiff obtained a letter from her doctor on March 11, 2003 approving her vacation to the Galapagos

7

Islands, plaintiff failed to provide that letter to the Department in advance of her vacation. Pltf's Depo. 205:20-206:14; Exhibit 12 (Mar. 11, 2003 Letter to Whom it May Concern from Dr. C. James). In fact, plaintiff never provided the March 11 letter to Mr. Lawrence, instead providing it to the EEO investigator on April 11, 2003. Pltf's Depo. 211:11-211:22. Notwithstanding that plaintiff never responded to the request for documents, and failed to provide her doctor's letter to the Department prior to the vacation, plaintiff was granted 72 hours LWOP for her vacation. Pltf's Depo. 206:15-207:4.

20. Plaintiff's only complaint relating to the request for leave without pay for the Galapagos Islands vacation is that Mr. Lawrence did not immediately approve the request and, instead, requested medical documentation. Pltf's Depo. 208:1-208:11. In deposition, however, plaintiff admitted that the request for medical documentation had no effect on whether or not she was authorized leave without pay for the vacation. Pltf's Depo. 208:12-208:16. In fact, notwithstanding that plaintiff admitted that she went on the vacation and received LWOP for that time period, and alleged her disability was such that she could not work, plaintiff was able to go to the airport, fly to the Galapagos Islands, enjoy her vacation and return home. Pltf's Depo. 195:18-197:8.

21. In May 2003, plaintiff provided the Department of Education with a letter from her treating physician stating that plaintiff would be unable to return to work for at least six months due to her depression and anxiety. Exhibit 13 (May 2, 2003 Letter To United States Dept. of Education from Dr. James). Based upon this letter, the Department kept plaintiff in a LWOP status. Pltf's Depo. 215:12-215:22.

22. In November 2003, plaintiff provided the Department with another letter from her treating physician. Exhibit 14 (Nov. 9, 2003 Letter To United States Dept. of Education from Dr. James Letter). In this letter, plaintiff's doctor stated, "[l]et me make it clear that Ms. Johnson's underlying depression and anxiety are not conditions that preclude her from returning to work at the Department of Education." Exhibit 14. Notwithstanding this fact, plaintiff's doctor advised that plaintiff would not be returning to the workplace. Exhibit 14.

23. On January 16, 2004, Mr. Lawrence sent plaintiff a letter titled "reasonable accommodation." Exhibit 15 (Memorandum to S. Johnson from M. Lawrence of Jan 6, 2004). In this letter, Mr. Lawrence noted that plaintiff had been in an LWOP status since pay period six of 2003. Exhibit 15. Additionally, he noted, plaintiff had exceeded her permissible leave under the FMLA. Exhibit 15. Mr. Lawrence further advised plaintiff that he was restricted from granting her continued LWOP once her twelve weeks of FMLA leave expired for the year 2004, which he informed her would be in April. Exhibit 15. Mr. Lawrence also advised plaintiff that, since plaintiff had not returned to work, the Department was examining, pursuant to its regulations, assigning plaintiff to a position that she could perform. Exhibit 15. To this end, Mr. Lawrence requested that plaintiff provide the Department with an updated resume by February 6, 2004. Exhibit 15. Mr. Lawrence also advised plaintiff that she could request an extension of time if necessary. Exhibit 15.

24. In his January 16, 2004 letter, Mr. Lawrence advised plaintiff that her continued absences were placing a burden to the remaining workforce. Exhibit 15. In deposition, plaintiff agreed that her absences were placing a burden on the remaining workforce because other employees were forced to do her work. Pltf's Depo. 228:18-228:3.

9

25. Plaintiff never provided the requested information or even responded to Mr. Lawrence's letter. Pltf's Depo. 232:10-232:15; 233:4-233:13.

26. Plaintiff originally claimed that the January 16, 2003 letter from Mr. Lawrence was discriminatory on the basis of her disability because it threatened her with termination. Pltf's Depo. 234:4-234:10. After further examination, however, plaintiff agreed that her "claim about the January 16, 2004 letter may be misplaced." Pltf's Depo. 235:15-235:17.

27. Notwithstanding that plaintiff knew she could not return to work, she never advised the Department of Education of this fact and refused to resign "because [she] thought [her] claim for EEOC would not go through if [she] resigned." Pltf's Depo. 239:18-239:21. In fact, based upon her failure to return to work, plaintiff expected that she would be terminated. Pltf's Depo. 240:11-240:21.

28. On March 3, 2004, Mr. Lawrence again sent a letter to plaintiff. Exhibit 16 (Mar. 3, 2004 Memorandum to S. Johnson from M. Lawrence). This letter reiterated his last letter, in that he requested the updated resume and advised plaintiff that as of April 5, she must return to work or provide medical documentation supporting an extended absence. Exhibit 16. Mr. Lawrence also advised plaintiff that, if she does not return to work or provide additional medical documentation, she could be classified as absent without leave ("AWOL"), which could lead to disciplinary action. Exhibit 16.

