# ORIGINAL

1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLUMBIA

3

4    SUSAN JOHNSON,                )

5    Plaintiff,                    )

6            vs.                   )    Case No.

7    MARGARET SPELLINGS,           )    06-0321 (GK)

8    Secretary of Education,       )

9    Defendant.

10

11

12          –      –      –      –      –

13          The deposition of **SUSAN JOHNSON** was

14    taken on Thursday, December 7, 2006, commencing

15    at 9:30 a.m., at the U.S. Attorney's Office, 555

16    4th Street, N.W., Washington, D.C., before Debra

17    L. Maheux, Notary Public.

18          –      –      –      –      –

19

20

21

22



2

```
 1               A P P E A R A N C E S

 2

 3     ON BEHALF OF THE PLAINTIFF:

 4          RICHARD E. JOHNSON, ESQ.

 5          3522 Majestic Lane

 6          Bowie, Maryland  20715-1604

 7          Phone and Fax:  301-262-9658

 8          Email:  Richard@verizon.net

 9

10     ON BEHALF OF DEFENDANTS:

11          JOHN F. HENAULT, JR., ESQ.

12          Assistant U.S. Attorney

13          District of Columbia

14          555 4th Street, N.W.

15          Washington, D.C.  20530

16          202-307-1249  Fax:  202-514-8780

17          Email:  John.Henault@usdoj.gov

18          -and-

19

20

21

22
```

```
 1        ROBERT FABIA, ESQ.

 2        Office of the General Counsel

 3        Division of Business and

 4        Administrative Law

 5        U.S. Department of Education

 6        400 Maryland Avenue, Southwest

 7        Washington, D.C.  20202-2110

 8        202-401-6606

 9

10

11  ALSO PRESENT:

12        PAUL VALENTIC, Husband

13

14

15  (Index appears following the transcript.)

16

17

18

19

20

21

22
```

4

1                    **P R O C E E D I N G S**

2                         -    -    -    -    -

3      Whereupon--

4                         **SUSAN JOHNSON**

5      a witness, called for examination, having been

6      first duly sworn, was examined and testified as

7      follows:

8              THE WITNESS:   I do.

9                         **EXAMINATION**

10             BY MR. HENAULT:

11      Q.    Good morning, ma'am.

12      A.    Good morning.

13      Q.    My name is John Henault.  I represent

14      the defendant, Margaret Spellings and the

15      Department of Education, in the action you've

16      filed in Federal Court.

17      A.    Right.

18      Q.    We're here today to take your testimony

19      regarding this case.

20      A.    Yes.

21      Q.    You understand you've been placed under

22      oath by the court reporter, correct?

23

1    and stuff about what was going on at the

2    Department of Education that I ended up

3    attempting suicide because of -- because of some

4    of the things that happened.

5        Q.    Prior to January 2005, when was the

6    last time you went to work at the Department of

7    Education?

8        A.    February 14, 2003.

9        Q.    And prior to January 2005, when was it,

10    and we'll get into this a little bit more later,

11    when was it -- it was, what, August 6, 2004 or

12    August 8, 2004 that you were removed as an

13    employee from the Department of Education,

14    correct?

15        A.    August 6, 2004.

16        Q.    Thank you.  In calendar year 2006, have

17    you been throwing up as a result of your

18    depressive disorder?

19        A.    Huh-uh.

20        Q.    What about 2005?

21        A.    No.  Wait a minute, 2005?

22        Q.    Yes, ma'am.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

57

1      A.    It was while I was in school at

2   University of Connecticut.

3      Q.    Why were you going to be fired from

4   Track Auto?

5      A.    Because I couldn't figure out what

6   happened to $20.

7      Q.    Other than your time at Department of

8   Education, have you ever had any disciplinary

9   action taken against you by any employer?

10      A.    No.

11      Q.    I think we've already said you started

12   working with the Department of Education

13   October -- since you left the Department of

14   Education in August of 2004, have you had any

15   employment?

16      A.    No.

17      Q.    Now, we've already said I think that

18   you started working at the Department of

19   Education October 18, 1993, correct?

20      A.    Right.

21      Q.    That was as a GS 6 secretary, right?

22      A.    No, I started out as a GS 5.

```
 1          Q.    GS 5 secretary?

 2          A.    Yeah.

 3          Q.    And you were a secretary in the office

 4   of the chief financial officer; is that right?

 5          A.    Right.

 6          Q.    What were your duties?

 7          A.    That's -- I think I had that

 8   information on my resume.

 9          Q.    What do you -- go ahead, I'm sorry.

10          A.    But it would be --

11          Q.    What do you recall your duties being as

12   a secretary in the office of the chief financial

13   officer?

14          A.    Okay.  I don't have to recall

15   everything?

16          Q.    Right.

17          A.    Okay.

18          Q.    Just what were your major -- what were

19   the major things that you did?

20          A.    Answering the phones.

21          Q.    Was it just basically clerical,

22   secretary type duties?
```

1      A.    Yeah.

2      Q.    Who was your immediate supervisor?

3      A.    Ruth Ann Harold.

4      Q.    Was she -- did she begin being your

5  supervisor when you were hired in October '93?

6      A.    Yes, correct.

7      Q.    When did she stop supervising you as a

8  secretary?

9      A.    When did she stop?  I'm not sure

10  exactly.

11      Q.    While you were a secretary, did you

12  work full time?

13      A.    Yeah, I worked full time.

14      Q.    What were your hours?

15      A.    They were 8:30 to 5:00.  I think that's

16  right, 8:30.

17      Q.    Roughly?  A normal hour workday though?

18      A.    Right.

19      Q.    Were you able to work those hours?

20      A.    Sometimes not.  I had -- I did get an

21  accommodation to work different -- to work later

22  hours if I needed to.

60

1        Q.    How often would you work later hours?

2    Now I'm just again talking about while you were

3    a secretary.

4        A.    Maybe twice a week.

5        Q.    On those two times a week, what time

6    would you typically come into work?

7        A.    I would probably come in around 10:00

8    and stay until 6:30.

9        Q.    And was that flexible starting time or

10   flexible hours the only accommodation that you

11   received as a secretary?

12       A.    The starting time and flexible hours?

13   Yeah.

14       Q.    Was that the only accommodation that

15   you ever requested as a secretary?

16       A.    Yes.  Yes, it is.

17       Q.    On May 12, 1996, you applied for and

18   were promoted to a GS 7 accountant position,

19   correct?

20       A.    Right.

21       Q.    In what section did you work?

22       A.    In the same section, but it was

61

1    accounting instead of secretary work.

2        Q.   So you were still in the office of the

3    chief financial officer at the Department of

4    Education?

5        A.   Right.

6        Q.   How was the office broken down?  Were

7    there different sections doing different jobs or

8    how was it broken -- I want to understand the

9    organization of the office.

10       A.   I don't quite understand the question.

11       Q.   Were you in -- when you were in

12   accounting, were you in any subgroups or any

13   specific focus of accounting or anything like

14   that?

15       A.   We were on the grant side.

16       Q.   Okay.  So you have the office of the

17   chief financial officer?

18       A.   Right.

19       Q.   The grants section is a component

20   within that office?

21       A.   Right.

22       Q.   Who supervised the grant section when

1    Q.    Now, your position as an accountant was

2  a career ladder position, correct?

3    A.    Uh-huh.

4    Q.    You began as a GS 7?

5    A.    Right.

6    Q.    And maximum grade was GS 12?

7    A.    Right.

8    Q.    What's your understanding of a career

9  ladder position?

10    A.    A career ladder position is you could

11  get a promotion as long as you got a pass on

12  your G-Pass.  You would move to the next grade.

13    Q.    Is it your belief that as long as you

14  got a pass you were entitled to be promoted?

15    A.    Right.

16    Q.    After how long?

17    A.    After a year of being in grade.

18    Q.    So it's your belief or your

19  understanding of the career ladder position that

20  after one year, if you were at the pass level,

21  you automatically received a promotion to the

22  next grade?

1      Q.   Yes?

2      A.   Yes.

3      Q.   What was the normal workday for your

4  position?

