### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Susan E. Johnson** | ) | |
| **5902 Mt. Eagle Drive, # 1601** | ) | |
| **Alexandria, Virginia 22303** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0321 (GK)** |
| | ) | |
| **Margaret Spellings, Secretary** | ) | |
| **U.S. Department of Education** | ) | |
| **400 Maryland Avenue, S.W.** | ) | |
| **Washington, D.C. 20202** | ) | |
| **Defendant** | ) | |

_____

### OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff opposes the Defendant's Motion for Summary Judgment. The record in this case shows that many genuine issues as to material facts exist as to the claims made by the Plaintiff. Defendant is therefore not entitled to judgment as a matter of law.

The "Defendant's Statement of Material Facts Not in Dispute", set forth with the Defendant's Motion for Summary Judgment, is an inaccurate, fragmentary, incomplete, and inadequate statement concerning facts material to the Plaintiff's claims in this case.

The Plaintiff's Statement of Material Facts follows.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.   The Plaintiff has the disabilities of Major Depression (with a history of recurrent episodes of Depression) and Anxiety Disorder, both of which conditions are chronic.

2.   Department officials knew about the Plaintiff's mental illness disabilities from the first year of her employment in 1993 by the Department of Education.  Agency officials in OCFO who knew about her disabilities included Jan Steinbrueck, Betty Hepak, Ruth Ann Harrold, Maureen Harris, Keith Cole, Cynthia Logan, Gary Wood, Mack Lawrence, Terry Bowie, and Mark Carney.

3.   The Plaintiff communicated verbally in person and by phone and in writing and by e-mail many times with supervisors concerning her mental illness disabilities.

4.   The Plaintiff's mental illness disabilities  of major depression and anxiety were known to her Department of Education supervisory officials from the first year of her employment in 1993. Furthermore, they were aware of her frequent psychiatric appointments, which required leave from work.  In 1994, following a suicidal episode, she was hospitalized for several weeks at Laurel Regional hospital in Laurel, Maryland, where she was under the care of her psychiatrist Dr. George C. James. (Plaintiff's Exhibit 1, Plaintiff's Exhibit 2)

5.   In addition to the Plaintiff's own communications with her supervisors, the Plaintiff's parents had conversations with her supervisors explaining her absence from work related to her mental illness and hospitalization, and (after she returned to work following her hospitalization

in 1994) her related difficulties getting to and remaining at work at regular hours for a full day. (See Complainant's Motion for Protective Order Submitted to EEOC Administrative Judge, in the EEOC Administrative Judge's records on this case.)

6.   In a sworn declaration, the Plaintiff's psychiatrist, Dr. George C. James stated that "Ms. Johnson suffers from Major Depression with history of recurrent episodes of depression and an Anxiety Disorder."  He commented that "both conditions are chronic". (Plaintiff's Exhibit 1)

7.   As to the effect on major life activities of the Plaintiff, Dr. James stated: "Her anxiety symptoms manifest itself as gastro intestinal problems (nausea, stomach cramps), fatigue, difficulty with social interactions or difficulty with leaving the house for shopping or dining. These symptoms have interfered with her work and social life. Ms. Johnson's symptoms of anxiety are chronic whereas her symptoms of depression are episodic." (Plaintiff's Exhibit 1)

8.   As to whether the Plaintiff's limitations and impairment are correctible by medications, Dr. James in his sworn declaration stated: "Her Anxiety disorder has been resistant to the medications attempted so far and this condition is primarily addressed with psychotherapy than with medications." (Plaintiff's Exhibit 1)

9.   The Plaintiff's psychotherapist,  Mary Jo Wilson, in her sworn declaration,  elaborated on the Plaintiff's disabilities and impairments.  As indicated in her statement, Ms. Wilson is a Certified Nurse Psychotherapist who worked together with the Plaintiff's Psychiatrist,

Dr. George C. James, continuously providing coordinated care (each in their separate office practices) for the Plaintiff from 1994 through 2004.  In her sworn declaration (Plaintiff's Exhibit 2), Ms. Wilson observed

> "Over the years, Ms. Johnson has struggled and continues to struggle with a debilitating anxiety and episodes of severe depression that has significantly impacted her life. Due to the severity of her depression she lived at home for many years requiring the support of her parents. While living at home she was reportedly not able to perform many tasks other than taking care of her basic needs. There were long periods when she was not able to drive due to severe fatigue and uncertainty about her ability to respond effectively while on the road. There were days and weeks when the fatigue associated with the depression as well as the anxiety prevented her from leaving the home. Ms. Johnson's anxiety has often been manifested as gastro intestinal problems, which would be particularly troublesome in the mornings. However, the problems were not limited to the morning but would occur in other parts of the day resulting in Susan leaving work prematurely. It was an attempt to maintain productivity at work that prompted a request for a more flexible schedule."

