1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - - x
                                  :
SUSAN E. JOHNSON,                 :
                                  :
        Complainant,              :    EEOC No.
                                  : 100-2003-08283X vs.
            :    Agency No.
                                  :    ED-2002-29-00 U.S. DEPARTMENT
OF EDUCATION, :
                                  :
        Agency.                   :
                                  :
- - - - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Wednesday, November 5, 2003

        The deposition of ORA ALGER, called for examination by
counsel for the Complainant in the above-entitled matter, pursuant
to Notice, in the offices of U.S. Department of Education, 400
Maryland Avenue, S.W., Washington, D.C., convened at 1:00 p.m.,
before PAULA J. EASTES, a notary public in and for the District of
Columbia, when were present on behalf of the parties:

2

APPEARANCES:

On behalf of the Complainant:

      RICHARD E. JOHNSON, ESQUIRE
      3522 Majestic Lane
      Bowie, Maryland 20715-1604
      (301) 262-9658

      PAUL J. VALENTIC
      U.S. Department of Education
      400 Maryland Avenue, S.W.
      Washington, D.C. 20202


On behalf of the Agency:

      ROBERT FABIA, ESQUIRE
      Agency Counsel
      Division of Business and Administrative Law
      Office of the General Counsel
      United States Department of Education
      Federal Office Building 6
      400 Maryland Avenue, S.W.
      Washington, D.C. 20202-2110
      (202) 401-6606

3

C O N T E N T S

| COMPLAINANT | EXAMINATION BY COUNSEL FOR AGENCY | WITNESS |
|---|---|---|
| ORA ALGER | | |
| By Mr. Johnson | 4 | -- |
| By Mr. Fabia | -- | 40 |

(No Exhibits.)

4

```
1                    P R O C E E D I N G S

2        Whereupon,

3                       ORA ALGER

4   was called for examination by counsel for the

5   Complainant and, having been duly sworn by the

6   notary public, was examined and testified as

7   follows:

8               MR. VALENTIC:  You are disabled.

9               Do you need an accommodation?

10              THE WITNESS:  No.

11              Thank you for asking.

12              EXAMINATION BY COUNSEL FOR COMPLAINANT

13              BY MR. JOHNSON:

14       Q.   Please state your name and the title of

15   your position.

16       A.   My name is Ora Alger and I am a

17   Management Analyst in the Office of the Chief

18   Financial Officer.

19       Q.   Have you had a role at any time with any

20   other legally recognized organization in the

21   Department of Education such as the Union for the

22   Collective Bargaining Unit?
```

1       A.    Yes.  I have.

2       Q.    When was that?

3       A.    I think it was back in late '93 until

4    about '98 I was involved as a Union Representative.

5    I started as a Chief Steward and worked all the way

6    to the President of Local 2607.

7       Q.    Thank you.

8             Were you previously available to be

9    called to give testimony in the Equal Opportunity's

10   EEO Investigative Hearing regarding the case of

11   Susan E. Johnson versus the Secretary of Education?

12      A.    Yes.  I was.

13      Q.    There has been a stipulation with regard

14   to that from the Agency in the prior witness'

15   testimony.

16           MR. FABIA:  Same with her.  We will

17   stipulate.

18           MR. JOHNSON:  Same stipulation.

19           MR. FABIA:  The letter shows they were

20   called.

21           BY MR. JOHNSON:

22      Q.    Do you know why your testimony was not

1    taken?  Do you have any knowledge of any reason or

2    the reason?

3        A.    No.  We were called in to give our

4    testimony.  We were even sworn in.  But then we

5    were dismissed.

6        Q.    You were sworn in?

7        A.    Yes.

8            MR. FABIA:  For the record, if you read

9    the record, it says they were all done as a group

10   at the start of it.

11           THE WITNESS:  Yes.

12           BY MR. JOHNSON:

13       Q.    How long have you known Susan Johnson and

14   in what context?

15       A.    I met Susan, I believe it was the latter

16   part of '94, 1994 and '95, in that area, mostly as

17   co-workers because we both work in OCFO, except she

18   was in a different unit than I was.  I was in FMO

19   and I think at the time she was working in -- I

20   could be wrong, but I think it was the payments

21   area or audit area.  I remember it was with

22   Jan Steinbrueck because we were on separate sides

1    of the hall.  I worked for Betty Hepak.  She worked

2    for Jan Steinbrueck.

