1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - - x
                                  :
SUSAN E. JOHNSON,                 :
                                  :
        Complainant,              :    EEOC No.
                                  : 100-2003-08283X vs.
            :   Agency No.
                                  :   ED-2002-29-00 U.S. DEPARTMENT
OF EDUCATION, :
                                  :
        Agency.                   :
                                  :
- - - - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Wednesday, November 5, 2003

        The deposition of JEANNE A. JOHNSON, called for
examination by counsel for the Complainant in the above-entitled
matter, pursuant to Notice, in the offices of U.S. Department of
Education, 400 Maryland Avenue, S.W., Washington, D.C., convened at
1:00 p.m., before PAULA J. EASTES, a notary public in and for the
District of Columbia, when were present on behalf of the parties:

APPEARANCES:

On behalf of the Complainant:

    RICHARD E. JOHNSON, ESQUIRE
    3522 Majestic Lane
    Bowie, Maryland 20715-1604
    (301) 262-9658

    PAUL J. VALENTIC
    U.S. Department of Education
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202


On behalf of the Agency:

    ROBERT FABIA, ESQUIRE
    Agency Counsel
    Division of Business and Administrative Law
    Office of the General Counsel
    United States Department of Education
    Federal Office Building 6
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202-2110
    (202) 401-6606

3

# C O N T E N T S

EXAMINATION BY COUNSEL FOR WITNESS

COMPLAINANT   AGENCY

JEANNE A. JOHNSON
     By Mr. Johnson            4              --
     By Mr. Fabia              --             40

# E X H I B I T S

JOHNSON DEPOSITION                    MARKED

Exhibit No. 1.................................. 6
Exhibit No. 2.................................. 26

1                P R O C E E D I N G S

2        Whereupon,

3                    JEANNE JOHNSON

4     was called for examination by counsel for the

5     Complainant and, having been duly sworn by the

6     notary public, was examined and testified as

7     follows:

8                EXAMINATION BY COUNSEL FOR COMPLAINANT

9                BY MR. JOHNSON:

10        Q.    Please state your name and the title of

11    your position.

12        A.    My name is Jeanne A. Johnson and I am a

13    Systems Accountant.

14        Q.    Have you had a role with any other

15    legally recognized organization at the Department

16    of Education such as the Union for the Collective

17    Bargaining Agreement Unit?

18        A.    Yes.  Since 1996 I was a Chief Steward

19    for Local 2607 of AFGE.  I have been the President

20    of the Local and I was also on the Executive Board

21    and an officer for the Council 252, which is the

22    Bargaining Unit for this Department.

1        Q.   Were you previously available to be

2   called to give testimony in the Equal Employment

3   Opportunity's Investigative Hearing regarding --

4            MR. FABIA:  Just one moment.  Pardon me.

5            (Deposition interruption.)

6            MR. FABIA:  Thank you.

7            BY MR. JOHNSON:

8        Q.   Were you previously available to be

9   called to give testimony in the Equal Employment

10   Opportunity's Investigative Hearing regarding the

11   case of Susan E. Johnson versus the Secretary of

12   Education?

13            MR. FABIA:  The Agency will stipulate to

14   that fact.

15            THE WITNESS:  Yes.

16            BY MR. JOHNSON:

17        Q.   Why was your testimony not taken at that

18   time?  Do you know?

19        A.   I do not know.  I was told to be on

20   stand-by.  We were sworn in and then we were

21   dismissed and told that they would call us later

22   and we never got called.

```
 1              MR. FABIA:  The Agency will stipulate to

 2    the fact that the record will show that there was

 3    no reason given to Ms. Johnson for that.

 4                        (Johnson Exhibit No. 1 was

 5                         marked for identification.)

 6              BY MR. JOHNSON:

 7         Q.   Please read the page from the

 8    Investigative Hearing I have handed to you that

 9    gives the statement of the EEO Investigator about

10    you being forbidden to testify.

11              I realize it is being stipulated to.

12         A.   (Witness complies.)

13         Q.   Do you know of anyone else who was

14    forbidden from testifying?

15         A.   Yes.  Ora Alger.

16         Q.   Thank you.

17              Why do you think that both of you were

18    not allowed to testify?

19              You say you just do not know?  Was that

20    your answer?

21         A.   Yes.  I do not know.

22         Q.   Okay.  Thank you.
```

1          Do you know who -- well, you just don't

2     know.  You don't know who might have forbidden it

3     or tried to prevent you from testifying and did

4     result in your not being able to testify?

5          A.   No.

6          Q.   How long have you known Susan Johnson?

7          A.   I guess I met her when I came with the

8     Department in 1995, May of 1995.

9          Q.   In what context did you know her?

10         A.   We were both working in the same unit.  I

11    was a systems accountant and she was an accountant

12    in the same operating unit.  We were co-workers.

13         Q.   Are you aware that Susan Johnson suffers

14    from a disability?

15              MR. FABIA:  One second for the noise.

16              If I get up, for the record, it is

17    because I have to tell people to be quiet outside

18    the room.  That is all.