29. Plaintiff alleges that the February 16, 2004 and March 3, 2004 letters were discriminatory against her solely on the basis that it was signed by Mack Lawrence, against whom she had previously alleged discrimination. Pltf's Depo. 250:4-250:7.

30. Plaintiff never responded to the March 3, 2004 letter from Mr. Lawrence. Pltf's Depo. 245:16-246:11.

31. Mr. Lawrence again wrote to plaintiff on March 25, 2004, advising her that her FMLA benefits would terminate on April 5 and explaining that she either needed to return to work or provide additional medical documentation. Exhibit 17 (Mar. 25, 2004 Memorandum to S. Johnson from M. Lawrence). This letter advised plaintiff that she must either return to work on April 5, 2004 or submit additional medical documentation for review. Exhibit 17. If plaintiff failed to do either, the letter advised, she would be placed in an Absent Without Leave ("AWOL") status, which could then lead to disciplinary actions. Exhibit 17.

32. Plaintiff admittedly never responded to this letter. Pltf's Depo. 251:22-252:2.

33. On April 5, 2004, the day by which plaintiff was expected to return to work, plaintiff did not come to work and did not call in sick. Pltf's Depo. 252:3-252:5. Nor did plaintiff provide any medical documentation supporting her absences. Pltf'S Depo. 252:6-252:9. Accordingly, plaintiff was placed in an AWOL status. Exhibit 18 (May 27, 2004 Notice of Proposed Removal).

34. Plaintiff alleges that the March 25, 2004 letter from Mr. Lawrence was discriminatory based solely on the fact that it came from Mr. Lawrence. Pltf's Depo. 252:10-252:16.

35. On May 27, 2004, because plaintiff failed to come to work, failed to call in to work, and failed to provide any medical documentation supporting her continued absences, Mr. Lawrence advised plaintiff by letter that he was proposing her removal from employment with the Department of Education. Exhibit 19 (May 27, 2004 Notice of Proposed Removal). This

11

letter advised plaintiff of the specifications supporting the proposal and advised her how to submit a response to the proposal.  Exhibit 18.  In deposition, plaintiff admitted that each of the 38 specifications supporting Charge I and each of the specifications supporting Charge 2 were accurate.  Pltf's Depo. 257:4-257:10.  Notwithstanding that the proposed removal letter advised plaintiff of her right to file a response, or request an oral hearing from Mr. Bowie, plaintiff never filed a response with Mr. Bowie.  Pltf's Depo. 258:22-259:10.

36.  After receiving the May 27, 2004 Notice of Proposed Removal, plaintiff knew she was going to be terminated, and admitted in deposition that the reasons set forth in the letter were sufficient justification to terminate her.  Pltf's Depo. 260:3-260:10.  Notwithstanding this knowledge, plaintiff did not resign because she was afraid of the effect a resignation would have on her EEO claim.  Pltf's Depo. 259:11-260:

37.  On July 21, 2004, Terry Bowie, the Director of Financial Management Operations, advised plaintiff by letter that he was upholding the proposal to remove her from employment with the Department of Education based upon her continued AWOL status, her refusal to come to work and her refusal to provide medical documentation to support her continued absences.  Exhibit 19 (July 21, 2004 Notice of Decision to Remove).  Accordingly, on August 6, 2004, plaintiff was removed from employment with the Department of Education.  Pltf's Depo. 272:2-272:8.

38.  In deposition, plaintiff admitted that the specification contained in Mr. Bowie's decision letter were correct.  Pltf's Depo. 264:4-266:22.  Regarding her termination from the Department of Education, plaintiff also admitted that she was not aware of any other opportunities that she should have been provided by the Department, that the Department had

provided plaintiff every opportunity available, and that the only option available to the Department was to terminate plaintiff. Pltf's Depo. 269:12-270:4. Plaintiff also admitted that her termination was justified by her failure to return to work and failure to provide medical documentation. Pltf's Depo. 270:5-270:9.

39. In deposition, plaintiff testified that the only facts giving rise to her hostile work environment claim are the letters she received from Mr. Lawrence in 2004. Pltf's Depo. 273:14-273:18.

40. Following her termination from the Department of Education in August 2004, plaintiff did not go to an EEO counselor to complain about the termination, instead filing a claim with the EEOC, which was rejected as improper and untimely.

41. Prior to filing her complaint in this action, plaintiff applied for in forma pauperis status. See Exhibit 20 (Application to Proceed Without Prepayment of Fees and Affidavit). In her affidavit of financial status, plaintiff declared that the only "real estate, stocks, bonds, securities, other financial instruments, automobiles or any other thing of value" she owned was a 1992 Saturn automobile, which she valued at approximately $300. Id.