5      A.   Normal workday that --

6      Q.   That you were scheduled to work?

7      A.   Oh, well, I had the gliding schedule,

8  so I could come in any time in between 7:00 and

9  9:30 and then work eight and a half hours after

10  that.

11      Q.   Was the gliding schedule an

12  accommodation?

13      A.   No.

14      Q.   How did it come about that you had a

15  gliding schedule?

16      A.   I don't know.

17      Q.   When you were a secretary did you have

18  a gliding schedule?

19      A.   Yeah, I did.

20      Q.   So then when you became an accountant,

21  you just continued the same gliding schedule?

22      A.   Right.

1          Q.    As an accountant, who was the first

2     supervisor that would permit you to come into

3     work at hours other than set in the gliding

4     schedule?

5          A.    Say this again?

6          Q.    When you became an accountant in May

7     1996 --

8          A.    Right.

9          Q.    -- were there any supervisors or did

10    anyone ever tell you you can come in at hours

11    other than those set by your gliding schedule?

12         A.    Yeah.

13         Q.    Who?

14         A.    Jan Steinbruck.

15         Q.    Who else, anyone?

16         A.    No, not anyone else.

17         Q.    Did Ms. Steinbruck ever tell you what

18    hours you could come in or was it any hours you

19    wanted to?

20         A.    Well, I told her that I needed an

21    accommodation, and sometimes I would come in

22    like 10:00 and work roughly eight and a half

1    hours after that, and --

2         Q.    Go ahead.  Anything else?

3         A.    You were about to say something?

4         Q.    No, go ahead and finish your answer

5    first.  I don't want to interrupt.

6         A.    I don't know.  I lost my train of

7    thought there.

8         Q.    Well, what we were discussing was what

9    hours you were allowed to come in as an

10   accommodation for your disability, and you gave

11   the example of some days you would come in at

12   10:00, which was actually a half hour outside of

13   your gliding schedule, correct?

14        A.    Right.

15        Q.    And then you would work eight and a

16   half hours after that, and then your day would

17   be over, right?

18        A.    Right.

19        Q.    Were there any limitations on what time

20   you could come in?

21        A.    No.

22        Q.    You were allowed to come in whenever

1    you wanted?

2         A.    Pretty much, yeah.

3         Q.    And Ms. Steinbruck was the supervisor

4    that let you to do that?

5         A.    Right.

6         Q.    Now, isn't it correct that there are

7    some days that you would come in to work at

8    between 5:00 and 7:00 p.m.?

9         A.    I didn't do that often.

10        Q.    But you did?

11        A.    I did.

12        Q.    When did you start coming in that late?

13        A.    I didn't do it very often.

14        Q.    How often would you do it, do you

15   recall?

16        A.    No, I don't recall.

17        Q.    When you came in at 5:00 to 7:00, who

18   was your supervisor?

19        A.    It probably would have been Cynthia

20   Logan.

21        Q.    When you came in those days say between

22   5:00 p.m. and 7:00 p.m. and then worked until

81

1     Q.    Anyone, any other time?

2     A.    Nope.

3     Q.    When you would work that late, would

4     there ever come a time when you would not be

5     able to come in the next day because you were

6     too tired from working so late?

7     A.    No.

8     Q.    You never left Ms. Logan a message

9     after working that late saying that you had

10    worked until midnight the night before and

11    couldn't come in to work the next morning?

12    A.    I might have said that on the year

13    end -- on September 30 when we did the year end

14    stuff and had to get everything in by the 30th.

15    Q.    Would that have been September 30, '98

16    or '99, do you recall?

17    A.    I don't recall.

18    Q.    On that time that you may have done it,

19    was that a day that you would come into work

20    real late and then work late?

21    A.    I don't remember.

22    Q.    Why was being able to come and go,

1    2004?

2        A.    Yes.

3        Q.    And my question wasn't clear.  I want

4    to be sure that the record is clear.  The

5    accommodation of coming into work at hours that

6    were outside of the gliding schedule hours, that

7    was the only accommodation you needed to do your

8    job between May '96 and the time you were

9    terminated in August of 2004, correct?

10       A.    Correct.

11            MR. HENAULT:    Let's mark this as

12   Exhibit 1, please.

13            **(Johnson Deposition Exhibit Number 1**

14   **was marked for identification.)**

15            BY MR. HENAULT:

16       Q.    Please take a look at that, ma'am.

17   Have you seen this before?

18       A.    Yes.

19       Q.    Did you request -- let me say this.

20   What has been marked as Johnson 1 is a January

21   14, 1995 letter from Dr. James to whom it may

22   concern regarding Susan Johnson, correct?

1        Q.    And you allege that the requirement

2    that you get preapproval is discriminatory

3    against you based on your disability, right?

4        A.    Uh-huh.

5        Q.    Yes?

6        A.    Yes.   Sorry.

7        Q.    What is discriminatory about the

8    requirement to get preapproval?   Why is that

9    discriminatory?

10        A.    Because it's hard for me to guess ahead

11    of time when I can do credit hours, and I do

12    unpredictable hours, and it's discriminatory

13    because I had it before, and they -- I've had --

14    I had it for a number of years, that they would

15    just let me do the hours and do the credit hours

16    whenever I could.   It's discriminatory because I

17    was allowed to do it before and then they

18    stopped it.

19        Q.    Okay.   Between January 14, 1998 -- bear

20    with me for a moment, please, ma'am.

21        A.    You mean January 14, 1995?

22        Q.    Is that '95?   Yes, yes, thank you very

1    preapproval prior to performing the work,

2    correct?

3        A.    Wait a minute.    Where were you starting

4    with?

5        Q.    I am reading Mr. Lawrence's 4:52 Email.

6    I'm looking at that one right there.    In this

7    Email Mr. Lawrence informs you that you can

8    still work credit hours, but you just have to

9    get preapproval.

10       A.    Right.

11       Q.    You tell him that "you modified the

12   entire agreement"?

13       A.    Right, because I didn't have to get

14   prior approval.    I just was allowed to work when

15   I could work.

16       Q.    Prior to this time, prior to March 23,

17   2000, had you ever provided a note from your

18   doctor saying that you should be allowed to work

19   credit hours?

20       A.    He didn't specifically say it like

21   that.    He would -- he just said that I should be

22   given a work schedule that's flexible.

```
 1        Q.    In fact what he, being Dr. James,

 2   actually said about your work schedule is that

 3   you could benefit from a work schedule of less

 4   than eight hours a day from time to time

 5   depending on her overall condition.   That's what

 6   he actually said, right?

 7        A.    Right.

 8        Q.    Nothing about being able to work credit

 9   hours, correct?  Isn't that correct, ma'am?

10        A.    Yeah, that's correct.

11        Q.    Okay.

12        A.    But I had an agreement in place that I

13   could work like Keith Cole says, that I could

14   work hours if I could do this, and clock in -- I

15   didn't have to clock in and out with my team

16   leader or supervisor.

17        Q.    Isn't it correct, ma'am, that you

18   didn't like this requirement to get preapproval

19   because you wanted to just be able to come in

20   when you wanted and leave when you wanted?

21        A.    Well, not -- it's because of my

22   illness, my disability that I wanted it that
```

1    way, not just because I wanted to do certain

2    hours.

3        Q.    Fair enough.   I'm not implying it's

4    not.   You felt because of your disability that

5    you should be able to just come into work when

6    you wanted and leave when you wanted without any

7    preapproval, correct?

8        A.    Right.

9        Q.    And there was never a note from any of

10   your doctors prior to March 2000 setting forth

11   those terms, were there?   Was there?

12       A.    About credit hours?

13       Q.    About you being able to set your own

14   schedule without preapproval, ma'am.

15       A.    Well, he didn't specifically say -- he

16   says:   "This flexibility is essential in order

17   to keep her absences to a minimum," so he was

18   saying that flexibility was the thing that I

19   needed.

20       Q.    Yes, ma'am, and that flexibility is

21   referring to the flexible schedule that is

22   sometimes less than eight hours a day that is

1    note from your doctor regarding credit hours,

2    had you?