10. Referring to the period of time after the Plaintiff moved from her parents' home in Maryland to Virginia (where she lives with Paul Valentic, her husband, and personal representative in the Department of Education with respect to this EEO Complaint), her psychotherapist, Ms. Wilson, added (Plaintiff's Exhibit 2):

> "Although Ms. Johnson is living more independently at this time, the depression and anxiety has impacted her functioning on a continuous basis. Ms. Johnson has very few

social contacts and seems to have limited capacity for any maintained activity of either a physical or social nature. There are still times when she is not comfortable driving due to her fatigue and anxiety. Ms. Johnson has always had great pride in her work and takes her responsibilities seriously. Over the years Dr. James has requested that Ms. Johnson be allowed certain accommodations at work to provide the best situation for her functioning. Over the last several years, Ms. Johnson has reported feelings of discrimination at work, against her as an individual with a mental illness as well as a questioning of her need for accommodations regarding her work schedule. Ms. Johnson symptoms of anxiety and depression have intensified in this situation resulting in a decrease in functioning and an absence from work.

   "Ms. Johnson has had periods of relative relief from depressive symptoms with medication and psychotherapy. The symptoms of anxiety have been more refractory in nature. Her response to medication can vary with the month of the year as well as the level of stress. This pattern seems to be a marker of her particular illness."


11. The Agency knew of the Plaintiff's disabilities.  The Plaintiff's mental illness disabilities of Major Depression and Anxiety Disorder were known to her Department of Education supervisory officials from the first year of her employment in 1993.  Furthermore, they were aware of her frequent appointments with her psychiatrist and her psychotherapist, which required many hours of leave from work.  Reasonable accommodations at work were recommended to help her with her chronic anxiety symptoms. Her psychiatrist recommended a flexible work schedule as providing the best situation to help her stay productive.

12. In the earlier years of the Plaintiff's employment by the Department, her reasonable accommodation needs were generally addressed through oral communications dealing with requested flexibility in work hours and credit hours to make up for missed hours. Letters from the Plaintiff's psychiatrist were provided, however, from time to time when requested.

13. When requested, letters from the Plaintiff's psychiatrist, Dr. George C. James, were provided to the Department, including January 14, 1995; November 26, 2001; March 11, 2003; May 2, 2003; and November 9, 2003. (Plaintiff's Exhibit 3)

14. In a letter to the Department of Education dated January 14, 1995, the Plaintiff's psychiatrist, Dr. George C. James, wrote (Plaintiff's Exhibit 3):

"This is to inform you that Ms. Susan Johnson is under my care and is being seen every 3 to 4 weeks. Due to recent changes in her medical condition, she has needed medication changes and more frequent follow-up visits. She could benefit from a work schedule of less than 8 hours a day from time to time depending on her overall condition. This flexibility is essential in order to keep her stressors to a minimum."

15. Department of Education employee Ora Alger, in her deposition on November 5, 2003 (Plaintiff's Exhibit 5), responded to questions by the Complainant's counsel. Referring to reasonable accommodation issues that the Plaintiff was having in 1995 with her supervisor, Jan Steinbrueck, while Ms. Alger was working under the supervision of Betty Hepak in another section of OCFO:

"I was the Chief Steward in the Union and I intervened for Susan and asked Betty Hepak if she wouldn't mind taking Susan on in our section and if she could accommodate Susan because Susan had a disability, if she would be able to accommodate her with scheduling different hours for her to come in and work.  She said, yes, that she would.  So, that is how I got to know that Susan had a disability.  And over the years, over the time that I have known her, we have discussed it off and on."

16. Jeanne Johnson is employed in the Office of the Chief Financial Officer (OCFO) of the Department of Education.  She was union representative for the bargaining unit, who the Plaintiff consulted about disability protections, reasonable accommodations, and career ladder promotions.  On several occasions, she discussed questions related to the Plaintiff's mental illness disabilities and needs for reasonable accommodations with supervisory and managerial staff.  (Plaintiff's Exhibit 6)

17.  Cynthia Logan was the Plaintiff's team leader in the Department of Education's Office of the Chief Financial Officer (OCFO) from 1998 to 2000.  She received many requests for reasonable accommodations for flexible working hours and work credit hours to meet the Plaintiff's needs based on her mental depression and anxiety.  Many such requests were communicated orally, in person or by phone.  At other times, the Plaintiff sent e-mail messages requesting approval of work credit hours as reasonable accommodations.  (Plaintiff's Exhibit 7)

18. In an e-mail message to Cynthia Logan on May 18, 1999 (5:59 pm), the Plaintiff discussed notes from her psychiatrist, Dr, George James, on her disabilities and need for

reasonable accommodations.

19. In her e-mail reply of May 19, 1999 (7:42 am), Cynthia Logan stated her "final point" refusing reasonable accommodations for the Plaintiff because "I can tell you that it does not mean that you do not fall under the same rules that govern other employees".

20. On February 12, 2000, Mr. Lawrence's predecessor, Keith Cole, who was the Plaintiff's immediate supervisor from April 1999 through February 2000, stated in an e-mail message to Mack Lawrence, Cynthia Logan, and Maureen Harris (Defendant's Exhibit 9):

"After an untold number of emails between Cynthia and Susan and now a phone call to me from Susan, I want to once again make it perfectly clear as to what we have agreed upon for Susan to work credit hours.

"Because Susan has some difficulty to stay on a daily routine, consistent schedule, I authorized Susan to work credit hours when it was physically possible for her to do so just as long as she had work to do.