3         Q.    Thank you.

4               Are you aware that Susan Johnson suffers

5    from a disability and when did you became aware of

6    this?

7               Did you know she was an individual with a

8    mental disability?

9         A.    Yes.  I did.

10              I think it was back in '95 there was an

11   incident that occurred and at that point I found

12   out that Susan had a mental disorder or a

13   disability.  She had some sort of disagreement with

14   Jan Steinbrueck at the time.  Jan was so upset

15   about it that I think she wanted to take some sort

16   of action at the time.  I was the Chief Steward in

17   the Union and I intervened for Susan and asked

18   Betty Hepak if she wouldn't mind taking Susan on in

19   our section and if she could accommodate Susan

20   because Susan had a disability, if she would be

21   able to accommodate her with scheduling different

22   hours for her to come in and work.  She said, yes,

1    that she would.  So, that is how I got to know that

2    Susan had a disability.  And over the years, over

3    the time that I have known her, we have discussed

4    it off and on.

5            I will say this for the record that most

6    of the time when I entertained anything on Susan's

7    behalf it was mostly done on not a formal basis as

8    much as an informal basis because that is my style

9    of working.  I like to work with people in an

10   informal basis instead of taking it to a formal

11   level which can become a lot more ugly than it does

12   if you sit down and try to reason with people.

13       Q.   Do you have any impression of the quality

14   of Susan Johnson's work and her work habits?  Is

15   she a good worker?

16       A.   She is an excellent worker.

17           I think the problem was that management

18   and some of the supervisors, because they didn't

19   see her as physically disabled, they I think sort

20   of took advantage of her in the sense that they

21   gave her quite a bit of work to do.  She always did

22   it well.

1            I mean, there were times when I was

2    leaving the office, she was coming in the office,

3    and worked unsupervised well by herself.

4            I know talking to some of the other

5    employees around her not only was she respected by

6    them, but they thought she carried more than her

7    workload.

8            So, I would say that, yes, she was an

9    excellent worker.  And I don't think, if I remember

10   correctly the times that I sat with Betty and other

11   supervisors, there was never mention in her

12   evaluation that there was any problem to my

13   knowledge.

14       Q.   To your knowledge was she a troublemaker?

15       A.   No.  A very quiet, very compassionate

16   person.  Caring.  Always caring for others.  You

17   know, more so at times than herself.  Always

18   wanting to do for others.  That is how I knew her.

19       Q.   Did she get along with her peers?

20       A.   Yes.  Absolutely.

21           Even today some of her peers ask about

22   her.  Today they wonder how she is doing, is she

1    doing well.  I think I hear comments like she is a

2    very loving and giving person, a very sweet person.

3    Those kind of comments.

4        Q.    Have you ever seen any indications of

5    discrimination against Susan Johnson?

6        A.    Discrimination against Susan.

7            I would say that there were times when

8    supervisors wouldn't accommodate her, allow her to

9    work certain hours.

10            I was very fortunate.  I think Susan and

11   I were both very fortunate when we worked for

12   Betty Hepak in that Betty was one of the rare

13   supervisors that was completely understanding about

14   people's disabilities.  But as Betty retired and

15   moved on other people came into the picture and I

16   don't think they were as empathetic as they could

17   have been with Susan or as understanding.

18            Again, when you don't see a physical

19   ailment on someone it is very hard to be

20   compassionate to someone that you can't actually

21   see the disability.

22       Q.    Do you have a great deal of knowledge or

```
1   understanding of the Americans with Disabilities

2   Act?

3        A.   Yes.

4             Well, I wouldn't say a great deal of

5   knowledge.

6        Q.   I don't mean as a legalistic proposition.

7        A.   Yes.  I understand it.

8             I think Susan, and there was another

9   young lady in the office by the name of Barbara

10  Schuman, they were the catalyst for me, as well as

11  other people in the Department, that sort of forced

12  me into educating myself.  Because of their

13  disabilities, and this is not about Susan, this is

14  about the other people that I worked with, they had

15  bipolar disabilities, manic-depressive

16  disabilities, I enrolled myself -- I became a

17  member, I am sorry, I became a member of the

18  National Alliance for the Mentally Ill.  So, I am a

19  member of NAMI so that I could understand the

20  people, what they were going through and who I was

21  representing so that I in turn could educate the

22  supervisor and the manager of what was going on
```

1  with the employee.