19              Just note it for the record.

20              BY MR. JOHNSON:

21         Q.   Are you aware that Susan Johnson suffers

22    from a disability?

1      A.   Yes.  I am.

2      Q.   When did you become aware of this?

3      A.   Actually I became aware of it probably

4  not long after I came.  Susan was pretty open and

5  we worked closely, physically close.  So, I was

6  aware of her working different hours and so forth.

7      Q.   So, that was when you became aware of it?

8      A.   Right.

9      Q.   And that is how you became aware of it?

10      A.   Yes.

11      Q.   Do you think that many people in her

12  office environment had known that Susan Johnson was

13  an individual with a mental disability?

14      A.   Absolutely.  And the reason I say that is

15  Susan did not hide the fact that she had issues and

16  was seeking reasonable accommodations.  And then

17  later, of course, when I became a Union

18  Representative and counseled her on many occasions

19  I was also aware of it.

20      Q.   Thank you.

21      A.   But I think it was pretty well-known.

22      Q.   Do you have any impression of the quality

1    of Susan Johnson's work and her work habits?  Is

2    she a good worker?  Is she a troublemaker?  Did she

3    get along with her peers?

4         A.   Actually Susan and I had a couple of

5    projects together early on.  She is an

6    exceptionally bright lady who did a very good job

7    on anything that you gave her.  If she didn't

8    understand, she would come back and ask questions.

9    I never had an issue or knew anyone else who had an

10   issue with her not achieving her work on time in a

11   very more than satisfactory manner and that she was

12   very quick to catch on to new things she was given.

13        Q.   Did you know of any trouble-making

14   issues, that she was making trouble?

15        A.   No.  She was very quiet.

16             The only issue that I am aware of, and it

17   wasn't trouble on her part, was I know that there

18   was an incident with a prior supervisor where I

19   believe they had harsh words or Susan got very

20   upset on one occasion.  But other than that, she

21   was very quiet.  You never knew when she was there.

22        Q.   Have you ever seen any indications of

1    discrimination against Susan Johnson?

2              When and what were the circumstances, if

3    you did?

4         A.   Susan was very open with her disability

5    and a couple of times she came to me in my Union

6    Representative position to talk about career ladder

7    increases, reasonable accommodation, which was a

8    fairly new law, and how that was being implemented

9    and that she was asking for accommodations.

10        Q.   You are referring to the Americans with

11   Diabilities Act?

12        A.   Yes.  The Americans with Disabilities

13   Act.

14        Q.   Which requires reasonable accomodation?

15        A.   Right.  Exactly.

16              She would come to me and we would talk

17   about the implications of that in her situation or

18   that a supervisor wasn't being responsive to her

19   questions about am I going to get promoted or what

20   do I need to do to get promoted or can I work these

21   other hours?

22              Usually she would ask me for advice.

1  There were a few occasions where I would actually

2  have to go and talk with her supervisor.  But those

3  were the circumstances.

4          And it wasn't just Susan.  I mean, I had

5  other cases.  So, there were other people.

6      Q.   Okay.  I think I have other questions

7  along those lines, but that is fine.  When it comes

8  to you it is fine.

9          Do you know if Susan Johnson ever filed

10  any kind of reasonable accommodations request

11  document?

12          I believe you indicated a knowledge of

13  the Americans with Disabilities Act and that oral

14  communications with supervisors and responsible

15  officials are perfectly acceptable in all of the

16  enforcement guidelines and so forth with respect to

17  the Americans with Disabilities Act.

18      A.   Yes.

19      Q.   Do you know that she made formal requests

20  as well as informal requests?

21      A.   Yes.  As a matter of fact, informal

22  requests too because on the one occasion I actually

1    got copies of the directives in the Department

2    about reasonable accommodation, I got information

3    on various mental disability issues, like

4    depression and bipolar and information like that.

5    I put that together with information on the various

6    mental health organizations and actually physically

7    gave them to supervisors so that they would have

8    the information they needed to be able to deal with

9    her requests.

10        Q.   Do you recall some of the supervisors?

11        A.   Yes.  It was Cynthia Logan, Keith Cole,

12   Maureen Harris.  Let me think who else was there.

13            I gave it to other employees also who

14   were working for the same supervisors.  But the

15   supervisors, I think that was all.

16        Q.   Have you seen evidence that Susan Johnson

17   was not being provided reasonable accommodations?

18        A.    In the early years she had reasonable

19   accommodations to my knowledge.  As I said, I would

20   be working like odd hours and Susan would be there

21   and I knew that they allowed her to work like

22   outside of core hours to accommodate her needs.

1       Q.    Was this before 1997, would you say?

2       A.    No.  It was before 2000.

3       Q.    It was before 2000.

4             So, there was more accommodation in the

5   period before 2000, is *that* your impression?

6       A.    Right.

7       Q.    Or your recollection?

8       A.    And it would have been the early years.

9   It was '97 and 98 because '99 is approximately the

10  time when I started giving the written information

11  to the supervisors.