42. In deposition, plaintiff admitted that she maintains two investment accounts. First, plaintiff stated that she and her husband own a joint non-retirement investment account at T. Rowe Price, which was opened in approximately December 2004. Pltf's Depo. 287:20-288:12. As of the time plaintiff was deposed, that non-retirement investment account was valued at approximately $170,000. Pltf's Depo. 288:16-288:17. Although plaintiff has a "verbal agreement" with her husband that she will not touch the money in the non-retirement investment account, plaintiff is the legal joint owner of that account. Pltf's Depo. 289:17-289:19.

13

43.  Plaintiff also admitted in deposition that, notwithstanding the statement in her

IFP application, she also owned a retirement account at T. Rowe Price that was opened in

approximately December 2005.  Pltf's Depo. 285:5-285:12.  That retirement account was valued

at approximately $27,000 as of December 2006.  Pltf's Depo. 285:19-285:21.

March 22, 2007                          Respectfully submitted,


                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. Bar # 498610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, DC BAR #434122
                                        Assistant United States Attorney


                                        _____/s/_____
                                        JOHN F. HENAULT, D.C. Bar # 472590
                                        Assistant United States Attorney
                                        555 4th Street, N.W.
                                        Washington, DC 20530
                                        (202) 307-1249
                                        (202) 514-8780 (facsimile)

14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| SUSAN E. JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-0321 (GK) |
| | ) | |
| MARGARET SPELLINGS, | ) | |
| Secretary of Education, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiff filed this action on February 23, 2006 against the Secretary of the Department of Education pursuant to the Rehabilitation Act, 29 U.S.C. § 791 et seq. Plaintiff alleges that defendant discriminated against her on the basis of her disability when she was denied a career ladder promotion to the GS-12 level, required to obtain approval to work credit hours and allegedly not approved for 72 hours of leave without pay ("LWOP") to take a vacation to the Galapagos Islands with her husband. Plaintiff also alleges that she was retaliated against for her participation in protected activity when defendant allegedly refused to approve her request for LWOP for the Galapagos Island vacation, "coerce[d], intimidate[d]," and "threaten[ed]" plaintiff into "relinquishing her claims and leaving her job as an accountant." Plaintiff further alleges that she was subject to a hostile work environment on the basis of her disabilities and discriminated against on the basis of her disabilities when she was terminated from the Department of Education on August 6, 2004.

## FACTS

Defendant incorporates her statement of material facts as to which there is no dispute as if set forth herein.

## LEGAL STANDARDS

### I.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Plaintiff, in response to defendant's motion, must "go beyond the pleadings and by [their] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  Laningham v. U.S. Navy, 813 F.2d

1236, 1242-43 (D.C. Cir. 1987); <u>Liberty Lobby</u>, 477 U.S. at 251 (the court must determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." <u>Liberty</u>

<u>Lobby</u>, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." <u>Williams v. Callaghan</u>, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Instead, while the

movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" <u>Id.</u> at 587

(citing Fed. R. Civ. P. 56(e)) (emphasis in original).

     Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial." <u>Morgan v.</u>

<u>Fed. Home Loan Mortgage Corp.</u>, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting <u>Calhoun v.</u>

<u>Johnson</u>, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation

omitted), <u>aff'd</u>, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); <u>see also</u>

<u>Marshall v. James</u>, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the

use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a

'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy

and inexpensive resolution of every case." <u>Marshall</u>, 276 F. Supp. 2d at 47 (quoting <u>Celotex</u>

<u>Corp.</u>, 477 U.S. at 327).

## II.    ESTABLISHING A <u>**PRIMA**</u> <u>**FACIE**</u> CLAIM OF DISCRIMINATION UNDER THE REHABILITATION ACT

To establish discrimination under the Rehabilitation Act ("the Act"), a plaintiff must

show that "[s]he is (1) an individual with a disability (2) who, with or without reasonable

accommodation, can perform the essential functions of the position, and (3) who suffered an

adverse employment decision due to [her] disability."[1] <u>Baloch v. Norton</u>, 355 F. Supp. 2d 246,

255 (D.D.C. 2005). <u>See</u> <u>also</u> <u>Mack v. Strauss</u>, 134 F. Supp. 2d 103, 109 (D.D.C.), <u>aff'd</u>, 2001

WL 1286263 (D.C. Cir. 2001). Thus, the two-fold threshold question under the Act is whether a

plaintiff is an individual with a disability who is "otherwise qualified" to perform his or her job.

<u>Id.</u> <u>See</u> <u>also</u> 29 U.S.C. § 794(a). In this case, defendant does not dispute that plaintiff suffers

from a disability that limits a major life activity. However, the undisputed, material facts

establish that plaintiff was not "qualified" to perform her job and, therefore, she cannot establish

a <u>prima</u> <u>facie</u> case and her claims under the Rehabilitation Act should be dismissed.