3        A.    Yeah, I did.

4        Q.    When did you provide a note from your

5    doctor regarding credit hours, ma'am?

6        A.    Well, I think -- I think -- see, we're

7    missing a bunch of notes because I couldn't -- I

8    didn't realize that the doctor didn't save the

9    notes and he switched practices, so this isn't

10   the only note.  This is one of the beginning

11   notes.

12       Q.    Yes, ma'am, and you told me there was

13   one note afterwards that you can't find but that

14   it said the same thing.  The only accommodation

15   you needed was a schedule, a potential workday

16   schedule less than eight hours?  That's your

17   testimony, ma'am.

18       A.    Right.

19       Q.    You never provided a note saying you

20   should be allowed to work credit hours, did you?

21       A.    Huh-uh.

22       Q.    No?

1     A.    No.

2     Q.    Okay.  Now, what did your father, Mr.

3   Johnson, tell you about your request to work

4   credit hours from which this Email arises?

5     A.    Can I see the note that's from November

6   2001 that he writes?

7           **(Johnson Deposition Exhibit Number 4**

8   **was marked for identification.)**

9           THE WITNESS:  See he doesn't say

10   anything about the eight hours in this one.

11          BY MR. HENAULT:

12    Q.    Let me talk about this note for a

13   minute, ma'am.  What this note says is that you

14   may need minor adjustments to your work schedule

15   to manage your condition and that you may need

16   time off from work occasionally, and that it's

17   unpredictable when you needed time off, right?

18    A.    Right.

19    Q.    It didn't say anything about you being

20   able to make up credit hours when you want, does

21   it?

22    A.    He's not working at our place.  He

1      Q.   So one year at GS 7 would have been May

2   12, 1997?

3      A.   Right.

4      Q.   You weren't promoted to a GS 9 on that

5   first anniversary, were you?

6      A.   No.

7      Q.   In fact, you remained a GS 7 for more

8   than two years, correct?

9      A.   Correct.

10     Q.   You weren't promoted to GS 9 until July

11   5, 1998, correct?

12     A.   That sounds right.

13     Q.   What did you do, if anything, to

14   request that you be promoted to a GS 9?

15     A.   I don't know if I did anything.

16     Q.   So you don't know whether you requested

17   the promotion of anyone?

18     A.   No.

19     Q.   Now, as we just said you became a GS 9

20   July 5, 1998.  You had a GS 7 for more than two

21   years.  Until you sought EEO counseling in

22   August of 2002, you never filed a claim of

1    discrimination relating to the delay in getting

2    a 9 GS promotion, did you?

3        A.    No.

4        Q.    August 2002 the first time you sought

5    EEO counseling about that issue, correct?

6        A.    Right, correct.

7        Q.    Now I want to talk about your promotion

8    from GS 9 to GS 11.  One year anniversary of

9    your GS 9 promotion would have been July 5,

10   1999, right?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Yes.

14       Q.    You weren't promoted to GS 11 on that

15   day, were you?

16       A.    No.

17       Q.    You were not promoted on the two year

18   anniversary of your GS 9 promotion, were you?

19       A.    No.

20       Q.    In fact, you weren't promoted to a GS

21   11 until November 19, 2000, correct?

22       A.    Correct.

1    Q.    So you had been a GS 9 for more than

2    two years?

3    A.    Right.

4    Q.    What, if anything, did you do to

5    request a promotion to a GS 11?

6    A.    I don't think I did anything.

7    Q.    You don't remember requesting it of

8    anyone?

9    A.    Of anyone, yeah.

10    Q.    You do remember requesting you get

11    promoted or you don't remember?

12    A.    I don't remember requesting.

13    Q.    Until August of 2002 you never sought

14    EEO counseling relating to the delay in your GS

15    11 promotion, correct?

16    A.    Right.

17    Q.    So that was over a year and a half

18    after you were promoted to GS 11 is the first

19    time you sought EEO counseling about the delay

20    in getting promoted to GS 11, correct?

21    A.    Uh-huh.

22    Q.    Yes?

1      A.    Yes.

2      Q.    Actually it's natural after lunch

3    people have a tendency to start doing that

4    again, and we'll try and keep reminding you to

5    say yes or no.

6      A.    Okay.

7      Q.    So according to the promotion rules or

8    regulations as you've described them to me, you

9    first became eligible for a GS 12 promotion on

10   November 19, 2001, correct?

11     A.    Right, correct.

12     Q.    Because that was one year you had been

13   at the GS 11 level?

14     A.    Right.

15     Q.    When was the first time you requested

16   to get your career ladder promotion to the GS

17   12?

18     A.    The first time I requested was when I

19   got my step increase because I knew that was

20   time and grade, that I had been a year time and

21   grade, excluding -- including my absences.

22     Q.    When was that?

1    A.    That was in February 2002.

2    Q.    I'm sorry, February of 2002 you said?

3    A.    Yeah.

4    Q.    I began to talk over you.  I apologize

5    for that.

6    A.    That's okay.

7    Q.    Because of your absences you actually

8    didn't become eligible for the possibility of

9    promotion to GS 12 until February 2002 instead

10   of November 2001?

11   A.    Right.

12   Q.    Because during that year did you have a

13   lot of absences?

14   A.    Yeah, I had a lot of absences.

15   Q.    In February of 2002 -- prior to

16   February of 2002, had you talked to anyone about

17   getting your career ladder promotion?

18   A.    Yeah, I talked to -- I talked to Mack

19   Lawrence about it, but he didn't respond.  He

20   kind of stonewalled me about the promotion.

21   Q.    When did you talk to Mr. Lawrence about

22   it?

1    **was marked for identification.)**

2              THE WITNESS:  I gave it to him by hand

3    though, so that's why it's not that he hasn't

4    received it because I gave it to him personally

5    in his hand, and I gave it to him again

6    personally in his hand.

7              BY MR. HENAULT:

8         Q.    When did you do that?

9         A.    The same date, 5/18/02.  Then when I

10   did it again, it was close to the time that --

11   in June.  I gave it to him again in June because

12   I hadn't had a response.

13        Q.    Take a look at what has now been marked

14   as Johnson 7, ma'am.

15        A.    Okay.

16        Q.    What has been marked as Exhibit 7 is a

17   May 16, 2002 Email, time 4:43 p.m., from you to

18   Terry Bowie, Mack Lawrence and Mark Carney,

19   correct?

20        A.    Right.

21        Q.    That's where you are sending him this

22   determination letter, right?

173

1      A.    Right.

2      Q.    Why did you send a letter on May 2 that

3  was dated May 18?

4      A.    I didn't send the letter on May 16.

5  Wait a minute.  Wait a minute.  May 16.

6      Q.    Let me see -- the letter that is marked

7  as Johnson 6, that is the determination letter

8  you wrote, correct?

9      A.    Right.

10     Q.    Is that the letter that is referenced

11  as attached in this Email as determination

12  letter.doc?

13     A.    Yes.  Well, we must have changed the

14  date slightly.

15     Q.    What do you mean you must have changed

16  the date slightly, ma'am?  When would you have

17  changed the date?

18     A.    Well, we might have put this to give

19  him the weekend or something like that.

20     Q.    And when you say we might have put

21  this, you were pointing to the date May 18, 2002

22  on Johnson 6, correct?

1     A.    Right.

2     Q.    Who is "we"?

3     A.    Well, my husband helped me write this.

4     Q.    Now, you said you also sent this to

5  Mack Lawrence.  He's not on this Email, is he,

6  the Email marked as Johnson 7?

7     A.    No, but I gave it to him personally in

8  his hand.

9     Q.    You said you also gave this personally

10 to Terry Bowie.

11    A.    No, I didn't give it personally to

12 Terry Bowie.  He got it by Email, and Mark

13 Carney got it by Email.

14    Q.    You see where the tracking is, the

15 heading on Johnson 7?

16    A.    Yes.

17    Q.    This was printed from your Email,

18 correct?

19    A.    Right.

20    Q.    So that's a function in your Email that

21 you can see when it's read, right?