"There is no requirement that she clock in and out with her team leader or supervisor. This is to accommodate her disability and work being done needs to be measurable and at her grade level just as would be expected of any other employee."

21. Mack Lawrence became the Plaintiff 's first-level supervisor in March 2000.  Within the first month of his taking over as the Plaintiff 's supervisor, he moved to change the reasonable accommodations arrangement of flexible hours and work credit hours for her.

22. On March 23, 2000 (4:52 pm), Mr. Lawrence sent an e-mail message to the Plaintiff (with copies to team leader Cynthia Logan and personnel specialist Gerri Wright) stating:

"Susan:

"We have to make a slight modification to your agreement with Keith and Maureen.  You may continue to work credit hours, but you must receive approval from your team leader (Cynthia) prior to performing the work.  Please stop by if there are any questions or concerns.

"Effective: March 26, 2000"

23. The Plaintiff sent back an e-mail message less than an hour later on March 23, 2000 (5:43 pm), protesting:  "You modified the entire agreement."

24. In a series of e-mail messages on April 3 and 4, 2000, the Plaintiff was again denied approval of her requests for work credit hours and reasonable accommodations by her team leader Cynthia Logan.  (E-mails between Susan Johnson and Cynthia Logan, copies to Mack Lawrence, Gary Wood, and Gerri Wright, April 3, 2000 (12:13 pm), April 3, 2000 (12:15 pm), April 3, 2000 (12:26 pm), April 3, 2000 (9:21 pm), April 4, 2000 (7:34 am), and April 4, 2000 (10:45 am).

25. Before and after Mack Lawrence became the Plaintiff's immediate supervisor in March 2000, he knew that she was an individual with disabilities.  When EEO Investigator Stewart asked Mr. Lawrence in the Investigative Hearing on February 5, 2003, when he became aware of the Plaintiff's disabilities, he responded: "Officially, when I became her supervisor, I guess.  But

I've been in the agency, so I knew -- I knew there was an issue…"

26. The Plaintiff's needs and arrangements for accommodations in terms of flexible hours were also known to Mr. Lawrence.

27. During June of 2002, the Plaintiff sent several e-mail messages to her supervisor, Mack Lawrence, requesting work credit hours (dated June 7, 2002 (8:38 am); June 7, 2002 (12:51 pm); June 11, 2002 (7:10 am); June 11, 2002 (7:36 am); June 11, 2002 (1:33 pm); June 25, 2002 (7:12 am).

28. On February 5, 2003, when EEO Investigator Stewart asked Mr. Lawrence (referring to the Plaintiff's request for the accommodations of credit hours): "Now .. can you specifically describe what kind of accommodations, she mentioned something, credit hours?"  He responded: "Yeah, we had discussed that specifically, and that's one of the points that we disagree on a little bit."

29. That there was no mutually modified agreement is further shown when the Investigator asked Mr. Lawrence:  "Is she fulfilling whatever her end of the agreement is?"  Mr. Lawrence answered:  "No, because she believes she doesn't have to tell me what she's working on, that's where we kind of disagree on the credit hours."

30. When the Investigator asked Mr. Lawrence what his "current agreement" was, he responded:  "The current agreement is that she can work credit hours as long as I know what

she's working on.  So that means that she can ask me, it can be I want to work credit hours for

the week on this project, because a project can take more than a week."  Mr. Lawrence added :

"What I'm not prepared to do is give a blanket approval for you to do whatever you want to do

whenever you want to do that.  I can't do that."

31. In response to a Supplementary Interrogatory from the EEO Investigator as to whether,

how, and when he became aware of the Plaintiff's disability, Mr. Lawrence answered on March

24, 2003:  "Yes, I am aware of the Complainant's illness since I have been in this office over 15

years.  However, as supervisor, I have not seen medical documentation of her illness."

32. In fact, Mr. Lawrence had received medical documentation (about a year and a half

earlier) on behalf of the Plaintiff in the form of a letter from Dr. James requesting reasonable

accommodation of Susan Johnson's needs (Plaintiff's Exhibit 3)

33. In a letter dated November 26, 2001 (Plaintiff's Exhibit 3), the Plaintiff's psychiatrist, Dr.

George C. James wrote:

> "This is to inform you that Ms. Susan Johnson is under my care and is seen on a regular
>
> basis as an outpatient.  Due to the nature of her condition, it is possible that she may need
>
> minor adjustment to her work schedule to manage her condition.  She may need time off
>
> from work occasionally which is often unpredictable.  A cooperative arrangement
>
> between Ms. Johnson and her employer will be helpful in limiting work related absences
>
> to a minimum."

34. Mr. Lawrence admits in a sworn declaration that he did deny accommodation requests without prior permission between "June and August 2002"

35. On August 8, 2002, on the Plaintiff's behalf, Paul Valentic (an employee in another part of OCFO and by then her husband) contacted the Department of Education's EEO-IDRC (Informal Dispute Resolution Center).  That was the date when the Plaintiff sought informal counseling, and when her first interview with Counselor Dianne Graham was established.