2          I am still a member of NAMI.  Even though

3  I am not actively involved any more in the Union, I

4  felt that I needed to keep myself educated with

5  people who have mental disorders.

6          Q.    Thank you.

7          Do you know if Susan Johnson ever filed

8  any kind of reasonable ~~accomodation~~ *accommodation* documents or

9  papers?

10         A.    Yes.

11         Q.    As well as oral requests?

12         A.    Yes.  She did it with Betty Hepak and I

13 believe -- what was that guy's name that was here?

14 I think it was Keith Cole.  He was a manager who

15 was here with us for not a long period of time, but

16 long enough that I think he accommodated her.

17         I know Betty did.  Betty worked out a

18 schedule with her that she could come in like at

19 5:00 o'clock, 6:00 o'clock, 7:00 o'clock, and work

20 very late at night.  But to Betty her idea was

21 Susan gets the work done, we need the work done.

22 It didn't matter to her how she got it done as long

1    as it was done.

2        Q.   Thank you.

3            Have you seen evidence that Susan Johnson

4    was not being provided reasonable accommodations?

5        A.   Let's see.  It was about maybe a year,

6    maybe a year-and-a-half ago, Susan came and spoke

7    with me and asked me for information.  I asked her

8    if she was having any problems and she said, well,

9    sort of.

10           I mean, Susan isn't the kind of person

11   that complains all the time.  My evaluation of her

12   is that she is not a big complainer.  She will sort

13   of suffer along through it before she will say or

14   do anything.

15           So, she came and she spoke to me off the

16   record and just wanted information.  She felt that

17   her supervisor wasn't accommodating her or they

18   weren't being reasonable with her.  So, I told her,

19   I said, we could start some formal process.

20       Q.   At this point in time you were not a

21   Union --

22       A.   I was at the end of my Union term.

1      Q.   At the end of your Union term?

2      A.   Yes.

3           It was about a year-and-a-half ago.  No.

4   I am sorry.  I stopped in '98.  '99.  So, it was

5   about maybe three years ago or so.

6           She was having problems back then too

7   with supervisors not accommodating her and I told

8   her we could start a formal.  She said, no, that

9   right now she was sort of gathering information.

10  It wasn't bad she said, but she thought it was

11  getting bad.

12          So, I told her whatever help she needed I

13  would be more than willing to help her and I was

14  willing to go talk to people.

15          At one time I spoke to Jeanne Johnson

16  about it.  We had a long conversation and she said,

17  you know, that maybe either I or both of us should

18  go talk to one of the managers and see what was

19  going on.

20     Q.   Has your relationship with Susan Johnson

21  been at the period of time when you had Union

22  responsibilities and were also a colleague of hers?

1      A.   Yes.

2      Q.   The same physical location or just

3  friends or whatever?

4      A.   I think more like office mates.  Knowing

5  each other.

6           She does a job totally different than

7  what I do, but we are a small enough group, sort of

8  like if you wanted to use corporate terminology, we

9  are a small enough firm that we all know each

10  other.  I mean, we are large, but we are small

11  enough that we all know each other and know about

12  each other.

13      Q.   Have you ever provided information or

14  documentation about reasonable accommodations to

15  any of her supervisors, managers or team leaders,

16  and who ~~had~~ received such documentation, if so, and

17  about when?

18      A.   I gave -- let me see -- I don't know if

19  it was Mack Lawrence or Terry Bowie.  When I joined

20  NAMI one of the things I asked of NAMI was to send

21  me a whole bunch of fliers and information so that

22  I could pass it out to people.  So, I did give it

1    not specifically on reasonable accommodation.    I

2    know Jeanne did because Jeanne and I talked about

3    that.    But I gave out information to people to

4    educate themselves on people who had mental

5    disorders and I know I gave pamphlets out to people

6    and I think one of them was Mack Lawrence and

7    another one was Terry Bowie and the head of HR.

8         Q.    Who was that?

9         A.    Well, Barbara Mailbranch, I gave her some

10    information as well.

11         Q.    HR is a departmental office?

12         A.    Yes.    It is a whole different office.    It

13    the Human Resource Office.