12      Q.    Have you seen any evidence that she was

13  not accommodated, for example, by allowing her to

14  substitute accrued leave that she had earned or

15  hours actually worked for time she missed due to

16  her illness?

17            Were you aware of those issues?

18      A.    Yes.  I was.

19            I mean, I was not her Union

20  Representative or anything, but she did speak to me

21  about that.  She was still coming to me as a friend

22  and an advisor about certain things.

1      Q.    This was after?

2      A.    Right.  Because in September of 2000 I

3  changed roles and was no longer in the Bargaining

4  Unit.  I became a management employee.

5           I then became a manager for Terry ~~Billy~~ *Bowie*

6  and Mark Carney and that group.  So, my role

7  changed, although my relationship with Susan, she

8  would still come to me.

9      Q.    Thank you for clarifying that for the

10  record and for me.

11           Have you ever provided documentation -- I

12  believe you answered this though.  Let me see.

13  Have you ever provided documentation about

14  reasonable accommodations to any of her

15  supervisors, managers or team leaders?

16           You answered that.

17      A.    Yes.

18      Q.    Do you know if Susan Johnson filed a,

19  quote, "Letter of Determination," close quote,

20  because her supervisors and managers refused to

21  discuss promotions and other issues with her?

22  And what is a "Letter of Determination"?

1      A.   Yes.  Susan came to me.

2           A "Letter of Determination," first of

3  all, is a letter that is under the Collective

4  Bargaining Agreement.  I can give you the section

5  if you want it.

6      Q.   Okay.  If you know it.  If it will only

7  take a minute.  Otherwise we can do it later.

8      A.   It is Article 18 of the Collective

9  Bargaining Agreement, Career Ladder.

10          What it does is if a person in a career

11  ladder does not receive a career ladder promotion,

12  they can ask in writing for their supervisor to

13  give them a letter stating whether they will in

14  fact or will not promote and it has certain

15  obligations.  You have to respond to it in 30 days.

16  If you are not going to promote, you have to give a

17  reason.  There are so many reasons in the

18  Bargaining Agreement that are acceptable.

19          So, I advised her to do that because she

20  felt that she wasn't getting clear answers on why

21  she wasn't being promoted.

22          A career ladder promotion, I always try

1   to explain it like if you are a telephone operator

2   and you come in your first day, you don't know what

3   all the answers to the questions are.  As you go up

4   in grade you are still doing the same job, you are

5   still answering the phone, but at a higher grade

6   you can then become a team leader, you are more of

7   an expert, and so it is more of a natural

8   progression.

9           There are only several reasons that you

10  are not promoted.  One is that you have an

11  unsatisfactory job performance, there is no work at

12  the higher level in your unit, there is going to be

13  a reorganization or you have had some kind of

14  disciplinary action.  Other than that, you would

15  normally advance through the career ladder.

16          So, in order to find out why she wasn't

17  being promoted I told her that she could use the

18  "Determination Letter".

19      Q.    What is time in grade?  Is that kind of

20  related to this issue?

21      A.    Yes.  You have to have the time in grade.

22      Q.    For certain grades?

1      A.   Right.   You have to have a year in each

2  grade.

3      Q.   Right.

4           And for certain grades the time in grade

5  is kind of a crucial ~~determinate~~ *determinant*, a person has a

6  real right to start asking for the advancement?

7      A.   Yes.   It is one year for each grade.

8           So, a person that comes in as a 7 a year

9  later can ask, am I going to get my 9, a year later

10  can ask, am I going to get 11, a year later can

11  ask, can I get a 12?   It doesn't mean you will, but

12  based on the reasons in the contract and based on a

13  "Determination Letter," if that is the way you have

14  to go, you would know what your career plan is.

15      Q.   Do you know why supervisors and managers,

16  why she found them refusing to discuss the matter

17  with her or avoiding her?

18      A.   I really have no idea because they are

19  required to at least respond within 30 days as to

20  one of the reasons in the Bargaining Agreement.

21  So, I would be very surprised to see they wouldn't

22  respond.

1    Q.   Do you think it had to do with some ideas

2    that they may have had about people whose medical

3    necessity in terms of their needs and so forth

4    require some flexibility in hours and things like

5    that?

6              I mean, is that supposed to be an issue?

7    A.   No.  It is not.

8              In other words, I know that not just in

9    Susan's case, but for many other cases I have had

10   as a Union Rep, that the typical old fashioned

11   before this agreement was codified was we will know

12   when you are ready.  Supervisors had a very odd way

13   of looking at it.  They thought they would know

14   when you were worthy, when you were ready.  But the

15   Bargaining Agreement very clearly states what the

16   criterion are for deciding whether someone is

17   ready.

18             I know that a lot of the supervisors,

19   their excuses would be they missed too much time or

20   they are not here enough or that kind of thing.

21   And that really unless it impacts their performance

22   rating should not be a factor of consideration at

1   all.

2       Q.   Well, I am not going by my script here

3   because you are really making me wonder.

4           I mean, does the Department have a

5   training program for supervisors and managers for

6   them to understand how they are to deal with these

7   issues you just were discussing?