## III.    ESTABLISHING A <u>**PRIMA**</u> <u>**FACIE**</u> CASE OF RETALIATION

A plaintiff establishes a <u>prima</u> <u>facie</u> case of retaliation or reprisal by demonstrating that

(1) she engaged in protected behavior; (2) the employer took an action against plaintiff that a

reasonable employee would believe was designed to dissuade a reasonable worker from making

or supporting a charge of discrimination; and (3) there is a causal link between the adverse action

---

[1]  The standards applied to the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, <u>et</u> <u>seq.</u>, are used to determine whether an individual has been discriminated against under the Rehabilitation Act. <u>See</u> 29 U.S.C. § 794(d).

4

and the protected activity.[2] Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).  The

Supreme Court recently clarified that Title VII's anti-retaliation provision pertains **only** to those

employer actions that are materially adverse to a reasonable employee or applicant.  Burlington

N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006).  Therefore, a plaintiff must demonstrate

"materially adverse consequences . . . such that a reasonable trier of fact could conclude that the

plaintiff has suffered objectively tangible harm" which would have dissuaded a reasonable

employee from making or supporting a charge of discrimination.  Rochon, 438 F.3d at 1219

(citing Brown, 199 F.3d at 457).

## IV.    THE MCDONNELL DOUGLAS BURDEN SHIFTING ANALYSIS

The burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), applies to discrimination claims under the Rehabilitation Act.  Barth v. Gelb, 2 F.3d

1180, 1186 (D.C. Cir. 1993); accord McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000); see

also Evans v. Davis Mem'l Goodwill Indus., 133 F. Supp. 2d 24, 29 (D.D.C. 2000).  The

analysis also applies to claims of retaliation for protected EEO activity.  See Holbrook v Reno,

196 F.3d 255, 263 (D.C. Cir. 1999) (citing Carney v. The American Univ., 151 F.3d 1090, 1094

(D.C. Cir. 1998)).

Pursuant to McDonnell Douglas, once a plaintiff establishes a prima facie case, the

burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason

for the challenged action.  Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)

(defendant's burden articulated for Title VII cases).  The defendant's burden is one of

_____

[2] Prior to Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006), and
Rochon, a plaintiff was required to establish an adverse employment action to meet the second
prong of the prima facie case test.  See Mitchell v. Baldrige, 759 F.2d 80. 86 (D.C. Cir. 1985).

production, not of proof.[3]  See Aka v. Washington Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998).

Thus, the defendant's burden is satisfied if he simply explains what he has done or produces

evidence of legitimate, nondiscriminatory reasons for the action.  St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502 (1993).

Importantly, the ultimate burden of persuading the court that the defendant intentionally

discriminated remains at all times with the plaintiff.  Hicks, 509 U.S. at 507; Aka, 156 F.3d at

1288.  Thus, even if a plaintiff establishes a prima facie case, the employer prevails unless the

employee succeeds in discrediting the employer's explanation.  See Sami v. Billington, 195 F.3d

1, 3 (D.C. Cir. 1999).  To do so, the plaintiff must present objective evidence that undermines the

defendant's proffered explanation for its actions and/or independent evidence of the employer's

discriminatory intent.  See Aka, 156 F.3d at 1289.  Moreover, even if a plaintiff creates a

genuine issue of material fact with respect to the employer's proffered reason, she will not

always be deemed to have presented enough evidence to survive summary judgment.  Id. at

1290.  A "weak issue of material fact" regarding the employer's explanation will not prevail in

the face of "abundant independent evidence" showing that no discrimination has occurred.  Id. at

1291.

Personal speculation of discriminatory intent or unsubstantiated allegations cannot create

a factual issue of pretext.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  A denial of a

---

[3] Defendant's burden is a "relatively light burden," Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), and it "need not persuade the Court that it was actually motivated by the proffered reasons."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  See also St. Mary's, 509 U.S. at 509 ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

defendant's articulated reason without substantiation for the denial also is insufficient.  Phillips

v. Holladay Prop. Serv., Inc., 937 F. Supp. 32, 35, n.2 (D.D.C. 1996), aff'd, 1997 WL 411695

(D.C. Cir. 1997).