22    A.    Right.

1       Q.    But for each individual, it shows, had

2   you not used those credit hours, your leave

3   without pay would have been higher, correct?

4       A.    Right.

5       Q.    So the total leave without pay hours

6   used wouldn't be inaccurate because there's no

7   total for your credit hours, would there?

8       A.    I guess you're right.

9       Q.    Okay.  Now, between pay period one,

10  2000 and --

11          MR. HENAULT:  Let's actually take a

12  quick five minute break because I think I have

13  some numbers wrong here I want to get right so

14  let's take five minutes.  We've been going at it

15  for almost an hour.

16          **(A brief recess was taken.)**

17          BY MR. HENAULT:

18      Q.    Ma'am, I want to talk about the numbers

19  for your attendance in the year 2001.  As you

20  sit here today, do you have any reason to

21  believe these numbers to be inaccurate?

22      A.    No.

1          Q.    Pay period one, 2001, shows that you

2    took eight hours of annual leave, three hours of

3    sick leave, 64 hours of leave without pay and

4    used five credit hours.  Do you see that?

5          A.    Yes.

6          Q.    Do you know whether that's accurate or

7    not?

8          A.    I think it is.

9          Q.    Pay period 2, you used no annual leave.

10   You used 4.5 hours of sick leave, and nothing

11   else, correct, or eight hours of holiday leave,

12   I'm sorry?  Correct?

13         A.    Yeah.

14         Q.    Do you believe that is accurate?

15         A.    Yes.

16         Q.    Instead of us sitting here and going

17   through all of them, because otherwise -- if you

18   would like I can go through every single pay

19   period for 2001 and ask you if you believe the

20   numbers are accurate or inaccurate, but can you

21   take a look for 2001, pay period 1 through 26

22   and tell me if there are any numbers that you

184

1    believe are inaccurate.

2         A.    I believe these are accurate.

3         Q.    Okay.

4         A.    I don't think they're inaccurate.

5         Q.    So between pay period -- for the year

6    2001, you used about -- I understand you don't

7    have a calculator, and I'm not going to ask you

8    to sit here and add it all up but that would

9    come to be about 278 and a half hours of leave

10   without pay, correct?  Does that look about

11   right?  We don't have to do that.  The numbers

12   are going to say what they're going to say.  I

13   don't need you to sit here and waste your time

14   adding.

15         Do you believe that in 2001, given the

16   absences reflected on this attendance sheet, you

17   were at work enough for your supervisor to make

18   a judgment about your ability to perform at the

19   GS 11 level?

20        A.    Yes, I do.

21        Q.    Why?

22        A.    Because when I was there I worked

1      A.    Yeah.

2      Q.    You can set that aside, ma'am.   Now,

3  one of your allegations that we've discussed the

4  subject, not the substance yet, was that you

5  allege that you were discriminated against and

6  retaliated against when Mr. Lawrence did not

7  preapprove you for 72 hours of leave without pay

8  for a vacation from March 18, 2003 to March 28,

9  2003, correct?

10     A.    Correct.

11     Q.    Now, in February of 2003, you sent Mr.

12  Lawrence an Email requesting that he approve

13  leave without pay for your vacation, correct?

14     A.    Right.

15         MR. HENAULT:   Let's mark that and we'll

16  talk about the specific Email.

17         **(Johnson Deposition Exhibit Number 10**

18  **was marked for identification.)**

19         BY MR. HENAULT:

20     Q.    Ma'am, the vacation you were taking

21  from March 18, 2003 to March 28, 2003, that was

22  a vacation you were taking with your husband,

1     correct?

2          A.     Yes, that's correct.

3          Q.     Where were you going?

4          A.     Galapagos Islands.

5          Q.     Now, what has been marked as Johnson

6     Exhibit 10 is an Email chain.  On the very top

7     is a March 13, 2003 Email.  The very bottom is a

8     Friday, February 28, 2003 Email sent at 6:22

9     p.m., correct?

10·         A.     Right.

11          Q.     Now, the Email is sent from an address

12     wildcitycat@aol.com; is that correct?

13          A.     Uh-huh.

14          Q.     Whose Email address is that?

15          A.     That's my Email or our Email address.

16          Q.     This is an Email you sent to Mack

17     Lawrence cc'ing Gary Wood and your yourself,

18     right?

19          A.     Right.

20          Q.     In this you tell him you want him to

21     preapprove 72 hours leave without pay so that

22     you can, with your doctor's support, go out of

1    the country to recuperate, right?

2        A.    Right.

3        Q.    When you sent this on February 28,

4    2003, you had not provided him with any medical

5    documentation or any documentation at all from

6    your doctor discussing this vacation, had you?

7        A.    Discussing a vacation?  No, but --

8        Q.    Yes.

9        A.    But I had given him medical

10   documentation though.

11       Q.    Saying what?

12       A.    Saying that I -- the medical

13   documentation of 2001.

14       Q.    What we've talked about, we've talked

15   about a letter in 1995.  We talked about a

16   letter I believe you said in 1997 that we don't

17   have a copy of, and we talked about the November

18   2001 letter?

19       A.    Uh-huh.

20       Q.    Other than those letters, had you

21   provided additional documentation from your

22   doctor?

1    A.    No.

2    Q.    So when you sent him this letter, you

3  had never provided Mr. Lawrence with any

4  documentation or anything in writing from your

5  doctor saying that you need this vacation for

6  medical reasons, correct?

7    A.    Right.

8    Q.    In response to your Email Mr. Lawrence

9  responded a couple days later saying "please see

10  me when you get in," right?

11    A.    Right.

12    Q.    That was March 3, 2003, at 5:23 p.m. he

13  responded?

14    A.    Right.

15    Q.    Did you ever go see him?

16    A.    I couldn't get into work.

17    Q.    Why?

18    A.    Because I was sick, and I couldn't get

19  in and because of the discrimination, I couldn't

20  get myself to come in.

21    Q.    Okay, ma'am.  On March 3, between March

22  3 -- right around March 3, what about your

1    requesting that you do not condition the reply

2    of my leave request on my having to be in."

3           Where did he ever tell you that he

4    conditioned his approval on you coming to see

5    him?

6        A.    It says "please see me when you get

7    in."  So he was --

8        Q.    That doesn't say if you don't come see

9    me, I will not approve, does it?

10       A.    No, it doesn't say that, but he

11   would -- if he just approved it, he would have

12   just said yes.

13       Q.    But at this time, even as of March 4,

14   2003, you had never provided him with any

15   documentation saying from your -- excuse me.

16   Let me start over.

17          As of March 4, 2003 you had not

18   provided Mr. Lawrence with any documentation

19   from your doctor saying that you needed a

20   vacation for medical reasons, had you?

21       A.    No.

22       Q.    But you expected him just to approve 72

1    hours leave without pay for medical reasons

2    because your doctor -- you told him that your

3    doctor supported it?

4        A.    Well, I was going to bring in the

5    medical note when I went in.

6        Q.    When were you going -- when did you --

7    we'll get to the medical note but you didn't

8    even have the medical note at this time, did

9    you?

10       A.    No.

11       Q.    In fact, the medical note that we'll

12   talk about is dated March 11.  So Mr. Lawrence

13   when he said "please see me when you get in" had

14   no way whether to know if there was something

15   your doctor approved of or not, did he?

16       A.    No, he did not.

17       Q.    Mr. Lawrence asking you to come see him

18   about this request, do you consider that to be

19   unreasonable?

20       A.    Well, I thought it was unreasonable

21   considering that I hadn't been able to get in.

22   He knew I hadn't been able to get in, and

1    actually he wasn't in on that date that he said

2    -- the next day when he said, "Please see me

3    when you get in," and it turned out he wasn't

4    in.  A couple people told me he wasn't in that

5    day.

6         Q.    You tell Mr. Lawrence in this March 4

7    Email that "I believe I have provided you with a

8    detailed explanation why I need to take leave."

9             You are referencing the February 28

10   Email, right?

11        A.    Right.

12        Q.    What detailed explanation did you

13   provide him?

14        A.    That it was from March 18 to the 28th

15   for 72 hours leave without pay hours for

16   recuperation.