36. The issues that the Plaintiff presented to the EEO-IDRC Counselor were the following:

- reasonable accommodations (credit hours) violations;

- promotion - systematic discrimination based on her disability;

- awards - systematic discrimination on cash awards based directly on her disability;

- hostile workplace; and

- opportunities not given and/or taken away due to her disability.

37. The issues were not resolved in the EEO-IDRC Counselor's informal counseling process.

38. On September 27, 2002, the Plaintiff filed a formal complaint with the Department of Education's Office of Equal Employment Opportunity charging unlawful employment discrimination and reprisals in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §791 et seq. *(Complaint of Susan E. Johnson v. Roderick R. Paige, Secretary of Education, Agency Case No. ED-2002-29-00).*

39. On December 10, 2002, the Department of Education's Equal Employment Opportunity (EEO) Group accepted the Plaintiff's complaint for formal processing.

40. On March 11, 2003, the Plaintiff's EEO complaint as originally filed was amended to add the following issues regarding such discriminatory actions and reprisals. "(6) I was discriminated against on February 28, 2003, based on mental disability (recurring depression) and reprisal (prior EEO activity), when I was denied reasonable accommodation (72 hours of LWOP); and (7) I was discriminated against continuously since May 12, 1997 (last date of incident being February 28, 2003), based on mental disability (recurring depression) and reprisal (prior EEO activity), when I was subjected to a hostile environment.  The additional charges in the EEO complaint were added because of further discriminatory actions and reprisals for EEO activity by her immediate supervisor, Mack Lawrence, on February 28, 2002, in the course of the investigation by the EEO Investigator to whom the Plaintiff's case was referred

41.  The issues were not resolved.

42. The Allegation of Discrimination form signed by the Department's IDR EEO Counselor certifies the date of 08/08/2002 as the date on which the latest incident/action occurred relating to the denial of request to work credit hours.  August 8 is also the initial contact date with the EEO, clearly within the 45-day period.  As is shown in the Investigation Report, repeated accommodation requests were still being denied until the action against her on 2/14/03.

43. The Plaintiff was denied the opportunity for promotion because of her disabilities, and because these disabilities necessitated reasonable accommodations involving flexibility and variability in working hours.  The Plaintiff held a GS-11 to GS-12 career ladder series position, which was subject to specific provisions in the Department of Education Collective Bargaining Agreement (Plaintiff's Exhibit 10) that an employee was entitled to consideration for promotion after meeting the time-in-grade requirement (one year from GS-11 to GS-12), if job performance has been fully successful.  Plaintiff had received her GS-11 grade level on November 19, 2000, and under the one-year time-in-grade condition became eligible one year later for promotion to GS-12 on November 19, 2001.

44. On February 22, 2002, three months prior to the time she sent a formal determination request letter on May 16, 2002, the Plaintiff had sent a more informal inquiry to her supervisor, Mack Lawrence, and his co-supervisor, Gary Wood, saying: "I am wondering how my career ladder consideration is going?"  There was no response.

45. In a sworn declaration, Mack Lawrence recalled that the Plaintiff had sent him (and Gary Wood) an e-mail message on February 22, 2002, inquiring about her career ladder promotion to the GS-12 level.  Mr. Lawrence did not respond to this message.

46. The Department of Education Collective Bargaining Agreement (Article 18) provides that, if an employee has completed time-in-grade and qualifications requirements for a career ladder promotion, the employee may request a determination from the supervisor as to whether the supervisor is prepared to recommend promotion.  The supervisor must respond to the

employee within thirty calendar days after the employee has requested such determination. (Plaintiff's Exhibit 10)

47. On May 16, 2002, the Plaintiff hand-delivered a letter requesting a determination by her immediate supervisor, Mack Lawrence, as to whether he was prepared to recommend a promotion to a GS-12 level.  (Plaintiff's Exhibit 7)

48. The Plaintiff sent a copy of the determination request letter to her second-line supervisor, Terry Bowie, by e-mail on May 16, 2002 (4:43 pm).  The Department's tracking system shows that this e-mail remained on Mr. Bowie's computer until June 25, 2002 (6:15 pm) when it was deleted -- several days after the 30-day deadline when a reply to the determination request letter was due as indicated in the letter, although it was never provided as required under section 18.05 of the Collective Bargaining Agreement.  (Plaintiff's Exhibit 10)

49. The Plaintiff sent a copy of the determination request letter to the Deputy Chief Financial Officer, Mark Carney, by e-mail on May 16, 2002 (4:43pm).  The Department's tracking system shows that this e-mail was read at Mr. Carney's computer on May 17, 2002 (7:24 am).

50. When the Investigator asked Mr. Lawrence what the Plaintiff should be doing to receive the career ladder promotion and whether he had discussed it with her, he answered that during her evaluations "it wasn't so specific as to what do you need to do to get promoted or what do you need or it was more or less this is the direction that we need to move in, because remember, I'm – I'm aware of her disability to the extent, and her sensitivity to an extent".

51. When the EEO Investigator asked whether she ever received a response to her letter of determination, the Plaintiff responded:  "No, I mean, not even verbally, or it was supposed to be written, but they didn't come up to me verbally and they didn't say we don't know." (Investigation Report: Tab F-8, page 32.)