14         Q.    Is it within OCFO or the Department?

15         A.    No.    It is the Department.

16         I was always trying to educate people

17    about mental disorders.    So, whoever would listen

18    to me I would let them know.    Because I was

19    representing a lot of people who had mental

20    disorders and it was getting ridiculous that the

21    Department wasn't treating them fair and equitable

22    I thought.    So, I figured, you know, maybe be a

```
 1    little bit of an advocate in trying to tell people

 2    about or educate people about their employees.

 3        Q.   To your knowledge are supervisors and

 4    managers educated or trained on the Americans with

 5    Disabilities Act, the reasonable accommodation

 6    provisions or the non-discrimination provisions?

 7        A.   Not to my knowledge.

 8             The question was do I know if managers

 9    have been trained in ADA?

10        Q.   With respect to reasonable

11    accommodations, especially with respect to those

12    who have mental illness.

13        A.   Not to my knowledge.

14             I know that there is all kinds of

15    information out there, not whether they avail

16    themselves of it.  I know the managers I ran across

17    didn't seem to have any knowledge of it.

18        Q.   Okay.  Thank you.

19             Have you any knowledge or evidence that

20    she was not accommodated, Susan Johnson was not

21    accommodated, for example, by allowing her to

22    substitute accrued leave that she had earned or
```

1    hours actually worked for time she missed due to

2    her illness?

3            Are you knowledgable about some issues

4    with respect to that?

5        A.   No.  I think Jeanne dealt with that.

6            There were times when Jeanne and I would

7    double-team.  What I mean by that is if I wasn't

8    around, Jeanne would pick up whatever my cases were

9    or visa versa and I know Jeanne and I worked with

10   Susan.  If for some reason I wasn't available due

11   to whatever responsibilities or duties I was doing,

12   Jeanne would pick up.  And so we would brief each

13   other.

14           So, I know that there were some problems

15   with Susan's time and attendance.  I wasn't fully

16   sure what the problem was since the managers were

17   aware of her accommodation.  So, I wasn't quite

18   sure why she was being I guess sort of singled out

19   with her time and attendance.

20       Q.   Do you know if Susan Johnson filed a

21   Letter of Determination because her supervisors and

22   managers refused to discuss promotions or other

1    issues with her?

2        A.    No.  I am not familiar with that.  I am

3    aware of it, but I am not familiar with the

4    details.  I think again Jeanne might have handled

5    that.

6        Q.    She handled those issues is what you are

7    saying?

8        A.    Yes.

9        Q.    More specifically, do you know about a

10    particular problem with respect to being denied

11    credit on time and attendance sheets with respect

12    to the Columbus Day federal holiday in 2002 and to

13    have a Code 50 placed on the T&A?

14        A.    I am aware of it.  I didn't handle it,

15    but I am aware that they, "they" meaning

16    management, denied her I think leave without pay.

17    It was her leave without pay as well as switching

18    the holiday on her.  And I wasn't quite sure of

19    that either because I tried to look that up in the

20    Collective Bargaining Agreement.

21        Q.    Did they charge her leave without pay on

22    the holiday?

1      A.   I think so.

2      Q.   Because of a claim that since she had not

3  worked the previous day, she should not receive

4  such?

5           Is your answer that you don't have

6  familiarity with it?

7      A.   I am not familiar.  I am aware that it

8  happened.  I am not sure why it happened.  I am

9  still sort of trying to figure that out because I

10  went to the CBA and I discussed it with Jeanne and

11  I was trying to figure out for the life of me why

12  they would do that.  I am not sure.  I still have

13  to figure out why they would do that.

14      Q.   Well, with the denial of the request did

15  you observe in Susan distress?

16      A.   Absolutely.  Yes.  I did.

17           I am trying to remember.  There were a

18  couple of times that she e-mailed me and I am

19  trying to remember what the e-mails were about and

20  I think she was asking what the regulations were

21  about time and attendance, if I am not mistaken.  I

22  have to go back and see if I still have that e-mail

1    or not.  But there were a couple of times she

2    e-mailed me from home.

3            For the record, even though I am not a

4    Union Representative any more, I still consider

5    myself an advocate, especially of people who can't

6    either defend themselves or people who don't know

7    how to defend themselves.

8            So, even though Susan was at home we were

9    office mates.  So, I have always said to her she

10   can ask me anything she wants at any time she

11   wants.  So, at that point I wasn't a Union

12   Representative, but I was more than willing to help

13   her in any way that I could.

14       Q.   I appreciate that.

15            Do you believe that Susan Johnson has

16   been discriminated against repeatedly?