8       A.   When I initially became a supervisor I

9   did not have supervisor training.  There was not at

10  least given to me a supervisory course.

11          Now, there is I believe now where they go

12  over a lot of the supervisory information in a

13  couple of days, of which this would be one part.  I

14  don't know that they concentrate on how to handle

15  career ladder promotions, other than telling them

16  this is a Bargaining Unit Agreement, you should

17  read it, understanding the impact of that.

18      Q.   How do you believe or do you understand

19  or do you know that the Americans for Disabilities

20  Act requirements, which is the law of the land,

21  relate to this?

22          I mean, any training you know about, are

1    these interconnections well explained?

2        A.    No.    They are not.    No.    They are not.

3            I am aware that on the Intranet they have

4    directives and information about the ADA and so

5    forth, but it is not a requirement as far as I know

6    for supervisors.

7        Q.    Thank you.

8            Do you know if Susan Johnson tried to get

9    her time and attendance changed for the Columbus

10   Day federal holiday in 2002 and to have a Code 50

11   placed in that T&A?

12           What is a Code 50?

13           And did the denial for the request create

14   distress for Susan because of the way she was

15   treated?

16           I mean, I can break that up, but I just

17   want to give you the whole context of that series

18   of questions.

19       A.    I became aware that she had asked for

20   leave without pay, I believe.

21           I am not sure what the Code 50 is.    I

22   would have to look it up.    I have to tell you.    I

1    am sitting here thinking I don't know what a Code

2    50 is.

3        Q.    This is just the beginning of the

4    process.

5        A.    I don't know what a Code 50 is.  I know

6    what a 30 is and I know what a 20 is, but I can't

7    think what a 50 is.

8            MR. FABIA:  We will stipulate that it is

9    an hours code meaning holiday not worked.

10            THE WITNESS:  Okay.

11            MR. JOHNSON:  We will I think pursue that

12    at other points.

13            BY MR. JOHNSON:

14        Q.    Please look at the pages handed to you.

15            MR. VALENTIC:  Why don't you just read it

16    without looking at the pages?

17            MR. JOHNSON:  Okay.

18            MR. VALENTIC:  It is not these pages.  It

19    is in here.  I think we can just explain it to her.

20            BY MR. JOHNSON:

21        Q.    There was testimony before the EEO

22    Investigative Hearing where Terry Bowie and

1    Mack Lawrence state that they are not aware of any

2    written documentation about the award process, the

3    bonus, the award process.

4              For your information, the EEO

5    Investigator then did enter into the record such

6    written documentation that she received that was

7    made available to her and this written

8    documentation we understand is used by the

9    Department concerning the proper process for

10   handling of awards.

11             Should first and second line supervisors

12   be familiar with such guidance when making award

13   decisions and what is your knowledge about the

14   documentation with regard to the proper process and

15   procedures for recommending, determining and making

16   awards to employees?

17        A.   The cash awards, what we call cash awards

18   or bonuses or whatever you call them, typically are

19   distributed at year end and there is a bonus pool.

20   And the only reason I know this is I became a

21   supervisor in September of 2000.  So, I did the

22   next several bonus distributions to the operating

1    people.

2        Q.    It was more of a mystery before you

3    became a supervisor?

4        A.    Yes.    It was kind of one of those things

5    you just kind of got a gift, but you never were

6    sure how it really got handed out and nobody ever

7    was allowed to talk about how much you got.

8              There is a matrix basically based on your

9    grade and based on your performance.    Whether it

10   was excellent, very good, good, fair or poor was

11   the amount of dollars that you got.

12             So, if you were a grade 9 and you did

13   very good, you got say $600.    If you are a grade 11

14   and you were fair, you may have gotten $700.    If

15   you were a grade 14 and you did very good, you

16   would get $1,000.    It was just a matrix and it just

17   tells you based on your grade and how you were

18   rated the money you got.

19       Q.    Well, you are aware, are you not, that

20   Susan did through the years receive many awards?

21       A.    That is what I understand.

22       Q.    And good ratings.

1          But the specific incident of more recent

2     vintage, which is why I am asking about first line

3     and second line supervisors, is that Mack Lawrence,

4     I guess who was the first line supervisor, and

5     Terry Bowie, who was the second line supervisor,

6     they did appear at the Investigative Hearing and

7     they did not indicate awareness of guidelines and

8     procedures.

9        A.   It was Terry Bowie's matrix.  Mack

10    Lawrence was a supervisor under Terry Bowie just

11    like I was.  We were equals.  So, we had the same

12    matrix for awards.

13          MR. VALENTIC:  It is not in here.  The

14    one that is in here is the general overall policy

15    for the entire Department of Education.

16          Is that what you are referring to?

17          THE WITNESS:  No.  This would have been

18    the cash bonuses awards that are given out by POC

19    or by unit.  Principle Operating Component is POC.

20          So, for instance, OCFO would be your POC.

21    That is your component.  FMO, which is Financial

22    Management Operations, would be Terry Bowie's

1    sub-unit.  And then under that would be Mack

2    Lawrence's unit, there would have been my unit when

3    I was there and so forth.

4            Those awards, I would say there was a

5    pool, there was so much money that they were

6    allowed to parcel out to employees for performance

7    or cash awards and that is where the matrix came

8    in.