**ARGUMENT**

I.    **THIS COURT SHOULD DISMISS PLAINTIFF'S CLAIMS DUE TO HER FALSE
      AND MISLEADING APPLICATION FOR IN FORMA PAUPERIS AFFIDAVIT**

       Plaintiff's action is subject to dismissal because the allegation of poverty set out in her in

forma pauperis application is untrue.  Plaintiff secured permission from the Court to proceed

without the prepayment of costs, as allowed under 28 U.S.C. § 1915, on February 23, 2006.  See

Motion For Leave to Proceed In Forma Pauperis (Docket No. 2); February 18, 2006 Docket

Entry ("ORDER (fiat) granting 2 Motion for Leave to Proceed in forma pauperis.  Signed by

Judge Ellen S. Huvelle on 2/17/006.").  In her affidavit of financial status, plaintiff, an

accountant who was represented by counsel, declared that the only "real estate, stocks, bonds,

securities, other financial instruments, automobiles or any other thing of value" she owned was a

1992 Saturn automobile, which she valued at approximately $300.  Id.

       In deposition, plaintiff admitted that she maintains two investment accounts.  First,

plaintiff stated that she and her husband own a joint non-retirement investment account at T.

Rowe Price, which was opened in approximately December 2004.  Pltf's Depo. 287:20-288:12.

As of the time plaintiff was deposed, that non-retirement investment account was valued at

approximately $170,000.  Pltf's Depo. 288:16-288:17.  Although plaintiff has a "verbal

agreement" with her husband that she will not touch the money in the non-retirement investment

account, plaintiff is the legal joint owner of that account.  Pltf's Depo. 289:17-289:19.

Plaintiff also admitted in deposition that, notwithstanding the statement in her IFP application, she also owned a retirement account at T. Rowe Price that was opened in approximately December 2005. Pltf's Depo. 285:5-285:12. That retirement account was valued at approximately $27,000 as of December 2006. Pltf's Depo. 285:19-285:21.

The In Forma Pauperis statute provides in relevant part:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the allegation of poverty is untrue.

28 U.S.C. § 1915(e)(2)(A). When analyzed in light of plaintiff's own deposition testimony, the falsehoods in plaintiff's application for IFP status offer a more than adequate basis for the Court to conclude that plaintiff's allegation of poverty is untrue. As a result, the Court should dismiss this action under 28 U.S.C. § 1915(e)(2); see also Mathis v. New York Life Insurance Co., 133 F.3d 546, 547-48 (7th Cir. 1998) (district courts have discretion to dismiss with prejudice a claim under Section 1915(e), as with the former 1915(d), where an applicant intentionally misrepresents his true financial status); Romesburg v. Trickey, 908 F.2d 258, 259-60 (8th Cir. 1990) (affirming district court's dismissal of IFP complaint based on failure to disclose real property); Dawson v. Lennon, 797 F.2d 934, 935-36 (11th Cir. 1986) (per curiam) (affirming revocation of IFP status and dismissal of complaint where plaintiff failed to disclose  substantial assets held in name of sham church); Thompson v. Carlson, 705 F.2d 868, 869 (6th Cir. 1983) (per curiam) (affirming dismissal after IFP status revoked for intentional misrepresentations of financial status); Harris v. Cuyler, 664 F.2d 388, 389-91 (3rd Cir. 1981).

8

II.     **PLAINTIFF'S CLAIM THAT THE DEPARTMENT DISCRIMINATED AGAINST HER BY REQUIRING HER TO OBTAIN APPROVAL FOR CREDIT HOURS IS TIME BARRED**

Federal employees may only file a civil action after exhausting their administrative remedies before the concerned Federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  "In addition to claims brought under Title VII, the administrative procedures established by the EEOC apply to claims brought under the Rehabilitation Act."  Wilderson v. Snow, No. 04-0708 (RJL), 2006 WL 571930, *2 (D.D.C. March 7, 2006).  See also 29 U.S.C. § 794a(a)(1).

The EEOC's regulations provide that "aggrieved" employees or applicants for employment who allege they have been discriminated against must first consult an agency EEO counselor and file an informal complaint of discrimination before filing a formal complaint of discrimination, and must do so within 45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  As stated by the United States Supreme Court, a party must file a charge of discrimination within the Title VII limitations period for each discrete act of discrimination alleged or lose the ability to recover for it.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002).  Although the 45 day requirement is not jurisdictional, and is more akin to a statute of limitations subject to waiver and estoppel, courts in this jurisdiction since Morgan have

9

been steadfast in enforcing the exhaustion requirement.  See Wilderson, 2006 WL 571930 at *2-*4 (dismissing plaintiff's claims for failure to exhaust within the 45 day limitations period); Powell v. Castaneda, 390 F. Supp. 2d 1 (D.D.C. 2005) (dismissing all unexhausted discrete acts of discrimination for failure to meet the 45 day requirement); Aceto v. England, 328 F. Supp. 2d 1 (D.D.C. 2004) (same).

Plaintiff claims that the Department discriminated against her when, in 1998, Ms. Logan informed plaintiff that she would need to seek approval prior to working credit hours and when, in March 2000, Mr. Lawrence confirmed this directive by email.  Stmt. of Mat. Facts ¶¶ 10 & 12. It is beyond dispute, however, that plaintiff did not seek EEO counseling and allege discrimination relating to this conduct until August 2002, well outside of the 45 day limit for raising such claims.  Stmt. of Mat. Facts ¶¶ 10 & 12.