17        Q.    So just because you told him that you

18   felt or that you are going outside of the

19   country to recuperate and feel that this

20   recuperation might possibly make it more likely

21   for me to return to a normal work life, that was

22   all the explanation needed?

1      A.    At the time, yeah.

2      Q.    Okay.  Do you believe it unreasonable

3  or discriminatory for a supervisor to ask for

4  medical documentation for a request like this?

5      A.    No, I don't believe that, and I

6  didn't -- I don't think I said that he couldn't

7  ask for any medical documentation.

8      Q.    I think what you said is basically the

9  explanation you gave him was sufficient.  Do you

10  allege that Mr. Lawrence telling you to come see

11  him when you get in was discriminatory?

12      A.    Yes.

13      Q.    Why?

14      A.    Because I was having trouble getting in

15  and he knew it, and that's why he said, "Please

16  see me when you get in" because --

17      Q.    You were having trouble getting in, so

18  after February 14, 2003, you couldn't get to

19  work, could you?

20      A.    No.

21      Q.    You couldn't do your job, could you?

22      A.    No, because of the discrimination that

1     was --

2          Q.    That's fine.  Regardless of what the

3     reason, your disability as of February 13 --

4     February 14, excuse me, 2003 going forward

5     prevented --

6          A.    After -- after February 14, 2003.

7          Q.    Let me ask the question again.

8     Beginning February 14, 2003 going forward?

9          A.    Right.

10         Q.    To August 2004, your condition made it

11    impossible for you to get to work to do your

12    job, didn't it?

13         A.    Yeah, but I was in on February 14, so

14    not including February 14.  It would be February

15    15.

16         Q.    Forward?

17         A.    Forward.

18         Q.    Your condition made it impossible for

19    you to get to work to do your job, didn't it?

20         A.    Right.

21         Q.    How long was the flight to the

22    Galapagos Islands?

1       A.    I don't remember.

2       Q.    Was it two hours, three hours, six

3    hours, twelve hours?

4       A.    I can't remember.

5       Q.    Was it a long flight?

6       A.    I think it was a long flight.  I really

7    can't remember.

8       Q.    Your disability didn't prevent you from

9    going to an airport, did it?

10       A.    No.

11       Q.    Your disability didn't prevent you from

12    sitting on a flight to get to the Galapagos

13    Islands, did it?

14       A.    No.

15       Q.    Did you have any layovers on the way to

16    Galapagos?

17       A.    I think so.

18       Q.    Where?

19       A.    I'm not sure.

20       Q.    Your disability didn't affect your

21    ability to do that, did it?

22       A.    No, but my -- I didn't feel like I was

197

1    being discriminated against from the airline.

2        Q.    How long were you in the Galapagos?

3        A.    Just the time from the 18th to March

4    28.

5        Q.    But notwithstanding your disability,

6    you were able to get back on the flight to come

7    back to the United States, right?

8        A.    Yeah.

9        Q.    No problem?

10       A.    No, but I wasn't being discriminated

11   against by the airline.

12       Q.    That's fine.  That's fine.  Now, if you

13   look at the --

14            MR. JOHNSON:  You are going to let her

15   finish the answers to the question; is that

16   correct?

17            MR. HENAULT:  I'm sorry?

18            MR. JOHNSON:  Just a couple times in

19   the last ten minutes you seem to me to kind of

20   appeared to cut her off but that's okay.  You

21   didn't mean to.

22            MR. HENAULT:   I apologize if I did.

1          **(Johnson Deposition Exhibit Number 12**

2   **was marked for identification.)**

3          BY MR. HENAULT:

4      Q.   Ma'am, what has been marked as Exhibit

5   12 is a March 11, 2003 letter from Dr. George C.

6   James to whom it may concern regarding Susan

7   Johnson Valentic?

8      A.   Correct.

9      Q.   Just so the record is clear, sometimes

10  your an name is listed as Susan Johnson or Susan

11  Valentic.  You use both those names, correct?

12     A.   Yes, I use Susan Johnson for work, for

13  my work information.

14     Q.   I just want to be clear, so that

15  there's -- if anything is written or anything,

16  it can be explained that Susan Johnson Valentic

17  or Susan Johnson or Susan Valentic is all the

18  same?

19     A.   It is the same person, yes.

20     Q.   When did you get this March 11, 2003

21  letter from Dr. James?

22     A.   March 11.

1      Q.    When did you give it to the Department
2   of Education?
3      A.    I don't know.  Do you know?
4      Q.    I don't have it documented right now.
5   Do you recall providing this to Mr. Lawrence
6   before you went on vacation.
7      A.    No, because I wasn't getting in, so...
8      Q.    How was this provided to your
9   supervisor, do you know?
10     A.    No, I can't remember.
11     Q.    Do you recall providing this letter to
12  Mr. Lawrence or anyone else at the Department of
13  Education before you went away on vacation?
14     A.    No, I don't.
15     Q.    Now, you took this vacation we already
16  talked about, right?
17     A.    Right.
18     Q.    And you received -- you were authorized
19  leave without pay for this vacation, right?
20     A.    Right I was.
21     Q.    You weren't listed as AWOL for this
22  vacation?

1       A.    No.

2       Q.    So you did -- you were on the payrolls

3    listed as leave without pay?

4       A.    Right, I think.

5       Q.    What is the complaint about leave

6    without pay for this vacation, ma'am?

7       A.    It was discriminatory and retaliation

8    that he asked -- because he would have given me

9    the 72 leave without pay hours anyways, so I

10   still say he conditioned it on me coming in,

11   whether he was going to say yes or no.

12      Q.    Ma'am, do you know whether in the

13   federal workplace if telling a supervisor that

14   you need to take a specific action due to a

15   medical condition triggers any responsibilities

16   on their part?

17      A.    No.

18      Q.    So you don't know whether after you

19   told Mr. Lawrence that he was told by others

20   that he had to do certain actions to address

21   that, do you?

22      A.    No.

1    Q.    So your objection and your allegations

2    regarding this 72 hours that we're discussing is

3    not that it wasn't approved or you didn't get

4    leave without pay for that period?

5    A.    No.

6    Q.    Because you did?

7    A.    Right.

8    Q.    It's just that he didn't approve it

9    immediately, and he then asked you for medical

10    documentation to support the request?

11    A.    Right.

12    Q.    That request for medical documentation

13    though had no effect on whether or not you were

14    authorized leave without pay for that vacation,

15    correct?

16    A.    Correct.

17    MR. HENAULT:    Let me mark this as the

18    next exhibit, please.

19    **(Johnson Deposition Exhibit Number 13**

20    **was marked for identification.)**

21    BY MR. HENAULT:

22    Q.    Okay, ma'am.    What has been marked as

1    says "please see me when you get in," it's --

2       Q.    That's what you took that to mean,

3    correct?

4       A.    Yeah.

5       Q.    Other than the March 11, 2003 letter

6    which has marked as Johnson Exhibit 12, did you

7    ever fill out any of the documentation that was

8    sent to you by Mr. Lawrence or provided that

9    information?

10      A.    No.

11      Q.    Would it seem accurate that I told you

12   that you in fact didn't provide that April 11,

13   2003 letter from Dr. James to Mr. Lawrence until

14   April 20, 2003?

15      A.    That would have to be because we gave

16   it to the investigator and then --

17      Q.    Did you ever send it to Mr. Lawrence?

18      A.    No.

19      Q.    Never?

20      A.    I don't think I sent it to him.  No, I

21   think -- I think it was through the

22   investigative reporting that he got it.

1      Q.    Why when your supervisor asks you for

2      specific information did you feel that you had

3      the right or the ability just to ignore his

4      request?

5      A.    I didn't think I was ignoring his

6      request.   I was saying it shouldn't be

7      necessary.

8      Q.    So you didn't do it because you felt it

9      unnecessary, right?

10     A.    I thought it was unnecessary for my --

11     for the time off, yeah.

12     Q.    Look at Johnson 11, Mr. Lawrence asks

13     that you give him the -- that you send the

14     requested information to him and the employee

15     relations team by March 17, 2003, correct?