52. Mr. Lawrence sworn declaration states that he spoke to the Plaintiff about promotion advancement difficulties.  This is contrary to the answer he gave to the EEO Investigator's question as to whether the Plaintiff discussed possible promotion with him, when he answered: "During her evaluations and this type of thing we've discussed what directions she's moving in, not specifically a promotion

53. Second-level supervisor Terry Bowie was asked by the EEO Investigator whether the Plaintiff ever discussed with him the possibility of being promoted to a GS-12, his response was "None.  Never."

54. However, the Investigator subsequently presented to Mr. Bowie an e-mail tracking document showing that, in fact, he did receive the e-mailed letter of determination from the Plaintiff.  Mr. Bowie then admitted: "So I could have accidently deleted it."

55. In response to questioning by the Equal Employment Opportunity (EEO) Investigator at the Investigative Hearing in the Department, the Plaintiff's first line supervisor, Mack Lawrence, answered that he had not specifically discussed a career ladder promotion, and what the plaintiff

needed to do, during evaluation meetings with the Plaintiff because he was aware of her disability and her sensitivity.

56. The Plaintiff 's calendar notes of meetings and appointments show July 8, 2002, and August 5, 2002, as specific dates when the Plaintiff met with Mr. Lawrence to discuss these issues, which remained unresolved on August 8, 2002, on the afternoon of which her initial contact with EEO-IDRC was made on her behalf by the Plaintiff  husband, Paul Valentic.

57.  The Plaintiff 's husband's calendar reflects that he visited the EEO-IDRC office on August 8, 2002. The allegation of discrimination form (signed by EEO-IDRC Counselor Dianne Graham on September 19, 2002) certifies the date of August 8, 2002, as the date on which the last incident occurred relating to the denial of request to work credit hours.  The form signed by EEO-IDRC Counselor Graham certified that the incident/action counseled was part of a continuing violation.

58. Another issue arose after the EEO Investigative Hearing on February 5, 2003.  The following occurred within a month after such Investigative Hearing.

59. The Plaintiff sent an e-mail on February 28, 2003, from her home computer to Mack Lawrence (with a copy to Gary Wood) requesting approval of 72 hours (9 days) of leave without pay LWOP

"Mr. Lawrence,

"I am requesting at this time approval for LWOP for the period between March 18th to

March 28th.  This is a total of 72 LWOP hours.  While I am attempting to come in between now and March 17th, I wish to request that you approve this request now.  If I earn any credit hours between and March 17th, of course, I will apply those to the 72 hours.

   "As you are well aware, I am having a great deal of difficulty at this time with coming in.  This is very likely a direct effect of current activities I am involved with at the agency.

   "With my doctor's support, I am going outside of the country during this time to recuperate.  It is felt that this recuperation might possible make it more likely for me to return to a normal work life.

   "Please reply as quickly as possible.

   "Sincerely,

   "Susan E. Johnson"


   60. Mr. Lawrence replies on Monday, March 3, 2003, demanding: "Susan, please see me when you get in."

   61. The Plaintiff replied the next day, on March 4, 2003, to Mack Lawrence (with a copy to Gary Wood)   "Mr. Lawrence:

   "As I stated in my e-mail request - I am having difficulty getting in.  I am requesting that you do not condition the reply of my leave request on my having to be in; although I am still trying to get in.

   "I am making this e-mail a second request that you take some action on my leave request.  I believe I have provided you with a detailed explanation why I need to take the

leave.  The reason I need the accommodation will not change whether I send you the

details or give you the details verbally.

    "I also want to ensure that this is not handled verbally and the documentation will exist

showing your decision on this matter.

    "Again, I wish to receive your decision by return mail."


62. Having received no response from Mr. Lawrence for more than a week, the Plaintiff on

March 12, 2003, sends an message from her home computer, with "Urgent!" in the heading, to

Mr. Lawrence (with a copy to Terry Bowie) in which she states

    "Mr. Lawrence, since we did not receive a timely reply from you and the only reply was

    your condition that I must come to the office which was an impossible request by you

    I referred this matter to the proper authorities."


63. The mention of "reference to the proper authorities" alludes to the fact that the Plaintiff's

husband, Paul Valentic (her personal representative) brought the matter  to the attention of the

EEO Investigator Tasha Stewart, since the Plaintiff and her husband recognized that Mr.

Lawrence's actions were threatening and retaliatory, following less than a month after Mr.

Lawrence faced the Plaintiff's discrimination charges against him at the Investigative Hearing on

February 5, 2003.


64. At Mr. Lawrence's request, Ms. Regina Shiver of the Department's Human Resources

Unit, prepared a draft of a letter to the Plaintiff in response to the Plaintiff's request for (Leave

Without Pay) LWOP for 72 hours.  In transmitting a draft, Ms. Shiver asked Mr. Lawrence a

question: "My understanding is that you do not have any medical documentation related to her condition? Is that correct?" Mr. Lawrence e-mails a response saying: "I do not have any documentation that stated that she has a 'serious medical condition'"

65. The Department of Education *Handbook for Reasonable Accommodations* states explicitly that the Department has a legal obligation to track all reasonable accommodations requested by and granted for applicants and employees, as provided pursuant to *Executive Order 13164 (Establishing Procedures to Facilitate the Provision of Reasonable Accommodation)*. (Plaintiff's Exhibit 9)

66. On June 3, 2003, the Plaintiff requested a hearing before an EEOC Administrative Judge on her complaint charging that she was discriminated against on the bases of disability (recurring depression with anxiety) and reprisal (prior EEO activity) by the Department of Education and supervisory and management officials thereof when--

- she was denied a promotion to the GS-12 level.