17       A.   Yes.  I do.  Because she has a disorder

18   that people don't want to educate themselves about

19   and I think the way she has been treated has been

20   horrible.  I think that for managers not to sit

21   down and to come up with some accommodation for her

22   and to help her, to support her, with her

1    disability is appalling, in my personal opinion it

2    is appalling.  You know, I think as managers we are

3    supposed to have an understanding of issues or at

4    least educate ourselves about the issues and try to

5    be, I think, as reasonable, as understanding, as we

6    know how to be and it is appalling me when some of

7    my peers don't adhere to that or don't even make an

8    attempt to.  So, I think it is appalling that she

9    has been discriminated against the way that she has

10   been.

11       Q.    This may already have been alluded to and

12   you can refer back to that.

13            Do you know of any other current or past

14   Department of Education employees, particularly in

15   the Office of the Chief Financial Officer, who have

16   been subjected to similar discriminatory treatment?

17       A.    Yes.

18            I mentioned Barbara Schuman early on.

19   She had a couple of disabilities.  She was not only

20   manic-depressive, but she had fibromyalgia, which

21   is very, very painful.  So, she had a double

22   whammy.  There were times when she couldn't even

1    walk because of the physical disability, which

2    didn't help the manic part of it.  They started

3    accommodating her, but then they made it almost

4    impossible.  It was almost impossible for her to

5    work.  You are either at work or if you are not at

6    work, then we are going to consider you AWOL.  I

7    mean, we went back and forth.

8         Q.   This was Barbara Schuman?

9         A.   This was Barbara Schuman.

10             Then there was Michael Gulot.  I did

11   represent Michael Gulot.

12        Q.   Would you spell his last name?

13        A.   Something like G-U-L-O-T.  It sounds

14   different than the way it is spelled.  So, I am

15   sorry.  I think it is G-U-L-O-T or something.

16   Michael Gulot.

17        Q.   And his situation was similar?

18        A.   He had SAD.  They call it SAD, which is

19   something or other syndrome, where he has to

20   actually --

21        Q.   Is that seasonal affective disorder?

22        A.   Yes.  Thank you.

1          He had a heck of a time just getting them

2    to give him a lamp for it.

3          I know we went through getting medical

4    documentation for that and stuff, but it took

5    forever.  Then eventually we were able to

6    accommodate him by putting him near a window.

7    Today he sits near a window, but for a while we had

8    to get a light for him so that he wouldn't get

9    depressed.

10    Q.    In the Investigative Hearing by the

11    Investigator, the EEO Investigator, Mack Lawrence

12    testified that he --

13          MR. VALENTIC:   -- he never had anyone

14    under his supervision that needed a reasonable

15    accommodation other than the minor accommodation

16    Susan needed.

17          BY MR. JOHNSON:

18    Q.    Do you have any knowledge about that?

19    A.    That is not true.   That is not true.

20    Because Barbara Schuman sat right outside his door.

21    Barbara Schuman sat right outside of his door and I

22    know she spoke to him several times.   Michael Gulot

1    was assigned to him and I know I spoke to him about

2    Michael a few times.  I never spoke to him about

3    Susan though.  I never did.

4         Q.   You never spoke to Mack Lawrence?

5         A.   To Mack Lawrence.

6         But I know Barbara Schuman sat right

7    outside his door.

8         Q.   Do you know if there was any time when

9    management sought to assign a staff employee to

10   occupy Susan Johnson's office when she was out and

11   would not that have made it very difficult on

12   Susan's return to get the other staffer out?

13        A.   Well, I do know they hired a summer

14   intern and they put her at her desk because I had

15   to go down, I was working on some analysis for our

16   audit.

17        Q.   Do you know anything about that?

18        A.   Mollie Dawson was assigned this intern

19   and when I went to go and find Mollie I couldn't

20   find her, but someone said, well, she was assigned

21   an intern.  I said, well, where can I find them,

22   and that is when I realized that she had been

1    assigned Susan's desk.

2        Q.   Where was Susan's work product or files

3    and belongings at that point?

4        A.   I am not sure.  I am going to make the

5    assumption that they were there.  I mean, you know,

6    the office --

7            MR. FABIA:  Objection to the question on

8    relevancy.  Objection unless this person has

9    personal firsthand knowledge.

10            BY MR. JOHNSON:

11        Q.   What do you have knowledge of?

12            MR. FABIA:  Not assuming.

13            MR. JOHNSON:  Yes.

14            THE WITNESS:  I have knowledge of that

15    there was someone assigned to Susan's desk or

16    office space and I have knowledge of the fact that

17    there were boxes and articles there.