9            So, based on your grade and based on your

10   performance, that is how much money you got.

11   Q.    This is a written document?  Is that what

12   you are saying?

13   A.    Yes.

14   Q.    The matrix is a written document?

15   A.    Yes.

16   Q.    Which is not in the record?

17           MR. VALENTIC:  The one that is in the

18   record by the Investigator is the one for the

19   entire Department of Education, which Mr. Bowie and

20   Mr. Lawrence said did not exist.

21           What we are searching for here is that in

22   the record it said there was another secret

1    document on award processes within the organization

2    itself.

3              BY MR. JOHNSON:

4         Q.   Was this a confidential document, a

5    secret document?

6         A.   It wasn't secret.  It was given to the

7    supervisors.

8              I mean, I have copies of the 2001 and the

9    2002.  Do you want that?

10        Q.   Yes.  Please.

11             Is this an extra copy?

12        A.   This is your copy.

13        Q.   Are they short documents?

14        A.   Yes.

15             These are just e-mails that came and this

16   has, for instance, the 2002 awards.  This is the

17   e-mail it came with.  So, you can see it came from

18   them.

19             Then this is 2001.

20                       (Johnson Exhibit No. 2 was

21                        marked for identification.)

22             BY MR. JOHNSON:

1     Q.   That is why you call it a matrix?

2     A.   Right.  Yes.  It is just a little chart.

3         This is the same thing for 2001, but it

4   also has a listing of the FMO cash awards and it

5   has Susan's name on it.

6     Q.   Is that the right order?

7     A.   I marked it 2002 and 2001.

8         But I mean every supervisor got that.

9         MR. VALENTIC:  Richard, since there is

10  going to be some confusion I am sure from the

11  writing here, why don't we say what is in the

12  record from the Investigator?  I believe this is

13  the page.  Then we can just clearly make a

14  difference between the two.

15        It is right here.  It talks about this is

16  the Department award.  But it is this page and that

17  one.

18        MR. JOHNSON:  On page PMI 451-1 the

19  paragraph I want to quote is:  "The Departmental

20  awards and the incentive program should provide an

21  environment which reinforces, which helps employees

22  meet strategic goals and the Department of Ed

```
 1    become a high performance organization."

 2              MR. VALENTIC:  It is Volume 2 of 2.

 3              MR. JOHNSON:  Volume 2 of 2 of the

 4    Investigative Report of this case.

 5              THE WITNESS:  Because there is a separate

 6    OCFO Award Program which is going on right now,

 7    they do, for instance, an Employee of the Month,

 8    Employee of the Year, peer awards and things like

 9    that.

10              BY MR. JOHNSON:

11        Q.   For OCFO as a whole?

12        A.   For just OCFO, which would really come

13    under that Department guideline.

14        Q.   And you know that OCFO is the Office of

15    the Chief Financial Officer.

16        A.   Right.

17              That is the POC.  That is the Principle

18    Operating Component.

19        Q.   Do you believe that Susan Johnson has

20    been discriminated against repeatedly?

21        A.   I think she has been subject to an

22    environment that is not conducive or supportive of
```

1    people with mental disabilities.  Yes.

2        Q.    Do you know of any other current or past

3    Department of Education employees, particularly in

4    the Office of the Chief Financial Officer, who have

5    been subjected to similar discriminatory treatment?

6        A.    Yes.

7        Q.    Who, when and what happened to these

8    individuals?

9            And I recognize as a supervisor and a

10   union official you know what you can say and what

11   not to in terms of privacy.

12       A.    Right.

13           Barbara Schuman was another employee.

14       Q.    That was one of my questions.

15       A.    She had a mental disability and I

16   represented her for quite a while to try to get her

17   reasonable accommodation.  For some reason they did

18   not want to reasonably accommodate her.  She

19   eventually got so ill that she had to leave the

20   Department.

21           There was another case.

22       Q.    Do you believe that her illness was

1    exacerbated by the treatment?

2            When you say she had to leave the

3    Department, in that sense was it an impelling force

4    to her leaving the Department?

5        A.   Absolutely.  She was not physically able

6    to come to work.  It made her so ill that she was

7    not able to be stabilized.

8        Q.   Who was her supervisor or team leader or

9    management official?

10       A.   She worked for Cynthia Logan, Mack

11   Lawrence, Keith Cole.  At one point in time ~~Jane~~ *Jan*

12   Steinbrueck.

13           This was during the same period for

14   Susan.  She was like here until 1999 or 2000.  So,

15   it was during that '97 to 2000 period.  But

16   particularly '98 and '99 is when I was dealing with

17   Barbara.

18       Q.   Do you know if there was any time when

19   management sought to assign a staff employee to

20   occupy Susan Johnson's office?

21           Would not that have made it very

22   difficult upon Susan's return to get the other

1    staffer out of Susan's own office space in view of

2    taking into account her disability and anxiety, her

3    chronic depression and anxiety?  Do you not think

4    that was distressing and an indication of a

5    management policy?