While plaintiff's complaint asserts that the discrimination was a "continuing violation," the Supreme Court has rejected this theory.  Under the continuing violation theory, a claim that alleges a wrongful act that occurred within the statute of limitations, but also alleges wrongful acts that occurred outside the limitations period, will not be time barred if the acts were committed in furtherance of a continuing wrongful act.  Mayers v. Laborers' Health & Safety Fund of N. Am., No. 05-7134 (D.C. Cir. Mar. 2, 2007) (affirming the rejection of a continuing violation theory for a failure to accommodate claim); Felter v. Norton, 412 F. Supp. 2d 118, 125 (D.D.C. 2006).  Under this theory, however, the acts alleged must be actual acts committed, not effects of prior acts.  Id.  See also Guerra v. Cuomo, 176 F.3d 547, 551 (D.C. Cir. 1999) ("Rather than continuing violations . . . Guerra has suffered what amounts to 'continuing effects of past discriminatory acts.'") (quoting Dixon v. Anderson, 928 F.2d 212, 216 (6th Cir. 1991));

Dasgupta v. University of Wisconsin Board of Regents, 121 F.3d 1138, 1140 (7th Cir. 1997) ("A lingering effect of an unlawful act is not itself an unlawful act.").

In Morgan, the United States Supreme Court's most recent case addressing the continuing violation theory, the Court held that discrete acts of discrimination are ***not*** actionable if time barred, even if they are related to acts that are properly exhausted.  Morgan, 536 U.S. at 113.  As explained by Judge Collyer in Coleman v. Potomac Elect. Power Co., 310 F. Supp. 2d 154, 159-60 (D.D.C. 2004) (Collyer, J.), "Morgan teaches that discrete claims of retaliation that are time-barred do not become timely by alleging one timely retaliatory act related to earlier, untimely, retaliatory acts."  In fact, the D.C. Circuit "has clearly held that a plaintiff may not rely on the continuing violation theory where she was aware of the discriminatory conduct at the time it occurred."  Schraeder v. Tomlinson, 311 F. Supp. 2d 21, 27 (D.D.C. 2004) (citing Taylor v. Fed. Deposit Ins. Corp., 132 F.3d 753, 765 (D.C. Cir. 1997) ("For statute of limitations purposes, a continuing violation is 'one that could not reasonably have been expected to be made the subject of a lawsuit when it fist occurred because the character of the violation did not become clear until it was repeated during the limitations period.")).

To the extent that there was any continued discrimination regarding the requirement to obtain prior approval for working credit hours, a fact that defendant disputes, that continued discrimination was the lingering or continuing effect of the 1998 and March 2000 decision, not new acts of discrimination.  Moreover, even if plaintiff could raise the claim regarding the requirement to obtain approval for working credit hours, those claims fail, as plaintiff cannot establish that she was subject to an adverse employment action.  Plaintiff was ***not*** precluded from working credit hours, she was simply required to obtain approval for those hours.

11

Although plaintiff did not like the fact that she needed approval, and would have preferred to work credit hours on her own schedule without any supervision, an agency is *not* required to provide plaintiff an accommodation of choice, only a reasonable accommodation.  Schmidt v. Methodist Hosp. of Indiana, Inc,. 89 F.3d 342, 345 (7th Cir. 1996) (employee not "qualified" if she rejects reasonable accommodations simply because they are not the accommodations of the plaintiff's choice); Hankins v. The Gap, Inc., 84 F.3d 797, 801 (6th Cir. 1996) (plaintiff suffering from migraine headaches who refused to take advantage of reasonable accommodations provided by employer because they were not the accommodations of plaintiff's choice was not "qualified individual with a disability ").

III.    **PLAINTIFF'S CLAIM THAT THE DEPARTMENT OF EDUCATION DISCRIMINATED AGAINST HER WHEN IT REFUSED HER REQUEST FOR A CAREER LADDER PROMOTION FAILS**

Plaintiff attempts to include in this action not just a claim relating to her GS-11 to GS-12 career ladder promotion, but also a claim relating to a delay in obtaining her promotions to the GS-9 and GS-11 levels.  These claims fail.  First, plaintiff failed to timely raise a claim relating to the GS-9 and GS-11 promotions and, therefore, those claims are time-barred.  See Stmt. of Mr. Facts ¶¶ 2-3.  As set forth above, a plaintiff claiming discrimination must seek EEO counseling within 45 days of the event giving rise to the claim.  Plaintiff was promoted to the GS-9 level on July 5, 1998, and promoted to the GS-11 level on November 19, 2000.  Plaintiff failed to seek EEO counseling within 45 days of these events and, in fact, did not seek EEO counseling until August 2002.  Stmt. of Mat. Facts ¶¶ 2-3.  Thus, plaintiff's claims relating to the GS-9 and GS-11 promotions are time barred.