16     A.    Right.

17     Q.    And we've already talked about you

18     didn't send it to -- either Mr. Lawrence or

19     anyone on the employee relations team including

20     Ms. Regina Shiver which is the name listed here

21     by March 17, did you?

22     A.    No.

1        Q.    Because you didn't believe you had to?

2        A.    Right.    Wow.

3        Q.    What's the matter?

4              MR. VALENTIC:    She doesn't have a watch

5        on.

6              **(Discussion off the record.)**

7              BY MR. HENAULT:

8        Q.    Ma'am, after you returned from

9        vacation, you got -- or a month and a half after

10       you returned from vacation, you got another

11       letter from Dr. James, didn't you?

12       A.    Yes.

13             MR. HENAULT:    Let's mark this letter.

14             **(Johnson Deposition Exhibit Number 14**

15       **was marked for identification.)**

16             BY MR. HENAULT:

17       Q.    What has been marked as Exhibit 14,

18       ma'am, is a May 2, 2003 letter from Dr. George

19       C. James to the United States Department of

20       Education, Re:    Susan Johnson, correct?

21       A.    Uh-huh.

22       Q.    And you requested that Dr. James send

1     Cynthia Logan.

2         Q.    Did you tell Mr. James that you wanted

3     to take six months off or was that his

4     suggestion of a time frame?

5         A.    That was his suggestion of a time

6     frame.

7         Q.    You agreed with that?

8         A.    Right.

9         Q.    When did you send this to the

10    Department of Education, do you remember?

11        A.    Right amp.

12        Q.    After the Department of Education

13    received this letter, they authorized you to

14    take six months off leave without pay, didn't

15    they?

16        A.    Yeah, but it says a minimum of six

17    month, and they took it to mean that it was the

18    maximum, and that's not what it is.   It's the

19    minimum of six months.

20        Q.    You were authorized leave without pay,

21    right?

22        A.    Right.

1     Q.    But you could use the computer at home?

2     Yes?

3     A.    Yes.

4     Q.    Did you ever ask anyone to be able to

5     do work from home?

6     A.    No, I didn't ask for that. I tried it

7     a couple of times, but it didn't seem feasible

8     to do work at home because of different

9     documents I needed and stuff like that.

10    Q.    In the fourth paragraph of Johnson 16,

11    Mr. Lawrence's January 16, 2004 memorandum, Mr.

12    Lawrence informs you that: "Your continued

13    absence is placing a burden on the work force

14    and impacts negativism on the efficiency of the

15    service."

16          Do you disagree with that?

17    A.    No.

18    Q.    You agree that it was a burden to the

19    remaining work force?

20    A.    Yes.

21    Q.    And that's because basically other

22    employees have to do your work, right?

```
 1        A.    Correct.

 2        Q.    And in order to help them do that, to

 3   help the Department of Education do that and

 4   to -- for them to work towards getting you back

 5   to work, he asked you for some specific

 6   information, right?  Look at the third paragraph

 7   from the bottom, beginning:  "In carrying out

 8   this search."

 9        A.    Yeah.

10        Q.    Did you ever provide that information

11   to Mr. Lawrence?

12        A.    No.

13        Q.    Did you ever provide that information

14   to anyone at the Department of Education?

15        A.    No.

16        Q.    So here is Mr. Lawrence telling you,

17   Hey, we can work to try to get you back to a

18   position at the Department of Education if you

19   just provide us this information, and you

20   refused to provide that, right?

21        A.    But my note has said that I couldn't

22   come back to work.
```

1      Q.   Okay.

2      A.   So that's -- I mean, that was why I

3    didn't respond to it.  I couldn't come back.

4      Q.   Did you respond to this January 16,

5    2004 letter in any way?

6      A.   No.

7      Q.   So where he says "please provide this

8    information by February 6, 2004 or it says if

9    you need an extension of time," just let him

10   know, you didn't respond by February 6, and you

11   never said, I need an extension of time, did

12   you?

13     A.   No.

14     Q.   Now, Mr. Lawrence also says that:  "You

15   can look at the EdHIRES to look for job

16   vacancies on your own, right?  Did you ever do

17   that?

18     A.   No, you have to do this ConnectEd is on

19   their -- I didn't have -- I didn't have the

20   ability to get to that EdHIRES.

21     Q.   Okay.  Did you ever ask your husband or

22   anyone else to look into other possible

1    positions at the Department of Education?

2         A.   No, I wasn't able to get back to work

3    at all, and I had a note saying that.

4         Q.   Now, do you allege -- in fact you do

5    allege that this January 16, 2004 letter is

6    retaliatory, right?

7         A.   Yes, I do.

8         Q.   What about it is retaliatory, ma'am?

9         A.   The fact that it kind of threatens me

10   that they're going to fire me.

11        Q.   Where does it tell you you will be

12   fired, ma'am?

13        A.   Well, it doesn't say they're going to

14   fire me but it --

15        Q.   Ma'am, in fact what it does do is tell

16   you that unfortunately Mr. Lawrence cannot

17   continue to grant you absences after your FMLA

18   12 weeks expires, right?

19        A.   Right.

20        Q.   And that if you want to or can come

21   back, we will help you find a new position,

22   right?

1        A.    It doesn't say if you want to or can

2    come back.   It says if you are coming back.

3        Q.    So what is retaliatory about this

4    letter?   We started off by you saying it was

5    threatening to fire you, but we've already

6    established that in fact it does not say you

7    will be fired, so what else is retaliatory about

8    this letter, ma'am?

9        A.    Well, when I got it, I thought I was

10   going to be fired, so it's the way I was looking

11   at it.

12       Q.    But will you acknowledge now that's not

13   actually what the letter says?

14       A.    Yeah, it doesn't --

15       Q.    So do you think maybe your claim about

16   the January 16, 2004 letter may be misplaced?

17       A.    Yes.

18            MR. HENAULT:   Let's mark this next

19   exhibit, please, number 17 I think.

20            **(Johnson Deposition Exhibit Number 17**

21   **was marked for identification.)**

22            BY MR. HENAULT:

 1    Education?

 2        A.    Right, at any job at the Department of

 3    Education.

 4        Q.    Let's turn back to Johnson 17, ma'am.

 5    Mr. Lawrence is telling you that nonetheless, he

 6    thinks it's important for them to be helpful or

 7    that your input will be important and helpful in

 8    their efforts to assist you, so he's given you

 9    an additional opportunity to provide

10    supplemental information to the Department of

11    Education about the possibility of you coming

12    back, right?

13        A.    Yes.

14        Q.    You never responded to this March 3,

15    2004 memo, did you?

16        A.    No, because I was not going to return

17    to work at the Department of Education at all.

18        Q.    Why didn't you submit your resignation,

19    ma'am?

20        A.    Because I thought my claim for EEOC

21    would not go through if I resigned.

22        Q.    So you wanted to be fired in fact

1    rather than resign, didn't you?

2        A.    Well, no.  I wanted -- I didn't want to

3    be fired.

4        Q.    But you knew you weren't going back?

5        A.    Right.

6        Q.    But you didn't want to resign because

7    you were afraid of the impact that would have on

8    your EEO claim.  Did you just expect that they

9    should keep you on the rolls indefinitely?

10       A.    No, I didn't expect that.

11       Q.    Did you expect that your employment

12   would at some point come to an end?

13       A.    Yes.

14       Q.    The only possible way if you weren't

15   going to resign was being terminated, correct?

16       A.    Right.

17       Q.    So based on your refusal to go back to

18   work, you expected to be terminated?

19       A.    Right.

20       Q.    I'm sorry, please, go ahead.

21       A.    No, I expected to be terminated.

22       Q.    And given your refusal to go back to

1    A.    Okay.

2    Q.    "Please note entitlement to LWOP under

3    the FLMA ends April 5."

4    A.    Right.

5    Q.    So here again you're on notice that as

6    of April 5, 2004 you're supposed to return to

7    work, right?  Correct?