- she was denied reasonable accommodation to work credit hours.

- she did not receive a cash award equal to that received by other employees doing similar work.

- On November 1, 2002, she was placed on leave without pay (LWOP) on the Columbus holiday.

- On February 28, 2003, she was denied 72 hours of LWOP as a reasonable accommodation.

- she was subjected to a hostile work environment.

67. Because of retaliatory actions occurring while the Plaintiff's discrimination case was pending before the EEOC Administrative Judge, the Plaintiff filed complaint submissions on May 6, 2004, and July 9, 2004, charging that the Department of Education and agency officials retaliated against her in violation of the provisions of section 503 of the Americans With Disabilities Act of 1990 (as made applicable to Federal employment by section 501 of the Rehabilitation Act). The charged retaliatory actions occurred while her discrimination case was pending before the EEOC Administrative Judge, and her claims were submitted directly to the EEOC.

68. The Plaintiff's retaliation complaint submission of May 6, 2004, charged that the Agency retaliated against her in a letter signed by Mack Lawrence dated March 25, 2004, that threatened termination of her Federal employment, following up on his letters dated January 16, 2004, and March 3, 2004, that attempted to coerce her to find lateral or lower-level employment in another job or to accept demotion to a lower grade level.

69. The Plaintiff's retaliation complaint submission of July 9, 2004, charged that Department retaliated against her in a letter signed by Mack Lawrence dated May 27, 2004, by threatening termination in proposing to remove her from her position as an accountant in the Department of Education, and attempting to compel her to apply for disability retirement in a manner designed to get her to relinquish the pursuit of remedies in her EEOC case.

70. Without a hearing, the EEOC Administrative Law Judge on July 14, 2004, issued an

order granting summary judgment for the Agency.

71. The Plaintiff's psychiatrist from 1994 through the end of 2004, Dr. George C. James stated in his sworn declaration (Plaintiff's Exhibit 1):

> "Over the last few years, her job became a source of stress which only added to her anxiety symptoms.  This began when Ms. Johnson felt an increasing resistance to her request for accommodations and felt discriminated against as an individual with chronic mental illness. Her worsening anxiety symptoms only worsened her day to day functioning and resulted in frequent absences from work.  I have provided several letters to the Department of Education from 1995 to 2003 concerning her need for flexible hours of work. She frequently made me aware of her oral and written communications requesting work-hour accommodations."

72. The Department of Education terminated the Plaintiff's employment on August 6, 2004. Following her termination and while her appeal to EEOC was still pending, the Plaintiff experienced steady deterioration in her depression and anxiety conditions, leading to a life-threatening suicide attempt several months later on January 3, 2005.  This attempt was followed by urgent Medivac helicopter transportation to Fairfax Inova Hospital in Virginia, where she was hospitalized on an emergency basis and was in critical condition for a substantial period of time. Traumatic impacts on her mental health have persisted since that time.

73. After her release from the hospital following her suicide attempt on January 3, 2005, the Plaintiff changed her psychiatric care to Dr. Franklin J. Pepper nearer her residence in

Alexandria, Virginia.  In his sworn declaration, he specified the diagnosis of her disabilities as

social anxiety disorder, and major depressive episodes, recurrent with anxiety.  He observed:

"Her Agency made it harder and harder for her to utilize the Accommodation that had been made

for her under the Americans With Disabilities Act.  Her EEOC petition was denied and, recently,

so was her appeal.  I have no doubt that there is any number of jobs she could work at in her

accounting field."   Without ADA accommodations and leave, and after her termination, he

concluded, in connection with her application for Federal Employees Retirement System

Disability benefits, that "Susan E. Johnson is not able to perform the job from which she was

separated by her Agency." (Plaintiff's Exhibit 10)

## PLAINTIFF'S ARGUMENTS

### Opposition to Defendant's Argument for Dismissal Based on
### Application to Waive Prepayment of Costs

Defendant's argument that the case should be dismissed because of the Plaintiff's answers on her Application to Waive Prepayment of Costs is without merit.

The issue the Defendant raises involves her answer to this question:

"5.  Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or any other thing of value?"

The Plaintiff checked "Yes".

"If "Yes," describe the property and state its value."

The Plaintiff wrote in her handwriting "Automobile - 1992 SL1 Saturn  Value = $300

The Defendant argues that the Plaintiff should have written in a description of a T. Rowe Price non-investment account set up by her husband with his money.

The Defendant did not understand that the question had anything to do with her husband's account on which he had put her name after they were married as a part of estate planning (like designating a life insurance beneficiary), when she had no access to that account unless and until he died.