18            BY MR. JOHNSON:

19        Q.   That is fine.

20            Do you have knowledge of whether a

21    similar pattern of office occupation involved any

22    other employees, Barbara Schuman or anyone?

1      A.   Yes.

2          Barbara Schuman's desk was occupied by

3    Frank Peterson.  They had hired a new person to

4    come on board.  I remember asking where Frank was

5    going to sit and they said they were going to

6    assign him to Barbara's desk.

7          I made mention to Mack that Barbara was

8    still assigned there, that to my knowledge she

9    hadn't resigned, quit or been fired.  They said

10   that since she was out at that point, she was out

11   on extended leave, that they would take care of

12   that, whatever the situation was.

13     Q.   Was he an employee or a summer intern?

14     A.   No.  She was an employee.

15     Q.   I mean Peterson.

16     A.   Frank Peterson.  He was a permanent

17   employee.

18     Q.   Okay.  Thank you.

19          Does it appear to you that the Department

20   -- I am sorry.

21     A.   I was just going to add that when Frank

22   came on board I went over and introduced myself to

1    him and Barbara Schuman's name plate was still in

2    his desk area.  I know he made mention that a lot

3    of her stuff was still there and he didn't know

4    whether he was going to pack it up for her or not.

5    So, I know we had that conversation.

6         Q.   Does the Collective Bargaining Agreement

7    deal with space and issues of this nature?

8         A.   Yes.  It does.

9         Q.   It does?

10        A.   Sure.  Yes.  Sure.  According to grade

11   and grade levels.  You know, a GS-12 will get X

12   amount of space, a GS 14 gets X amount of space, a

13   GS 14/15, depending if they are lawyers, they get

14   offices.  It depends at what level they are at.

15   They get private offices with windows.  It depends.

16   There is an agreement based on people's rank and

17   where they sit and who gets what.

18             To some of the employees that means a lot

19   because I guess they hold identity to that.  It

20   means something to have an 8 x 12 space or a

21   private office or a door.  It means something.

22        Q.    In the case of individuals with

1    disabilities who may be on a flexible working

2    schedule over periods of time when they are out due

3    to their illness --

4         A.    Do they share the desk?

5         Q.    Do they share the desk and what are the

6    implications?

7         A.    That would have to be negotiated.  It is

8    just not an assumed.  It is not assumed that

9    someone is just going to come in and take your

10   desk, that it is going to be assigned to somebody

11   else.  That is worked out in negotiation.  That was

12   worked out with the OGC.  The OGC, that is the

13   Office of General Counsel.  I know some of the

14   lawyers worked out, I guess they call it rotating

15   offices.  You know, when one was out, when one was

16   out working from home, the other one would be at

17   that desk.

18        Q.    You mean lawyers in the legal office, the

19   Office of the General Counsel?

20        A.    Yes.  Yes.

21              But that has never been worked out in

22   OCFO.  We have never had that kind of agreement

1   here.

2       Q.   What does it do to the dignity of an

3   employee who was a regular full time employee who

4   is out because of illness and to find that their

5   office has been occupied and assigned to someone

6   else and the ~~affect~~ *effect* upon the return of a person who

7   has disabilities, particularly a person with

8   chronic depression and anxiety such as Susan?

9       A.   Well, I can't answer for others, but I

10  know how it would make me feel.  It would make me

11  feel that I wasn't valued.  It would make me feel

12  that I wasn't appreciated.  It would certainly make

13  me feel devalued for sure.

14          So, if I feel that way and I don't have a

15  mental disorder, I can imagine for a person who

16  does have a mental disorder.  It must not be good

17  for their dignity.

18      Q.   Does it appear to you that the Department

19  and the Office of the Chief Financial Officer have

20  systematically tried to force out some people with

21  disabilities, in other words, by subjecting these

22  persons to what the EEOC and the court cases call

1  constructive discharges or termination, meaning

2  actions construed to be equivalent?  In other

3  words, constructive firings?

4       A.    Can you ask the question again?  Did you

5  specifically ask it for OCFO or did you ask it

6  regarding the Department as a whole?

7       Q.    "The Department" and I said "and".  So, I

8  mean the Office of the Chief Financial Officer.

9       A.    I think by some of the managers'

10  behavior, I think that in my opinion they have

11  driven people to either resign or to leave.  Yes.