6         A.   Well, I have to tell you I didn't know

7    that of my own knowledge, but it certainly would

8    have been distressing.  But I did not know that

9    they attempted to do that.  I know that they did in

10   Barbara Schuman's case before she left.

11        Q.   I believe that was my next question.

12             Did you ever see this pattern of office

13   occupation involving other employees with

14   disabilities?  What about Barbara Schuman?  You

15   have answered that question.

16             Does it appear to you that the Department

17   and the Office of the Chief Financial Officer have

18   systematically tried to force out some persons with

19   diabilities?  In other words, by subjecting these

20   persons to what the EEOC and court cases call

21   constructive discharges or termination,

22   constructive discharges meaning actions construed

1    to be the equivalent of constructive firings?

2            Do you believe that there has been a

3    policy that could be seen in that light with

4    respect to some employees with disabilities?

5        A.   I think I see more of a tendency with

6    employees with mental disabilities to have less of

7    a willingness to work with them and to rather have

8    them just leave.  I think because it is easier.  I

9    mean, people with mental disabilities are more

10   difficult to work with.  It takes a lot more time

11   and effort on a supervisor's part and I haven't

12   always seen that willingness to go the extra mile.

13       Q.   But wasn't that the fundamental purpose

14   of the Americans with Disabilities Act?  That is a

15   policy of the Federal Government --

16       A.   Absolutely.

17       Q.   -- that supervisors and management

18   officials should make that special effort and that

19   the government would be able to provide services to

20   the public --

21       A.   Absolutely.

22       Q.   -- effectively by making use of more

```
 1    members of our society, including --

 2              MR. FABIA:  Objection.

 3              Is there a question here?

 4              MR. JOHNSON:  Right.

 5              BY MR. JOHNSON:

 6        Q.   Is that not true?

 7              MR. FABIA:  You called this person as

 8    your witness and I have been rather lenient and not

 9    objected.

10              MR. JOHNSON:  I know.  But, as you know,

11    in depositions there are leading questions.

12              BY MR. JOHNSON:

13        Q.   So, I just wondered if you agreed.

14        A.   Well, I have dealt with reasonable

15    accommodation cases with physically challenged

16    people and mentally challenged people and I have

17    found in almost all cases that the mentally

18    challenged people had a more difficult time gaining

19    reasonable accommodation for several reasons.

20              One is that the supervisors and the

21    management I don't believe were adequately trained

22    in what constituted a mental disability and to have
```

1    an understanding and appreciation of it.

2            Second of all, that it just took more

3    time and in many cases unfortunately here in the

4    government, it is not just here in education,

5    management training and support is not what I would

6    consider adequate.  You know, we just take our best

7    technicians sometimes and promote them.  We don't

8    worry about the people part of that.

9            The second part of the problem that

10   people who are mentally disabled have is that they

11   are not able to support their own positions.  If I

12   have lost a leg, I can say I have lost a leg,

13   please accommodate me.  But these are people who

14   are not able to think sometimes rationally or they

15   are in medication change.  They don't have the

16   support that they need to push for reasonable

17   accommodations.  So, they are much tougher.

18           The ADA was very new.  I don't know that

19   everyone understood exactly what it meant.  We were

20   still kind of thrashing that out looking for

21   guidance.

22           So, yes, I think that there was and

1    continues to be a problem for the mentally disabled

2    in getting fair treatment.

3        Q.    Have you seen discrimination instances,

4    other discrimination instances, against Susan

5    Johnson since 1997, and you have already described

6    some, that you would consider to have dangerously

7    impacted upon her mental and physical well-being?

8        A.    Well, yes.  I mean, Susan was very -- how

9    do I say this -- very keen to get some kind of

10   self-respect and some kind of feedback that she was

11   a good worker, that they appreciated her.  So,

12   every time she either couldn't get an answer or

13   they wouldn't deal with her or they wouldn't

14   promote her or they wouldn't tell her why, it just

15   sent her into a tizzy because she didn't have the

16   self-esteem to be able to handle that.  And as a

17   result it became a self-fulfilling prophesy.  The

18   more they did that to her the sicker she got and

19   the less she was able to be here.  And that is very

20   typical.  That is typically what happens.

21        So, yes.  I mean, even when I dealt with

22   Susan I was usually very careful to make sure that

1    she understood this didn't really have anything to

2    do with her as a person, that it wasn't her

3    self-worth, that this was something physical just

4    as if she had diabetes or cancer.

5            I mean, you know, it just was very

6    important to her.  And I am afraid that that same

7    sensitivity wasn't always given to her by

8    management.

9        Q.   Do you believe that higher level

10   supervisors and managers, upper level supervisors

11   and managers, were involved in or aware of

12   Susan Johnson being subjected to discrimination at

13   the upper levels of the Chief Financial Office or

14   otherwise?

15       A.   I am assuming that her requests would

16   have had to go to senior managers eventually.

17           I mean, everyone was aware that Susan had

18   a mental disability from the higher level.  She

19   never made a secret of it.  Everyone knew that.