Second, plaintiff cannot establish a <u>prima</u> <u>facie</u> case of discrimination relating to the GS-11 to GS-12 promotion because she was not "otherwise qualified" under the Rehabilitation Act. It is black letter law that an essential function of any government job is the ability to come to work and complete assignments within a reasonable period of time.  The leading case on this issue is <u>Carr v. Reno</u>, 23 F.3d 525 (D.C. Cir. 1994).  In <u>Reno</u>, the plaintiff sued the defendant under the Rehabilitation Act, claiming her disability motivated defendant to terminate her employment.  Defendant maintained that the plaintiff had been discharged because of her unanticipated and prolonged absences, and that, because of her absences, as a threshold issue, she was not "otherwise qualified" within the meaning of the Rehabilitation Act.  The Court agreed, affirming the agency's termination, holding that the plaintiff did not establish a <u>prima</u> <u>facie</u> case under the Rehabilitation Act.  The Court stated, "We agree with the proposition that an essential function of any government job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time." <u>Id.</u> at 530.  The Court held that the plaintiff's "prolonged, frequent and unpredictable absences render her unqualified for any government job." <u>Id.</u> at 530-531.  <u>See also</u> <u>Rosell v. Kelliher</u>, 2006 WL 1102833, 4* (D.D.C. 2006) ("One of the most fundamental requirements of any government job is the ability to appear for work.") and <u>Sampson v. Citibank</u>, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (holding that an employee who cannot meet the attendance requirements of the job is not a "qualified individual" under the ADA).

Other courts agree with the holding in <u>Reno</u>.  <u>See, e.g.</u>, <u>Walders v. Garrett</u>, 765 F. Supp. 303, 309-10 (E.D. Va 1991), <u>aff'd</u>, 956 F.3d 1163 (4th Cir. 1992) ("Few would dispute that, in general, employees cannot perform their jobs successfully without meeting some threshold of

13

both attendance and regularity. The weight of authority supports this commonsense conclusion."); Jackson v. Veterans Admin., 22 F.3d 277, 279-80 (11th Cir. 1994) (holding that an employee with a history of sporadic, unpredictable absences was not otherwise qualified); Halperin v. Abacus Technology Corp., 128 F.3d 191, 198 (4th Cir. 1997) (holding that an employee unable to come to work on a regular basis is unable to satisfy the functions of her job); Tyndall v. National Educational Centers, Inc., 31 F.3d 209, 213 (4th Cir. 1994) (An employee "who does not come to work cannot perform any of his job functions, essential or otherwise."); Wimbley v. Bolger, 642 F. Supp. 481, 485 (W.D. Tenn. 1986) ("It is elemental that one who does not come to work cannot perform *any* of his job functions") (emphasis in the original).

Between the time plaintiff was promoted to the GS-11 level and the time she became eligible for promotion to the GS-12 level, plaintiff missed approximately 590 hours of the approximately 2080 hours in a work year. In fact, plaintiff herself acknowledges that she was absent from work for a large portion of the time, that her absences created a burden for the remaining workforce, and that, due to her medical condition, she was unable to go to work and do her job. Stmt. of Mat. Facts ¶¶ 6, 13, 14, 24. Accordingly, plaintiff was not otherwise qualified under the Rehabilitation Act and, therefore, cannot establish a prima facie case of disability discrimination.

Even if plaintiff could establish a prima facie case, however, defendant had a legitimate, non-discriminatory reason for the refusal to promote plaintiff and plaintiff cannot establish that defendant's reason is pretext for discrimination. Mr. Lawrence, as plaintiff's first line supervisor, determined that plaintiff should not receive a career ladder promotion to the GS-12 level because he did not believe that he had observed plaintiff's work enough during the past

14

year to believe she was capable of performing at the GS-12 level. Stmt. of Mat. Facts ¶ 5.

Specifically, Mr. Lawrence testified that he believed it was "nearly impossible to do this job

unless you're here." Stmt. of Mat. Facts ¶ 5. Likewise, Mr. Lawrence stated that he had not

been able to actually observe that plaintiff was capable of performing the duties of the GS-12

level because "she's not here enough in order [move] to the next grade." Stmt. of Mat. Facts ¶ 5.

Mr. Lawrence then explained that notwithstanding plaintiff's absences from work, his section

still had to make its deadlines and, therefore, her work had to be reassigned to other employees.

Stmt. of Mat. Facts ¶ 5. Because Mr. Lawrence did not believe he had the opportunity to

observe plaintiff's ability to work at the GS-12 level, he denied her request for a promotion.