8    A.    Uh-huh.

9    Q.    Yes?

10   A.    Yes.

11   Q.    And the next paragraph down says:   "If

12   you're unable to return, you may submit

13   additional medical information for

14   consideration," right?

15   A.    Right.

16   Q.    Did you provide any additional medical

17   information, ma'am?

18   A.    No.

19   Q.    And you did not return to work on April

20   5, 2004?

21   A.    No.

22   Q.    And in fact you didn't call work at all

1    on April 5, 2004, did you?

2        A.    No.

3        Q.    You just didn't show up?

4        A.    Right.

5        Q.    Correct?

6        A.    Uh-huh.

7        Q.    Yes or no, ma'am?

8        A.    Yes.

9        Q.    So you didn't call, didn't show up,

10    just didn't do anything, right?

11        A.    Right.

12        Q.    And actually the memo also advises you

13    that if you do not come back to work and do not

14    provide additional medical documentation, you

15    may be designated as AWOL or absent without

16    leave, right?

17        A.    Uh-huh.

18        Q.    Yes or no, please.

19        A.    Yes.

20        Q.    And that although AWOL itself isn't

21    disciplinary, AWOL can lead to disciplinary

22    action, correct?

1      A.    Right.

2      Q.    Anything else?

3      A.    No.

4      Q.    So your complaint about the March 3 and

5    January 16, 2004 letters comes down to the fact

6    that it is from Mack Lawrence and nothing else?

7      A.    Yes.

8           MR. HENAULT:  Let's mark this as the

9    next exhibit, please.  Let's take a five minute

10   break before we get into this.

11          **(Johnson Deposition Exhibit Number 18**

12   **was marked for identification.)**

13          **(Whereupon, a brief recess was taken.)**

14          BY MR. HENAULT:

15     Q.    Ma'am, what has been marked as Johnson

16   Exhibit 18 is a March 25, 2004 memorandum from

17   Mack Lawrence to you, correct?

18     A.    Right.

19     Q.    And subject, termination of Family

20   Medical Leave Act benefits, correct?

21     A.    Uh-huh.

22     Q.    And the purpose of this memo is to

251

1    inform you that your entitlement to FMLA expires

2    on April 5, 2004, correct?

3        A.    Correct.

4        Q.    And at that time you're expecting to

5    return to work?

6        A.    Correct.

7        Q.    You had already been made aware of this

8    fact from the other memos, right?

9        A.    Right.

10       Q.    And much like the March 3, 2004

11   memorandum, this one also informs you that if

12   you do not return to work or provide additional

13   medical documentation, you'll be designated as

14   AWOL, correct?

15       A.    Right.

16       Q.    And the same thing as previously,

17   although AWOL itself is not disciplinary, AWOL

18   can lead to disciplinary actions, correct?

19       A.    Right.

20       Q.    Potentially including your removal?

21       A.    Right.

22       Q.    You didn't respond to this March 25,

1    2004 memo, did you?

2        A.    No.

3        Q.    You didn't report to work on April 5,

4    did you?

5        A.    No.

6        Q.    You didn't provide any additional

7    medical documentation after receiving this memo,

8    did you?

9        A.    No.

10       Q.    Do you also believe this memo is

11   harassing or retaliatory or discriminatory?

12       A.    Just the fact that Mack was the one

13   sent the letter.

14       Q.    So much like the other two letters,

15   it's solely because it was sent by Mr. Lawrence?

16       A.    Yeah.

17       Q.    Now, I want to make sure I get this

18   right because we talked about your claim that

19   you were retaliated against by supervisors who

20   used coercion, intimidation and threats, that

21   claim is based solely on these exchanges of

22   letters plus the proposal to remove and your --

1    duty, correct?

2         A.    Right.

3         Q.    That's accurate, correct?

4         A.    Okay, all the 38 are correct.

5         Q.    Okay.

6         A.    38 specifications.

7         Q.    And then if you look at charge 2,

8    absent without leave, all 38 specifications

9    there are accurate also, aren't they?

10        A.    Yes.

11        Q.    So then this memo goes on to inform you

12   that in accordance with the MSPB's holding in

13   Douglas v. Veterans Administration, Mr. Lawrence

14   has done an analysis and based on his conclusion

15   is proposing that you be removed from federal

16   service, correct?

17        A.    Right.

18        Q.    This letter informs you that you have a

19   right to appeal that proposal, right?  Look at

20   the second to the last page, ma'am, reply

21   rights?

22        A.    Oh, okay.  It does.

258

1     Q.    Did you ever submit -- your reply

2    rights are to submit affidavits, evidence orally

3    or in writing or both to -- within ten days

4    after receipt of this proposal to Mr. Terry

5    Bowie, right?

6     A.    But he's one of the people that was

7    discriminating against me or that I feel was

8    discriminating against me.

9     Q.    Okay, ma'am.  This letter informs you

10    that you have ten days from receipt to submit

11    evidence either orally or in writing to Mr.

12    Terry Bowie, right?  That's what it says,

13    correct?

14    A.    Yeah, but like I said if he was one of

15    the ones discriminating against, me so how could

16    he be a deciding official?

17    Q.    Ma'am, my only question is:  That's

18    what this letter says, right?

19    A.    Okay.

20    Q.    And that's accurate, correct?

21    A.    Right.

22    Q.    Did you ever send Mr. Bowie any

1    information?

2        A.    No.

3        Q.    Did you ever request an oral hearing?

4        A.    No.

5        Q.    Did you ever submit any evidence at all

6    to Mr. Bowie?

7        A.    No.

8        Q.    You submitted nothing to Mr. Bowie,

9    right?

10       A.    Right.

11       Q.    Now, actually here on May 27, 2004,

12   you're being told that we're proposing that you

13   be removed.  Why didn't you say to Mr. Bowie,

14   don't remove me, ask me to resign and I will if

15   that's what you real wanted?

16       A.    I don't -- I don't know, but that's

17   what I wanted was resign, not termination.

18       Q.    Why didn't you resign then after

19   receiving this letter, ma'am?

20       A.    I don't know.

21       Q.    Isn't the real reason you didn't resign

22   is because you were afraid of the effect it

1    would have on your EEO claim?

2        A.    Yeah, it is.

3        Q.    When you read this May 27, 2004 letter

4    you knew you were likely to be terminated,

5    right?

6        A.    Yes.

7        Q.    And in fact don't you agree that there

8    is -- the reasons set forth in here are enough

9    to terminate someone from federal employment?

10       A.    Yes.

11       Q.    So you knew you were going to be

12   terminated?

13       A.    But I still didn't expect it when it

14   happened.

15       Q.    So you knew it was going to happen, but

16   you just didn't expect it when it actually did?

17       A.    Yeah.

18       Q.    This tells you you have ten days from

19   set, and receipt is presumed to be June 4, 2004,

20   right?

21       A.    Okay.

22       Q.    So you knew potentially any time after

1    Department of Education as an employee?

2        A.    Oh, I guess I must have received this

3    then.  Oh, yeah effective on August 6, 2004.

4        Q.    Ma'am, look at the -- take a look at

5    the specifications in here, specifically the

6    failure to follow proper leave procedures,

7    number 1 on the second page.  That's accurate,

8    isn't it?

9        A.    Yes, that's accurate.

10       Q.    I want to look -- see the two indented

11   paragraphs above that, beginning "you have been

12   carried in the leave without pay status for most

13   of the 2003 leave year"?

14       A.    Wait a minute, what page?

15       Q.    That page, the indented paragraph.

16       A.    Okay.  I wasn't on that page.

17       Q.    Take a look at that, please, and I'm

18   going to ask you some questions specifically

19   about those two indented paragraphs.  It tells

20   that in pay period one to five of 2003, you used

21   254 of leave without pay; is that accurate?

22       A.    Pay period one to five I used 254 hours

1   of leave without pay?  It doesn't seem right.

2   It's only five pay periods, 80 times five is --

3   wait a minute.

4        Q.   Is 400, ma'am.

5        A.   Yeah.  Wait a minute.  I guess it's

6   accurate.  I don't know.

7        Q.   Do you have any evidence that it's

8   inaccurate?