The Government's deposition of the Plaintiff was transcribed as follows:

Q.   And one is a separate investment account that is owned by both you and your husband?

A.   Right.

Q.   Okay.

A.   But I don't have access to it and I never received any income from it.

Q.  Okay.  Your name is on the account?

A.  Right.

Q.  When was that account opened?

A.  I guess that was two years ago.

Q.  How much money was deposited into this account to open it?

A.  I don't know.

Q.  Do you know the value of it right now?

A.  The value of it is 170,000.

Q.  That's the current value roughly?

A.  Roughly.

Q.  But you have no idea what the beginning value was two years ago?

A.  No.

Q.  Where did the money come from that was put into that account?

A.  It came from my husband.

Q.  Okay.

A.  That's why it's really his account but I can get it after he dies.

Q.  But your name is on there right now, correct?

A.  Right.

Q.  You are a joint owner of that money legally?

A.  Right, but I can't access it.  I don't have access to it.

Q.  Because of a verbal agreement that you have with your husband?

A.  Right.

Q.  But other than that, you are legally you are an owner of that money also, right?

A.  Right.

In addition, the Defendant argues that the Plaintiff should have also written in a description of an IRA retirement account at T. Rowe Price.

Q.  Do you have any retirement accounts?

A.  I have one retirement account in a T. Rowe Price IRA.

Q.  You have a T. Rowe Price?

A.  IRA.

Q.  When did you open that IRA, do you know?

A.  Approximately a year ago.

Q.  Prior to --

A.  And it was my TSP, the TSP stuff that I got from -- after my removal, I put it into a T. Rowe Price IRA.

Q.  And that was approximately a year ago?

A.  Uh-huh.

Q.  What's the value of that account, do you know?

A.  It's $27,000 now.

The Plaintiff did not understand the question to be asking about accounts that are not currently available or accessible.  Indeed, the only question related to retirement annuities was on the preceding page, Question 3, which reads

"3.  In the past 12 twelve months have you received any money from any of the following sources:

..... (c) Pensions, annuities, or life insurance payments".  The Plaintiff checked "No".

Whether payments were actually being received within the prior 12 months--that was

what the only question about retirement pensions and annuities asked. When the Plaintiff signed the application, she was receiving no pensions or annuities. There was nothing in any other question relating to retirement investments.

Question 4 asked: "Do you have any cash or checking or savings account?" The Plaintiff answered "Yes" and stated the total amount as $2,262.49 as of that date.

Clearly the context of these questions involves accessible resources when the application is filed, not investments unavailable until old age or death.

The Plaintiff did not intentionally misrepresent her financial resources.

The Defendant's Argument is without merit.

### Opposition to Defendant's Argument that Plaintiff's Claim Regarding Denial of Reasonable Accommodations for Work Credit Hours is Time Barred

The Defendant argues that the Plaintiff's claim regarding denial of reasonable accommodations for work credit hours is time barred. This argument was made on the assumption that there was no denial of such a reasonable accommodation within the 45-day period of the time she initiated EEO contact, The Defendant is mistaken.

The Plaintiff's immediate supervisor, Mack Lawrence, denied her request for reasonable accommodation on June 25, 2002, and on August 5, 2002, both dates within 45 days of the Plaintiff's seeking EEO counseling.

The Defendant's Motion tries to characterize those reasonable accommodation denials as lingering effects of prior acts of denials, but these were new acts of discrimination denying the Plaintiff's reasonable accommodation requests when she requested them within the time limits.

**Opposition to Defendant's Argument Against Plaintiff's Claim that Department
Discriminated Against Her in Refusing Her Request for Career Ladder Promotion**

The Defendant's Motion is not correct in stating that the Plaintiff attempted to include in

this action claims relating to time delays in her eventual promotion to the GS-9 and GS-11

levels, which would be time barred.  The Defendant has expressed her belief that there were

discriminatory time delays in making such promotions, and those delays are  part of the

background.

However, the claims in paragraphs 8 and 9 of the Plaintiff's Complaint charge that the

Plaintiff was discriminated against because of her disabilities when she was denied a career-

ladder promotion from GS-11 to GS-12, and that the Plaintiff's supervisor ignored her request

for such a career ladder promotion determination, even though a response setting forth such a

determination is required under the Department of Education Collective Bargaining Agreement.

The Defendant's Motion states that the Plaintiff cannot establish a prima facie case of

discrimination relating to the GS-11 to GS-12 promotion because she was not "otherwise

qualified" under the Rehabilitation Act because of missed work hours.  It cannot be logically

argued that the Plaintiff was not otherwise qualified to perform the essential functions of her job

when she never received less than fully satisfactory job ratings.

In referring to absences from work, the Motion states:

"Between the time plaintiff was promoted to the GS-11 level and the time she became

eligible for promotion to the GS-12 level, plaintiff missed approximately 590 hours of the

approximately 2080 hours in a work year."

That means that the Plaintiff had worked 1490 hours in that work year (almost 72 percent

of the time), despite the denial of accommodations that would have enabled her to work many

more non-core work hours and receive credit for such work.