12       Q.    Specifically any of the people you have

13  previously mentioned?

14       A.    I think Barbara Schuman.

15            I know Michael ~~Gulot~~ *Guillot* came close to it,

16  but he hung in there.

17            I know I worked with an employee from

18  another office, OM --

19       Q.    The Office of Management?

20       A.    -- the Office of Management, who

21  eventually tried to commit suicide and wound up at

22  Saint Elizabeth.  I wound up going to Saint

1    Elizabeth to visit him.

2              At that point then everything got

3    accelerated to try to see if we could get him

4    disability or give him some sort of medical

5    discharge.  Everything got accelerated.  But up

6    until that point I had been fighting with people

7    that eventually this guy was going to do something

8    and not do it to someone, but do it to himself.

9    And he did.  He tried to commit suicide.

10        Q.   Have you seen discrimination instances

11   against Susan Johnson since 1997 in these cases,

12   including what you have already described that you

13   would consider to have dangerously impacted her

14   mental and physical well-being?

15        A.   I think that not valuing her as a person

16   and not giving her the opportunities of being able

17   to work things out, I think that it has caused her

18   to sort of go over the edge.  I really do.

19             I know the last time I talked with Susan

20   I felt really bad for her.  I think if people would

21   have been a little bit more compassionate, a little

22   bit more understanding, just a little bit more

1   willing to work with her, I don't think they would

2   have driven her over the edge.

3            I know Barbara Schuman felt like she was

4   driven over the edge.

5        Q.   Do you have knowledge of higher level

6   supervisors and managers who might have been

7   involved in or aware of Susan Johnson being

8   subjected to discrimination perhaps at the level of

9   the Chief Financial Officer, Deputy Chief Financial

10  Officer?  Do you believe that they would have

11  participated, were aware and participated, in the

12  discrimination that is alleged?

13       A.   Let me put it this way.  Rumors fly

14  around here.  Everyone knew about Susan.  Everyone

15  knew about Barbara.  Everyone knew about Michael.

16  Because everybody seems to know about the crazies.

17  That is how they term them.

18       Q.   They use taunting terms?

19       A.   I am not saying that management used

20  those terms, but everybody knows about everybody.

21  So, I would find it difficult to believe that

22  higher management wouldn't know about the situation

1    with either Susan or Barbara or Michael.

2         Q.    I know terminology like first line

3    supervisor, second line supervisor, but the Deputy

4    Chief Financial Officer, would it be within his

5    responsibility to inform himself of what is going

6    on in the office of concerns such as these

7    discrimination concerns under the Americans with

8    Disabilities Act?  Do they just stop at the second

9    level supervisor or is it a matter that the Chief

10   Financial Officer and/or the Deputy Chief Financial

11   Officer should be aware of?

12        A.    I think anyone who aspires to a

13   management position, regardless of the level,

14   whether they are a Deputy, a secretary, a Chief

15   Financial Officer, regardless of who they are,

16   should educate themselves if they want to manage

17   people, they need to manage people.  In order to

18   manage people you need to manage sort of the whole

19   person, not just an aspect of them and I think they

20   need to know everything that goes along with that,

21   whether it be ADA, whether it be reasonable

22   accommodations.  They need to have at least an

1    awareness or a knowledge of it.

2          I am not saying that they need to

3    constantly be involved in it, but they should have

4    some knowledge of it.

5          I mean, I am not a medical expert, but at

6    least I took the time to educate myself about

7    people with mental disorders.  At least I am aware

8    of a situation that if something were to happen to

9    someone or someone was in dire straights at least I

10   would understand where they are coming from.

11   Q.   Are you aware of the OCFO's profile where

12   employees identify disabilities?

13         It is my understanding the premise of

14   this is, and it is in the record of the

15   Investigative Hearing that Susan --

16   A.   I have never seen that.

17   Q.   That is right.  Bedtime reading.

18         It self-identifies herself as having a

19   mental disability.  Code 91.

20   A.   Okay.

21   Q.   Were you aware that she had

22   self-identified herself as Code 91 in the OCFO

1    profile for the managers of the Office of the Chief

2    Financial Officer?

3        A.    Well, I was aware that because she had

4    asked for reasonable accommodations and had brought

5    documentation to the effect that she had a mental

6    disability.  I would think that that would be part

7    of her profile on any record.

8        Q.    Was it widely known that she had a mental

9    illness and that she had a disability?