20   They knew she had been accommodated.

21           MR. FABIA:  Objection.

22           The question was whether you knew, if you

1   had personal knowledge.

2           THE WITNESS:  Did I personally know if

3   they knew?

4           MR. FABIA:  Right.  Yes or no?

5           THE WITNESS:  I did in the fact of those

6   people I spoke with.

7           MR. FABIA:  But he asked if upper level

8   management knew or if you knew of that.

9           THE WITNESS:  Who are we talking about?

10          MR. FABIA:  I don't know.  He hasn't

11  identified anybody.

12          THE WITNESS:  Upper level management.

13          BY MR. JOHNSON:

14      Q.  You have no personal knowledge that

15  Mark Carney -- although he was second level.

16          MR. VALENTIC:  Wait a second.  I think

17  she is trying to say upper level.

18          Who in upper level?

19          THE WITNESS:  At one point in time Mark

20  Carney was the FMO Director.  So, he would have had

21  to have known at that point.  I can't say for

22  Jack Martin.  I don't know that.

1          BY MR. JOHNSON:

2      Q.    Thank you for answering the question in a

3   fashion to inform us of the process, which I think is

4   what we want here.  Thank you very much.

5          Do you believe that Susan Johnson has

6   been subjected to a hostile work environment?

7      A.    I could certainly understand where that

8   could be perceived as a hostile work environment.

9   Yes.

10     Q.    Why don't you think that most supervisors

11  or managers at higher levels did anything to help

12  stop the discrimination and reprisals that produced

13  such a hostile work environment, if you think that

14  there was?

15     A.    I don't know.  I mean, I don't know.

16     Q.    Given your experience and your extensive

17  knowledge of the history of OCFO's handling of

18  individual employees with disabilities and your

19  direct knowledge of Susan Johnson, do you believe

20  that it would be dangerous to Susan's health, both

21  her mental and physical health, for her to return

22  to work at the Department?

1      A.    In the current environment, yes, I do.

2   Yes.  I do.

3      Q.    Do you think that Susan Johnson would

4   have made a very good federal employee if her

5   supervisors and managers had not discriminated

6   against her continually?

7      A.    To my knowledge Susan was never anything

8   less than an outstanding employee.

9      Q.    Is there anything else that you would

10  like to add that might help understand the issues

11  involved in this case?

12     A.    I don't think I have any other

13  information.  I think that is it.

14     Q.    Thank you.

15          In view of Counsellor Fabia's comment, I

16  don't have to, but I think I will ask one more

17  question because in the process of asking questions

18  at this stage we do not have the court rules about

19  leading questions and so forth and it being a

20  little bit more informal in administrative law, it

21  is not like a court of law.

22          Did we rehearse these questions?

1      A.    No.

2            I mean, I was aware of, like I said, and

3      I had talked with Mr. Fabia previously in very

4      basic terms about what I was going to say or what I

5      had knowledge of in my union position and in my

6      management position.  So, I don't think that we had

7      any surprises.  We didn't rehearse anything.  I

8      mean, he just told me that I was going to be a

9      witness.  I knew what I was going to say the first

10     time around.

11           MR. JOHNSON:  Thank you.

12           We have plenty of time, Counselor.

13           EXAMINATION BY COUNSEL FOR THE AGENCY

14           BY MR. FABIA:

15     Q.    Ms. Johnson, in asking you these

16     questions, again, you understand you are under

17     oath, so that you know you have to tell the truth

18     as best as possible?

19     A.    Yes.  I do.

20     Q.    Are you familiar with what the Fifth

21     Amendment stands for?

22     A.    Yes.

1    Q.    The right of incrimination?

2    A.    Yes.  I do.

3    Q.    Just to be sure, that means when you are

4  under oath, any kind of procedure, state or local,

5  federal, giving sworn testimony, if you feel that a

6  reasonable person would believe that the answer you

7  give would lead to criminal prosecution or to

8  imprisonment, that would be the question of raising

9  your rights as to raise the Fifth Amendment not to

10  incriminate yourself.  But if it is a question that

11  you might be subject to embarrassment or lead to a

12  civil action against you, like a discharge, that is

13  not enough to raise a right to a privilege.

14          Do you understand?

15    A.    Yes.

16    Q.    Now, you mentioned that you were a Union

17  Representative or had various offices; is that

18  right?

19    A.    Yes.

20    Q.    When did that relationship with the union

21  end for you?

22    A.    September 2000.

1    Q.    So, would it be fair to say that from

2    your testimony with Mr. Johnson that prior to that

3    time, and I guess we would be back to like 1996,

4    you acted as Ms. Johnson's representative,

5    Susan Johnson's representative?

6    A.    I never acted as her representative.    I

7    was her Union Representative.

8         In other words, we never initiated a

9    formal union grievance or action.    It was all very

10   informal.    In other words, she would come to me for

11   advice or I would go and give information or get

12   information from her supervisors.

13   Q.    But you said you weren't acting her as

14   her representative though?

15   A.    I was not in a formal grievance

16   procedure.    That is correct.