Plaintiff cannot establish that this justification is pretext for discrimination.

## IV. PLAINTIFF'S CLAIM THAT THE DEPARTMENT DISCRIMINATED AGAINST HER WHEN IT ALLEGEDLY FAILED TO APPROVE HER 72 HOUR LWOP REQUEST FOR A VACATION TO THE GALAPAGOS ISLANDS FAILS

Plaintiff alleges that she was discriminated against when the Department allegedly

refused to approve in advance her request for 72 hours of LWOP for a ten day vacation with her

husband to the Galapagos Islands in March 2003. This claim is nonsensical. In deposition,

plaintiff admitted that her LWOP request was approved and that she was in fact designated in a

LWOP status for these 72 hours. Stmt. of Mat. Facts ¶¶ 15-20. Accordingly, her claim relating

to her request for LWOP for a ten day vacation to the Galapagos Islands with her husband must

fail.

In fact, plaintiff's claim relating to her ten day vacation to the Galapagos Islands is

curious at best. In deposition, plaintiff testified that, as of February 14, 2003, her condition

rendered her in such a condition that she was unable to go to work and perform the functions of

her job.  Stmt. of Mat. Facts ¶ 14.  Notwithstanding this allegedly debilitating condition, however, plaintiff was capable of going to an airport, flying to the Galapagos Islands, enjoying her vacation and returning home.  Stmt. of Mat. Facts ¶ 20.  These undisputed facts shed much light on the fact that her claims in this action are entirely without merit.

## V.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM FAILS

Plaintiff claims that she was subject to a hostile work environment that attempted to force her to give up her job with coercion, intimidation and threats.  In deposition, plaintiff stated that this claim is solely supported by the letters Ms. Lawrence sent to her beginning on January 16, 2004.  In deposition, however, plaintiff admitted that much of this claim is without merit.  In fact, upon questioning regarding this claim, plaintiff admitted that the ***only*** thing supporting this claim is the fact that the letters were written by Mr. Lawrence, against whom she had previously alleged discrimination.  Stmt. of Mat. Facts ¶ 39.

The workplace environment becomes "hostile" for purposes of a hostile work environment claim ***only*** when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v. Suders, 542 U.S. 129 (2004); Clark Cty. School Dist., 532 U.S. at 270-271; Holbrook v. Reno, 196 F.3d at 262.  The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment.  To determine whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the

16

discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employees performance.  See Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998).  These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  Id. at 787 (citations omitted).

In light of the fact that plaintiff concedes that the only reason the letters about which she complains are discriminatory or hostile is the fact that they were written by someone against whom she had alleged discrimination, plaintiff's hostile work environment claim fails; there was nothing objectively harassing, intimidating or ridiculing about the letters from Mr. Lawrence.[4] Moreover, the letters could not have interfered with plaintiff's performance because, at the time, she was not performing her duties.

## VI.    PLAINTIFF'S CLAIM OF DISCRIMINATION RELATING TO HER TERMINATION FAILS

Plaintiff's complaint alleges that her termination was discriminatory on the basis of her disability.  This claim fails for several reasons.  First, in deposition, plaintiff admitted that the Department had provided her every opportunity to either come back to work or provide medical documentation, and she did neither.  Stmt. of Mat. Facts ¶ 38.  Further, plaintiff admitted that, based upon plaintiff's conduct, the *only* option left was for her to be terminated, which is what the Department did.  Stmt. of Mat. Facts ¶ 38.  Further, plaintiff admitted that the termination

---

[4]  Moreover, plaintiff actually received the letters from Mr. Lawrence at home, *not* in a "work environment."

was justified by her own failure to come back to work and failure to provide medical documentation.  Stmt. of Mat. Facts ¶ 38.

Even if plaintiff's admissions were not dispositive, the law is clear that an essential function of a job is the ability to come to work.  See Carr v. Reno, 23 F.3d 525 (D.C. Cir. 1994) (essential function of any government job is the ability to come to work and complete assignments within a reasonable period of time); Rosell v. Kelliher, 2006 WL 1102833, 4* (D.D.C. 2006) ("One of the most fundamental requirements of any government job is the ability to appear for work."); Sampson v. Citibank, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (holding that an employee who cannot meet the attendance requirements of the job is not a "qualified individual" under the ADA).  From February 14, 2003 until her removal in August 2004, plaintiff failed to come to work.  In fact, even after plaintiff was told several times that she was required to either report to work on April 5, 2004 or provide additional medical documentation, plaintiff refused to do either.  Thus, plaintiff failed to perform the essential function of her job and was properly terminated.

## CONCLUSION

For the foregoing reasons, Margaret Spellings, in her official capacity as Secretary of the Department of Education, respectfully requests that the Court grant summary judgment in her favor on plaintiff's claims.

March 22, 2007                          Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)


19