9        A.   No.

10       Q.   So for the first five pay periods of

11  2003 which would be 400 hours of work time, you

12  were leave without pay for more than half,

13  correct?

14       A.   Right.

15       Q.   Beginning in pay period six to pay

16  period 26, which are the remaining pay periods

17  in year 2003, you used 80 hours of leave without

18  pay for each pay period, correct?

19       A.   Right.

20       Q.   And then for 2004 in pay period one to

21  pay period eight you were -- excuse me, you used

22  80 hours of leave without pay for each pay

1    period, right?

2        A.    Uh-huh.

3        Q.    Yes?

4        A.    Yes.

5        Q.    And that included your 12 weeks of

6    absences under the Family Medical Leave Act?

7        A.    Right.

8        Q.    And then on March 25, you were told to

9    return to the office on April 5.  You didn't do

10   that, right?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    I didn't do that.

14       Q.    All right.  Alternatively you were told

15   to submit additional medical information.  You

16   didn't do that, correct?

17       A.    Correct.

18       Q.    And thereafter you were charged AWOL

19   since April 5, 2004?

20       A.    Right.

21       Q.    Correct?

22       A.    Correct.

1    submit a resignation any time you wanted, right?

2         A.    Right.

3         Q.    But you didn't do it, correct?

4         A.    Correct.

5         Q.    So the opportunity to resign was an

6    opportunity that you had, correct?

7         A.    Yes.

8         Q.    That you didn't exercise, correct?

9         A.    Right.

10        Q.    That you didn't take that opportunity?

11        A.    Right.

12        Q.    So what other opportunities should the

13   Department of Education have given you, ma'am?

14        A.    I don't know.

15        Q.    In fact, you can't think of any other

16   opportunities, can you?

17        A.    No, I can't.

18        Q.    They had given you every opportunity

19   available, didn't they?

20        A.    As far as I know.

21        Q.    The only opportunity left to the

22   Department of Education is to terminate you, to

1    remove you from employment, right?

2        A.    Right.

3        Q.    And that's what they did?

4        A.    Yes.

5        Q.    And that was actually justified by your

6    failure to come back to work and failure to

7    provide medical documentation, wasn't it?

8        A.    Yeah, but my note -- well, my note that

9    I wasn't coming back should have been enough.

10       Q.    Okay, ma'am.  From the last note you

11   provided, which was following your November 9,

12   2003 letter from Dr. James that you provided to

13   the Department of Education, did you provide any

14   other notes?

15       A.    No.

16       Q.    Okay.  Through the four letters we've

17   just discussed, the Department of Education was

18   saying to you if you have a medical reason, give

19   us documentation.  They were telling you, Give

20   us documentation, right?

21       A.    Yes.

22       Q.    Saying if you're unable to come back to

1    coming back.

2         Q.    Okay.   Now, you were actually -- you

3    were in fact removed from the Department of

4    Education as an employee on August 6, 2004,

5    correct?

6         A.    Uh-huh.

7         Q.    Yes?

8         A.    Yes.

9              MR. HENAULT:   Let's mark this.

10             **(Johnson Deposition Exhibit Number 21**

11   **was marked for identification.)**

12             BY MR. HENAULT:

13        Q.    Ma'am, what has been marked as Exhibit

14   21 is an SF 50 notification of personnel action

15   effective 8/6/2004 removing you from employment

16   with the Department of Education, correct?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    Now, one of your claims also in this

21   action was that you were subject to a hostile

22   work environment because of your disabilities,

273

1    correct?

2        A.    Correct yes.

3        Q.    We've talked about your other claims

4    today.    We're talked about the credit hours, the

5    request or requirement that you get preapproval

6    for credit hours.

7        A.    Right.

8        Q.    We've talked about the 72 hours leave

9    without pay.

10        A.    Right.

11        Q.    We've talked about your career ladder

12    promotions.

13        A.    Right.

14        Q.    We have talked about the letters in

15    2004 that you claim are harassing, coercive and

16    retaliatory.    Are there any other actions that

17    you allege comprise a hostile work environment?

18        A.    No.

19        Q.    Ma'am, August 12, 2002 is the first

20    time a claim, an informal complaint or claim of

21    discrimination was made with the EEO office on

22    your behalf, right?

1      A.    It was originally in his name.    I don't

2    know if it's now in both of our names.

3      Q.    Who pays the mortgage?

4      A.    My husband.

5      Q.    Do you have any retirement accounts?

6      A.    I have one retirement account in a T.

7    Rowe Price IRA.

8      Q.    You have a T. Rowe Price?

9      A.    IRA.

10     Q.    When did you open that IRA, do you

11   know?

12     A.    Approximately a year ago.

13     Q.    Prior to --

14     A.    And it was my TSP, the TSP stuff that I

15   got from -- after my removal, I put it into a T.

16   Rowe Price IRA.

17     Q.    And that was approximately a year ago?

18     A.    Uh-huh.

19     Q.    What's the value of that account, do

20   you know?

21     A.    It's $27,000 now.

22     Q.    What was it --

1    one I'm talking about.

2        Q.    Oh, it's the same account, okay.

3        A.    Oh, were you talking about a different

4    account?

5        Q.    I thought -- I must have been confused.

6    I thought you said that you have the T. Rowe

7    Price IRA that was rolled over from your TSP?

8        A.    Right.

9        Q.    I thought you said you have a separate

10   T. Rowe Price investment account with your

11   husband.

12       A.    No, we have some other investments.

13       Q.    Other than what is in the T. Rowe Price

14   IRA?

15       A.    Right, other than what's in the T. Rowe

16   Price IRA but I don't --

17       Q.    Are those investments also with T. Rowe

18   Price?

19       A.    Yeah.

20       Q.    So there are at least two accounts with

21   T. Rowe Price that we're talking about, one is

22   your IRA?

288

1        A.    Right.

2        Q.    And one is a separate investment

3    account that is owned by both you and your

4    husband?

5        A.    Right.

6        Q.    Okay.

7        A.    But I don't have access to it and I

8    never received any income from it.

9        Q.    Okay.  Your name is on the account?

10        A.    Right.

11        Q.    When was that account opened?

12        A.    I guess that was two years ago.

13        Q.    How much money was deposited into this

14    account to open it?

15        A.    I don't know.

16        Q.    Do you know the value of it right now?

17        A.    The value of it is 170,000.

18        Q.    That's the current value roughly?

19        A.    Roughly.

20        Q.    But you have no idea what the beginning

21    value was two years ago?

22        A.    No.

1        Q.    Where did the money come from that was

2    put into that account?

3        A.    It came from my husband.

4        Q.    Okay.

5        A.    That's why it's really his account but

6    I can get it after he dies.

7        Q.    But your name is on there right now,

8    correct?

9        A.    Right.

10       Q.    You are a joint owner of that money

11   legally?

12       A.    Right, but I can't access it.  I don't

13   have access to it.

14       Q.    Because of a verbal agreement that you

15   have with your husband?

16       A.    Right.

17       Q.    But other than that, you are legally

18   you are an owner of that money also, right?

19       A.    Right.

20            MR. HENAULT:  Let's take -- it's ten

21   past right now.  Let's take ten minutes.

22            **(Whereupon, a brief recess was taken.)**

308

```
 1   DISTRICT OF COLUMBIA, to wit:

 2

 3            I, Debra L. Maheux, the officer before
     whom the foregoing deposition was taken, do
     hereby certify that the within-named witness
 4   personally appeared before me at the time and
     place herein set out, and after having been duly
 5   sworn by me, according to law, was examined by
     counsel.
 6
              I further certify that the examination
 7   was recorded stenographically by me and this
     transcript is a true record of the proceedings.
 8
              I further certify that I am not of
 9   counsel to any of the parties, nor an employee
     of counsel, nor related to any of the parties,
10   nor in any way interested in the outcome of this
     action.
11
              As witness my hand and notarial seal
12   this 27th day of December, 2006.

13

14

15

16                        Debra L. Maheux
                          Notary Public
17

18

19   MY COMMISSION EXPIRES:

20                   3/14/08

21

22
```