The fact that the Plaintiff worked the overwhelming majority of work hours during that annual time period negates the validity of the Defendant's argument in support the determination  that Plaintiff should not receive a career ladder promotion to the GS-12 level because the Plaintiff's supervisor did not believe that he had observed Plaintiff's work enough during the past year to believe that she was capable of performing at the GS-12 level.

With the issues that continue to be relevant concerning the supervisor's actions and inaction, a prima facie case exists.  The charge that the supervisor's argument is a pretext for discrimination remains viable.

### Opposition to Defendant's Argument Against Plaintiff's Claim that the Department Discriminated Against Her by Failing to Approve Her Request for Leave Without Pay (LWOP) for 72 Hours for Galapagos Islands Trip

The Defendant's Motion states:  "In deposition, plaintiff admitted that her LWOP request was approved and that she was in fact designated in a LWOP status for those 72 hours."

The issue is not whether, at a later time, certain leave sheets may have been prepared in the Department showing LWOP for 72 hours of leave taken.  The discrimination occurred because her supervisor refused to approve her LWOP request in advance.  He allowed her to remain uncertain and anxious -- actually until the date that several subsequently prepared leave sheets were shown to her at the deposition -- as to whether she would be declared Absent Without Leave (AWOL) for that 72-hour period, with all of the negative connotations and consequences that AWOL status means.

Secret and retroactive decisions to assign LWOP instead of AWOL leave status to the requested leave cannot redeem the original discrimination and retaliation against the Plaintiff by her supervisor.

The supervisor's actions on this matter occurred less than a month after he had been brought before the EEO Investigator to respond to the Plaintiff's charges of discrimination against him on the Plaintiff's reasonable accommodations and career ladder promotion discrimination charges when these were pending in the Department.

This issue is about unpaid leave, not pay. She was without a balance of earned leave to use. It is important because it is about the traumatic impacts on the Plaintiff resulting from the supervisor's refusal to act on a timely basis upon a reasonable accommodation request asking approval of such leave. Her request was supported by her psychiatrist's letter indicating that a recuperative trip would be helpful in relieving stress.

This claim is viable, and should not be dismissed.


**Opposition to Defendant's Argument Against Plaintiff's Hostile Work Environment Claim**

The Defendant's Motion sets forth the legal criteria for a hostile work environment claim as follows:

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment. To determine whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employees performance.

In opposing Plaintiff's claims that she was subject to a hostile work environment that attempted to force her to give up her job with coercion, intimidation and threats, the Defendant's Motion inferred that the Plaintiff's position was that the only thing supporting

the claim was the fact that letters leading to her termination were signed by her supervisor, Mack Lawrence, against whom she had previously alleged discrimination.

In fact, a hostile work environment was one of the charges presented to the EEO Counselor in August 2002. The pattern of hostility toward the Plaintiff's because of her disabilities, her needs for reasonable accommodations, and her discrimination charges continued as the Plaintiff's case proceeded through the EEO process until the hostility culminated in the actions of Mr. Lawrence when he sent the letters leading to her termination as a Federal employee.

In terms of the defining criteria, the hostility was severe causing immense trauma to the Plaintiff. It was pervasive involving all aspects of the interactions between the Plaintiff and her supervisor. The Department engaged in abusive conduct in dismissive schemes at avoid the Plaintiff's concerns at every step, attempting to force her into actions under other Federal processes, including the Family and Medical Leave Act and the Merit Systems Protection Board appeals process, instead of addressing her concerns under the Americans With Disabilities Act standards under the Rehabilitation Act. The frequency of the discriminatory conduct is evidenced by the multiple actions against the Plaintiff by the Defendant. The actions threatened the physical and mental health of the Plaintiff, and in fact did cause severe injury to the Plaintiff. The employer's conduct interfered with the employee's performance by ultimately making it impossible for the Plaintiff to return to her workplace.

The hostile work environment charges cannot be denied as a viable claim.

**Opposition to Defendant's Argument Against Plaintiff's**
**Claim of Discrimination Relating to Her Termination**

The Defendant's Motion argues against Plaintiff's claim of discrimination relating to her termination by asserting that the law is clear that an essential function of a job is the ability to come to work and to complete assignments within a reasonable period of time.

That is exactly what the Plaintiff did for the overwhelming majority of the time that she was an employee of the Department of Education.  She had never received less than fully satisfactory performance ratings.

The fact is that the Plaintiff's ultimate inability to go to the workplace was a direct consequence of her last supervisor's denial of reasonable accommodations that would have enabled her to complete her job assignments by receiving credit for work at times when she could do so, in recognition of her disabilities.

The Department may argue that it had to terminate the Plaintiff after a long period of absences.  But the Department created that circumstance, and must be held accountable and liable for the damages caused by its discriminatory and retaliatory actions.

The Plaintiff's claim of discrimination relating to her termination is unassailable and is a viable legal claim.


**CONCLUSION**

The Plaintiff respectively requests that the Court deny the Defendant's motion for summary judgment.

April 2, 2007

Respectfully submitted,

_____/s/_____
Richard E. Johnson
Counsel for the Plaintiff
District of Columbia Bar # 86686
3522 Majestic Lane
Bowie, Maryland 20715-1604
Phone and fax number: 301-262-9658
E-mail: richard-johnson@verizon.net