10       A.    Yes.  It was.  It was.

11              I mean, all her co-workers knew.  And I

12   find it very hard to believe that one manager

13   wouldn't speak to another manager regarding another

14   employee regardless.  I mean, whether you are bad,

15   good or indifferent, another manager is going to I

16   would think pass that on to each other.

17       Q.    Why do you think those supervisors or

18   managers at higher levels didn't do anything?  You

19   just don't know or do you?

20       A.    No.

21              I mean, if I were to say, it would be

22   making the assumption that they didn't want to

1   bother with it, they didn't want to deal with it.

2       Q.   Do you believe that Susan Johnson has

3   been subjected to a hostile work environment, that

4   there is hostility within the work environment?

5       A.   Yes.  I think when any work environment

6   lacks compassion of any sort, I think it is a

7   hostile environment.

8       Q.   Given your experience and the knowledge

9   of OCFO and your direct knowledge of Susan Johnson,

10  do you believe that it would be dangerous to

11  Susan's health, both her mental and physical

12  health, for her to return to work for the

13  Department?

14      A.   Yes.  I do.  I do because I think there

15  is too much hostility, too much resentment, going

16  on.

17      Q.   At what level?  Supervisory, managerial

18  or co-workers?

19      A.   No.  No.  Not the co-workers.  Certainly

20  not the co-workers.  No.  I would say more at the

21  supervisor level, management level.

22      Q.   Do you think that Susan Johnson would

1    have made a very good federal employee if her

2    supervisors and managers had not discriminated

3    against her particularly?

4         A.   Yes.  I think if Susan would have been

5    given the opportunity and people would have really

6    worked with her, I think she would have made an

7    excellent federal employee.

8              She was.  Come on.  Her record reflects

9    that.  You show me in anywhere in her record where

10   it says that she wasn't.  I mean, from her

11   evaluations.

12        Q.   Were you aware of awards?

13        A.   She got a raise.  She would get bonuses

14   each time.

15             I would hope that someone who isn't a

16   good employee is not getting my taxpayer dollars

17   and your taxpayer dollar bonuses.  That would be

18   fraud.

19        Q.   Do you know about her concern about not

20   being promoted from a grade 11 to a grade 12 or

21   having justification provided within the time and

22   grade requirements?

1      A.    Can you ask that again?

2      Q.    Do you have knowledge of her request for

3  a promotion in grade level from --

4             MR. VALENTIC:   11 to 12.

5             BY MR. JOHNSON:

6      Q.    -- GS 11 to GS 12 after having been an

7  employee for the requisite time in service?

8             I mean, I just wondered if you had

9  personal knowledge about that issue.

10     A.    No.

11     Q.    Okay.

12            Is there anything else that you would

13  like to add that might help understand the issues

14  involved in this case?

15     A.    No.

16            I guess I would just like to end by

17  saying that it really is a shame that we have to

18  sit here today to even discuss this matter.  You

19  would think that in this time and age, especially

20  now with Hearings going on in the Hill at the

21  moment regarding mental health issues, that we

22  wouldn't have to be even discussing a person like

1    Susan's disabilities, that especially the

2    Department of Education, since we are educators,

3    would be educating ourselves in mental disorder

4    disabilities, especially when the disability is

5    physically seen.  It is a shame that the Department

6    hasn't done more about that.

7         Q.    Finally, I don't have to ask this

8    question and there is nothing wrong if it had been

9    the case, but did we rehearse a script of questions

10   and answers for this occasion?

11        A.    No.  No.  We did not.

12            MR. JOHNSON:  Thank you.

13            That concludes my questions.

14            Counselor.

15            EXAMINATION BY COUNSEL FOR THE AGENCY

16            BY MR. FABIA:

17        Q.    Ms. Alger, let me ask you just one or two

18   questions.

19        A.    Sure.

20        Q.    Do you know of any legal findings of

21   liability against any OFCFO officials regarding

22   disability discrimination?  That is, something that

1    has been issued by an adjudicatory body, such as

2    the EEOC or by a court or even Arbitrator?

3         A.    No.

4              MR. FABIA:   That is all.  No other

5    questions.

6              MR. JOHNSON:   Thank you.

7              (Whereupon, at 2:45 p.m., the taking of

8    the deposition was concluded.)

9                        (Signature not waived.)

10

11

12

13

14

15

16

17

18

19

20

21

22