17        There are various activities as a Union

18   steward.    One is if someone would come and say what

19   does this mean or what can I do, I would give them

20   advice.    You can file a grievance.    You can go to

21   IDR.    I will just go and talk with your supervisor

22   and see if we can work it out informally, which is

1    99 percent of the time how we resolve things

2    because it was just easier.  And then I would go

3    and talk with the supervisor about whatever issue

4    it was, go back to the union person or the

5    Bargaining Unit employee and tell them what the

6    status was and they would decide whether then to go

7    with a grievance or not.

8        Q.   So, between the time that I guess you

9    first really met her in this relationship of being

10   a Union Representative, you never had discussions

11   with her regarding instigating a union grievance or

12   going to what is called the Informal Dispute

13   Resolution Center or even filing a formal EEO

14   complaint regarding her situation?

15       A.   There were times I advised her she should

16   consider it.  Yes.  She was not willing to do that.

17       Q.   When was that?

18       A.   That would have been '97 through '99, I

19   guess.  I mean, during that time she was having

20   issues.  She would come to me and ask me questions

21   and I would advise her.

22       Q.   But you hadn't in fact directed her?  You

```
1    said you could possibly consider filing a

2    complaint --

3         A.   Yes.  Absolutely.

4         Q.   -- or going to the EEO?

5         A.   Well, I don't think I ever told her to go

6    to EEO.  I helped her --

7         Q.   Pardon me.  But you might have suggested

8    if not going to EEO, maybe possibly --

9         A.   A grievance.

10        Q.   -- a Union grievance?

11        A.   Yes.  Absolutely.

12             She was not willing to do that.

13        Q.   Correct me if I am wrong.  Under what we

14   call the Collective Bargaining Agreement it does

15   allow for the filing of a Union grievance on

16   matters that would cover what we call

17   discrimination, employment discrimination?

18        A.   Yes.

19        Q.   So that you could file one or the other?

20   That is, if you filed a grievance on a claim of

21   employment discrimination, you cannot go ahead and

22   file an EEO complaint on it?
```

1        A.    That is correct.

2        Q.    And if you filed an EEO complaint, you

3    can't file a Union grievance?

4        A.    Right.

5        Q.    Again correct me if I am wrong.  In

6    trying to characterize what you were saying, it is

7    that based on your background as a Union

8    Representative, you would have steered her toward

9    filing a Union grievance to cover the issues of

10    employment discrimination?

11        A.    Well, actually the issue wasn't

12    employment discrimination.  The issue was much

13    smaller than that in sections.

14             For instance, career ladder promotions.

15    That is a very tiny issue.  And in that one issue I

16    advised her she should file a Union grievance.

17    Absolutely.  Because that was very clear to me.

18             I did not take that and say you should

19    file an EEOC, they are discriminating against you

20    with all these other incidences.

21        Q.    Let me ask you a question regarding the

22    allegation you said about the career ladder denial.

1    A.    Yes.

2    Q.    Was that with the understanding that it

3    could or could not have had allegations of

4    discrimination with it, not just a

5    straight-forward?

6    A.    It was just a straight-forward.

7    Q.    Because you understand now she is

8    alleging that it is an issue of discrimination?

9    A.    Yes.

10          I don't understand what you are asking

11    me.  I am sorry.  I don't.

12    Q.    That is all right.

13    A.    In other words, I was a Union Rep dealing

14    with she came to me with an issue of career ladder

15    promotion.  She never said to me does this and five

16    other things add up to discrimination and a hostile

17    work environment?

18          I mean, I was dealing with that one

19    issue.  Then later, you know, if there was another

20    issue.  And I am sure at some point in time I said

21    to her, you know, it looks like discrimination to

22    me based on your mental disability, which is why I

1    gave the information to her supervisors regarding

2    ADA.

3         Q.   When would that have been?

4         A.   1999.  June.

5         Q.   June of 1999?

6         A.   That is correct.

7         Q.   Okay.  Good.

8              MR. FABIA:  That is all.  No other

9    questions.

10             MR. JOHNSON:  Thank you very much.

11             THE WITNESS:  Thank you.

12             MR. VALENTIC:  We wanted to add one thing

13   to the record that we forgot.

14             Are you disabled?  Do you suffer from a

15   disability?

16             MR. JOHNSON:  I gather we were supposed

17   to ask this at the beginning.

18             MR. VALENTIC:  We should have asked you

19   before.

20             MR. JOHNSON:  Apparently we are supposed

21   to ask everyone.

22             MR. VALENTIC:  Do you suffer from a

1   disability?

2           THE WITNESS:  Yes.  I do.

3           MR. VALENTIC:  Do you need an

4   accommodation for this?

5           THE WITNESS:  Actually I have not asked

6   the Department for an accomodation.

7           MR. VALENTIC:  Thank you.

8           MR. FABIA:  Thank you.

9           (Whereupon, at 1:50 p.m., the taking of

10   the deposition was concluded.)

11                        (Signature not waived.)

12

13

14

15

16

17

18

19

20

21

22