1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLUMBIA

3

4         SUSAN JOHNSON,                )

5         Plaintiff,                    )

6              vs.                      )   Case No.

7         MARGARET SPELLINGS,           )   06-0321 (GK)

8         Secretary of Education,       )

9         Defendant.

10

11

12                   -     -     -     -     -

13              The deposition of SUSAN JOHNSON was

14       taken on Thursday, December 7, 2006, commencing

15       at 9:30 a.m., at the U.S. Attorney's Office, 555

16       4th Street, N.W., Washington, D.C., before Debra

17       L. Maheux, Notary Public.

18                   -     -     -     -     -

19

20

21

22

1                    A P P E A R A N C E S

2

3       ON BEHALF OF THE PLAINTIFF:

4               RICHARD E. JOHNSON, ESQ.

5               3522 Majestic Lane

6               Bowie, Maryland  20715-1604

7               Phone and Fax:  301-262-9658

8               Email:  Richard@verizon.net

9

10      ON BEHALF OF DEFENDANTS:

11              JOHN F. HENAULT, JR., ESQ.

12              Assistant U.S. Attorney

13              District of Columbia

14              555 4th Street, N.W.

15              Washington, D.C.  20530

16              202-307-1249  Fax:  202-514-8780

17              Email:  John.Henault@usdoj.gov

18              -and-

19

20

21

22

1              ROBERT FABIA, ESQ.

2              Office of the General Counsel

3              Division of Business and

4              Administrative Law

5              U.S. Department of Education

6              400 Maryland Avenue, Southwest

7              Washington, D.C.  20202-2110

8              202-401-6606

9

10

11     ALSO PRESENT:

12              PAUL VALENTIC, Husband

13

14

15     (Index appears following the transcript.)

16

17

18

19

20

21

22

```
1                   P R O C E E D I N G S

2                  -    -    -    -    -

3    Whereupon--

4                   SUSAN JOHNSON

5    a witness, called for examination, having been

6    first duly sworn, was examined and testified as

7    follows:

8                   THE WITNESS:  I do.

9                      EXAMINATION

10                  BY MR. HENAULT:

11        Q.    Good morning, ma'am.

12        A.    Good morning.

13        Q.    My name is John Henault.  I represent

14   the defendant, Margaret Spellings and the

15   Department of Education, in the action you've

16   filed in Federal Court.

17        A.    Right.

18        Q.    We're here today to take your testimony

19   regarding this case.

20        A.    Yes.

21        Q.    You understand you've been placed under

22   oath by the court reporter, correct?
```

1       A.    Right, correct.

2       Q.    You know what that means, ma'am?

3       A.    Yes, I know what that means.

4       Q.    Have you ever been deposed before?

5       A.    No.  Oh, yes.  I was deposed in the

6   EEOC investigative reporting.

7       Q.    Okay.

8             MR. HENAULT:  I just want to say for

9   the record that, Mr. Valentic, it is Ms.

10  Johnson's testimony that matters.

11            MR. VALENTIC:  I'm not going to say a

12  word.

13            MR. HENAULT:  To the extent I know you

14  just touched her and indicated that one of her

15  answers was wrong.  You cannot do that.

16            MR. VALENTIC:  I won't.

17            MR. HENAULT:  Okay?

18            MR. VALENTIC:  All right.

19            BY MR. HENAULT:

20      Q.    I know you said you've been deposed in

21  the investigative stage.  I want to go through

22  some of the background rules for a deposition

1    just to start.  Your testimony, as you can see,

2    is being taken down by the court reporter.  She

3    can only take down verbal comments, so it's very

4    important that you answer questions verbally

5    with a yes, no, whatever your answer may be

6    instead of a nod of the head or a uh-huh,

7    huh-uh, things like that.  Do you understand?

8         A.    I understand.

9         Q.    And because she can only take down what

10   one person is saying at a time, I will try not

11   to talk over you.

12        A.    Okay.

13        Q.    I will try to let you answer your

14   question before I start again.  Is that fair

15   enough?

16        A.    Yeah.

17        Q.    And I would ask that you do the same.

18        A.    Okay.

19        Q.    Have you taken any drugs, prescription

20   or otherwise, in the past 12 hours?

21        A.    Yes, I have.

22        Q.    What have you taken, ma'am?

```
1          A.    I've taken Zoloft, Lipitor, Ziac, Z I A

2     C, and Clonopin.

3          Q.    What is the Zoloft for, ma'am?

4          A.    Zoloft is for depression.

5          Q.    When did you last take that?

6          A.    I took it at I guess about 7:15 in the

7     morning.

8          Q.    Is there anything about you taking

9     Zoloft that will prevent you from giving honest

10    and accurate and truthful testimony today?

11         A.    No.

12         Q.    Now, Lipitor is for what?

13         A.    Cholesterol.

14         Q.    And is there anything about Lipitor

15    that will prevent you from giving honest,

16    accurate and truthful testimony today?

17         A.    No.

18         Q.    Ziac, what is Ziac, ma'am?

19         A.    That's a blood pressure medicine.

20         Q.    Same question:  Anything about Ziac

21    that will prevent you from giving honest,

22    accurate and truthful testimony?
```

1      A.   No.

2      Q.   Now, Clonopin, what do you take

3   Clonopin for?

4      A.   Anxiety.

5      Q.   When is the last time you took

6   Clonopin?

7      A.   At 7:15.

8      Q.   Anything about the Clonopin that will

9   prevent you from giving honest, truthful and

10   accurate testimony?

11      A.   No.

12      Q.   What dosage of Zoloft do you take, do

13   you know?

14      A.   I would have to look in my purse for

15   the --

16      Q.   Could you, please?  And I'll have the

17   same question about the Clonopin also, ma'am.

18      A.   Zoloft is a hundred milligrams.

19      Q.   So you took a hundred milligrams of

20   Zoloft at 7:15 this morning?

21      A.   Yeah.

22      Q.   What about the Clonopin, ma'am?

1          A.    .05 milligrams.

2          Q.    And that was the dosage you took this

3     morning?

4          A.    Yes.

5          Q.    Thank you very much.  Do you drink

6     alcohol?

7          A.    Not very much, not very often.

8          Q.    Have you had any alcohol in the past 12

9     hours?

10         A.    No.

11         Q.    I would like to start off, ma'am, with

12    your education.  I understand you have a

13    bachelor's degree, correct?

14         A.    Yes, I have a bachelor's degree from

15    the University of Connecticut, Storrs,

16    Connecticut.

17         Q.    When did you receive that?

18         A.    I received that in 1989.

19         Q.    And you said it's a bachelor's degree?

20         A.    Yeah.

21         Q.    What was the subject of your study?

22         A.    My main -- my major was management and

```
 1    human resources, but I had a concentration in

 2    accounting.

 3        Q.    Other than your bachelor's degree that

 4    you received from the University of Connecticut

 5    in 1989, do you have any other formal education?

 6        A.    No.  I mean, I took some courses.  I

 7    took some extra courses, but not any -- not like

 8    for a master's or anything like that.

 9        Q.    Let's talk a little bit about the

10    courses you've taken.  What courses have you

11    taken?

12        A.    I took a paralegal class.

13        Q.    Where did you take the paralegal class?

14        A.    At the University of Maryland.

15        Q.    When did you take that?

16        A.    Gosh, I don't know.

17        Q.    Does early to mid 1992 or late 1994

18    sound about right, do you recall?

19        A.    I can't remember the exact date.

20        Q.    Fair enough.  Fair enough.  And just to

21    let you know, unless I ask you for a specific

22    day, a specific time or anything like that, you
```

1    can give me estimates on dates.  This isn't --

2    especially when I'm going through your

3    background, this isn't a game of got-ya.  I'm

4    just trying to understand your background and

5    your education, okay?

6         A.   Okay.

7         Q.   How many paralegal classes did you take

8    at the University of Maryland?

9         A.   Just one.

10        Q.   Do you recall how many credit hours it

11   was?

12        A.   Three.

13        Q.   Three?  Any other classes at the

14   University of Maryland, ma'am?

15        A.   Not that I can recall.

16        Q.   Any other formal education or any other

17   classes you've taken?

18        A.   I retook tax accounting.

19        Q.   Where did you retake tax accounting,

20   ma'am?

21        A.   At Prince George's County Community

22   College.

1    Q.    Do you recall when you took that class?

2    A.    No, I don't recall the date.

3    Q.    Do you recall how many hours it was?

4    A.    It was for three credits too though.

5    Q.    Is that the only class you took at PG

6    County Community College?

7    A.    Yeah.

8    Q.    Other than what we've discussed now,

9    any other formal education or classes or

10    anything like that?

11    A.    Not that I can recall.

12    Q.    And you said other than your bachelor's

13    degree, you have no other degrees, correct?

14    A.    Right.

15    Q.    Are you married, ma'am?

16    A.    Yeah.

17    Q.    To whom?

18    A.    Paul Valentic who is sitting next to

19    me.

20    Q.    I understand it can be kind of awkward

21    when someone is sitting there, but the

22    questions, it's for the record you understand,

1    so that's why I have to ask.  Some questions

2    might seem a little awkward, but it's necessary.

3    I can see Mr. Valentic is sitting next to you.

4    I know Mr. Valentic is your husband, but it's

5    important that we have the record established in

6    the case.  That's why I ask questions like that,

7    okay?

8        A.   Okay.

9        Q.   When did you get married?

10       A.   I got married July 21, 2002.

11       Q.   Any children?

12       A.   No.

13       Q.   You were employed at the Department of

14   Education when you got married, correct?

15       A.   Right, correct.

16       Q.   Have you ever had any separations from

17   your husband?

18       A.   No.

19       Q.   Any marital problems?

20       A.   No.

21       Q.   Now, ma'am, your complaint alleges that

22   you suffer from mental disabilities, correct?

```
1          A.    Correct.

2          Q.    Correct if I'm wrong because ultimately

3     it's your testimony that matters, depressive

4     disorder is one disability you allege, right?

5          A.    Correct.

6          Q.    The other is anxiety disorder?

7          A.    Correct.

8          Q.    Any other disabilities?

9          A.    No, sir, those are the two main ones.

10         Q.    Let's start with the -- the two main

11    ones, are they minor disabilities?

12         A.    No, they're not minor.

13         Q.    I mean, other than -- what I'm trying

14    to understand is you said that the depressive

15    disorder and the anxiety disorder were the two

16    main ones.  Are there others other than those

17    two disabilities?

18         A.    No.

19         Q.    So your depressive disorder and anxiety

20    disorder are the only two disabilities you

21    suffer from?

22         A.    Right.
```

```
1          Q.    Let's start with your depressive

2     disorder.  When were you diagnosed with a

3     depressive disorder, ma'am?

4          A.    In 1989.

5          Q.    Where were you diagnosed with a

6     depressive disorder?

7          A.    At The Psychiatric Institute of

8     Montgomery County.

9          Q.    Was it a staff doctor there that

10    diagnosed you or was it a doctor you were seeing

11    regularly?

12         A.    It was a staff doctor.

13         Q.    What were the circumstances that led to

14    you being diagnosed with a depressive disorder

15    in 1989?

16         A.    I attempted suicide.

17         Q.    When was that?

18         A.    That was April 1989.

19         Q.    How did you attempt suicide?

20         A.    I tried to -- wait a minute.  I drank

21    some bleach.

22         Q.    Sorry about that.  That's a front door
```

1     alarm that will go off, okay?

2            You drank some bleach.  Anything else

3     that was involved in your suicide attempt in

4     April of 1989?

5     A.    No.

6     Q.    Where were you when you attempted

7     suicide?

8     A.    I was at my house, my parents' house.

9     Q.    Where was that?

10    A.    It's in Bowie, Maryland.

11    Q.    How was it that you ended up at The

12    Psychiatric Institute of Montgomery County?

13    A.    My parents had me go to a counselor and

14    she did -- she diagnosed me as having clinical

15    depression and didn't feel I should go home,

16    felt I should go to The Psychiatric Institute of

17    Montgomery County.

18    Q.    So you were hospitalized after your

19    April 1989 suicide attempt?

20    A.    Right.

21    Q.    For how long?

22    A.    For about a month.

1      Q.    Now, when you drank the bleach, were

2   you rushed to the hospital or anything?

3      A.    No.

4      Q.    What affects did drinking the bleach

5   have on you?

6      A.    It didn't really have that much affect

7   on me.  I didn't take that much I think.

8      Q.    Okay.  Now, I'm going to -- we'll get

9   specifically to when you started with the

10   Department of Education and all that, but

11   correct me if I'm wrong, your employment began

12   there October of 1993, correct?

13      A.    Right.

14      Q.    When you started there in October,

15   there at the Department of Education in October

16   of 1993, did you advise them of this suicide

17   attempt in April of 1989?

18      A.    I advised them that I had a disability.

19      Q.    Who did you advise?

20      A.    Ruth Ann Harold.

21      Q.    Did you tell her that you suffered from

22   a depressive disorder?

1        A.    Yes.

2        Q.    When did you advise Ms. Harold about

3    your disability?

4        A.    Pretty much as soon as I got there.

5        Q.    How did you tell her?  Was it verbally?

6    Was it in writing?  Was it a note from your

7    doctor?

8        A.    Verbally.

9        Q.    Verbally?  What did you tell Ms. Harold

10    that your disability was?

11        A.    Depression.

12        Q.    Did you provide any notes from your

13    doctors?

14        A.    I did after I attempted in 1994.

15        Q.    So the first time you provided

16    documentation advising the Department of

17    Education that you suffered from a disability

18    was when?

19        A.    1994.

20        Q.    Do you remember the date?

21        A.    It probably would have been March 1994.

22        Q.    Now, let's talk about your anxiety

1    disorder.  When were you first diagnosed with

2    your anxiety disorder?

3         A.    That was kind of an ongoing thing.  I

4    guess I was first diagnosed with it -- I don't

5    know the exact date that I was.

6         Q.    Roughly what year, ma'am?

7         A.    Roughly?  I would say 1998.

8         Q.    Who diagnosed you with an anxiety

9    disorder?

10         A.    My psychiatrist at the time, Dr. George

11    C. James.

12         Q.    He was someone that you were seeing

13    routinely?

14         A.    Yeah.

15         Q.    For your depressive disorder

16    presumably?

17         A.    Right.

18         Q.    Let me back up for a second.  Beginning

19    in 1989 through October 1993, what effects did

20    your depressive disorder have on you?

21         A.    What effects?

22         Q.    How did it affect your life?

1        A.    It made me bedridden sometimes.   I

2   would throw up, and get -- I would be drowsy.

3        Q.    What else?

4        A.    I don't know.

5        Q.    Were there any other effects in your

6   life?  I'll tell you what.  I limited my

7   question from roughly 1989 to 1993.

8        A.    Right.

9        Q.    From the time of your diagnosis in 1989

10  through current times, what effects does your

11  depressive disorder have on your life?

12       A.    Okay.  Well, like I said bedridden,

13  crying spurts, drowsiness.  I think that's

14  pretty much it.

15       Q.    How often are you bedridden because of

16  your depressive disorder?

17       A.    It depends on what's going on in my

18  life.

19       Q.    Okay.

20       A.    It depends if things are stressful or

21  not.

22       Q.    So stress increases the effect and

1    causes you to be bedridden more; is that an

2    accurate statement?

3         A.    Certain stress, yes.

4         Q.    Certain stress.  What kind of stress

5    causes you to be bedridden because of your

6    depressive disorder?

7         A.    Like harassment.

8         Q.    What else?

9         A.    Just -- sorry.

10        Q.    That's okay.  Let me tell you, the most

11   important thing here is that you give complete,

12   accurate and honest testimony.  If you need to

13   take a minute to think about a question, by all

14   means, please do.

15        A.    Okay.  Well, harassment is the big

16   thing that will -- so I think I'm done with the

17   question.

18        Q.    In calendar year 2006, has your

19   depressive disorder caused you to be bedridden

20   at all?

21        A.    2006?

22        Q.    Yes, the current year, ma'am.

1     A.   No.

2     Q.   Calendar year 2005, do you recall being

3  bedridden at all as a result of your depressive

4  disorder?

5     A.   Yes.

6     Q.   When or how many times?

7     A.   The beginning of the year.

8     Q.   How many times roughly in the beginning

9  of the year, and can you give me just a rough

10  time frame from when to when?

11     A.   Like January '05 to February.

12     Q.   And we'll get into it a little bit

13  further, but you attempted suicide during that

14  time frame, right?

15     A.   Right.

16     Q.   Who was harassing you between January

17  '05 and February '05, ma'am, that caused you to

18  be bedridden?

19     A.   That was left over from the Department

20  of Education stuff that was done to me.

21     Q.   What do you mean it was left over?

22     A.   I mean I still had all these emotions

1   and stuff about what was going on at the

2   Department of Education that I ended up

3   attempting suicide because of -- because of some

4   of the things that happened.

5       Q.   Prior to January 2005, when was the

6   last time you went to work at the Department of

7   Education?

8       A.   February 14, 2003.

9       Q.   And prior to January 2005, when was it,

10  and we'll get into this a little bit more later,

11  when was it -- it was, what, August 6, 2004 or

12  August 8, 2004 that you were removed as an

13  employee from the Department of Education,

14  correct?

15      A.   August 6, 2004.

16      Q.   Thank you.  In calendar year 2006, have

17  you been throwing up as a result of your

18  depressive disorder?

19      A.   Huh-uh.

20      Q.   What about 2005?

21      A.   No.  Wait a minute, 2005?

22      Q.   Yes, ma'am.

1    A.   That's right, no.

2    Q.   No, you didn't throw up at all in the

3  January to February 2005 time frame?

4    A.   No.

5    Q.   What about being drowsy, has your

6  depressive disorder caused you to be drowsy in

7  calendar year 2006 that you can recall?

8    A.   Yes.

9    Q.   How many times?

10    A.   About maybe six times a month.

11    Q.   Now when you're drowsy what effect does

12  that have on you?  Do you feel tired?  Do you go

13  to bed?  Are you not able to get out of bed?

14  What effect does feeling drowsy have on your

15  daily activities?

16    A.   I go to bed.

17    Q.   What else, anything?

18    A.   No.  I just go to bed and try and sleep

19  it off.

20    Q.   Regardless of what time of day it is?

21    A.   Uh-huh.

22    Q.   But now that's -- you consider that to

1    be different than bedridden, right?

2        A.    Yeah, I do.

3        Q.    How long are you in bed before you

4    really consider yourself to be bedridden?

5        A.    Bedridden is if I'm in bed the entire

6    time.

7        Q.    Entire time, like how long?

8        A.    Entire 24 hours.

9        Q.    Now when you're feeling drowsy and you

10   go to bed, how long do you usually stay in bed?

11       A.    About 16 hours.

12       Q.    So about six times a month this year,

13   you're in bed for roughly -- because of your

14   depressive disorder 16 hours, correct?  So would

15   that be like six days a month or when you say

16   six times a month, I'm trying to understand

17   that.  Do you mean six days?

18       A.    Yes, six days.

19       Q.    Okay, thank you.  Calendar year 2005,

20   roughly how often would you be bedridden?

21   Excuse me, I apologize.  How often would you be

22   drowsy due to your depressive disorder?

1      A.    About the same, six days a month.

2      Q.    Would it be pretty much the same

3    effect, ma'am, that you would be just drowsy, go

4    to bed and stay in bed for about 16 hours?

5      A.    Yes.

6      Q.    Calendar year 2004, let's talk about

7    that.  How often were you bedridden in calendar

8    year 2004?

9      A.    I would say it would have been in

10   November and December, and I was bedridden

11   probably 25 days.

12     Q.    25 days each month or out of that two

13   month span?

14     A.    Out of that two month span.

15     Q.    Any other incidents that you recall of

16   being bedridden in 2004?

17     A.    No.

18     Q.    What about 2003?

19     A.    2003 I guess I was bedridden -- I don't

20   really know.

21     Q.    Was it a lot, do you recall?  Was it

22   not a lot?

1        A.   Not a lot.

2        Q.   What about 2002, ma'am?

3        A.   Not a lot on that either.

4        Q.   Same question for 2001 and then the

5   year 2000, and that's as far as we'll go back?

6        A.   Okay.

7        Q.   So 2001, how often do you recall being

8   bedridden in the year 2001?

9        A.   Not a lot.

10       Q.   Same question for 2000, please, ma'am?

11       A.   Not a lot.

12       Q.   Now, the roughly 25 days, and I

13  understand it's an estimation, that you were

14  bedridden in 2004, would you consider that to be

15  a lot or not a lot?

16       A.   A lot.

17       Q.   So you think that between -- for the

18  years 2000, 2001, 2002 and 2003 you were

19  probably bedridden less than 25 days?

20       A.   Uh-huh.

21       Q.   Each entire year?

22       A.   Yeah.

1    Q.   Where is the dividing line in your mind

2    for being bedridden a lot or not a lot?  Is it

3    five days would be not a lot, yet ten days would

4    be a lot, or ten and eleven or where do you draw

5    the line?

6    A.   I would say 20 days is not a lot, and

7    25 is a lot.

8    Q.   Thank you.  That helps.

9    A.   It does.

10    Q.   When did you start taking medication?

11    Let me establish this first.  You take

12    medication to help you with your depressive

13    disorder, correct?

14    A.   Uh-huh.

15    Q.   When did you start taking that

16    medication?

17    A.   The medication that I'm taking now?

18    Q.   Any medication to assist you with your

19    depressive disorder?

20    A.   I started in 198 -- oh, 1988 I started

21    through -- at the school.

22    Q.   How was it it came about that you

1    started taking medication for that if you were

2    not diagnosed with the depressive disorder until

3    1989?

4         A.   Well, I guess I actually was diagnosed

5    in 1988 by the University of Connecticut people.

6         Q.   How did that diagnosis come about?

7         A.   I went there complaining about anxiety

8    for tests and stuff like that, and they gave me

9    some medication to help me.

10        Q.   Help you with depression or help you

11   with anxiety, ma'am?

12        A.   Actually help me with anxiety.

13        Q.   Now, you previously told me that you

14   weren't diagnosed for an anxiety problem until

15   1998.  Is that inaccurate?

16        A.   Yeah, that's inaccurate.

17        Q.   So when were you diagnosed with an

18   anxiety problem?

19        A.   1988.

20        Q.   That was at the University of

21   Connecticut?

22        A.   Yeah.

1      Q.    How did -- and correct me if I'm wrong,

2    I think I understand you now.  You were

3    diagnosed with an anxiety problem because you

4    had anxiety issues to do with exams involved

5    with your schooling?

6      A.    Yes.

7      Q.    And you sought help with that?  You

8    need to say yes or no?

9      A.    Yes.

10      Q.    So you were prescribed some medicine to

11    assist you with that anxiety?

12      A.    Yes.  Yeah.

13      Q.    I just need to try and understand this

14    now.  So you were diagnosed -- you believe you

15    were diagnosed with anxiety disorder in 1988 at

16    University of Connecticut?

17      A.    Right.

18      Q.    What about the depressive disorder,

19    ma'am, was that at that time or was that in 1989

20    when you tried to commit suicide?

21      A.    It was 1989.

22      Q.    Okay.  From the time of your diagnosis

1    with the depressive disorder in '89 -- and you

2    started receiving medication to help you with

3    that in 1989, correct?

4        A.    Right.

5        Q.    What effect did that medication have on

6    you?

7        A.    It made me drowsy.

8        Q.    Did it help your depressive disorder?

9        A.    Yeah, it did.

10       Q.    Did it make it go away or make it

11   better or make it more bearable or how would you

12   classify it?

13       A.    It made it more bearable.

14       Q.    But when you were taking the medication

15   for your depressive disorder, would that

16   alleviate some of the being bedridden, throwing

17   up, drowsy and crying spurts?

18       A.    Yeah.

19       Q.    So would you consider that your

20   depressive disorder is controllable with

21   medication?

22       A.    Not totally.

```
 1        Q.   But in part?

 2        A.    In part, yes.

 3        Q.    And I understand this is kind of a

 4   vague question, but to put it into percentages,

 5   what percentage would you say the medication has

 6   cut down on your depressive disorder in your

 7   opinion?

 8        A.    What percentage?  In my opinion the

 9   percentage that's cut down on my depressive

10   disorder is maybe 70 percent.

11        Q.   And has that been constant since

12   roughly 1989 until today?

13        A.    No.

14        Q.    No, there were some ups and downs in

15   there?

16        A.    Right.

17        Q.    When?

18        A.    Ups and downs?  I don't know exactly.

19        Q.    Now, you also take medication to assist

20   you with the anxiety disorder, right?  That's

21   the Clonopin?

22        A.    Uh-huh.
```

1      Q.    How long have you been on the Clonopin?

2      A.    Since January '05.

3      Q.    And just let me say, I think you did it

4   again just a second ago.  You said uh-huh to a

5   question.

6      A.    Oh, yes.

7      Q.    It's natural to do that.  I will try

8   and correct you when I hear it, but please keep

9   in mind that, just in the back of your head.

10     A.    I'm sorry.

11     Q.    It's okay.  Every witness does it.  I

12   do it.  In response to your questions, I may do

13   the same thing.

14     A.    Okay.

15     Q.    And either me or the court reporter

16   will try to remind you if it happens.  I just

17   want to let you know try to keep it in the back

18   of your head to say yes or no instead of uh-huh

19   or huh-uh, things like that, okay?

20     A.    Okay.

21     Q.    Thank you.  Does the medicine you take

22   to help you with your anxiety disorder help

1    control that?

2        A.    Yeah, it does.

3        Q.    Has that been a constant from 1988

4    through today?

5        A.    I haven't been taking Clonopin since

6    then.

7        Q.    Right, but you've been taking a

8    combination, whether it be Clonopin or other

9    medications, correct?

10        A.    Right.

11        Q.    Actually, have you been taking anxiety

12    medications from 1988 through the present time?

13        A.    No.

14        Q.    Constant?

15        A.    No, that's why I was going to -- say.

16    That's why I said in 1998 the anxiety became

17    a -- became more of an issue.

18        Q.    So while you were at the University of

19    Connecticut, you were prescribed medication to

20    assist with your anxiety, correct?

21        A.    Right.

22        Q.    When you left the University of

1    Connecticut, did you stop taking that

2    medication?

3        A.    Yeah.

4        Q.    And then when did you start taking

5    medication again to assist you with anxiety?

6        A.    I didn't start until I think 1998.

7        Q.    Okay.  I understand that now.  Since

8    1998 through present day, have you been taking

9    consistently medicine to assist you with your

10   anxiety disorder?

11       A.    Yes, I have.

12       Q.    Has it helped?

13       A.    Yeah.

14       Q.    Consistently?

15       A.    It's helped some.

16       Q.    Some.  What percentage do you believe

17   that the medication you take for your anxiety

18   disorder has decreased your symptoms?

19       A.    50 percent.

20       Q.    So when you started at the Department

21   of Labor in October of 1993, the only disability

22   you had was a depressive disorder, correct?

1      A.   Right.

2      Q.   Because it wasn't until 1998 that you

3   were again diagnosed by Dr. James with an

4   anxiety disorder also?

5      A.   Right.

6      Q.   When was the first time you told -- did

7   I say Department of Labor?  I meant the

8   Department of Education.  I apologize.  I have

9   so many cases going on with so many agencies

10   that I mess up the names sometimes, but I meant

11   Department of Education.

12      A.   Yes.

13      Q.   When is the first time you advised

14   anybody at the Department of Education that you

15   were suffering from an anxiety disorder?

16      A.   Let me think about that.  I guess in

17   1998.

18      Q.   Who do you recall telling?

19      A.   Cynthia Logan.

20      Q.   Did you tell her verbally or in writing

21   or how was --

22      A.   Verbally.

```
 1        Q.   I'm sorry.  Hold on a second.  How was

 2   the information that you were suffering from an

 3   anxiety disorder conveyed to Ms. Logan in 1998?

 4        A.   Well, I was trying to explain what my

 5   disability was, and I said I had a depressive

 6   disorder plus I had anxiety issues.

 7        Q.   So that was verbally?

 8        A.   Verbally.

 9        Q.   Did you ever provide Ms. Logan with any

10   written documentation from your doctor saying

11   that you suffered from an anxiety disorder?

12        A.   No.

13        Q.   Have you ever provided any of your

14   supervisors at the Department of Education with

15   documentation from a physician?

16        A.   Yes.

17        Q.   Or from a treating doctor saying that

18   you were suffering from an anxiety disorder?

19        A.   Yes, I have.

20        Q.   When was that, ma'am?

21        A.   I did in 1995.

22        Q.   Let me stop you there for a second,
```

1    ma'am, because maybe I'm misunderstanding

2    something.  You've told me that Dr. James

3    diagnosed you with an anxiety disorder in 1998,

4    correct?

5        A.   Right.

6        Q.   But then you just told me that you

7    provided documentation to the Department of

8    Education saying you suffered from an anxiety

9    disorder in the 1995.  How could you have

10   provided documentation prior to the time you

11   were diagnosed?

12       A.   Right.  You have a point there.

13       Q.   My question is specifically relating to

14   the anxiety disorder.  When is the first time

15   that you provided the Department of Education

16   with documentation from a treating doctor saying

17   you were suffering from an anxiety disorder,

18   ma'am?

19       A.   That I'm suffering from an anxiety

20   disorder?  I guess it was 2001.  1995 was

21   depressive.

22       Q.   Okay.  And I think we'll get into the

1     specific document, but previously you told me

2     that you gave the Department of Education

3     something in writing about a depressive disorder

4     in March 1994.  Now you've said 1995.  Did you

5     provide documentation in 1994 and 1995?

6          A.   Yes, correct.

7          Q.   Okay.  The roughly March 1994

8     documentation you provided, who was that from?

9          A.   That would have been from the staff

10    person at The Psychiatric Institute of

11    Montgomery County.

12         Q.   Okay.  Who was Ruth Ann Harold?

13         A.   Ruth Ann Harold was the supervisor.

14         Q.   She was your supervisor?

15         A.   Yeah.

16         Q.   Okay.  And who was Cynthia Logan?

17         A.   She was a team leader.

18         Q.   So --

19         A.   But --

20         Q.   Go ahead.

21         A.   But acted as a supervisor.

22         Q.   Beginning in roughly or beginning in

1    calendar year 2000, how often would you receive

2    treatment for your depressive disorder and

3    anxiety disorder combined?

4        A.    How often would I receive treatment?

5    Okay.  Let's see.  A therapist, about three

6    times -- about every three weeks, and I would

7    see the psychiatrist about every month.

8        Q.    Anything else?

9        A.    No.

10        Q.    I'm going to go through and ask the

11    same question for several follow-on years.  In

12    calendar year 2001, did that increase or

13    decrease or remain the same?

14        A.    It was the same for 2001.

15        Q.    So in 2001 you would see a therapist

16    every three weeks and a psychiatrist about once

17    a month?

18        A.    Uh-huh.  Yes.

19        Q.    In 2000 who was the therapist?

20        A.    2000, it was George C. James.

21        Q.    Who was the psychiatrist in 2000?

22        A.    I'm sorry.  The psychiatrist was George

1    C. James.   The therapist was Mary Jo Wilson.

2    I'm sorry about that.

3        Q.    That's okay.   Correct me if I'm wrong,

4    but in 2001 I think we just said that you

5    continued to see a therapist every three weeks,

6    right?

7        A.    Right.

8        Q.    Was that still Mary Jo Wilson?

9        A.    Right.

10        Q.    And you considered -- you still saw a

11    psychiatrist about once a month, right?

12        A.    Uh-huh.

13        Q.    Was that Dr. James?

14        A.    Yeah.

15        Q.    In 2002 did your frequency of treatment

16    change at all?

17        A.    Yes, I had to start seeing my therapist

18    every two weeks of a month, but I saw my

19    psychiatrist every month.   They both -- they

20    conferred with each other.

21        Q.    Was the therapist still Ms. Wilson?

22        A.    Yes.

```
 1        Q.   The psychiatrist was still Dr. James?

 2        A.   Yes.

 3        Q.   2003 now, did you consider -- did you

 4    continue to see Ms. Wilson?

 5        A.   Yes.

 6        Q.   And continued to see Dr. James?

 7        A.   Yes.

 8        Q.   How often in 2003 would you see Ms.

 9    Wilson?

10        A.   About the same as 2002.

11        Q.   So about every two weeks?

12        A.   Right.

13        Q.   Was it the same with Dr. James in 2003?

14        A.   Yeah.

15        Q.   2004, did you continue to see Ms.

16    Wilson?

17        A.   Yes.

18        Q.   How often?

19        A.   Every two weeks in a month.

20        Q.   And continued to see Dr. James also?

21        A.   Right.

22        Q.   How often, still once a month?
```

1      A.   Yeah.

2      Q.   Now, 2005, did you continue to see Ms.

3   Wilson?

4      A.   No.

5      Q.   Did you get a new therapist?

6      A.   Yeah.

7      Q.   Who was that?

8      A.   Dr. Pepper.

9      Q.   How often would you see Dr. Pepper in

10   2005?

11      A.   I saw him about every month.

12      Q.   Roughly one time a month?

13      A.   Yes.

14      Q.   When in 2005 did you begin to see Dr.

15   Pepper instead of Ms. Wilson?

16      A.   Well, actually I -- I'm sorry.  It was

17   actually -- well, I started seeing Dr. Pepper

18   after my hospitalization.  My hospitalization

19   was in January '05.

20      Q.   Okay.  Thank you.  In 2005, did you

21   continue to see Dr. James?

22      A.   No.  Dr. Pepper took over his -- Dr.

1    Pepper is the psychiatrist.

2        Q.    Okay.  So in early 2005 after your

3    hospitalization, you stopped seeing the

4    therapist, Ms. Wilson, and the psychiatrist, Dr.

5    James, and began seeing only Dr. Pepper?

6        A.    Right.

7        Q.    And you would only see him once a

8    month?

9        A.    Right.

10        Q.    Okay.  2006, do you continue to see Dr.

11    Pepper?

12        A.    Yes.

13        Q.    You do not see Ms. Wilson or Dr. James

14    any more, correct?

15        A.    No.

16        Q.    How often do you see Dr. Pepper?

17        A.    Once a month.

18        Q.    Ma'am, we've already talked about

19    briefly your suicide attempt in 1989, correct?

20        A.    (Nods head).

21        Q.    How many other times have you -- yes or

22    no, ma'am?  You shook your head.

1      A.   Oh, yes.

2      Q.   How many other times have you attempted

3   suicide?

4      A.   I've attempted suicide -- wait a

5   minute.  Five times.

6      Q.   Were there any attempts before 1989?

7      A.   No.

8      Q.   When was the first attempted suicide

9   after 1989?

10      A.   1994.  Oh, I'm sorry.

11      Q.   Go ahead.

12      A.   I'm sorry.  1990.

13      Q.   Do you recall when in 1990?

14      A.   No.

15      Q.   How did you attempt suicide?

16      A.   I was going to jump the Bay Bridge,

17   jump off the Bay Bridge.

18      Q.   Okay.  Did you take any steps to do

19   that?

20      A.   Well, I was on the railing of the Bay

21   Bridge.

22      Q.   Okay.  Were you hospitalized after

1    that?

2        A.    Yes.

3        Q.    For how long?

4        A.    A month.

5        Q.    Where?

6        A.    Psychiatric Institute of Montgomery

7    County.

8        Q.    Was there an incident or anything

9    specific that brought along the suicide attempt

10   in 1990?

11       A.    There wasn't anything specific, no.

12       Q.    Just everything together?

13       A.    Right.

14       Q.    Okay.  When was the next time you

15   attempted suicide after 1990?

16       A.    1994.

17       Q.    How did you attempt suicide in 1994?

18       A.    1994?  I don't remember.

19       Q.    Do you recall what led to the attempted

20   suicide in 1994?

21       A.    No.

22       Q.    How did you attempt suicide in 1994?

```
 1        A.    I don't know.

 2        Q.    When was the next time after 1994?

 3        A.    2005.

 4        Q.    How did you attempt suicide in 2005,

 5   ma'am?

 6        A.    In 2005, I -- now I know what 1994 was.

 7        Q.    Go ahead, please.

 8        A.    1994 I took a bunch of Trazodone pills,

 9   overdose.

10        Q.    Did someone find you after you took the

11   pills or how --

12        A.    Yes, my mother did.

13        Q.    And you were rushed to the hospital?

14        A.    Right.

15        Q.    Were you admitted to the hospital for

16   any period of time off that?

17        A.    Yes.

18        Q.    For how long?

19        A.    I was in the hospital for like 14 days,

20   and then I was a partial patient, partial

21   hospitalization program for a couple weeks.

22        Q.    Was that still at The Psychiatric
```

1       Institute of Montgomery County?

2           A.   No.  This was at the Laurel Regional

3       Hospital.

4           Q.   Now, you said your fourth attempted

5       suicide was January of 2005?

6           A.   Yes.  Yeah.

7           Q.   How did you attempt suicide in January

8       2005?

9           A.   I swallowed a bunch of Effexor pills.

10          Q.   Who found you?

11          A.   My husband.

12          Q.   And you were hospitalized, correct?

13          A.   Yes.  Yeah.

14          Q.   Where?

15          A.   I was hospitalized at Fairfax Hospital.

16          Q.   For how long?

17          A.   For about 14 days, and then I had 14

18      days of partial hospitalization.

19          Q.   Now, you went back and you actually

20      remembered some stuff about 1994.  Do you recall

21      what it was that led to the attempted suicide in

22      1994?

1   A. I just remember feeling very

2 overwhelmed and didn't feel like I could do

3 anything right.

4   Q. Overwhelmed with what?

5   A. Overwhelmed with everything that was

6 going on, anything, just little things.

7   Q. What led to the suicide attempt in

8 January 2005?

9   A. The -- all the stuff dealing with the

10 Department of Education.  It had said that I --

11 they had said that I had poor performance, which

12 I didn't have poor performance, and that

13 bothered me a lot.  It was -- I was out a lot,

14 which -- but my work was quality work when I was

15 in, and so I didn't have poor performance

16 issues.  I just had that I was out a lot.

17   Q. Okay.  What else?

18   A. I don't know if there was much else.

19   Q. When was it that someone at the

20 Department of Education told you you had poor

21 performance, ma'am?

22   A. It was in some of the court documents

 1    that I received.

 2         Q.   Did anyone tell you that, though?

 3         A.   No.

 4         Q.   Prior to January 2005, just so the

 5    record is clear, the last time you actually had

 6    been to work at the Department of Education was

 7    February 14, 2003, correct?

 8         A.   Uh-huh.

 9         Q.   And you had been terminated, removed as

10    an employee from the department August 6, 2004,

11    correct?

12         A.   Yes, yes.

13         Q.   Now, you've given me now four attempts

14    of suicide.  You previously told me there was

15    five.  When was the fifth?

16         A.   The fifth was before I -- I'm sorry,

17    I'm remembering these as we go along.

18         Q.   That's fine, and as we go along,

19    please, if you need to correct something or you

20    remember something, please tell me because like

21    I said, the most important thing is we have

22    honest, accurate, the best testimony we can, so

```
1    if you remember something else, please let me

2    know.

3              I'll tell you what, why don't we take a

4    quick five-minute break, and then we'll start up

5    again, okay?

6         A.   Okay.

7              (A brief recess was taken.)

8              MR. HENAULT:  Back on.

9              BY MR. HENAULT:

10        Q.   All right, ma'am.  I would like to

11   switch gears a little now and start with your

12   employment history.  What was the job you had

13   immediately prior to joining -- actually I think

14   I can speed this up a little bit.  Immediately

15   prior to joining the Department of Education,

16   you worked for the American Bankers Association,

17   correct?

18        A.   Yes, part time.

19        Q.   That was from September 2003 to October

20   2003?

21        A.   Say it again.

22        Q.   That was from roughly September -- I'm
```

1    sorry, I was wrong there.  That was roughly

2    September 1992 to October 1993?

3        A.   Yeah.

4        Q.   And you were a part-time clerical

5    worker?

6        A.   Correct.

7        Q.   While you were working at the American

8    Bankers' Association, did you require any

9    accommodations for any disabilities?

10       A.   No, I didn't.

11       Q.   Why did you leave the American Bankers'

12   Association?

13       A.   To go to Department of Education.

14       Q.   Before joining the American Bankers'

15   Association, you worked for a company called

16   Graham, Incorporated, correct?

17       A.   Correct.

18       Q.   That was -- actually you worked there

19   at the same time?

20       A.   That was the same time, right, yeah.

21       Q.   You were also a part-time clerical

22   worker there?

1      A.    Right.

2      Q.    Did you require any accommodations for

3    your disabilities to be able to work at Graham,

4    Incorporated?

5      A.    No.

6      Q.    How many hours a week would you work at

7    the American Bankers' Association roughly?

8      A.    Well, it was kind of like temporary

9    work, so it depended on when they needed people.

10      Q.    Was there a time where you worked more

11    hours?  What's the maximum amount of time you

12    recall working at the American Bankers'

13    Association per week?

14      A.    40 hours.

15      Q.    Between September '92 and October '93

16    when you worked at both the American Bankers'

17    Association and Graham, Incorporated, did you

18    generally work full time between those two jobs?

19      A.    No, I was off -- they were both like

20    temporary positions so I was off some of the

21    time, and --

22      Q.    For that almost one year, if you had to

```
1      estimate between the two companies combined, how

2    many hours a week would you work on average?

3         A.   For both those companies?

4         Q.   Yes, ma'am.

5         A.   I can't remember.  I would have to go

6    back to my records.

7         Q.   From roughly July 1992 to August 1992,

8    you worked for Fox Temps, Incorporated, correct?

9         A.   Right.

10        Q.   You only worked there six hours a week?

11        A.   Yes.

12        Q.   As a receptionist?

13        A.   Right.

14        Q.   Did you require any accommodations to

15   be able to work that time at Fox Temps?

16        A.   No.

17        Q.   From February '92 to June '92 you were

18   unemployed, correct?

19        A.   Right.

20        Q.   And lived with your parents?

21        A.   Correct.

22        Q.   Why were you unemployed during that
```

1    time?

2         A.    What point?  What was the times again?

3         Q.    February '92 to June '92.

4         A.    Oh, because I quit my job at Joseph

5    Smith and Sons and I didn't have a job to go to

6    right afterwards.

7         Q.    So prior to that you were with Joseph

8    Smith and Sons, right?

9         A.    Right.

10        Q.    And that was from roughly September

11   1990 to February '92?

12        A.    Right.

13        Q.    Why did you quit that job?

14        A.    Well, I tried to get a raise, and they

15   didn't agree with a raise, so I quit the job.

16        Q.    While working at Joseph Smith and Sons,

17   did you require any disabilities to -- excuse

18   me.  Did you require any accommodations to --

19   for any disabilities?

20        A.    No.  They let me work around different

21   hours though.

22        Q.    Like what hours did you work there?

1       A.    Well, sometimes I would come in later,

2   like ten and stay until six.

3       Q.    Ten a.m. and stay until six p.m.?

4       A.    Right.   And I also came in on Saturdays

5   sometimes to make-up for the days that I was

6   out?

7       Q.    Were those I guess formal

8   accommodations that you had requested or it was

9   just an agreement that you had with them that

10  you could come and go as you pleased?

11      A.    Just -- it wasn't an accommodation.   It

12  was just -- I could come and go as long as I

13  could do my work.

14      Q.    Have you ever been terminated from a

15  job other than the Department of Education?

16      A.    No.

17      Q.    Have you ever resigned from a job

18  instead of being fired?

19      A.    Yes.

20      Q.    Where?

21      A.    When I was working for Track Auto.

22      Q.    When was that?

1       A.    It was while I was in school at

2    University of Connecticut.

3       Q.    Why were you going to be fired from

4    Track Auto?

5       A.    Because I couldn't figure out what

6    happened to $20.

7       Q.    Other than your time at Department of

8    Education, have you ever had any disciplinary

9    action taken against you by any employer?

10      A.    No.

11      Q.    I think we've already said you started

12   working with the Department of Education

13   October -- since you left the Department of

14   Education in August of 2004, have you had any

15   employment?

16      A.    No.

17      Q.    Now, we've already said I think that

18   you started working at the Department of

19   Education October 18, 1993, correct?

20      A.    Right.

21      Q.    That was as a GS 6 secretary, right?

22      A.    No, I started out as a GS 5.

1      Q.    GS 5 secretary?

2      A.    Yeah.

3      Q.    And you were a secretary in the office

4   of the chief financial officer; is that right?

5      A.    Right.

6      Q.    What were your duties?

7      A.    That's -- I think I had that

8   information on my resume.

9      Q.    What do you -- go ahead, I'm sorry.

10     A.    But it would be --

11     Q.    What do you recall your duties being as

12   a secretary in the office of the chief financial

13   officer?

14     A.    Okay.  I don't have to recall

15   everything?

16     Q.    Right.

17     A.    Okay.

18     Q.    Just what were your major -- what were

19   the major things that you did?

20     A.    Answering the phones.

21     Q.    Was it just basically clerical,

22   secretary type duties?

1    A.    Yeah.

2    Q.    Who was your immediate supervisor?

3    A.    Ruth Ann Harold.

4    Q.    Was she -- did she begin being your

5    supervisor when you were hired in October '93?

6    A.    Yes, correct.

7    Q.    When did she stop supervising you as a

8    secretary?

9    A.    When did she stop?  I'm not sure

10    exactly.

11    Q.    While you were a secretary, did you

12    work full time?

13    A.    Yeah, I worked full time.

14    Q.    What were your hours?

15    A.    They were 8:30 to 5:00.  I think that's

16    right, 8:30.

17    Q.    Roughly?  A normal hour workday though?

18    A.    Right.

19    Q.    Were you able to work those hours?

20    A.    Sometimes not.  I had -- I did get an

21    accommodation to work different -- to work later

22    hours if I needed to.

1    Q.   How often would you work later hours?

2    Now I'm just again talking about while you were

3    a secretary.

4    A.   Maybe twice a week.

5    Q.   On those two times a week, what time

6    would you typically come into work?

7    A.   I would probably come in around 10:00

8    and stay until 6:30.

9    Q.   And was that flexible starting time or

10   flexible hours the only accommodation that you

11   received as a secretary?

12   A.   The starting time and flexible hours?

13   Yeah.

14   Q.   Was that the only accommodation that

15   you ever requested as a secretary?

16   A.   Yes.  Yes, it is.

17   Q.   On May 12, 1996, you applied for and

18   were promoted to a GS 7 accountant position,

19   correct?

20   A.   Right.

21   Q.   In what section did you work?

22   A.   In the same section, but it was

1    accounting instead of secretary work.

2        Q.    So you were still in the office of the

3    chief financial officer at the Department of

4    Education?

5        A.    Right.

6        Q.    How was the office broken down?  Were

7    there different sections doing different jobs or

8    how was it broken -- I want to understand the

9    organization of the office.

10       A.    I don't quite understand the question.

11       Q.    Were you in -- when you were in

12   accounting, were you in any subgroups or any

13   specific focus of accounting or anything like

14   that?

15       A.    We were on the grant side.

16       Q.    Okay.  So you have the office of the

17   chief financial officer?

18       A.    Right.

19       Q.    The grants section is a component

20   within that office?

21       A.    Right.

22       Q.    Who supervised the grant section when

1    you started there in May '96?

2         A.   Jan Steinbruck.

3         Q.   In 1996, was she your first line

4    supervisor or were there any other supervisors

5    in between you and Ms. Steinbruck?

6         A.   She was my first line supervisor.

7         Q.   Who did she report to, do you know?

8         A.   I think she reported to Gloria Jarman.

9         Q.   Was that the chief financial officer?

10        A.   What was her position?  No, not the

11   chief financial officer, the director of the

12   whole -- the director of financial management.

13        Q.   What was Ms. Steinbruck's position, do

14   you know?

15        A.   Grant supervisor.

16        Q.   Did there come a time when Ms.

17   Steinbruck left as grant supervisor and your

18   immediate supervisor changed?

19        A.   Yeah, she left.  I'm not sure when she

20   left.

21        Q.   Who became your supervisor after she

22   left though?

1        A.    Cynthia became -- she was actually a

2    team leader but she was like a supervisor.

3        Q.    When Ms. Steinbruck was the team

4    leader, was there also a team leader when you

5    worked or did you just work directly with Ms.

6    Steinbruck?

7        A.    I worked directly with Ms. Steinbruck.

8        Q.    And then there came a time when teams

9    were created; is that right, or were the teams

10    created previously?

11        A.    There became a time when the teams were

12    created.

13        Q.    What team were you on?  Did it have a

14    name?

15        A.    No.

16        Q.    What did your team do?

17        A.    We dealt with grants.

18        Q.    What did some of the other teams do?

19        A.    Some of the other teams --

20        Q.    To the best of your knowledge?

21        A.    Dealt with loans.

22        Q.    Who else was on your grant team?

1        A.    I don't really recall.

2        Q.    Do you recall anyone else that was on

3    the grant team besides Ms. Logan who was the

4    team leader?

5        A.    Oh, wait a minute.  I thought -- no,

6    she wasn't the team leader of the grants

7    section.  Wait a minute.  I got something

8    confused here.

9        Q.    What team did Ms. Logan lead?

10        A.    She led the accounts receivable team.

11        Q.    Okay.  That's the team on which you

12    worked?

13        A.    Right.

14        Q.    So was the accounts receivable team

15    part of the grants section?

16        A.    No.

17        Q.    Where did the accounts receivable team

18    fall into the office?

19        A.    Where did it fall into the office?

20        Q.    Yes.  What I'm trying to understand is

21    how the office structure worked.  For instance,

22    if Ms. Steinbruck was the grant supervisor and

1    you worked directly for her, but then there

2    appears to have been a team also, I want to know

3    how and when that changed as far as your duties,

4    who you worked with and who you reported to.  Do

5    you understand?

6         A.    Yeah.

7         Q.    To the best you can recall this, can

8    you give me that information?

9         A.    Okay.  Well, I don't know.

10        Q.    Well, there came a time, do you recall

11   when Cynthia Logan became your team leader?

12        A.    1998.

13        Q.    Were you transferred to her team or how

14   did it come about that she became your team

15   leader?

16        A.    I was transferred to her team.

17        Q.    Prior to that time, what were you

18   doing?

19        A.    Prior to that time I was in

20   unclassified duties.

21        Q.    How long were you in unclassified

22   duties?

1      A.    For let's see, from August 1997 to

2  sometime in 1998.

3      Q.    Prior to doing unclassified duties in

4  August '97, what were you doing?

5      A.    I was doing accounting work under Jan

6  Steinbruck.

7      Q.    While you were in unclassified duty,

8  who was your supervisor?

9      A.    Betty Hepak.

10      Q.    Can you spell that last name, please?

11      A.    H E P A K.

12      Q.    What were your responsibilities while

13  doing unclassified duties, ma'am?

14      A.    I got together conference information

15  and for conferences that were being held outside

16  of the Department of Education.

17      Q.    And then sometime thereafter in 1998

18  you transferred to Ms. Logan's team, right?

19      A.    Right.

20      Q.    That was the accounts receivable team?

21      A.    Right.

22      Q.    Do you recall any other team members on

1    that team?

2        A.    Yes, Theresa Todd.

3        Q.    Ms. Todd?  Who else?

4        A.    Shirley Tucker.

5        Q.    Who else, ma'am?

6        A.    I'm trying to think.  I don't think

7    there was any more?

8        Q.    There came a time when you left Ms.

9    Logan's team, right?

10       A.    Uh-huh.

11       Q.    Let me first back up one second.  When

12   Ms. Logan was your team supervisor, who was the

13   supervisor you reported to above her?

14       A.    That would be Jan.

15       Q.    Okay.  There came a time then when you

16   left Ms. Logan's team, right?

17       A.    Right.

18       Q.    What, did you go to another team or to

19   another section or what did you do after that?

20       A.    I went back to the grants section.

21       Q.    Who was your immediate supervisor then?

22       A.    Gary Wood.

1    Q.    Do you recall when that was?

2    A.    That was in -- no, I don't recall when

3    that was.

4    Q.    How long, just an estimate, do you

5    believe you worked for Ms. Logan on the accounts

6    receivable team?

7    A.    I think a year and a half.

8    Q.    And then you went and were supervised

9    by Gary Wood on the grants team?

10    A.    Right.

11    Q.    Who was your second line supervisor

12    above Mr. Wood?

13    A.    That would have been -- at that time

14    I'm not sure if it was -- it might have been

15    Mark Carney.

16    Q.    Was Mr. Mack Lawrence anywhere in your

17    reporting chain at that time?

18    A.    Not at that time, no.

19    Q.    How long did you work for Gary Wood?

20    You said about a year and a half; is that right?

21    No, that's how long -- how long were you

22    supervised by Mr. Wood?

1          A.    For about a year.

2          Q.    After Mr. Wood, who supervised you?

3          A.    Mack Lawrence.

4          Q.    And Mr. Lawrence started supervising

5      you in March of 2000, correct?

6          A.    Right.

7          Q.    What section -- how did it come about

8      that Mr. Lawrence became your supervisor?  Did

9      Mr. Wood leave or did you transfer to a new

10     section?

11         A.    Wait a minute.  Say that again.

12         Q.    How did it come about that Mr. Lawrence

13     became your supervisor?  Did Mr. Wood leave the

14     section you were working in or did you move to a

15     new section?

16         A.    No, I stayed in the same section.  It's

17     just the supervisors changed.

18         Q.    Okay.  Between March 2000 and the time

19     you left as an employee in August of 2004, was

20     Mr. Lawrence continually your first line

21     supervisor?

22         A.    Yes.

```
1         Q.   Now, your position as an accountant was

2    a career ladder position, correct?

3         A.   Uh-huh.

4         Q.   You began as a GS 7?

5         A.   Right.

6         Q.   And maximum grade was GS 12?

7         A.   Right.

8         Q.   What's your understanding of a career

9    ladder position?

10        A.   A career ladder position is you could

11   get a promotion as long as you got a pass on

12   your G-Pass.  You would move to the next grade.

13        Q.   Is it your belief that as long as you

14   got a pass you were entitled to be promoted?

15        A.   Right.

16        Q.   After how long?

17        A.   After a year of being in grade.

18        Q.   So it's your belief or your

19   understanding of the career ladder position that

20   after one year, if you were at the pass level,

21   you automatically received a promotion to the

22   next grade?
```

1        A.    Right.

2        Q.    Did you have any understanding of any

3    process that you were required to go through to

4    obtain this promotion?

5        A.    No.

6        Q.    It just automatically would show up

7    one day.  They would tell you now you're the

8    next grade higher?

9        A.    Right.

10       Q.    I want to go through to make sure I

11    understand and know all of the allegations that

12    are contained in your complaint, okay?

13       A.    Okay.

14       Q.    Number 1, you allege that you were

15    discriminated against in violation of the Rehab

16    Act when you did not receive a career ladder

17    promotion from the GS 11 level to the GS 12

18    level, correct?

19       A.    Correct.

20       Q.    Does your complaint about career ladder

21    promotion involve any other promotions or is it

22    just from the GS 11 to the GS 12 level?

1      A.   Oh, no.  We do go back and talk about

2    previous promotions.

3      Q.   Is your allegation that you did not

4    receive those previous promotions also as a

5    result of your disability?

6      A.   Yes, correct.

7      Q.   And you're challenging not receiving

8    those promotions timely?

9      A.   Right.

10      Q.   Anything else related to promotions?

11      A.   No.

12      Q.   What level promotions are you

13    challenging?

14      A.   The GS 9, GS 11 and GS 12.

15      Q.   Okay.  So your allegation of

16    discrimination regarding your promotions is that

17    you did not receive a promotion from GS 7 to GS

18    9 when you should have?

19      A.   Right.

20      Q.   You did not -- and also your allegation

21    regarding your career ladder promotion is you

22    did not receive a GS 9 to a GS 11 promotion when

1    you should have?

2        A.    Right.

3        Q.    You're also alleging that your failure

4    to receive a promotion from the GS 11 to GS 12

5    was discriminatory?

6        A.    Right.

7        Q.    But other than those three promotions,

8    that's it, right?

9        A.    Uh-huh.

10       Q.    Yes?

11       A.    Yes.  I'm sorry.

12       Q.    Now, you allege that you were

13   discriminated against in violation of the

14   Rehabilitation Act when in March 2000 Mr.

15   Lawrence requested that you get approval before

16   earning credit hours, right?

17       A.    Right.

18       Q.    Anything else to do with credit hours?

19       A.    What do you mean?

20       Q.    Do your allegations involve anything

21   else to do with credit hours other than Mr.

22   Lawrence telling you that you had to get

1    approval?

2        A.    No.

3        Q.    Now, you allege that you were

4    discriminated against in violation of the

5    Rehabilitation Act when Mr. Lawrence did not

6    preapprove you for 72 hours of leave without pay

7    for a vacation from March 18, 2003 to March 28,

8    2003, correct?

9        A.    Uh-huh, correct.  Yes.

10        Q.    Do you allege any other allegations or

11    wrong doing -- actually you also alleged that

12    Mr. Lawrence's failure to preapprove you for

13    those 72 hours of leave without pay was

14    retaliation for your prior EEO activity, right?

15        A.    Right.

16        Q.    Anything else?  Do you have any other

17    allegations regarding the 72 hour leave without

18    pay issue?

19        A.    No.

20        Q.    You allege that you were retaliated

21    against by supervisors who used coercion,

22    intimidation and threats to get you to

1    relinquish your claims and leave your job as an

2    accountant, correct?

3        A.    Uh-huh, correct.

4        Q.    You also allege that you were subject

5    to a hostile work environment on the basis of

6    your disabilities, correct?

7        A.    Correct.

8        Q.    Finally you allege that the Department

9    of Education discriminated and retaliated

10   against you when it terminated your employment

11   on August 6, 2004, correct?

12       A.    Correct.

13       Q.    Any other claims besides those that

14   we've just discussed?

15       A.    No.

16       Q.    Now, I want to start with your

17   allegation that Mr. Lawrence discriminated

18   against you when he requested that you get prior

19   approval for credit hours.  There was a point

20   when your supervisor permitted you to come in on

21   unpredictable hours, correct?

22       A.    Uh-huh.

1      Q.    Yes?

2      A.    Yes.

3      Q.    What was the normal workday for your

4   position?

5      A.    Normal workday that --

6      Q.    That you were scheduled to work?

7      A.    Oh, well, I had the gliding schedule,

8   so I could come in any time in between 7:00 and

9   9:30 and then work eight and a half hours after

10   that.

11      Q.    Was the gliding schedule an

12   accommodation?

13      A.    No.

14      Q.    How did it come about that you had a

15   gliding schedule?

16      A.    I don't know.

17      Q.    When you were a secretary did you have

18   a gliding schedule?

19      A.    Yeah, I did.

20      Q.    So then when you became an accountant,

21   you just continued the same gliding schedule?

22      A.    Right.

1    Q.    As an accountant, who was the first

2    supervisor that would permit you to come into

3    work at hours other than set in the gliding

4    schedule?

5    A.    Say this again?

6    Q.    When you became an accountant in May

7    1996 --

8    A.    Right.

9    Q.    -- were there any supervisors or did

10    anyone ever tell you you can come in at hours

11    other than those set by your gliding schedule?

12    A.    Yeah.

13    Q.    Who?

14    A.    Jan Steinbruck.

15    Q.    Who else, anyone?

16    A.    No, not anyone else.

17    Q.    Did Ms. Steinbruck ever tell you what

18    hours you could come in or was it any hours you

19    wanted to?

20    A.    Well, I told her that I needed an

21    accommodation, and sometimes I would come in

22    like 10:00 and work roughly eight and a half

1    hours after that, and --

2        Q.   Go ahead.  Anything else?

3        A.   You were about to say something?

4        Q.   No, go ahead and finish your answer

5    first.  I don't want to interrupt.

6        A.   I don't know.  I lost my train of

7    thought there.

8        Q.   Well, what we were discussing was what

9    hours you were allowed to come in as an

10   accommodation for your disability, and you gave

11   the example of some days you would come in at

12   10:00, which was actually a half hour outside of

13   your gliding schedule, correct?

14       A.   Right.

15       Q.   And then you would work eight and a

16   half hours after that, and then your day would

17   be over, right?

18       A.   Right.

19       Q.   Were there any limitations on what time

20   you could come in?

21       A.   No.

22       Q.   You were allowed to come in whenever

1    you wanted?

2        A.    Pretty much, yeah.

3        Q.    And Ms. Steinbruck was the supervisor

4    that let you to do that?

5        A.    Right.

6        Q.    Now, isn't it correct that there are

7    some days that you would come in to work at

8    between 5:00 and 7:00 p.m.?

9        A.    I didn't do that often.

10       Q.    But you did?

11       A.    I did.

12       Q.    When did you start coming in that late?

13       A.    I didn't do it very often.

14       Q.    How often would you do it, do you

15   recall?

16       A.    No, I don't recall.

17       Q.    When you came in at 5:00 to 7:00, who

18   was your supervisor?

19       A.    It probably would have been Cynthia

20   Logan.

21       Q.    When you came in those days say between

22   5:00 p.m. and 7:00 p.m. and then worked until

 1    whenever you were done, what time would you

 2    typically work until?

 3        A.    Well, I didn't do it very often, and I

 4    probably worked like four hours.

 5        Q.    So if you came in at 5:00, that would

 6    be until 9:00 p.m., and if you came in at 7:00,

 7    8:00, 9:00, 10:00, 11:00 p.m. roughly?

 8        A.    Right, but I didn't do it very often.

 9        Q.    Ms. Logan started supervising you in

10    1998.  How often do you recall doing this, just

11    an estimate in 1998, this kind of schedule?

12        A.    The five o'clock to seven?

13        Q.    Yes, come in like at the end of

14    everyone else's workday?

15        A.    I only recall like maybe four times the

16    entire time I was with her.

17        Q.    What about after you left her

18    supervision?

19        A.    I recall one time after I left her

20    supervision.

21        Q.    Who was your supervisor then?

22        A.    Gary Wood.

1      Q.    Anyone, any other time?

2      A.    Nope.

3      Q.    When you would work that late, would

4    there ever come a time when you would not be

5    able to come in the next day because you were

6    too tired from working so late?

7      A.    No.

8      Q.    You never left Ms. Logan a message

9    after working that late saying that you had

10   worked until midnight the night before and

11   couldn't come in to work the next morning?

12     A.    I might have said that on the year

13   end -- on September 30 when we did the year end

14   stuff and had to get everything in by the 30th.

15     Q.    Would that have been September 30, '98

16   or '99, do you recall?

17     A.    I don't recall.

18     Q.    On that time that you may have done it,

19   was that a day that you would come into work

20   real late and then work late?

21     A.    I don't remember.

22     Q.    Why was being able to come and go,

1    being able to come into work when you felt you

2    could or wanted to and then leave when you felt

3    you could or wanted to -- how did that help your

4    disabilities or why did your disabilities make

5    that necessary in your opinion?

6         A.   It made it necessary because -- wait a

7    minute.   You said two things.   Now, can you

8    repeat that again?

9         Q.   Yeah.   I won't make you read it.   How

10   did basically coming in later than the hours set

11   by your gliding schedule -- in your opinion why

12   did your disability make that necessary?

13        A.   Because a lot of times that I would be

14   drowsy and sometimes my anxiety would get up

15   there and I would get sick, so I would need

16   to -- I would feel better later on in the day

17   and then I would go in.

18        Q.   I understand the drowsiness, so you

19   were too tired to go to work, but how did the

20   anxiety -- what were you anxious about?

21        A.   I just have chronic anxiety, which is I

22   pretty much worry about everything.

1    Q.   And that precluded you from getting to

2    work on time?  Yes?

3    A.   Yes.

4    Q.   In what way was it paralyzing or could

5    you not do anything when you were suffering --

6    were they anxiety attacks or was it constant?

7    A.   It was constant.

8    Q.   And so was it paralyzing or why could

9    you not get yourself to work at a certain time

10   because of this anxiety?

11   A.   Well, I would get sick, and then I

12   couldn't -- I wouldn't feel well for awhile.

13   Q.   When that would happen, how long would

14   it typically take for you to feel well?

15   A.   To feel better?  A couple hours.

16   Q.   Now, this accommodation of being

17   allowed to come into work later and work later,

18   that was the only accommodation that you

19   required to do your job, right?

20   A.   Right.

21   Q.   Was that constant from 1996 when you

22   became an accountant until the time you left in

1    2004?

2        A.    Yes.

3        Q.    And my question wasn't clear.  I want

4    to be sure that the record is clear.  The

5    accommodation of coming into work at hours that

6    were outside of the gliding schedule hours, that

7    was the only accommodation you needed to do your

8    job between May '96 and the time you were

9    terminated in August of 2004, correct?

10       A.    Correct.

11           MR. HENAULT:  Let's mark this as

12    Exhibit 1, please.

13           (Johnson Deposition Exhibit Number 1

14    was marked for identification.)

15           BY MR. HENAULT:

16       Q.    Please take a look at that, ma'am.

17    Have you seen this before?

18       A.    Yes.

19       Q.    Did you request -- let me say this.

20    What has been marked as Johnson 1 is a January

21    14, 1995 letter from Dr. James to whom it may

22    concern regarding Susan Johnson, correct?

1      A.    Right.

2      Q.    Did you request that Dr. James write

3   this letter?

4      A.    Yes, I did.

5      Q.    And you requested that he write it why?

6      A.    Because I needed written documentation

7   of my -- of why I needed an accommodation.

8      Q.    Okay.  And is this the first letter you

9   gave to the Department of Education?

10     A.    No, I don't have the first letter.

11     Q.    Okay.  You do not -- there was -- it's

12   your testimony that there was also a March 1994

13   letter, correct?

14     A.    Right.

15     Q.    And you do not have a copy of that

16   letter?

17     A.    No.  No, I don't have a copy of it.

18     Q.    So this would have been the second

19   letter that you provided?

20     A.    Right.

21     Q.    And here we have the only accommodation

22   that's requested is that you get a work schedule

1    of less than eight hours per day from time to

2    time depending on your condition, right?

3        A.    Uh-huh.

4        Q.    This letter doesn't say what disability

5    you suffer from, does it?

6        A.    No, it doesn't.

7        Q.    Is it your recollection, did the March

8    2004 -- or 1994 letter say what disability you

9    suffered from?

10       A.    Yeah, because I needed it to explain

11   why I was out.

12       Q.    And what's your recollection of what

13   that letter said?

14       A.    That I had had a depressive episode and

15   that -- and that I was -- wait a minute.  That I

16   had had a depressive episode and that I was

17   going to need some flexibility in my hours.

18       Q.    That depressive disorder was your

19   attempted suicide in 1994, correct?

20       A.    Right.

21       Q.    So this letter requests that you get a

22   schedule of less than eight hours a day from

1     time to time?

2         A.    Uh-huh.

3         Q.    Yes?

4         A.    Right.

5         Q.    And you received that accommodation,

6     right?

7         A.    Right, I did.

8         Q.    The Department of Education let you

9     work less than eight hours per day as needed?

10        A.    Right, up until 1997 when they started

11    making it harder on me then.

12        Q.    What happened in 1997 that it became

13    harder on you?

14        A.    They would question -- they would

15    question whether I should be able to -- I'm

16    sorry.

17        Q.    No, don't apologize.  Just take your

18    time.

19        A.    They were questioning whether I would

20    be able to use my credit hours.

21        Q.    That was in 1997?

22        A.    Yeah.

1      Q.    Who is "they"?

2      A.    Actually I'll say 1998.

3      Q.    So in 1998 someone began to question

4  whether you could use your credit hours?

5      A.    Whether I could get credit hours, not

6  use credit hours, get credit hours.

7      Q.    Who began to question that?

8      A.    Cynthia Logan.

9      Q.    What are credit hours?

10     A.    They're hours after the normal day of

11  work that you accumulate.

12     Q.    What did -- go ahead, I'm sorry.

13     A.    So like if you worked 6:00 to 7:00,

14  then that would be one credit hour outside the

15  regular work schedule.

16     Q.    Okay.  And let's talk a little bit

17  about those credit hours.  There are agency

18  guidelines regarding earning credit hours,

19  correct?

20     A.    Uh-huh.

21     Q.    Yes?

22     A.    Yes.

1          Q.    The guidelines are contained in the

2    agency's collective bargaining agreement with

3    the union, correct?

4          A.    Yes.

5          Q.    Under these guidelines an employee on a

6    gliding schedule must have a schedule covering

7    the core hours which are 9:30 to 3:00, correct?

8          A.    Right.

9          Q.    And there's a limitation that an

10   employee can only earn two credit hours per

11   workday, right?

12         A.    Correct.

13         Q.    And earning those credit hours must

14   occur between 7:30 a.m. and 6:30 p.m., correct?

15         A.    No, they changed it to a different --

16   to 8:00.

17         Q.    They changed it to eight o'clock.  When

18   was that changed?

19         A.    I don't know, but I know that they

20   changed it to eight o'clock.

21         Q.    And under the guidelines and the

22   agreement with the union, an employee cannot

1     accumulate more than 24 credit hours for

2     carryover to the next pay period, correct?

3         A.    Right.

4         Q.    So what did Ms. Logan tell you in 1998

5     about your credit hours?

6         A.    Well, she was saying that I couldn't

7     use my accommodation.  See, that's not an

8     accommodation what you're -- what you just read

9     was what every employee gets.

10        Q.    Correct.  Those are the agency

11    guidelines on earning credit hours, correct?

12        A.    Right.

13        Q.    Right.

14        A.    So it's not an accommodation.

15        Q.    Right.  I was just establishing for the

16    record what credit hours are.

17        A.    Okay.

18        Q.    And what rules there were at the

19    Department of Education about credit hours.

20        A.    Okay.

21        Q.    I understand that you had a different

22    agreement, and that's what I want to talk about

1    now.

2        A.    Okay.

3        Q.    What did Ms. Logan tell you?

4        A.    She said that she wanted to know what I

5    was doing before I did the credit hours, but

6    that work had to be a priority like in overtime.

7        Q.    When did Ms. Logan first tell you this?

8        A.    I'm not sure.

9        Q.    But you recall it being sometime in

10    1998?

11        A.    Yeah.

12        Q.    And at this time Ms. Logan was your

13    immediate supervisor, right?

14        A.    Right.

15        Q.    So she said she wanted to know what you

16    were doing?  What do you mean what you were

17    doing?

18        A.    What type of work I was doing.

19        Q.    And then you also indicated that she

20    told you work had to be a priority in the

21    overtime hours?  What do you mean?

22        A.    Work had to be a priority as if it's

1    overtime.

2        Q.    Okay.  So what Ms. Logan told you was

3    something to the effect, correct me if I'm

4    wrong, that she wanted to know what type of work

5    you were doing, and if you were going to be

6    there for credit hours, it had to be for work

7    purposes; is that right?

8        A.    It had to be for priority work

9    purposes.

10        Q.    Okay.  What is a priority work purpose?

11        A.    I don't know.  It's whatever she

12    considered a priority.

13        Q.    Did you ever ask her what was a

14    priority?

15        A.    No.

16        Q.    Did you ever say to her, Can I work

17    these credit hours, and she told you words to

18    the effect that, No, you can't because this is

19    not a priority?

20        A.    I can't recall.

21        Q.    Do you ever recall being denied the

22    ability to work credit hours?

```
1          A.    Yes.

2          Q.    Because what you were going to do was

3     not a priority?

4          A.    Yes, I do.

5          Q.    When?

6          A.    Sometime in 1998.

7          Q.    What was the work you wanted to do

8     then?

9          A.    Just work on my -- work on the general

10    stuff that I was doing.

11         Q.    What general stuff, ma'am?

12         A.    Getting the checks prepared and put in

13    the system.

14         Q.    And this is -- you told Ms. Logan this

15    is what you would be doing on your credit hours?

16         A.    Uh-huh.

17         Q.    Yes?

18         A.    Yes.

19         Q.    She said, No, that's not a priority?

20         A.    Well, no, she didn't say no, that's not

21    a priority, but she would say --

22         Q.    What did she say, ma'am?
```

1       A.    That, no, I'm not going to give you the

2    credit hours.

3       Q.    Now, was this an instance where you had

4    already worked those hours and were asking for

5    credit or were asking for preapproval to work

6    those hours?

7       A.    I had already worked them.

8       Q.    And that was after Ms. Logan had told

9    you that she wanted you to get approval for

10   working credit hours prior to the fact, right?

11      A.    Uh-huh.

12      Q.    Yes?

13      A.    Yes.

14      Q.    So that was an instance where you had

15   not done what she asked you, right?

16      A.    Right.

17      Q.    Did there ever come a time when you

18   asked for preapproval to work credit hours and

19   someone said no?

20      A.    Yes.

21      Q.    When?

22      A.    When I was working under Mack Lawrence.

1           MR. JOHNSON:  Can we take a break as an

2    accommodation for me, please?

3           MR. HENAULT:  Absolutely.  Let's take a

4    five minute break.

5           (Whereupon, a brief recess was taken.)

6           MR. HENAULT:  Back on.

7           BY MR. HENAULT:

8      Q.   Did there ever come a time that you

9    requested preapproval for credit hours from Ms.

10   Logan and Ms. Logan told you no?

11     A.   I can't really remember.

12     Q.   Do you allege for purposes of this

13   action that Ms. Logan ever told you no, she

14   would not preapprove you for credit hours?

15     A.   Yeah, I do.

16     Q.   When did that happen, ma'am?

17     A.   It happened several times, but I don't

18   know the exact dates.

19     Q.   What year did that happen in?

20     A.   1998 and 1999.

21     Q.   What were the circumstances that you --

22   I just want to be clear.  You say that there

1    were two times that you sought preapproval for

2    credit hours from Ms. Logan and she told you no,

3    correct?

4         A.    Uh-huh.

5         Q.    Yes?

6         A.    Yes.

7         Q.    What were the circumstances for the one

8    time in 1998?

9         A.    She didn't feel I should stay later

10   because she thought I wouldn't come in in the

11   morning then.

12        Q.    How many hours had you already worked

13   on this day in 1998?

14        A.    I had already worked eight hours.

15        Q.    Was that during the normal workday?

16        A.    Well, no.  It was a little bit off.

17        Q.    But when you requested those hours,

18   when you requested the ability to work extra

19   hours, you had already worked eight?

20        A.    Yes.

21        Q.    What time did you want to work until?

22        A.    I wanted to work until eight o'clock.

1      Q.    What were you working on at the time?

2      A.    Putting stuff in the system.

3      Q.    What do you mean putting stuff in the

4   system?

5      A.    Putting in information about checks

6   into the system.

7      Q.    Prior to this time -- and you said you

8   don't recall when this was in 1998?

9      A.    Huh-uh.

10     Q.    No?

11     A.    No.

12     Q.    Okay.  Prior to this time, had there

13   been an occasion that you had worked late into

14   the night and then told Ms. Logan that you would

15   not be able to be in the next morning because

16   you were too tired from working late?

17     A.    No, I didn't.

18     Q.    What indication did you give her that

19   you would not be able to come in the next day,

20   any?

21     A.    No.

22     Q.    So this one day in 1998 that you can't

1    remember when it was, you allege that Ms. Logan

2    denied you preapproval for working credit hours?

3        A.    Right.

4        Q.    After that one day, did you file or

5    seek EEO counseling or complain about

6    discrimination within 45 days?

7        A.    No.

8        Q.    Did you ever before September 2002 file

9    a formal complaint of discrimination regarding

10    that one day?

11        A.    No.

12        Q.    Now, the day in 1999 that you allege

13    Ms. Logan would not preapprove you for credit

14    hours, do you remember, was that early '99,

15    late '99, mid '99?   What do you remember about

16    that?

17        A.    Early '99.

18        Q.    What were you working on that day?

19        A.    Putting checks into the system.

20        Q.    When you wanted to work the extra

21    credit hours, how many hours had you already

22    worked?

1    A.    This time I think I had only worked six

2    hours.

3    Q.    What time did you want to work until?

4    A.    I think it was until 8:00 too.

5    Q.    Would that have been for hours to carry

6    over to another day or to make up for hours that

7    you missed that day?

8    A.    To make-up for hours that I missed that

9    day.

10   Q.    And at what point in the day did you

11   request preapproval from Ms. Logan to work

12   credit hours?

13   A.    At what point in the day did I ask?

14   Q.    Yes, was it after you had already

15   worked --

16   A.    Afternoon.

17   Q.    Afternoon?  Did you do it verbal or in

18   writing?

19   A.    Verbally.

20   Q.    Same with the 1998 incident, did you

21   request to work credit hours verbally or in

22   writing?

1        A.    Verbally.

2        Q.    After this day in early 1999 that you

3    allege Ms. Logan denied you preapproval for

4    working credit hours, did you within 45 days of

5    that day seek EEO counseling and allege

6    discrimination?

7        A.    No.

8        Q.    Prior to September of 2002, did you

9    ever file a formal complaint of discrimination

10   regarding that instance in 1999?

11       A.    No.

12       Q.    Other than those two instances where

13   you allege that Ms. Logan denied you the

14   ability -- excuse me.  Other than those two

15   instances where you allege that Ms. Logan would

16   not preapprove you to work credit hours, are

17   there any other instances of Ms. Logan doing so?

18       A.    Well, there are other instances of when

19   I had worked credit hours -- when I had already

20   worked credit hours that she wouldn't approve

21   the credit, wouldn't approve afterwards the

22   credit hours.

1    Q.    We'll get into those in a minute.

2    Other than the two instances, one in 1998 and

3    one in 1999 that we just discussed, were there

4    any instances of Ms. Logan not pre approving you

5    for credit hours?

6    A.    No.

7    Q.    Now, you allege that there were times

8    when you did not seek preapproval from Ms. Logan

9    and worked credit hours anyway, and they would

10   not give credit for them, correct?

11   A.    Right.

12   Q.    This was after she had told you that

13   you needed to request preapproval, right?

14   A.    Right.

15   Q.    When are those instances?  First of

16   all, how many were there?

17   A.    There were lots.  I can't come up

18   with -- there was lots of times.

19   Q.    Well, for purposes of this case, how

20   many times do you allege that Ms. Logan

21   discriminated against you by not giving you

22   credit for credit hours that she did not

1    preapprove?

2        A.   I would say 25 times.

3        Q.   I want to know:  When were these 25

4    times?

5        A.   I wouldn't be able to tell you because

6    it happened a lot over the --

7        Q.   Do you have any records that show when

8    these 25 times were?

9        A.   No.

10       Q.   And you cannot provide the dates of

11   these 25 times, right?

12       A.   No.

13       Q.   Can you tell me for any one of these

14   times how many credit hours you had worked?

15       A.   Two.

16       Q.   Two each time or two times?

17       A.   No, two each time.

18       Q.   Okay.  For these 25 times why did you

19   not seek preapproval from Ms. Logan?

20       A.   Well, sometimes I couldn't get her

21   because she was -- she wasn't there or she was

22   in a meeting or in training, and so I couldn't

1    get prior approval because of that.

2        Q.    For these 25 times, what is the time

3    span of that?  How many -- was it between 1998

4    and 1999 or when was the last time that you

5    recall Ms. Logan not giving you credit for

6    credit hours you worked that she didn't

7    preapprove?

8        A.    Up to the time that I -- that I stopped

9    working for her.

10       Q.    Which was when, ma'am?

11       A.    I think it was -- I think I stopped

12   working for her in April 2000 I think.

13       Q.    And so all these 25 times took place

14   before April 2000, right?

15       A.    Yeah.

16       Q.    How many of these 25 times were you not

17   able to get preapproval because Ms. Logan was in

18   a meeting?

19       A.    Well, I wouldn't know where she was.  I

20   just couldn't --

21       Q.    Well, you told me that you weren't able

22   to get preapproval because Ms. Logan was in a

1    meeting or had been in training or other things.

2        A.   Right.

3        Q.   I want to know how many times you

4    weren't able to get preapproval because she was

5    in a meeting?

6        A.   Well, she just wasn't there when I

7    tried to get her for the credit hours, so I was

8    just explaining that that's probably what she

9    was doing, probably in a meeting or training or

10   maybe even out sick.

11       Q.   Okay.  You just know she was not there

12   when you went to get approval, correct?

13       A.   Right.

14       Q.   Not that -- you don't know that she was

15   in a meeting?

16       A.   Right.

17       Q.   You don't know that she was in

18   training?

19       A.   Right.

20       Q.   You don't know that she was out sick?

21       A.   Right.  I just said she's --

22       Q.   Just that she was not there to give you

1    preapproval?

2        A.    Right.

3        Q.    How would you go about seeking

4    preapproval?

5        A.    I would Email.  No, I would talk to her

6    in person, not Email.

7        Q.    Not Email at all?

8        A.    No.

9        Q.    It was only talking to her for

10    preapproval?

11        A.    Yes.

12        Q.    You would walk to her desk and try to

13    talk to her in person or pick up the phone or

14    how would you do it?

15        A.    I would try to talk to her in person at

16    her desk.

17        Q.    For these 25 times that she was not --

18    I presume that it's your testimony that she was

19    not at her desk when you went there?

20        A.    Right.

21        Q.    Do you ever recall going back to her

22    desk again to see if she was then there?

1          A.   Yes.  Yeah.

2          Q.   Of these 25 times how many times did

3     you go back again to see if she was there?

4          A.   All 25 times.

5          Q.   How many times did you go back to her

6     desk for these 25 occasions?

7          A.   I don't know.

8               MR. JOHNSON:  Objection.  Hasn't the

9     question been answered?

10              MR. HENAULT:  Go ahead, you can answer.

11              MR. JOHNSON:  Go ahead.

12              THE WITNESS:  I don't know how many

13    exact times, but I would check to see if she

14    would come back.

15              BY MR. HENAULT:

16         Q.   Did you have a practice of checking

17    once, of checking twice, of checking three

18    times?  How did you do it?

19         A.   I guess checking three times.

20         Q.   It was your practice to go back to her

21    desk three times to check for her?

22         A.   Yeah.

1    Q.    Is it your testimony that you followed

2    that practice for each of these 25 times --

3    A.    Yes.

4    Q.    -- that you were unable to find her?

5    A.    Yeah.

6    Q.    So you can swear under oath that for

7    each of these 25 times you went back to her desk

8    three times to see if she was there and she was

9    not?

10    A.    Yes.

11    Q.    Okay.  Did you ever write her a note

12    and leave it at her desk and tell her you were

13    looking for her to get preapproval?

14    A.    No.

15    Q.    Did you ever -- you just said you never

16    sent her an Email telling her you were looking

17    for her to get preapproval, right?

18    A.    I don't think so.

19    Q.    Did you ever leave her a voice mail

20    telling her you wanted preapproval or you were

21    looking for her to get preapproval?

22    A.    Yes, I left voice mail.

1      Q.   How many times?

2      A.   I don't know.

3      Q.   Was it something you would do every

4   time you were seeking preapproval and couldn't

5   find her?

6      A.   I'm not sure if it's every time.

7      Q.   How often would you do it?

8      A.   I really don't know.  I really don't

9   recall.

10     Q.   Who was your second line supervisor at

11  the time?

12     A.   Mack Lawrence.

13     Q.   For any of these 25 times that you

14  couldn't reach Ms. Logan, did you go to Mr.

15  Lawrence and say, I would like preapproval?

16     A.   No.  Lawrence wasn't the supervisor the

17  whole time.  He just came in in March 2000,

18  so....

19     Q.   Well, between March 2000 when Mack

20  Lawrence became your second line supervisor and

21  April of 2000 when you left the supervision of

22  Cynthia Logan, how many times did you seek

1    preapproval from Ms. Logan and could not find

2    her?

3        A.    Between March and April?

4        Q.    Yes, ma'am, 2000?

5        A.    I can't say a definite number.

6        Q.    Was there any time that you could not

7    find Ms. Logan to get preapproval and you went

8    to Mr. Lawrence seeking preapproval?

9        A.    No.

10       Q.    And who was your second line supervisor

11   between the time you started working for -- it

12   was Mr. Wood, right?  He was your second line

13   supervisor the time when Ms. Logan was your

14   immediate supervisor?

15       A.    Yes, Wood.

16       Q.    Was there ever an occasion where you

17   couldn't find Ms. Logan to get preapproval and

18   you went looking for Mr. Wood to get

19   preapproval?

20       A.    No.

21       Q.    Why?

22       A.    I didn't think he could do it.

1      Q.    He was your second line supervisor,

2    correct?

3      A.    Right.

4      Q.    He was Ms. Logan's first line

5    supervisor?

6      A.    Right.

7      Q.    But you didn't believe he had the

8    authority to approve that?

9      A.    No.

10     Q.    Did Ms. Logan have a secretary during

11    this time?

12     A.    No.

13     Q.    During the times that you were

14    allegedly looking for Ms. Logan but couldn't

15    find her, did you tell anyone else, Hey, if you

16    see her, tell her I'm looking for her or words

17    to that effect?

18     A.    No.

19     Q.    Now, you weren't happy with the

20    requirement that you get preapproval for your

21    credit hours, correct?

22     A.    Right.

1        Q.    And you allege that the requirement

2    that you get preapproval is discriminatory

3    against you based on your disability, right?

4        A.    Uh-huh.

5        Q.    Yes?

6        A.    Yes.  Sorry.

7        Q.    What is discriminatory about the

8    requirement to get preapproval?  Why is that

9    discriminatory?

10        A.    Because it's hard for me to guess ahead

11    of time when I can do credit hours, and I do

12    unpredictable hours, and it's discriminatory

13    because I had it before, and they -- I've had --

14    I had it for a number of years, that they would

15    just let me do the hours and do the credit hours

16    whenever I could.  It's discriminatory because I

17    was allowed to do it before and then they

18    stopped it.

19        Q.    Okay.  Between January 14, 1998 -- bear

20    with me for a moment, please, ma'am.

21        A.    You mean January 14, 1995?

22        Q.    Is that '95?  Yes, yes, thank you very

1    much.   Was it May -- when was the next doctor's

2    letter that you brought in after this Exhibit 1,

3    do you recall?

4         A.   Oh, I don't -- the next doctor note I

5    gave, we don't have a copy of.

6         Q.   When was that, ma'am?

7         A.   It would have been I think 1997.

8         Q.   What did this letter in 1997 -- first

9    of all, who was this letter from?

10        A.   From Dr. George James, Dr. George C.

11   James.

12        Q.   Who was it to?

13        A.   To whom it -- whomever it may concern.

14        Q.   What did this letter say?

15        A.   It said basically the same thing that

16   this one said.

17        Q.   Anything different than this, to your

18   recollection?

19        A.   No.

20        Q.   So it was informing the Department of

21   Education that the accommodation you need would

22   be a work schedule of less than eight hours a

1    day from time to time depending on your overall

2    condition?

3        A.    Right.

4        Q.    And I think we've already said that's

5    consistently the only accommodation that was

6    requested by you or on your behalf, right?

7        A.    Uh-huh.

8        Q.    Yes?

9        A.    Yes.

10       Q.    Now, Mr. Lawrence we've said became

11   your supervisor in March of 2000, correct?

12       A.    Right.

13            (Johnson Deposition Exhibit Number 2

14   was marked for identification.)

15            BY MR. HENAULT:

16       Q.    Actually, ma'am, before we get into

17   Exhibit 2, let me ask you:  Ms. Logan stopped

18   being your supervisor in April 2000 you said,

19   correct?

20       A.    Uh-huh.

21       Q.    So after that time she never again told

22   you that you could not get credit for hours that

1    you worked that weren't preapproved, right?

2        A.    Right.

3        Q.    You didn't seek EEO counseling within

4    45 days of April of 2002, did you?

5        A.    No.

6        Q.    Prior to September -- I may have messed

7    up that question.  Let me ask it again.  You

8    didn't seek EEO counseling within 45 days of

9    April 2000, did you?

10       A.    No.

11       Q.    Prior to September of 2002, you never

12   filed a formal complaint of discrimination about

13   Ms. Logan's denial for these 25 times, did you?

14       A.    No.

15       Q.    Okay, ma'am.  Take a look at what has

16   been marked as Exhibit 2, please?  What Exhibit

17   2 is, it begins on the very bottom with an Email

18   from K.A. Cole to Susan Johnson, Cynthia Logan,

19   cc'ing Mack Lawrence and Maureen Harris,

20   correct?

21       A.    Uh-huh.

22       Q.    Is that a yes?

1          A.   Yes, correct.

2          Q.   That's a February 12, 2000 Email,

3    correct?

4          A.   Correct.

5          Q.   The next Email in this chain is a March

6    23 Email from Mr. Lawrence to you, correct?

7          A.   Correct.

8          Q.   And a return Email from you that same

9    day, correct?

10         A.   Right.

11         Q.   And then above that is another Email

12   from you that same day to yourself, Mr.

13   Lawrence, Ms. Logan and Ms. Wright, correct?

14         A.   Right.

15         Q.   And the very top one is from you to

16   your husband, Paul Valentic, right?

17         A.   Right.

18         Q.   Now, let's look at the March 23, 2000

19   Email portion of it, 4:52 Email from Mr.

20   Lawrence to you, and what he tells you is that:

21   Effective March 26, 2000, you may continue to

22   work credit hours but you have to receive

1  preapproval prior to performing the work,

2  correct?

3     A.   Wait a minute.  Where were you starting

4  with?

5     Q.   I am reading Mr. Lawrence's 4:52 Email.

6  I'm looking at that one right there.  In this

7  Email Mr. Lawrence informs you that you can

8  still work credit hours, but you just have to

9  get preapproval.

10    A.   Right.

11    Q.   You tell him that "you modified the

12  entire agreement"?

13    A.   Right, because I didn't have to get

14  prior approval.  I just was allowed to work when

15  I could work.

16    Q.   Prior to this time, prior to March 23,

17  2000, had you ever provided a note from your

18  doctor saying that you should be allowed to work

19  credit hours?

20    A.   He didn't specifically say it like

21  that.  He would -- he just said that I should be

22  given a work schedule that's flexible.

1     Q.   In fact what he, being Dr. James,

2   actually said about your work schedule is that

3   you could benefit from a work schedule of less

4   than eight hours a day from time to time

5   depending on her overall condition.  That's what

6   he actually said, right?

7     A.   Right.

8     Q.   Nothing about being able to work credit

9   hours, correct?  Isn't that correct, ma'am?

10    A.   Yeah, that's correct.

11    Q.   Okay.

12    A.   But I had an agreement in place that I

13  could work like Keith Cole says, that I could

14  work hours if I could do this, and clock in -- I

15  didn't have to clock in and out with my team

16  leader or supervisor.

17    Q.   Isn't it correct, ma'am, that you

18  didn't like this requirement to get preapproval

19  because you wanted to just be able to come in

20  when you wanted and leave when you wanted?

21    A.   Well, not -- it's because of my

22  illness, my disability that I wanted it that

1    way, not just because I wanted to do certain

2    hours.

3         Q.    Fair enough.   I'm not implying it's

4    not.   You felt because of your disability that

5    you should be able to just come into work when

6    you wanted and leave when you wanted without any

7    preapproval, correct?

8         A.    Right.

9         Q.    And there was never a note from any of

10   your doctors prior to March 2000 setting forth

11   those terms, were there?   Was there?

12        A.    About credit hours?

13        Q.    About you being able to set your own

14   schedule without preapproval, ma'am.

15        A.    Well, he didn't specifically say -- he

16   says:   "This flexibility is essential in order

17   to keep her absences to a minimum," so he was

18   saying that flexibility was the thing that I

19   needed.

20        Q.    Yes, ma'am, and that flexibility is

21   referring to the flexible schedule that is

22   sometimes less than eight hours a day that is

1    referenced in the prior sentence, correct?

2        A.    Yeah.

3        Q.    Now, when we were talking about Mr.

4    Logan, you touched on this -- excuse me, Ms.

5    Logan, you touched on this a little bit, but I

6    want to follow-up on this because you said there

7    were instances of Mr. Lawrence denying you

8    preapproval to work credit hours?

9        A.    Uh-huh.

10       Q.    Yes?  You said that?

11       A.    Yes, I said that.

12       Q.    How many times did that happen?

13       A.    I would have to say -- I would say

14   there was like ten times of him doing that.

15       Q.    You know for a fact there are ten times

16   or are you estimating this to be approximately

17   ten times?

18       A.    I'm estimating this.

19       Q.    And I want to ask that same question

20   about the 25 times that you allege Ms. Logan

21   denied -- or excuse me, that Ms. Logan denied

22   you credit for hours that you had worked without

1    seeking her preapproval.

2             Now, you had previously said 25 times,

3    correct?

4        A.    Uh-huh.

5        Q.    Yes?

6        A.    Yes.

7        Q.    Is that an estimation or do you know it

8    to be 25?

9        A.    It's an estimate.

10       Q.    Okay.  So you estimate ten times for

11   which Mr. Lawrence denied you preapproval to

12   work credit hours?

13       A.    Right.

14       Q.    When were those times?

15       A.    I don't know.  I just know that there

16   was approximately ten times when that happened.

17       Q.    For these ten times, were these times

18   that you -- let me -- when you sought

19   preapproval from Mr. Lawrence, was it your

20   practice to send an Email or to go to him

21   personally?

22       A.    Send an Email.

1        Q.    So for these ten times presumably there

2    would be Emails, requests from you, right?

3        A.    Right.

4        Q.    And when he denied it, would he tell

5    you he was denying it or would he respond in

6    Email?

7        A.    He would respond in Email.

8        Q.    Do you remember when any of these times

9    were, these roughly ten times?

10       A.    No.

11       Q.    Were these instances where you didn't

12   get a response from him or he responded, no, he

13   would not preapprove it?

14       A.    Sometimes I didn't get a response in

15   time.

16       Q.    How many out of these estimated ten

17   times of Mr. Lawrence not giving you preapproval

18   were instances where you did not get a response

19   in time?

20       A.    About three.

21       Q.    So that would be roughly seven times he

22   outright denied your ability to work credit

1    hours?

2       A.   Yes.

3       Q.   Can you give me any approximations of

4    when these seven times were?

5       A.   No.

6       Q.   What were you working on that you

7    wanted to work credit hours?

8       A.   I don't know.  I would have just been

9    working on my regular work.

10      Q.   That's a guess, right?  You don't know

11   in fact what you were working on, correct?

12      A.   Right.

13      Q.   How many credit hours were you seeking

14   to work for these seven times where he issued an

15   outright denial, do you know?

16      A.   Two credit hours.

17      Q.   It was two credit hours each time?

18      A.   Two credit hours for -- no, I guess --

19   no, I'm sorry, it would have been 16 credit

20   hours.

21      Q.   My question was:  Would it be two

22   credit hours per day that you were seeking to

1    work that he denied?

2        A.    Oh, that's -- yeah, two credit hours

3    per day.

4        Q.    Did you ever work more than two credit

5    hours per day?

6        A.    Yeah, I did but I didn't put them down

7    as --

8        Q.    Why not?

9        A.    Because I knew that it was two credit

10   hours that you could get.

11       Q.    Because of the guidelines that we went

12   over earlier?

13       A.    Right.

14       Q.    Did you ever ask someone if you could

15   work more than two credit hours a day?

16       A.    Yeah.

17       Q.    Who?

18       A.    I asked Gary Wood if I could.

19       Q.    What did Mr. Wood tell you?

20       A.    He said that he preferred that I not

21   work more than two credit hours.

22       Q.    One of your allegations in this lawsuit

1    is not that you should have been permitted to

2    work more than two credit hours a day, is it?

3    That was a convoluted question.  Are you

4    alleging for purposes of this lawsuit that you

5    should have been permitted to work more than two

6    credit hours a day?

7        A.    No.

8        Q.    So these approximately seven times that

9    Mr. Lawrence gave you an outright denial, did

10    you ever ask him why?

11        A.    I don't think so.  I think I just got

12    upset when I found out he denied it.

13        Q.    For the three times that you did not

14    get a response from Mr. Lawrence in time, did

15    you ever go try to find him?

16        A.    Yeah.

17        Q.    How many of those three times did you

18    try to find him?

19        A.    The three times.

20        Q.    Where did you go to try to find him?

21        A.    Tried to find him in his office.

22        Q.    Did you leave a note for him or

1   anything telling him you were looking for him

2   other than your Email?

3       A.   No, no.

4       Q.   Did you ask anyone where he was?

5       A.   Yeah, I have asked people where he was.

6       Q.   Did you for these three times ask

7   people where he was?

8       A.   Yeah.

9       Q.   Who did you ask?

10      A.   I asked his secretary.

11      Q.   Anyone else?

12      A.   Nope.

13      Q.   Were there instances where you worked

14  credit hours without seeking preapproval and Mr.

15  Lawrence refused to give you credit for them?

16      A.   Yeah, there was lots of types of those.

17      Q.   How many times?

18      A.   I would say a hundred times.

19      Q.   A hundred times that you went to him

20  and told him you had worked these credit hours

21  and he said, No, I'm not going to give you

22  credit for them?

1       A.   No, a hundred times sounds too much.

2    I'm doing an estimate.   Say 50.

3       Q.   You really don't know how many times it

4    was, do you?

5       A.   No.

6       Q.   You're just guessing?

7       A.   Right.

8       Q.   When was the last time that you recall

9    Mr. Lawrence denying your request to work credit

10   hours?

11      A.   The last time?   I think it was February

12   2003.

13      Q.   What happened in February 2003?

14      A.   He denied my credit hours that I

15   worked.

16      Q.   That you had previously worked without

17   preapproval?

18      A.   Right.

19      Q.   I think my question -- maybe I

20   misspoke, but I was trying to ask when is the

21   last time you recall Mr. Lawrence not

22   preapproving a request?

1        A.   Oh, okay.  That was my fault I think.

2        Q.   It could very well have been mine

3    anyway, but let's try and be clear now.

4        A.   Not preapproving a request?  I think

5    that was February 2003 too.

6        Q.   February 2003?

7        A.   Yeah.

8        Q.   So in February of 2003 you requested to

9    work credit hours.

10       A.   Right.

11       Q.   Mr. Lawrence told you no?

12       A.   Right.

13       Q.   And you worked them anyway and then

14   went and sought post work approval; is that

15   accurate?

16       A.   Right.

17       Q.   So not withstanding that Mr. Lawrence

18   had told you no, you did it anyway?

19       A.   Right.

20       Q.   So you knew when you worked -- were

21   working those hours that you weren't supposed to

22   be doing it?

1       A.   Right.

2       Q.   Were there any other instances of that

3    happening?

4       A.   No.

5       Q.   Were there any other -- I guess so the

6    record is clear, were there any other instances

7    of you requesting preapproval, not getting it

8    and then working the hours anyway?

9       A.   No.

10          (Johnson Deposition Exhibit Number 3

11    was marked for identification.)

12          BY MR. HENAULT:

13       Q.   Ms. Johnson, what has been marked as

14    Johnson 3 is a chain of Emails mostly between

15    you and Mr. Lawrence beginning June 7, 2002 and

16    going through June 25, 2002, correct?

17       A.   Uh-huh.

18       Q.   And these are all Emails that you

19    either sent or received from or that you

20    exchanged with Mr. Lawrence, right?

21       A.   Right.

22       Q.   Let's go to the very bottom Email, the

1    June 7, 2002, 8:38 Email.  Here's an instance

2    where you actually are saying you did one credit

3    hour each Monday and Tuesday, and you're seeking

4    approval for it after it's already done, right?

5        A.   Right.

6        Q.   You didn't get preapproval for this?

7        A.   No.

8        Q.   Do you know why you didn't get

9    preapproval for it?

10       A.   No.

11       Q.   How long was this pay period, do you

12   know, June 7?  This was a Friday.  Was this the

13   end of a pay period or the middle of a pay

14   period?

15       A.   I don't know.  I have no idea.

16       Q.   If you look at the June 11, 2002, 7:15

17   a.m. Email, you say here "I've already done two

18   credit hours unofficially and would like to get

19   those too."  That's correct, right?

20       A.   On which Email?

21       Q.   The Email from you.  It's on the very

22   bottom of the page going over to the second

1    page.  It's the Tuesday, June 11, 2002, 7:15

2    a.m. Email.

3        A.   Oh, okay.

4        Q.   And you're saying you've already done

5    two credit hours unofficially and would like to

6    get credit for those; is that correct?

7        A.   Right.

8        Q.   So these are two credit hours that you

9    did not seek preapproval for?

10       A.   Right.

11       Q.   And on June 11, Mr. Lawrence tells you

12   to please stop by his office so you can talk

13   about your request, right?

14       A.   Right.

15       Q.   Did you ever stop by to talk about it

16   with him?

17       A.   I don't recall.

18       Q.   Here you say that you want him to know

19   that Richard E.  Johnson, your father, and a

20   lawyer says it's legally binding with a note

21   from your doctor that he has to give you those

22   credit hours, right?

1     A.   Yeah.

2     Q.   What did you tell your father about

3  this subject?

4     A.   I told him everything.

5     Q.   What is everything?

6     A.   Well, I told him that they were having

7  problems giving me the credit hours when I could

8  do them and on unpredictable hours, and I don't

9  totally recall everything I talked to him about,

10  but I told him the situation, how I thought it

11  was --

12     Q.   Did you show him the note from your

13  doctor?

14     A.   Yeah, he knew about what the note from

15  my doctor said.

16     Q.   How did he know what the note from your

17  doctor said?

18     A.   He had read it.

19     Q.   You had given it to him to read?

20     A.   Uh-huh.

21     Q.   But when you say legally binding with a

22  note from your doctor, you had never provided a

1    note from your doctor regarding credit hours,

2    had you?

3        A.   Yeah, I did.

4        Q.   When did you provide a note from your

5    doctor regarding credit hours, ma'am?

6        A.   Well, I think -- I think -- see, we're

7    missing a bunch of notes because I couldn't -- I

8    didn't realize that the doctor didn't save the

9    notes and he switched practices, so this isn't

10   the only note.  This is one of the beginning

11   notes.

12       Q.   Yes, ma'am, and you told me there was

13   one note afterwards that you can't find but that

14   it said the same thing.  The only accommodation

15   you needed was a schedule, a potential workday

16   schedule less than eight hours?  That's your

17   testimony, ma'am.

18       A.   Right.

19       Q.   You never provided a note saying you

20   should be allowed to work credit hours, did you?

21       A.   Huh-uh.

22       Q.   No?

1      A.    No.

2      Q.    Okay.  Now, what did your father, Mr.

3  Johnson, tell you about your request to work

4  credit hours from which this Email arises?

5      A.    Can I see the note that's from November

6  2001 that he writes?

7            (Johnson Deposition Exhibit Number 4

8  was marked for identification.)

9            THE WITNESS:  See he doesn't say

10  anything about the eight hours in this one.

11            BY MR. HENAULT:

12      Q.    Let me talk about this note for a

13  minute, ma'am.  What this note says is that you

14  may need minor adjustments to your work schedule

15  to manage your condition and that you may need

16  time off from work occasionally, and that it's

17  unpredictable when you needed time off, right?

18      A.    Right.

19      Q.    It didn't say anything about you being

20  able to make up credit hours when you want, does

21  it?

22      A.    He's not working at our place.  He

1    doesn't specifically say what to do.

2        Q.    That's correct.  It doesn't say that,

3    does it?

4        A.    It doesn't specifically say it, but it

5    also doesn't -- it doesn't not say that it would

6    work out.  Minor adjustments, in order to do

7    minor adjustments, I would need to do -- I need

8    to do credit hours.

9        Q.    It doesn't say that, does it?

10       A.    Well, he doesn't have to specifically

11   say what -- specifically say what to do.  He

12   just -- I mean, the credit hours is what I came

13   up with and it was -- it had worked from 1993 to

14   1997, so it had been already -- as a reasonable

15   accommodation, it had already been in place for

16   a number of years.

17       Q.    That's just it, ma'am.  It was

18   something you came up with, not something that

19   was recommended by your doctor, right?

20       A.    Well, he kind of implies it though.

21       Q.    Did you request that your doctor write

22   this November 26, 2001 letter?

1        A.    Yeah.

2        Q.    Why?

3        A.    Because they needed a note.

4        Q.    Who's they?  Who told you they needed a

5   note?

6        A.    Gary Wood told me he needed a note.

7        Q.    Did you see this before it was sent?

8        A.    Yeah, I did.

9        Q.    So you approved it?

10       A.    Yes.

11       Q.    You could have asked him to put

12   something in there about credit hours, couldn't

13   you have?

14       A.    Well, I didn't think it needed to be

15   that specific.  That's too specific for a

16   doctor's note I think, because he doesn't know

17   about credit hours, about my work, the way it

18   goes.

19       Q.    One of the things that Dr. James

20   discusses in this letter is that a cooperative

21   arrangement between you and your employer will

22   be helpful in limiting work related absences,

1    correct?

2        A.    Right.

3        Q.    Now, cooperative implies that your

4    employer cooperates with you?

5        A.    Right.

6        Q.    And that you cooperate with your

7    employer?

8        A.    Right.

9        Q.    Did you cooperate with your employer?

10       A.    Yeah.

11       Q.    One of the things they asked for was

12   that you receive -- that you request preapproval

13   prior to working credit hours, right?

14       A.    But that wouldn't be an accommodation

15   then.  That's what everybody else has to do.

16       Q.    One of the things they asked you to do

17   was get preapproval prior to working credit

18   hours, right?

19       A.    Yes, but that wouldn't be an

20   accommodation.

21       Q.    The answer is yes, correct?

22       A.    Yeah.

1      Q.    You didn't do that, did you?

2      A.    No.

3      Q.    Now, the credit hours referenced in

4    Johnson Exhibit 3, when Lawrence says, "Please

5    stop by so we can discuss," I think you've

6    already said you don't remember stopping by or

7    you didn't stop by, do you recall?

8      A.    I don't remember if I stopped by.

9      Q.    Okay.  Do you know whether he ever

10   approved these credit hours?

11     A.    No, I don't.  I can't recall.

12     Q.    So naturally you don't know whether

13   they were disapproved?

14     A.    No.

15     Q.    Now, what else about -- other than what

16   we've discussed now to do with the credit hour

17   issue, what else was discriminatory about the

18   credit hour issue?  If we've covered it, that's

19   fine.  I want to make sure we've exhausted the

20   topic.

21     A.    Well, it was discriminatory because

22   they didn't need to have or -- because for years

1    I had had this in place that I could do credit

2    hours, do the hours when I can do it, and it was

3    discriminatory because it was a reasonable

4    accommodation that was already in effect, and it

5    had been working for years, and they just

6    decided that it wouldn't be an accommodation.

7    It would be like a regular person, kind of like

8    getting affirmative action where you give

9    somebody a little bit.  You give somebody a

10   little bit of leeway in order to get where

11   they're trying to go.

12        Q.   Okay.  Anything else?

13        A.   No.

14        Q.   Do you know what gave rise to the

15   decision to require you to get preapproval for

16   credit hours?

17        A.   No, I don't know.

18        Q.   You know of nothing on that topic at

19   all?

20        A.   What gave rise to it?

21        Q.   Right.

22        A.   No.

1      Q.   You don't know what led Ms. Logan to

2   tell you that you should get preapproval for the

3   credit hours?

4      A.   No, I don't.

5      Q.   Same question regarding Mr. Lawrence?

6      A.   No, I don't.

7      Q.   Did anyone ever tell you?

8      A.   No.

9           MR. HENAULT:  It's 12:30 right now.  Do

10   you want to take a half hour lunch break?  Why

11   don't we take 30 minutes and be back at one.

12          (Whereupon, at 12:30 p.m., a lunch

13   recess was taken.)

14

15

16

17

18

19

20

21

22

```
1                    AFTERNOON SESSION

2                    (12:58 p.m.)

3          BY MR. HENAULT:

4          Q.   Ma'am, in your opinion was there

5     anything about your disability that made you

6     unable to request preapproval for credit hours?

7          A.   Well, I couldn't often predict when I

8     was going to be in or predict the hours that I

9     would be in, so that -- that's because of my

10    disability.

11         Q.   Right.  But once you were in, you had

12    the ability to request approval to work credit

13    hours, right?

14         A.   Once I was in?

15         Q.   Yes.

16         A.   Well --

17         Q.   What I'm trying to understand is what

18    do you consider unreasonable about the request

19    that you seek preapproval for working credit

20    hours?

21         A.   Because I had a written agreement or I

22    had -- not a written agreement, an agreement
```

1    before that I could work credit hours when I

2    could work with them, when it was possible for

3    me to work them.

4         Q.   That was not a written agreement,

5    right?

6         A.   No, not a written agreement.

7         Q.   So other than the fact that you had

8    agreed with your supervisor that you could do

9    this previously, what was unreasonable about

10    seeking preapproval to work credit hours?

11         A.   The fact that I couldn't always predict

12    when I would be in so I couldn't predict ahead

13    of time when I would do credit hours.

14         Q.   But if you came into work at whatever

15    time on a given workday, was it unreasonable --

16    if you know you are going to be working credit

17    hours into the night, is it unreasonable for you

18    to ask your supervisor, Can I work credit hours

19    today?  Is that unreasonable?

20         A.   No.

21         Q.   And how does the fact that you don't

22    know when you're actually going to be able to

1    come into work -- coming into work is

2    unpredictable, how does that make getting

3    preapproval for working credit hours

4    unreasonable?

5        A.    Because I wouldn't know if I would be

6    doing any credit hours at all and I wouldn't be

7    able to tell them what I would be working on

8    because I wouldn't know if I would be doing

9    them.

10       Q.    Did you ever request preapproval credit

11   hours and then realize, No, I'm not going to be

12   able to work these hours so you didn't?

13       A.    Right.

14       Q.    So there's nothing wrong with that, is

15   there?

16       A.    No.

17       Q.    Now, I want to move on here to your

18   allegation that you were discriminated against

19   in violation of the Rehabilitation Act when you

20   did not get your career ladder promotions timely

21   or at all in the case of the GS 12, and I want

22   to start with your promotion history, and I

1     think we've already said your accountant

2     position was a career ladder position, correct?

3          A.    Uh-huh.

4          Q.    Yes?

5          A.    Yes.

6          Q.    With full promotion to the GS 12 level?

7          A.    Correct.

8          Q.    And you're understanding of a career

9     ladder position is that if you are -- if you get

10    a pass for one year, then you automatically get

11    promoted?

12         A.    Right.

13         Q.    Correct?

14         A.    Correct.

15         Q.    Do you believe it mandatory that you

16    get promoted or at that time you're eligible for

17    promotion?

18         A.    At that time you're eligible for a

19    promotion.

20         Q.    You were promoted to a GS 7 in May 12,

21    1996?

22         A.    A GS -- yeah.

```
1        Q.    So one year at GS 7 would have been May

2   12, 1997?

3        A.    Right.

4        Q.    You weren't promoted to a GS 9 on that

5   first anniversary, were you?

6        A.    No.

7        Q.    In fact, you remained a GS 7 for more

8   than two years, correct?

9        A.    Correct.

10        Q.    You weren't promoted to GS 9 until July

11   5, 1998, correct?

12        A.    That sounds right.

13        Q.    What did you do, if anything, to

14   request that you be promoted to a GS 9?

15        A.    I don't know if I did anything.

16        Q.    So you don't know whether you requested

17   the promotion of anyone?

18        A.    No.

19        Q.    Now, as we just said you became a GS 9

20   July 5, 1998.  You had a GS 7 for more than two

21   years.  Until you sought EEO counseling in

22   August of 2002, you never filed a claim of
```

1    discrimination relating to the delay in getting

2    a 9 GS promotion, did you?

3        A.    No.

4        Q.    August 2002 the first time you sought

5    EEO counseling about that issue, correct?

6        A.    Right, correct.

7        Q.    Now I want to talk about your promotion

8    from GS 9 to GS 11.  One year anniversary of

9    your GS 9 promotion would have been July 5,

10   1999, right?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Yes.

14       Q.    You weren't promoted to GS 11 on that

15   day, were you?

16       A.    No.

17       Q.    You were not promoted on the two year

18   anniversary of your GS 9 promotion, were you?

19       A.    No.

20       Q.    In fact, you weren't promoted to a GS

21   11 until November 19, 2000, correct?

22       A.    Correct.

```
1        Q.   So you had been a GS 9 for more than

2   two years?

3        A.   Right.

4        Q.   What, if anything, did you do to

5   request a promotion to a GS 11?

6        A.   I don't think I did anything.

7        Q.   You don't remember requesting it of

8   anyone?

9        A.   Of anyone, yeah.

10       Q.   You do remember requesting you get

11  promoted or you don't remember?

12       A.   I don't remember requesting.

13       Q.   Until August of 2002 you never sought

14  EEO counseling relating to the delay in your GS

15  11 promotion, correct?

16       A.   Right.

17       Q.   So that was over a year and a half

18  after you were promoted to GS 11 is the first

19  time you sought EEO counseling about the delay

20  in getting promoted to GS 11, correct?

21       A.   Uh-huh.

22       Q.   Yes?
```

1       A.    Yes.

2       Q.    Actually it's natural after lunch

3   people have a tendency to start doing that

4   again, and we'll try and keep reminding you to

5   say yes or no.

6       A.    Okay.

7       Q.    So according to the promotion rules or

8   regulations as you've described them to me, you

9   first became eligible for a GS 12 promotion on

10  November 19, 2001, correct?

11      A.    Right, correct.

12      Q.    Because that was one year you had been

13  at the GS 11 level?

14      A.    Right.

15      Q.    When was the first time you requested

16  to get your career ladder promotion to the GS

17  12?

18      A.    The first time I requested was when I

19  got my step increase because I knew that was

20  time and grade, that I had been a year time and

21  grade, excluding -- including my absences.

22      Q.    When was that?

1          A.    That was in February 2002.

2          Q.    I'm sorry, February of 2002 you said?

3          A.    Yeah.

4          Q.    I began to talk over you.  I apologize

5     for that.

6          A.    That's okay.

7          Q.    Because of your absences you actually

8     didn't become eligible for the possibility of

9     promotion to GS 12 until February 2002 instead

10    of November 2001?

11         A.    Right.

12         Q.    Because during that year did you have a

13    lot of absences?

14         A.    Yeah, I had a lot of absences.

15         Q.    In February of 2002 -- prior to

16    February of 2002, had you talked to anyone about

17    getting your career ladder promotion?

18         A.    Yeah, I talked to -- I talked to Mack

19    Lawrence about it, but he didn't respond.  He

20    kind of stonewalled me about the promotion.

21         Q.    When did you talk to Mr. Lawrence about

22    it?

1      A.    In December of the year, December of

2    2001.

3      Q.    At that time you weren't yet eligible

4    to be promoted, right?

5      A.    Right, but I was asking about it for

6    the future.

7      Q.    Okay.  And what did you ask him?

8      A.    I was asking him what I needed to be

9    promoted to --

10      Q.    I'm sorry, go ahead.

11      A.    -- to a GS 12.

12      Q.    And how did he respond?

13      A.    He didn't really respond.

14      Q.    He didn't -- well, he didn't think

15    given your absences that you were ready to be

16    promoted to a GS 12?

17      A.    No.

18      Q.    Did he ever tell you that?

19      A.    No, not --

20      Q.    Did he ever tell you anything about

21    your career ladder promotion?

22      A.    No.

1          MR. HENAULT:  Let's mark this as the

2    next exhibit, please.

3          (Johnson Deposition Exhibit Number 5

4    was marked for identification.)

5          BY MR. HENAULT:

6      Q.   Ma'am, what has been marked as Johnson

7    Exhibit 5 is an Email of Friday, February 22,

8    2002 at 2:10 p.m. from you to Mack Lawrence and

9    Gary Wood, correct?

10     A.   Uh-huh.  Correct.  Sorry.

11     Q.   At this time was Gary Wood a supervisor

12   of you?

13     A.   No, I don't think he was.

14     Q.   He stopped supervising you I believe is

15   your testimony in March of 2000 when Mr.

16   Lawrence became supervisor, correct?

17     A.   Correct.

18     Q.   Was Gary Wood in any level of

19   supervision of you?

20     A.   Well, he -- Mack Lawrence and Gary Wood

21   kind of took their supervisory ability -- kind

22   of shared the supervising abilities.

1       Q.    Who supervised you?

2       A.    Well, Mack Lawrence.

3       Q.    Okay.

4       A.    But Gary Wood was like the -- another

5   supervisor like.

6       Q.    Was he Mr. Lawrence's equal or did Mr.

7   Lawrence report to Mr. Wood?

8       A.    I think he was the equal.

9       Q.    But Mr. Wood didn't supervise you; that

10  was Mr. Lawrence's responsibility?

11      A.    Right.

12      Q.    Mr. Wood had his own team of employees

13  that he supervised?

14      A.    Huh-uh.  It was the same employees

15  that -- they kind of had two supervisors there

16  for awhile.

17      Q.    But was Mr. Wood supervising you during

18  that time or during the February 22 -- around

19  February 22, 2002?

20      A.    Yeah, he was supervising me too also.

21      Q.    Which is why you included him on the

22  Email?

1      A.   Right.

2      Q.   How long had Mr. Wood been supervising

3  you also?

4      A.   I don't know.

5      Q.   How long after this did Mr. Wood

6  continue to supervise you?

7      A.   I don't know.

8      Q.   Do you allege that Mr. Wood took any

9  actions against you that were discriminatory

10  based on your disability?

11      A.   Yes, I did.

12      Q.   What did Mr. Wood do to you?

13      A.   He didn't -- he didn't -- he didn't

14  promote me to the GS 12 level and he didn't --

15  sorry.  He started to not let me do the credit

16  hours.  I had to have prior approval for the

17  credit hours.

18      Q.   From Mr. Wood?

19      A.   Yeah.

20      Q.   Or from Mr. Lawrence or from either

21  one?

22      A.   Either one.

1        Q.    Now, you talked before about instances

2    where you sought preapproval from Mr. Lawrence

3    but didn't get a response in time.    Remember

4    that?

5        A.    Uh-huh.

6        Q.    In any of those instances did you go

7    looking or seeking out Mr. Wood for his

8    approval?

9        A.    No, I didn't.

10        Q.    Why not?

11        A.    Because I didn't think that would be

12    okay.

13        Q.    He was a supervisor, right?

14        A.    Yeah.

15        Q.    He supervised you in conjunction with

16    Mr. Lawrence, correct?

17        A.    Yes, right.

18        Q.    They were equals you just told me,

19    right?  They both supervised the same group of

20    people, correct?

21        A.    Right.

22        Q.    But you didn't think it was okay.   Why

1    didn't you think it would be okay?

2        A.    Well, because he wasn't the acting

3    supervisor.    He was -- he was the supervisor

4    when Mack wasn't there, but when Mack was there,

5    Mack was the supervisor.

6        Q.    Then during this time then, February

7    2002, was Gary Wood a supervisor or was Gary

8    Wood only a supervisor when Mr. Lawrence was not

9    there?

10        A.    Only supervisor when Mr. Lawrence

11    wasn't there.

12        Q.    How often was Mr. Lawrence not there?

13        A.    I don't know.

14        Q.    How often were you supervised by Mr.

15    Wood then?

16        A.    I'm not sure.

17        Q.    If Mr. Wood was only a supervisor when

18    Mr. Lawrence was not there, how could Mr. Wood

19    have promoted you to your GS 12 level?    Wouldn't

20    that have been a decision of Mr. Lawrence's?

21        A.    Yeah.

22        Q.    So how could Mr. Wood have done that?

1    He couldn't, could he?

2        A.    No.

3        Q.    And as far as getting preapproval for

4    credit hours, that was something Mr. Lawrence

5    said would happen, right?

6        A.    Right.

7        Q.    So when Mr. Wood was acting supervisor

8    in his absences, do you think he could just

9    disregard Mr. Lawrence's instructions?

10       A.    No.

11       Q.    Then how was it that Mr. Wood

12   discriminated against you?  Is your complaint

13   against Mr. Wood or Mr. Lawrence?

14       A.    Mr. Lawrence.

15       Q.    So not Mr. Wood?

16       A.    Right.

17       Q.    Okay.  So what we have here as Exhibit

18   5 is a February 22, 2002 Email, and you are

19   wondering how your career ladder consideration

20   is going, right?

21       A.    Right.

22       Q.    Is this the first time you sent them

1    something in writing about your career ladder

2    promotion to GS 12?

3        A.    Yes.

4        Q.    But you had discussed it with Mr.

5    Lawrence previously?

6        A.    Right.

7        Q.    Had you discussed it with Mr. Wood

8    previously?

9        A.    No, not that I can think of.

10        Q.    Now, you say here "it doesn't seem fair

11    to me that some people are much higher without

12    as much experience."  Who was higher?  What do

13    you mean by higher?

14        A.    A higher grade.

15        Q.    Who was a higher grade?

16        A.    Actually almost all the people were in

17    my section except for David Miranda.

18        Q.    David Miranda?

19        A.    He wasn't higher than me, yeah.

20        Q.    Who was a GS 12 do you know?

21        A.    No, I don't know.

22        Q.    Then how do you know they were all

1    higher than you?

2        A.   I know from a sheet that I have.  If I

3    had the investigative reports, I would be able

4    to tell you.

5        Q.   Let me say at the time you wrote this

6    -- at the time you wrote this, right?

7        A.   Right.

8        Q.   Who did you know to be at a higher

9    level than you?

10       A.   David Dana.

11       Q.   David Dana?

12       A.   Yeah.

13       Q.   What grade level was Mr. Dana?

14       A.   A 13 or a 14.

15       Q.   So he had a different position all

16   together than you, correct?

17       A.   A higher position, but not different --

18   not -- he didn't do different stuff.

19       Q.   But he was not in the same career

20   ladder to the GS 12 position that you were?

21       A.   No.

22       Q.   Who else?

1       A.   Dorothea Glasgow.

2       Q.   What grade level was Ms. Glasgow?

3       A.   Either GS 13 or 14.

4       Q.   So once again Ms. Glasgow would not

5    have been in the same career ladder position as

6    you, right?

7       A.   Right, no.

8       Q.   Who else?

9       A.   Richard Esterbrook.

10      Q.   I'm going to ask you to spell that for

11   both me and the court reporter if you could.

12      A.   Okay.   E S T E R B R O O K.

13      Q.   What grade was Mr. Esterbrook?

14      A.   14.

15      Q.   So Mr. Esterbrook was not in the same

16   career ladder position as you?

17      A.   Right.

18      Q.   Who else?

19      A.   Fluorene Jones.

20      Q.   Fluorene?

21      A.   Jones.

22      Q.   Jones.   What grade was Ms. Jones?

1       A.    I think she was a GS 13.

2       Q.    Okay.  So similar to the other three,

3   Ms. Jones would not have been in the same career

4   ladder position series as you because that only

5   went to GS 12, correct?

6       A.    Correct.

7       Q.    Who else?

8       A.    I don't know.  That's all I can

9   remember off the sheet.

10      Q.    Was there anyone that you compared

11  yourself to grade wise to roughly time in, time

12  in service --

13      A.    No.

14      Q.    -- that you know to have been promoted

15  to the GS 12 after only one year as a GS 11 in a

16  career ladder position?

17      A.    No.

18      Q.    Now, you also say, "I know I did not

19  start out with the federal government but with

20  private industry, but frankly the private

21  industry is more cut throat than the federal

22  government."

1          What private industry did you start out

2     with?  Your experience in private industry was

3     as a secretary, was it not?

4          A.   No.  Joseph Smith and Sons I was

5     accounting.

6          Q.   You were a payroll administrative

7     assistant with Joseph Smith and Sons, right?

8          A.   Right, and also --

9          Q.   That was from September 1990 to

10    February 1992, correct?

11         A.   Right, but that's not a secretary

12    position.

13         Q.   Okay.

14         A.   And I did accounting work for them.

15         Q.   But the other three positions that you

16    had, American Bankers' Association, Graham,

17    Inc., Fox Temp, Inc., you did clerical or

18    receptionist duties, correct?

19         A.   Yeah, but -- no, some of them I did

20    more.  I did -- in American Bankers'

21    Association, I did some accounts payable for

22    them.

1    Q.   What did you do regarding accounts

2    payable?

3    A.   I received checks -- accounts

4    receivable, I'm sorry, accounts receivable.  I

5    received checks from -- and processed them for

6    them and I also -- I think it's in my resume,

7    but I can't recall.

8    Q.   But your experience with cut throat

9    private industry would have been from September

10   1992 to October 1993, temporary part-time work

11   that you did with the American Bankers'

12   Association, correct?

13   A.   Some of it, yeah.

14   Q.   Where else did you gain that

15   experience?

16   A.   From Joseph Smith and Son.

17   Q.   Okay.  Anywhere else?

18   A.   From Graham and Company.

19   Q.   Anywhere else?  Just to be clear,

20   Graham and Company was also part-time temporary

21   worker from September 1992 to October 1993,

22   correct?

1        A.    Uh-huh, yes.

2              MR. HENAULT:    Mark this as the next

3    exhibit.

4              (Johnson Deposition Exhibit Number 6

5    was marked for identification.)

6              BY MR. HENAULT:

7        Q.    Ma'am, after you sent your February 22,

8    2002 Email, which is marked as Johnson 5, did

9    you get any response from anyone?

10       A.    No.

11       Q.    Did you ever go and ask Mr. Lawrence

12   about the issue of your career ladder promotion?

13       A.    Yes, I did.

14       Q.    When?

15       A.    In April of 2002.

16       Q.    What happened then?

17       A.    He pretty much didn't tell me.

18       Q.    He didn't tell you?

19       A.    No.

20       Q.    He didn't tell you yes or no?  He

21   didn't tell you anything?

22       A.    Right, he didn't tell me anything.  I

1    asked him if it was Terry Bowie that was

2    preventing the promotion, and he didn't answer

3    that either.

4         Q.   Who was Ms. Bowie?  Is Terry Bowie male

5    or female?

6         A.   Male.

7         Q.   Who is Mr. Bowie?

8         A.   He was your supervisor.

9         Q.   So your second line supervisor?

10        A.   Right.

11        Q.   Prior to April 2002 did you ever say

12   anything to Mr. Bowie about your career ladder

13   promotion?

14        A.   I didn't say anything to him on April

15   2002.  It was just Mack Lawrence.

16        Q.   Okay.  So prior to that you had only

17   talked to Mack Lawrence?

18        A.   Right.

19        Q.   And your Email to Gary Wood?

20        A.   Right.

21        Q.   Why would you think in April of 2002

22   would you think it was Mr. Bowie that was

1    blocking your career ladder promotion?

2         A.    Because I didn't think that they

3    thought -- they didn't give any indication that

4    I wasn't getting my career ladder promotion.

5         Q.    In the more than two years it took you

6    to go from a GS 7 to a GS 9, did anyone tell you

7    during the interim period, at the end of the

8    first year as a GS 11 that you were or were not

9    getting your career ladder promotion?

10        A.    No.

11        Q.    At any time prior to the time you got

12   your GS 9 career ladder promotion, did anyone

13   ever tell you you were or were not getting it?

14        A.    No.

15        Q.    In the I think more than two years it

16   took you to go from GS 9 to GS 11, did anyone

17   tell you that you were or were not getting the

18   promotion?

19        A.    Huh-uh.

20        Q.    No?

21        A.    No.  I'm sorry.

22        Q.    So at the end of your first year as a

1      GS 9, no one came to you and said, You're not

2      getting it?

3          A.    No.

4          Q.    And conversely no one came and said,

5      You are getting it?

6          A.    Right.

7          Q.    You just got it eventually?

8          A.    Right.

9          Q.    So why because no one had said anything

10     to you about the GS 12 did you have an

11     expectation that you would get it?

12         A.    Because I had been a year end grade,

13     and I had a pass for my last performance

14     appraisal so then I gave your exhibit here.

15         Q.    We haven't gotten to this yet.  I'm

16     saying, why at the end would you have expected

17     to get it?  And I think you just answered my

18     question.  Let's not get into this exhibit yet.

19         A.    Okay.

20         Q.    At the end of your first year as a GS 7

21     had you received a pass?

22         A.    Yes.

1    Q.    But you weren't promoted automatically

2    then, correct?

3    A.    Right.

4    Q.    At the end of your second year as a GS

5    7, had you received a pass?

6    A.    Yes.

7    Q.    But you didn't just receive an

8    automatic promotion then, correct?

9    A.    Right.

10    Q.    At the end of your first year as a GS

11    9, had you had a pass?

12    A.    Yes.

13    Q.    You didn't receive an automatic

14    promotion then, did you?

15    A.    No, but I didn't know about the rule

16    until -- I didn't know about this until 2002.

17    Q.    When in 2002 did you find out about it?

18    I'm sorry, I cut you off.

19    A.    Oh, I think I cut you off.    Sorry.

20    Q.    When did you find out about it?

21    A.    I found out in 2002, the beginning of

22    2002 that if you're a year and grade and you

1    pass, you're supposed to go on your career

2    ladder promotion.

3        Q.    Who told you that or how did you find

4    out about it?

5        A.    I found out about that through Jeannie

6    Johnson.

7        Q.    Jeannie Johnson?  Who was Ms. Johnson,

8    Ms. Jeannie Johnson so we're clear?  Who was

9    she?

10        A.    She was somebody that knew a great deal

11    about human resources because she had been a

12    union official.

13        Q.    So she had been a union official.  Did

14    you work with Ms. Johnson?

15        A.    I did when I was doing unclassified

16    duties, but otherwise, no.

17        Q.    Had you asked Ms. Johnson about the

18    promotion process?

19        A.    Yeah, I did ask her about it.

20        Q.    What led you to ask her about it?

21        A.    Because I was wondering about getting

22    my GS 12, so I --

```
 1          Q.    That was in early 2002 you said you

 2    found out about that?

 3          A.    Yeah.

 4          Q.    Why did you -- I believe you told me

 5    the first time you asked Mack Lawrence about it

 6    was late December 2001.

 7          A.    Right.

 8          Q.    How did you know about it then?

 9          A.    Wait a minute.  I must -- I must be

10    wrong on when I asked about it.  I must have

11    asked about -- yeah, because December 2001 is

12    when I had my step.  Then when would it be?  It

13    had to have been before that time.

14          Q.    Before what time, ma'am?

15          A.    December 2001, so before December 2001.

16          Q.    Had to have been when what, when you

17    spoke to Ms. Johnson about it?

18          A.    Yeah, I must have spoken with her about

19    it in November or something.

20          Q.    You don't know when you spoke with her

21    about it, do you?

22          A.    No.
```

1      Q.   November is just a guess?

2      A.   Right.

3      Q.   In fact you don't know for sure that

4   you knew about it before the end of December,

5   2001, do you?

6      A.   I'm pretty sure I did because as soon

7   as I knew about it is when I asked -- as soon as

8   I knew about it is when I asked --

9      Q.   When you asked who?

10     A.   As soon as I knew about it is when I

11  asked them whether I was getting a career ladder

12  promotion.

13     Q.   Would that have been this February 2002

14  time frame or when?

15     A.   Yeah, the February 2002 time frame, so

16  it was early January that I had talked to her.

17     Q.   So then your testimony before that you

18  talked to Mr. Lawrence about the issue in

19  December isn't accurate, right, December of

20  2001?

21     A.   Right.

22     Q.   I have another question:  You told me

1    that you received your step increase in February

2    of 2002.  Yet this Email here says December

3    2001.

4         A.    I'm wrong on that too.  It's December

5    2001.

6         Q.    Okay.  Does your disability, the

7    depressive disorder or the anxiety disorder,

8    have any effect on your memory?

9         A.    I'm not sure.

10        Q.    Has any doctor or therapist or anyone

11   ever told you that it can lead to memory issues?

12        A.    No.

13        Q.    To you knowledge does any of the

14   medication you take affect memory function or

15   memory issues?

16        A.    Not that I know of.

17        Q.    Now let's go to -- this is Exhibit 6,

18   right?  Johnson Exhibit 6 is a letter you sent

19   by Email on May 18, 2002 to Mr. T.  Bowie?

20   B  O  W  I  E, correct?

21        A.    Right.

22        Q.    Why did you send this letter to Mr.

1    Bowie or Bowie, whatever it is?

2        A.    Bowie.  I sent it because it's actually

3    in one of the union things that if you want to

4    know why you're not being promoted, you're

5    supposed to give a determination letter.  That's

6    what it's called, a determination letter, to

7    find out why you're not getting it or what you

8    need to do in order to get a career ladder

9    promotion, and I gave this to Terry Bowie, Mack

10   Lawrence and Mark Carney, and Terry Bowie is

11   Mack Lawrence's supervisor, and then Mark Carney

12   is the person above him.

13       Q.    According to your union rules, who were

14   you supposed to request this determination

15   letter from or send the determination letter to?

16       A.    Send it to your supervisor.

17       Q.    Your supervisor was Mr. Lawrence,

18   correct?

19       A.    Yeah, and I gave it to him.

20            MR. HENAULT:  In fact let's mark this

21   now, what I had torn off as the next exhibit.

22            (Johnson Deposition Exhibit Number 7

1    was marked for identification.)

2         THE WITNESS:  I gave it to him by hand

3    though, so that's why it's not that he hasn't

4    received it because I gave it to him personally

5    in his hand, and I gave it to him again

6    personally in his hand.

7         BY MR. HENAULT:

8    Q.    When did you do that?

9    A.    The same date, 5/18/02.  Then when I

10   did it again, it was close to the time that --

11   in June.  I gave it to him again in June because

12   I hadn't had a response.

13   Q.    Take a look at what has now been marked

14   as Johnson 7, ma'am.

15   A.    Okay.

16   Q.    What has been marked as Exhibit 7 is a

17   May 16, 2002 Email, time 4:43 p.m., from you to

18   Terry Bowie, Mack Lawrence and Mark Carney,

19   correct?

20   A.    Right.

21   Q.    That's where you are sending him this

22   determination letter, right?

1      A.    Right.

2      Q.    Why did you send a letter on May 2 that

3   was dated May 18?

4      A.    I didn't send the letter on May 16.

5   Wait a minute.  Wait a minute.  May 16.

6      Q.    Let me see -- the letter that is marked

7   as Johnson 6, that is the determination letter

8   you wrote, correct?

9      A.    Right.

10      Q.    Is that the letter that is referenced

11   as attached in this Email as determination

12   letter.doc?

13      A.    Yes.  Well, we must have changed the

14   date slightly.

15      Q.    What do you mean you must have changed

16   the date slightly, ma'am?  When would you have

17   changed the date?

18      A.    Well, we might have put this to give

19   him the weekend or something like that.

20      Q.    And when you say we might have put

21   this, you were pointing to the date May 18, 2002

22   on Johnson 6, correct?

1      A.    Right.

2      Q.    Who is "we"?

3      A.    Well, my husband helped me write this.

4      Q.    Now, you said you also sent this to

5    Mack Lawrence.  He's not on this Email, is he,

6    the Email marked as Johnson 7?

7      A.    No, but I gave it to him personally in

8    his hand.

9      Q.    You said you also gave this personally

10   to Terry Bowie.

11     A.    No, I didn't give it personally to

12   Terry Bowie.  He got it by Email, and Mark

13   Carney got it by Email.

14     Q.    You see where the tracking is, the

15   heading on Johnson 7?

16     A.    Yes.

17     Q.    This was printed from your Email,

18   correct?

19     A.    Right.

20     Q.    So that's a function in your Email that

21   you can see when it's read, right?

22     A.    Right.

1       Q.    And for Mr. Bowie, it shows, in fact --

2   it doesn't show it was read.  It shows it was

3   deleted, correct?

4       A.    Right.

5       Q.    For Mr. Carney it shows read,

6   5/17/2003, correct?

7       A.    Right.

8       Q.    Do you know if Mr. Bowie ever read this

9   letter?

10      A.    I don't think he ever did.  I think he

11  just deleted it.

12      Q.    You never provided him with a copy by

13  hand?  This is the only copy you ever provided

14  to him was by Email, correct?

15      A.    Right, but he shouldn't have just

16  deleted it without figuring out what was being

17  said.

18          MR. HENAULT:  Let's mark this whole

19  package as Johnson 8, please.

20          (Johnson Deposition Exhibit Number 8

21  was marked for identification.)

22          BY MR. HENAULT:

1       Q.   Ma'am, please take a look at what has

2    been marked as Johnson Exhibit 8.

3       A.   Uh-huh.

4       Q.   What has been marked as Exhibit 8 is a

5    package of documents that are performance

6    appraisal from March '98 to April of 2002,

7    correct?

8       A.   Uh-huh.

9       Q.   When was this package compiled?

10       A.   When was it compiled?

11       Q.   Let me say:  Was this something you put

12    together and sent a supervisor or was this

13    something you put together in the course of your

14    EEO complaint?

15       A.   In the course of the EEOC complaint.

16       Q.   Thank you.  That helps me.  Ma'am, turn

17    to the second appraisal back in Exhibit 8, which

18    is the rating of record that is signed by you on

19    6/26/01.  Do you see that?

20       A.   Yeah.

21       Q.   If you would please turn to the last

22    page of that, under number 7 "willingly accepts

1    and completes a fair share of the workload."

2    Now, what this page is is a self critique for

3    your appraisal, correct?

4         A.    Yes, that's my self.

5         Q.    And under "willingly accepts and

6    completes a fair share of the workload," you

7    say:  "The only time this is a problem is when

8    I'm out sick."  Correct?

9         A.    Right.

10        Q.    Were you out sick often during this

11   period, this evaluation period?

12        A.    This evaluation period?

13        Q.    Beginning at 5/02/2000 and ending

14   4/30/2001?

15        A.    I was out sick some of the time.

16        Q.    Some of the time, okay.  And providing

17   accurate and timely data -- look at number 12,

18   "providing accurate and timely data to customers

19   and co-workers," your self-evaluation is that

20   "this is a problem when I am out sick," correct?

21        A.    Right.

22        Q.    So your sickness or your sick time

1    prevented you from providing accurate and timely

2    data to customers and co-workers, didn't it?

3        A.    Well, actually it wasn't that bad.  I

4    know it was my self-critique, but I'm a lot

5    worse on myself than people are with me, and I

6    would get to whatever customer or co-workers had

7    a question or anything when I was back from

8    being out sick right away.

9        Q.    But what would happen if that was

10    something that needed answering while you were

11    out sick?

12        A.    Then I wouldn't be able to do it.

13        Q.    Ma'am, you were promoted in November of

14    2000 to the GS 7, correct?

15        A.    November of 2000?

16        Q.    To GS -- excuse me, to GS 11?

17        A.    Yeah.

18        Q.    I'm sorry about that.  So when this

19    pass came out, you had not had a full year with

20    a pass as a GS 11, had you?

21        A.    No.

22        Q.    Do you know, is the promotion

1  requirement that you have a full year of

2  successful performance at your current grade

3  level or is it that once you're there a year,

4  regardless of when you receive your rating?

5      A.   I don't think they specify.

6      Q.   You don't know?

7      A.   Right, I don't know.

8      Q.   Okay.

9           MR. HENAULT:  Mark this as the next

10  exhibit.

11           (Johnson Deposition Exhibit Number 9

12  was marked for identification.)

13           BY MR. HENAULT:

14      Q.   Ma'am, I will tell you what has been

15  marked as Johnson Exhibit 9 is a complete leave

16  audit beginning pay period one, year 2000, to

17  pay period ten, 2004, and this comes from a

18  report of investigation into your EEO

19  complaints.  Have you seen this before?

20      A.   I don't think so.

21      Q.   I want you to take a look at it and

22  tell me if you have any evidence to dispute

1    what's there.

2        A.    It doesn't add up my credit hours

3    because that would lessen my leave without pay

4    hours.

5        Q.    Actually, ma'am, if you look -- let's

6    pick a day.  You are correct, there is no total

7    for your credit hours, but let's look at year

8    2000, pay period one.  You see you worked 53

9    hours, correct?

10        A.    Uh-huh.

11        Q.    You used 30 minutes of sick time, okay,

12    and you used six and a half credit hours?

13        A.    Wait a minute.  Which one are you

14    looking at?

15        Q.    2000, pay period one?  Right here, let

16    me point at this.  You worked 53 hours.

17        A.    Right.

18        Q.    You took a half hour sick leave?

19        A.    Oh, yeah, I used --

20        Q.    You used six and a half --

21        A.    Yes, of my credit hours.

22        Q.    Of credit hours.

1        A.    Right.

2        Q.    Used for this pay period.

3        A.    Right.

4        Q.    And then you had -- let me -- bear with

5    me for one moment.  I want to make sure I get

6    this accurate.  Ma'am, if you used credit hours,

7    then you wouldn't have taken those hours for

8    leave without pay, correct?

9        A.    Right.

10       Q.    So look at pay -- year 2000, pay period

11   2.  It shows you used nine hours of leave with

12   pay and also used 5.5 credit hours, correct?

13       A.    Right.

14       Q.    So had you not used 5.5 hours of credit

15   hours, then that would be 14.5 hours leave

16   without pay, correct?

17       A.    Right.

18       Q.    So actually it does account for your

19   leave without pay, doesn't it, this chart?  It

20   doesn't have a total at the very bottom for

21   credit hours?

22       A.    Yes, that's what I'm talking about.

1    Q.    But for each individual, it shows, had

2    you not used those credit hours, your leave

3    without pay would have been higher, correct?

4    A.    Right.

5    Q.    So the total leave without pay hours

6    used wouldn't be inaccurate because there's no

7    total for your credit hours, would there?

8    A.    I guess you're right.

9    Q.    Okay.  Now, between pay period one,

10    2000 and --

11        MR. HENAULT:  Let's actually take a

12    quick five minute break because I think I have

13    some numbers wrong here I want to get right so

14    let's take five minutes.  We've been going at it

15    for almost an hour.

16        (A brief recess was taken.)

17        BY MR. HENAULT:

18    Q.    Ma'am, I want to talk about the numbers

19    for your attendance in the year 2001.  As you

20    sit here today, do you have any reason to

21    believe these numbers to be inaccurate?

22    A.    No.

1       Q.   Pay period one, 2001, shows that you

2   took eight hours of annual leave, three hours of

3   sick leave, 64 hours of leave without pay and

4   used five credit hours.  Do you see that?

5       A.   Yes.

6       Q.   Do you know whether that's accurate or

7   not?

8       A.   I think it is.

9       Q.   Pay period 2, you used no annual leave.

10  You used 4.5 hours of sick leave, and nothing

11  else, correct, or eight hours of holiday leave,

12  I'm sorry?  Correct?

13      A.   Yeah.

14      Q.   Do you believe that is accurate?

15      A.   Yes.

16      Q.   Instead of us sitting here and going

17  through all of them, because otherwise -- if you

18  would like I can go through every single pay

19  period for 2001 and ask you if you believe the

20  numbers are accurate or inaccurate, but can you

21  take a look for 2001, pay period 1 through 26

22  and tell me if there are any numbers that you

1    believe are inaccurate.

2        A.    I believe these are accurate.

3        Q.    Okay.

4        A.    I don't think they're inaccurate.

5        Q.    So between pay period -- for the year

6    2001, you used about -- I understand you don't

7    have a calculator, and I'm not going to ask you

8    to sit here and add it all up but that would

9    come to be about 278 and a half hours of leave

10   without pay, correct?  Does that look about

11   right?  We don't have to do that.  The numbers

12   are going to say what they're going to say.  I

13   don't need you to sit here and waste your time

14   adding.

15        Do you believe that in 2001, given the

16   absences reflected on this attendance sheet, you

17   were at work enough for your supervisor to make

18   a judgment about your ability to perform at the

19   GS 11 level?

20       A.    Yes, I do.

21       Q.    Why?

22       A.    Because when I was there I worked

1    really hard, and I did get all my assignments

2    done on time and I even helped out other people

3    with their assignments when they were in

4    training or something or out sick.

5        Q.   Do you know -- how many work hours are

6    there in a work year, do you know?

7        A.   I don't know.

8        Q.   For 2001?

9        A.   I think it's 230.5 is the leave without

10   pay hours.

11       Q.   You can set that aside, ma'am, because

12   like I said, I'm not going to ask you to add

13   them all up.  You said you have no reason --

14   actually take a look through the rest of the

15   document and tell me if you believe any of the

16   other numbers for other pay periods are

17   inaccurate, and take your time and look through

18   it if you would like?

19       A.   I have no reason to believe they're

20   inaccurate.

21       Q.   They look like they're accurate to you

22   with your memory of the time you worked?

1        A.    Yeah.

2        Q.    You can set that aside, ma'am.  Now,

3    one of your allegations that we've discussed the

4    subject, not the substance yet, was that you

5    allege that you were discriminated against and

6    retaliated against when Mr. Lawrence did not

7    preapprove you for 72 hours of leave without pay

8    for a vacation from March 18, 2003 to March 28,

9    2003, correct?

10       A.    Correct.

11       Q.    Now, in February of 2003, you sent Mr.

12   Lawrence an Email requesting that he approve

13   leave without pay for your vacation, correct?

14       A.    Right.

15            MR. HENAULT:  Let's mark that and we'll

16   talk about the specific Email.

17            (Johnson Deposition Exhibit Number 10

18   was marked for identification.)

19            BY MR. HENAULT:

20       Q.    Ma'am, the vacation you were taking

21   from March 18, 2003 to March 28, 2003, that was

22   a vacation you were taking with your husband,

1    correct?

2        A.    Yes, that's correct.

3        Q.    Where were you going?

4        A.    Galapagos Islands.

5        Q.    Now, what has been marked as Johnson

6    Exhibit 10 is an Email chain.  On the very top

7    is a March 13, 2003 Email.  The very bottom is a

8    Friday, February 28, 2003 Email sent at 6:22

9    p.m., correct?

10       A.    Right.

11       Q.    Now, the Email is sent from an address

12   wildcitycat@aol.com; is that correct?

13       A.    Uh-huh.

14       Q.    Whose Email address is that?

15       A.    That's my Email or our Email address.

16       Q.    This is an Email you sent to Mack

17   Lawrence cc'ing Gary Wood and your yourself,

18   right?

19       A.    Right.

20       Q.    In this you tell him you want him to

21   preapprove 72 hours leave without pay so that

22   you can, with your doctor's support, go out of

1    the country to recuperate, right?

2        A.    Right.

3        Q.    When you sent this on February 28,

4    2003, you had not provided him with any medical

5    documentation or any documentation at all from

6    your doctor discussing this vacation, had you?

7        A.    Discussing a vacation?  No, but --

8        Q.    Yes.

9        A.    But I had given him medical

10    documentation though.

11        Q.    Saying what?

12        A.    Saying that I -- the medical

13    documentation of 2001.

14        Q.    What we've talked about, we've talked

15    about a letter in 1995.  We talked about a

16    letter I believe you said in 1997 that we don't

17    have a copy of, and we talked about the November

18    2001 letter?

19        A.    Uh-huh.

20        Q.    Other than those letters, had you

21    provided additional documentation from your

22    doctor?

1      A.   No.

2      Q.   So when you sent him this letter, you

3   had never provided Mr. Lawrence with any

4   documentation or anything in writing from your

5   doctor saying that you need this vacation for

6   medical reasons, correct?

7      A.   Right.

8      Q.   In response to your Email Mr. Lawrence

9   responded a couple days later saying "please see

10   me when you get in," right?

11      A.   Right.

12      Q.   That was March 3, 2003, at 5:23 p.m. he

13   responded?

14      A.   Right.

15      Q.   Did you ever go see him?

16      A.   I couldn't get into work.

17      Q.   Why?

18      A.   Because I was sick, and I couldn't get

19   in and because of the discrimination, I couldn't

20   get myself to come in.

21      Q.   Okay, ma'am.  On March 3, between March

22   3 -- right around March 3, what about your

1    disability made you unable to come into work?

2        A.    Well, the discrimination that had been

3    happening to me caused me to not feel

4    comfortable at work and so I would get sick and

5    wouldn't be able to go into work.

6        Q.    You sent this Email February 28, 2003,

7    the bottom one, but your last day you had

8    actually been in the office was February 14,

9    2003, correct?

10       A.    That's correct.

11       Q.    In fact between February 14 and we'll

12   discuss this in-depth a little bit later -- but

13   between February 14, 2003 and August 6, 2004 you

14   never went into work?

15       A.    Right.

16       Q.    So here you're telling Mr. Lawrence you

17   need 72 hours so you can take a vacation to the

18   Galapagos Islands, but you cannot go into work

19   to see him about this request, correct?

20       A.    Right.

21       Q.    Now, you responded back to him the next

22   day, March 4, 2003, 6:48 p.m.  You say:  "I am

1    requesting that you do not condition the reply

2    of my leave request on my having to be in."

3            Where did he ever tell you that he

4    conditioned his approval on you coming to see

5    him?

6        A.   It says "please see me when you get

7    in."  So he was --

8        Q.   That doesn't say if you don't come see

9    me, I will not approve, does it?

10       A.   No, it doesn't say that, but he

11   would -- if he just approved it, he would have

12   just said yes.

13       Q.   But at this time, even as of March 4,

14   2003, you had never provided him with any

15   documentation saying from your -- excuse me.

16   Let me start over.

17           As of March 4, 2003 you had not

18   provided Mr. Lawrence with any documentation

19   from your doctor saying that you needed a

20   vacation for medical reasons, had you?

21       A.   No.

22       Q.   But you expected him just to approve 72

1    hours leave without pay for medical reasons

2    because your doctor -- you told him that your

3    doctor supported it?

4        A.   Well, I was going to bring in the

5    medical note when I went in.

6        Q.   When were you going -- when did you --

7    we'll get to the medical note but you didn't

8    even have the medical note at this time, did

9    you?

10       A.   No.

11       Q.   In fact, the medical note that we'll

12   talk about is dated March 11.  So Mr. Lawrence

13   when he said "please see me when you get in" had

14   no way whether to know if there was something

15   your doctor approved of or not, did he?

16       A.   No, he did not.

17       Q.   Mr. Lawrence asking you to come see him

18   about this request, do you consider that to be

19   unreasonable?

20       A.   Well, I thought it was unreasonable

21   considering that I hadn't been able to get in.

22   He knew I hadn't been able to get in, and

1    actually he wasn't in on that date that he said

2    -- the next day when he said, "Please see me

3    when you get in," and it turned out he wasn't

4    in.  A couple people told me he wasn't in that

5    day.

6        Q.   You tell Mr. Lawrence in this March 4

7    Email that "I believe I have provided you with a

8    detailed explanation why I need to take leave."

9            You are referencing the February 28

10   Email, right?

11       A.   Right.

12       Q.   What detailed explanation did you

13   provide him?

14       A.   That it was from March 18 to the 28th

15   for 72 hours leave without pay hours for

16   recuperation.

17       Q.   So just because you told him that you

18   felt or that you are going outside of the

19   country to recuperate and feel that this

20   recuperation might possibly make it more likely

21   for me to return to a normal work life, that was

22   all the explanation needed?

1      A.    At the time, yeah.

2      Q.    Okay.  Do you believe it unreasonable

3  or discriminatory for a supervisor to ask for

4  medical documentation for a request like this?

5      A.    No, I don't believe that, and I

6  didn't -- I don't think I said that he couldn't

7  ask for any medical documentation.

8      Q.    I think what you said is basically the

9  explanation you gave him was sufficient.  Do you

10  allege that Mr. Lawrence telling you to come see

11  him when you get in was discriminatory?

12      A.    Yes.

13      Q.    Why?

14      A.    Because I was having trouble getting in

15  and he knew it, and that's why he said, "Please

16  see me when you get in" because --

17      Q.    You were having trouble getting in, so

18  after February 14, 2003, you couldn't get to

19  work, could you?

20      A.    No.

21      Q.    You couldn't do your job, could you?

22      A.    No, because of the discrimination that

1    was --

2        Q.    That's fine.   Regardless of what the

3    reason, your disability as of February 13 --

4    February 14, excuse me, 2003 going forward

5    prevented --

6        A.    After -- after February 14, 2003.

7        Q.    Let me ask the question again.

8    Beginning February 14, 2003 going forward?

9        A.    Right.

10       Q.    To August 2004, your condition made it

11   impossible for you to get to work to do your

12   job, didn't it?

13       A.    Yeah, but I was in on February 14, so

14   not including February 14.   It would be February

15   15.

16       Q.    Forward?

17       A.    Forward.

18       Q.    Your condition made it impossible for

19   you to get to work to do your job, didn't it?

20       A.    Right.

21       Q.    How long was the flight to the

22   Galapagos Islands?

1          A.   I don't remember.

2          Q.   Was it two hours, three hours, six

3     hours, twelve hours?

4          A.   I can't remember.

5          Q.   Was it a long flight?

6          A.   I think it was a long flight.  I really

7     can't remember.

8          Q.   Your disability didn't prevent you from

9     going to an airport, did it?

10         A.   No.

11         Q.   Your disability didn't prevent you from

12    sitting on a flight to get to the Galapagos

13    Islands, did it?

14         A.   No.

15         Q.   Did you have any layovers on the way to

16    Galapagos?

17         A.   I think so.

18         Q.   Where?

19         A.   I'm not sure.

20         Q.   Your disability didn't affect your

21    ability to do that, did it?

22         A.   No, but my -- I didn't feel like I was

1    being discriminated against from the airline.

2        Q.    How long were you in the Galapagos?

3        A.    Just the time from the 18th to March

4    28.

5        Q.    But notwithstanding your disability,

6    you were able to get back on the flight to come

7    back to the United States, right?

8        A.    Yeah.

9        Q.    No problem?

10       A.    No, but I wasn't being discriminated

11   against by the airline.

12       Q.    That's fine.  That's fine.  Now, if you

13   look at the --

14            MR. JOHNSON:  You are going to let her

15   finish the answers to the question; is that

16   correct?

17            MR. HENAULT:  I'm sorry?

18            MR. JOHNSON:  Just a couple times in

19   the last ten minutes you seem to me to kind of

20   appeared to cut her off but that's okay.  You

21   didn't mean to.

22            MR. HENAULT:  I apologize if I did.

1           MR. JOHNSON:  Thank you.

2           BY MR. HENAULT:

3      Q.   If I interrupt your questioning, please

4    let me know, and I will absolutely let you

5    finish the answer.  Now, look at the top portion

6    of the Email, Johnson 10 or actually if you look

7    at the one sent on March 12, 2003, at 3:19 p.m.,

8    that's from Mr. Lawrence to your AOL address,

9    Email address, and your work Email address,

10   correct?

11     A.   Yeah.

12     Q.   And that was Mr. Lawrence forwarding to

13   you a package of documents, correct?

14     A.   Uh-huh.

15     Q.   Yes?

16     A.   Yes.

17          (Johnson Deposition Exhibit Number 11

18   was marked for identification.)

19          BY MR. HENAULT:

20     Q.   Now, when Mr. Lawrence sent you this

21   March 12, 2003 Email that's the second one down

22   on Johnson 10, you had not provided him with

1    your physician's note yet, had you?

2        A.    No.

3        Q.    What has been marked as Johnson 11,

4    please take a look at this, ma'am.  This is the

5    package of documents that were sent to you by

6    Mr. Lawrence on March 12, 2003; isn't that

7    correct?

8        A.    Uh-huh.

9        Q.    Yes?

10       A.    Yes, it is.

11       Q.    Was there anything discriminatory about

12   Mr. Lawrence's request for this information?

13           MR. JOHNSON:  Could you give us time to

14   go through this, please?

15           MR. HENAULT:  Go ahead, ma'am.

16           THE WITNESS:  Okay.

17           BY MR. HENAULT:

18       Q.    What's the matter?

19       A.    I think it was discriminatory when he

20   asked for medical documentation when I had 72

21   hours of leave without pay.

22       Q.    But the reason you said you needed this

1    specific 72 hours was because of a medical

2    condition, correct?

3        A.    Yeah, but I could have just been taking

4    72 hours off just for regular leave.

5        Q.    You could have, but you specifically

6    told him that you needed this 72 hours of

7    vacation -- excuse me, of leave without pay for

8    your medical condition to recuperate, right?

9        A.    Right.

10       Q.    So he sent you a request for supporting

11   medical documentation.  You alleged that this

12   was improper for him to ask for the supporting

13   documentation?

14       A.    Yeah, I do.

15       Q.    Here if you look at the second

16   paragraph down:  "Although you verbally informed

17   me of your medical condition, you have never

18   provided me with any adequate medical

19   documentation to support any of your requests

20   for leave due to your medical condition."

21       A.    Now that wasn't true.  He got the

22   November 2001 memo.

1      Q.    Let's go back and look at the November

2    2001 memo, ma'am?

3              THE REPORTER:  It's Exhibit 1.  Is that

4    the one you need?

5              THE WITNESS:  Yes.

6              BY MR. HENAULT:

7      Q.    In fact this one does say that you may

8    need time off from work occasionally which is

9    often unpredictable, right?

10     A.    Right.

11     Q.    But there was nothing about you needing

12   this 72 hours to recuperate from your medical

13   condition, was there?

14     A.    No, but he didn't have to have medical

15   documentation to give me leave without pay.

16     Q.    Okay.  So you believe --

17     A.    He did it because he wanted to be

18   discriminatory.

19     Q.    That's your conclusion, right?

20     A.    Yes.

21     Q.    Or your belief?

22     A.    My belief.

1      Q.   Do you have any evidence besides that

2   that Mr. Lawrence did this because he wanted to

3   be discriminatory or retaliatory towards you?

4      A.   The release of medical information was

5   kind of discriminatory because it says

6   "authorize my physicians, counselors and/or

7   treatment officials to release the medical

8   records or other information pertaining to my

9   condition to supervisor."

10       Just to get an accommodation, you don't

11   need to have a doctor's note to do it.  I just

12   provided a doctor's note, and they did, but you

13   don't have to have one.

14      Q.   So it's your allegation that the

15   Department of Education had no right to ask you

16   for medical information to justify your request

17   for accommodations, including this March 2003

18   request for 72 hours leave without pay?

19      A.   No.  They have a right to ask for it,

20   but not at the degree that they -- that they --

21   they have a right to have the information, but

22   they don't have the right to -- let me get my

1    thoughts together.  Sorry.

2        Q.   Please do.

3        A.   Well, I did get a medical note as you

4    said of March 11, 2003, so I did end up doing

5    that.

6        Q.   Right.  My question --

7        A.   And I didn't --

8        Q.   I'm sorry, go ahead.

9        A.   I'm not saying that that's wrong to do

10   that.  It just wasn't -- it shouldn't have been

11   a requirement that I had to do because if I had

12   just been out sick, he would have approved my

13   leave without pay but he conditioned upon it on

14   my coming in.

15       Q.   Let's go back to that for a minute

16   though, ma'am, because it wasn't conditioned

17   upon you coming in.  He just asked you to come

18   see him, right?

19       A.   Yeah, and so it was a conditioned upon

20   me coming in, please see me when you get in, so

21   he wasn't going to talk to me about it.

22       Q.   Did he ever tell you that?

1        A.    No, but that's what he does when he

2    doesn't want you to talk on the Email.  He goes

3    "please see me."

4        Q.    But you never went to see him, did you?

5        A.    I couldn't because I wasn't going into

6    work.

7        Q.    Did you ever call him?

8        A.    Yeah.

9        Q.    To talk about this?

10       A.    I don't know if I did or didn't.

11       Q.    You know you didn't, don't you?

12       A.    No, I don't know I didn't.

13       Q.    Do you recall calling him?

14       A.    No.

15       Q.    Okay.

16       A.    But I don't know if I did or didn't.

17       Q.    As you sit here today, you have no

18   evidence that you called to talk to him about

19   this request, do you?

20       A.    No.

21            MR. HENAULT:  Let's mark this as the

22   next exhibit, please.

1             (Johnson Deposition Exhibit Number 12

2    was marked for identification.)

3             BY MR. HENAULT:

4        Q.   Ma'am, what has been marked as Exhibit

5    12 is a March 11, 2003 letter from Dr. George C.

6    James to whom it may concern regarding Susan

7    Johnson Valentic?

8        A.   Correct.

9        Q.   Just so the record is clear, sometimes

10    your an name is listed as Susan Johnson or Susan

11    Valentic.  You use both those names, correct?

12        A.   Yes, I use Susan Johnson for work, for

13    my work information.

14        Q.   I just want to be clear, so that

15    there's -- if anything is written or anything,

16    it can be explained that Susan Johnson Valentic

17    or Susan Johnson or Susan Valentic is all the

18    same?

19        A.   It is the same person, yes.

20        Q.   When did you get this March 11, 2003

21    letter from Dr. James?

22        A.   March 11.

1      Q.    When did you give it to the Department

2   of Education?

3      A.    I don't know.   Do you know?

4      Q.    I don't have it documented right now.

5   Do you recall providing this to Mr. Lawrence

6   before you went on vacation.

7      A.    No, because I wasn't getting in, so...

8      Q.    How was this provided to your

9   supervisor, do you know?

10     A.    No, I can't remember.

11     Q.    Do you recall providing this letter to

12   Mr. Lawrence or anyone else at the Department of

13   Education before you went away on vacation?

14     A.    No, I don't.

15     Q.    Now, you took this vacation we already

16   talked about, right?

17     A.    Right.

18     Q.    And you received -- you were authorized

19   leave without pay for this vacation, right?

20     A.    Right I was.

21     Q.    You weren't listed as AWOL for this

22   vacation?

1    A.   No.

2    Q.   So you did -- you were on the payrolls

3    listed as leave without pay?

4    A.   Right, I think.

5    Q.   What is the complaint about leave

6    without pay for this vacation, ma'am?

7    A.   It was discriminatory and retaliation

8    that he asked -- because he would have given me

9    the 72 leave without pay hours anyways, so I

10   still say he conditioned it on me coming in,

11   whether he was going to say yes or no.

12   Q.   Ma'am, do you know whether in the

13   federal workplace if telling a supervisor that

14   you need to take a specific action due to a

15   medical condition triggers any responsibilities

16   on their part?

17   A.   No.

18   Q.   So you don't know whether after you

19   told Mr. Lawrence that he was told by others

20   that he had to do certain actions to address

21   that, do you?

22   A.   No.

1      Q.    So your objection and your allegations

2    regarding this 72 hours that we're discussing is

3    not that it wasn't approved or you didn't get

4    leave without pay for that period?

5      A.    No.

6      Q.    Because you did?

7      A.    Right.

8      Q.    It's just that he didn't approve it

9    immediately, and he then asked you for medical

10   documentation to support the request?

11     A.    Right.

12     Q.    That request for medical documentation

13   though had no effect on whether or not you were

14   authorized leave without pay for that vacation,

15   correct?

16     A.    Correct.

17          MR. HENAULT:  Let me mark this as the

18   next exhibit, please.

19          (Johnson Deposition Exhibit Number 13

20   was marked for identification.)

21          BY MR. HENAULT:

22     Q.    Okay, ma'am.  What has been marked as

1    Johnson 13 is an Email chain that, if you'll

2    look at the very back begins with your Email,

3    your February 8, 2003 Email to Mr. Lawrence;

4    then his reply to you to please see him when you

5    get in; then your March 4 Email.  Then we have

6    again the March 12, 2003 Email that was marked

7    and discussed.  All these are contained in

8    Johnson 10.

9          But then on top of that on Exhibit 13,

10   we have an Email from you to Mr. Lawrence saying

11   that "since we did not receive a timely reply

12   from you and the only reply was your condition

13   that I must come to the office, which was an

14   impossible request by you, I referred this

15   matter to the proper authorities."

16          Who are the proper authorities, ma'am?

17   A.    We referred it to the EEOC -- EEOC

18   investigator.

19   Q.    When did you refer this to them?

20   A.    Sometime in between -- sometime in

21   between March 4 and March 12.

22   Q.    When you say you referred it to the

1    proper authorities, are you talking about you

2    filed an amendment to your claim --

3        A.    Yes.

4        Q.    -- of discrimination?

5        A.    Well, they added it to my claim.

6        Q.    We've already talked about this

7    briefly, ma'am, but I want to be clear, Mr.

8    Lawrence did not tell you that, Come to my

9    office or I will not approve it, did he?

10       A.    No, he didn't say that, but he knew

11   that I couldn't get in, and that -- and that in

12   itself was kind of saying, Not unless you can

13   get in.  Well --

14       Q.    I'm sorry, finish.  Go ahead.

15       A.    I'm done.

16       Q.    That's your interpretation of what he

17   said, right?

18       A.    Right.

19       Q.    That's how you took it?

20       A.    Right, that's how I took it.

21       Q.    That's not what he said?

22       A.    Well, that's pretty much when he

1    says "please see me when you get in," it's --

2       Q.   That's what you took that to mean,

3    correct?

4       A.   Yeah.

5       Q.   Other than the March 11, 2003 letter

6    which has marked as Johnson Exhibit 12, did you

7    ever fill out any of the documentation that was

8    sent to you by Mr. Lawrence or provided that

9    information?

10      A.   No.

11      Q.   Would it seem accurate that I told you

12   that you in fact didn't provide that April 11,

13   2003 letter from Dr. James to Mr. Lawrence until

14   April 20, 2003?

15      A.   That would have to be because we gave

16   it to the investigator and then --

17      Q.   Did you ever send it to Mr. Lawrence?

18      A.   No.

19      Q.   Never?

20      A.   I don't think I sent it to him.  No, I

21   think -- I think it was through the

22   investigative reporting that he got it.

1    Q.    Why when your supervisor asks you for

2   specific information did you feel that you had

3   the right or the ability just to ignore his

4   request?

5    A.    I didn't think I was ignoring his

6   request.  I was saying it shouldn't be

7   necessary.

8    Q.    So you didn't do it because you felt it

9   unnecessary, right?

10    A.    I thought it was unnecessary for my --

11   for the time off, yeah.

12    Q.    Look at Johnson 11, Mr. Lawrence asks

13   that you give him the -- that you send the

14   requested information to him and the employee

15   relations team by March 17, 2003, correct?

16    A.    Right.

17    Q.    And we've already talked about you

18   didn't send it to -- either Mr. Lawrence or

19   anyone on the employee relations team including

20   Ms. Regina Shiver which is the name listed here

21   by March 17, did you?

22    A.    No.

1      Q.    Because you didn't believe you had to?

2      A.    Right.  Wow.

3      Q.    What's the matter?

4            MR. VALENTIC:  She doesn't have a watch

5      on.

6            (Discussion off the record.)

7            BY MR. HENAULT:

8      Q.    Ma'am, after you returned from

9      vacation, you got -- or a month and a half after

10     you returned from vacation, you got another

11     letter from Dr. James, didn't you?

12     A.    Yes.

13           MR. HENAULT:  Let's mark this letter.

14           (Johnson Deposition Exhibit Number 14

15     was marked for identification.)

16           BY MR. HENAULT:

17     Q.    What has been marked as Exhibit 14,

18     ma'am, is a May 2, 2003 letter from Dr. George

19     C. James to the United States Department of

20     Education, Re:  Susan Johnson, correct?

21     A.    Uh-huh.

22     Q.    And you requested that Dr. James send

1    this letter, right, or you requested he write

2    this letter for you?

3        A.    Yeah, I requested he write a letter for

4    me.

5        Q.    And in this letter, Dr. James says:  As

6    a result of the stress, stressful conditions

7    relating to -- I'm paraphrasing, please correct

8    me if you believe I got it wrong.  As a result

9    of the stressful conditions from the EEO claims,

10   you will be unable to return to the workplace

11   for a minimum of six months, correct?

12       A.    Right.

13       Q.    Now, based on the receipt of this

14   letter -- who did you send this to, anyone at

15   the Department of Education?  Let me back up,

16   excuse me.  Did you send this to the Department

17   of Education or did your doctor?

18       A.    I sent it to the Department of

19   Education.

20       Q.    Who did you send it to?

21       A.    I think I sent it to Jack Martin, Terry

22   Wood -- Terry Bowie, sorry, Mack Lawrence,

1    Cynthia Logan.

2        Q.    Did you tell Mr. James that you wanted

3    to take six months off or was that his

4    suggestion of a time frame?

5        A.    That was his suggestion of a time

6    frame.

7        Q.    You agreed with that?

8        A.    Right.

9        Q.    When did you send this to the

10   Department of Education, do you remember?

11       A.    Right amp.

12       Q.    After the Department of Education

13   received this letter, they authorized you to

14   take six months off leave without pay, didn't

15   they?

16       A.    Yeah, but it says a minimum of six

17   month, and they took it to mean that it was the

18   maximum, and that's not what it is.   It's the

19   minimum of six months.

20       Q.    You were authorized leave without pay,

21   right?

22       A.    Right.

1    Q.   Now, if you look at the second

2  paragraph, it talks about "Ms. Johnson's level

3  of depression and equity has been exacerbated by

4  a number of recent reasonable accommodations at

5  work, a lack of resolution regarding her EEO

6  complaining and the negative environment she

7  feels at work."  It says that, correct?

8    A.   Uh-huh.

9    Q.   What was the resistance to reasonable

10 accommodations?

11   A.   The resistance to the reasonable

12 accommodation of the credit hour.

13   Q.   Anything else?  Anything else ma'am?

14   A.   Not that I can think of right now.

15   Q.   We've talked a little bit about the

16 resistance you're referring to on the credit

17 hours.  That's the resistance where Mr. Lawrence

18 informs you that effective March 26, 2000 you

19 may continue to work credit hours but you must

20 receive approval from your team leader prior to

21 performing the work.  That's what you classify

22 as the resistance to reasonable accommodations,

1    correct?

2        A.    Yeah.

3        Q.    Do you know if Dr. James ever talked to

4    anyone at the Department of Education?

5        A.    No, he didn't.

6        Q.    So all the information he had he

7    received just from you?

8        A.    Yeah, but he always said that they

9    could call him.  I always said they could call

10   him if they had any questions.

11       Q.    Did you ever provide a release to the

12   Department of Education for them to talk to your

13   physician?

14       A.    No.

15       Q.    Are you aware that under the Privacy

16   Act the Department of Education could be held

17   liable if they called and talked to your

18   physician without your prior approval?

19       A.    I gave my prior approval though.  I

20   said they could talk to him.

21       Q.    Are you aware that they cannot do so

22   without written, signed approval from you?

1    A.    They could have requested for it, and I

2  would have provided it.

3    Q.    In fact didn't they ask for written

4  authorization to talk to your doctor in the

5  March 12, 2003 packet of documents, a release of

6  medical information?  That's what that request

7  was, isn't it?  I'm specifically talking about

8  the fourth page of Exhibit 11, ma'am.  In this

9  document --

10    A.    Yeah my from.

11    Q.    -- hold on.  Your supervisor is asking

12  for a release to talk to your physicians,

13  counselors and treatment professionals, correct?

14    A.    Correct.

15    Q.    So your statement that you would have

16  given that signed authorization if asked is

17  actually wrong, isn't it?

18    A.    Well, this was conditioned upon the 72

19  hours of leave without pay.

20    Q.    Ma'am --

21    A.    It wasn't --

22    Q.    I'm sorry, go ahead.

```
1            A.   It wasn't just a general one for just

2       talking to him.

3            Q.   But when asked, you refused, correct?

4            A.   No, I just refused for the 72 hours.

5            Q.   You refused to sign this release to

6       allow your supervisors to talk to your doctor,

7       didn't you?

8                 MR. JOHNSON:  Objection, badgering.

9                 MR. HENAULT:  You may answer, ma'am.

10                 MR. JOHNSON:  You may answer.  I just

11       entered an objection.

12                 THE WITNESS:  I'm not going to.

13                 BY MR. HENAULT:

14            Q.   No, ma'am.  You have to answer.

15                 MR. JOHNSON:  You have to answer.  I

16       made an objection, but you go ahead and answer.

17       That's not the problem in answering.

18                 THE WITNESS:  What's the question

19       again?

20                 BY MR. HENAULT:

21            Q.   When asked to provide this release to

22       allow your supervisor to talk to your doctor,
```

1    you refused; isn't that correct?

2        A.    That's correct, but not without good

3    reason.

4        Q.    Now, six months after the May 2, 2003

5    letter --

6            MR. HENAULT:  Go ahead and mark the

7    next exhibit.

8            (Johnson Deposition Exhibit Number 15

9    was marked for identification.)

10           BY MR. HENAULT:

11       Q.    Ma'am, what has been marked as Exhibit

12   15 is a November 9, 2003 letter from Dr. George

13   James to the United States Department of

14   Education regarding you, correct?

15       A.    Uh-huh, correct.

16       Q.    Now, this letter was written just about

17   six months after the May 2 letter, right?

18   Correct?

19       A.    Correct.

20       Q.    So this is the follow-up letter to --

21       A.    To the May 2 letter, yeah.

22       Q.    Did you ask Dr. James to send this

1    letter?

2        A.    Yeah, I asked him to send a letter for

3    me.

4        Q.    Did you read it before it was sent?

5        A.    Yes.

6        Q.    Did you approve of what it said?

7        A.    Well, no.  He wrote it up and then I

8    received it then and I got to read it.

9        Q.    Did you agree with what it said?

10        A.    Yeah.

11        Q.    Now, I want to be clear, I'm looking --

12    I'm going to read from the third paragraph,

13    okay?  Beginning with:  "Let me make it clear

14    that Ms. Johnson's underlying depression and

15    anxiety are not conditions that preclude her

16    from returning to the work at the Department of

17    Education."

18            Did I read that correctly?

19        A.    Uh-huh.

20        Q.    So did you agree that your depression

21    and anxiety weren't preventing you from

22    returning to work?

1    A.    I think he didn't mean at the present

2    time.  He meant returning to work at all, did

3    not preclude her from work at the Department of

4    Education at all.

5    Q.    That sentence is written at the present

6    tense, isn't it, ma'am?

7    A.    Are not conditions that preclude her

8    from returning to work at Department of

9    Education at all.

10   Q.    Does it say "at all," ma'am?

11   A.    No, but that's what I think he meant.

12   Q.    That's not what he said though, is it,

13   ma'am?

14   A.    That's not what he wrote.

15   Q.    It's not what he wrote, correct.

16   According to Dr. James, his own writing, it's

17   his opinion that "Your underlying depression and

18   anxiety are not conditions that preclude you

19   from returning to work at the Department of

20   Education," right?

21   MR. JOHNSON:  I'm sorry, I don't have a

22   number for this exhibit.

1          MR. HENAULT:   15.

2          THE WITNESS:  Well, it's not true.  My

3   depression and anxiety did preclude me from

4   returning to work.

5          BY MR. HENAULT:

6     Q.    That was your impression, your opinion,

7   right?

8     A.    Yeah.

9     Q.    Okay.  Now, another one of your claims

10   against the Department of Education, ma'am, is

11   that you allege that you were retaliated against

12   by supervisors who used coercion, intimidation

13   and threats to get you to relinquish -- excuse

14   me, relinquish your claims and leave your job as

15   an accountant, correct?

16     A.    Right.

17     Q.    And that claim is based on a series of

18   letters that you received mostly from Mack

19   Lawrence in early to mid 2004, correct?

20     A.    Right.  Correct.

21     Q.    Is this exchange of letters, which

22   we'll go over all the letters, and I'll give you

1    the opportunity to tell me if there are any

2    others -- but the exchange of letters beginning

3    January 16, 2004, is that the only thing that

4    supports this claim?

5        A.   I think so.

6        Q.   Okay.  Then let's go through we'll

7    begin with the first letter.

8            MR. HENAULT:  Please mark this as the

9    next exhibit.

10            (Johnson Deposition Exhibit Number 16

11    was marked for identification.)

12            BY MR. HENAULT:

13        Q.   Ma'am, what has been marked as Exhibit

14    16 is a January 16, 2004 memorandum from Mack

15    Lawrence to Susan Johnson, subject, reasonable

16    accommodation, correct?

17        A.   Right.

18        Q.   You received this memo, correct?

19        A.   Yeah.

20        Q.   It was sent to you at home?

21        A.   Yes.

22        Q.   Do you know when you received it?

1      A.   No, I'm not sure.

2      Q.   In this letter Mr. Lawrence informs you

3    that based upon the November 9, 2003 letter from

4    Dr. James, he is granting you a continued

5    extension of your leave without pay status,

6    correct?  Look at the beginning of the second

7    paragraph, ma'am.

8      A.   But he said not to exceed November 6,

9    2003, which isn't true.  It wasn't -- it was a

10   minimum of six months, not a maximum of six

11   months.

12     Q.   But he says:  "Based on your November

13   9, 2003 letter, he will grant you a continuation

14   of leave without pay," correct?

15     A.   Right.

16     Q.   And thereby excusing your prolonged

17   absence from the workplace, correct?

18     A.   Right.

19     Q.   I want to talk about something because

20   you say that it was wrong for Mr. Lawrence to

21   believe that your leave without pay status would

22   not exceed November 6, 2003 but between November

1    6, 2003 and the January 16, 2004 letter here,

2    you were never designated as absent without

3    leave, were you?

4        A.   I guess not.  I don't know.

5        Q.   Let's go back and look at the exhibit

6    that is the leave audit.

7        A.   I think I was -- that's where I think

8    it is wrong.  That I was given without -- AWOL,

9    I got some at the end of the pay period, but I

10   also received some before I think -- see, I

11   don't think they have this right.

12       Q.   If you look at November 2002, pay

13   period --

14       A.   You mean 2003?

15       Q.   Yeah.  Hold on.

16       A.   It says 80 hours of leave without pay

17   but I think they did end up putting me on AWOL.

18       Q.   When?

19       A.   On November 6.

20       Q.   That was 2003?

21       A.   Yes.  It doesn't say I'm there.  It

22   says 80 hours of leave without pay.

1      Q.   So it's your testimony that you were

2   designated AWOL for November 6, beginning

3   November 6, 2003?

4      A.   Yeah, not the whole time, just November

5   6 until they got this letter which was dated

6   November 9.

7      Q.   Was there any disciplinary action taken

8   against you at that time because of that

9   November 6 to November 9, 2003, AWOL?

10     A.   No.

11     Q.   How did you find out you were being

12   designated AWOL instead of leave without pay for

13   that time?

14     A.   I went in on the computer and checked

15   my payroll information.

16     Q.   At home you did that?

17     A.   Yeah.

18     Q.   So you weren't able to get to work,

19   right?

20     A.   Huh-uh.

21     Q.   No?

22     A.   No.

1      Q.    But you could use the computer at home?

2    Yes?

3      A.    Yes.

4      Q.    Did you ever ask anyone to be able to

5    do work from home?

6      A.    No, I didn't ask for that.  I tried it

7    a couple of times, but it didn't seem feasible

8    to do work at home because of different

9    documents I needed and stuff like that.

10     Q.    In the fourth paragraph of Johnson 16,

11   Mr. Lawrence's January 16, 2004 memorandum, Mr.

12   Lawrence informs you that:  "Your continued

13   absence is placing a burden on the work force

14   and impacts negativism on the efficiency of the

15   service."

16           Do you disagree with that?

17     A.    No.

18     Q.    You agree that it was a burden to the

19   remaining work force?

20     A.    Yes.

21     Q.    And that's because basically other

22   employees have to do your work, right?

1      A.    Right.

2      Q.    Among other reasons, right?

3      A.    Right.

4      Q.    Mr. Lawrence also informs you --

5      A.    But at this point I was coming back to

6    work.  I had -- in the previous note it had said

7    that I wasn't returning to the workplace.

8      Q.    Right.  In this letter, Mr. Lawrence

9    also informs you of your entitlement to under

10   the Family Medical Leave Act, right?

11     A.    Right.

12     Q.    And that under the Family Medical Leave

13   Act, you have 12 weeks of authorized absence

14   from the workplace, right?

15     A.    Right.

16     Q.    And because this is a new year starting

17   in January of 2004, your entitlement to 12 weeks

18   starts all over again, right?

19     A.    Okay.

20     Q.    Is that accurate?

21     A.    Yeah, yeah, I think so.

22     Q.    Does that comport with your

1    understanding of the Family Medical Leave Act?

2        A.    Yes, I think so.

3        Q.    So basically you have 12 free weeks to

4    be away from the workplace under the Family

5    Medical Leave Act beginning in January 2004,

6    right?

7        A.    Right.

8        Q.    And Mr. Lawrence tells you that that 12

9    weeks will expire in April, right?

10       A.    Right.

11       Q.    So as of January 16, 2004 or whenever

12   shortly thereafter you received this, you were

13   on notice that your authorized absences from

14   work would end in April, correct?  Yes?

15       A.    Yes.

16       Q.    He also tells you that he is not

17   permitted to authorize your LWOP indefinitely

18   after that, right?

19       A.    Right.

20       Q.    If you look at the bottom of the last

21   sentence in the fourth paragraph, ma'am:  "As

22   such, I am restricted from granting you extended

1    LWOP status indefinitely after your FMLA

2    allowance of 12 weeks expires for the calendar

3    year of 2004 which will be this forthcoming

4    April."

5         A.   Oh, okay.

6         Q.   That's what that says, right?

7         A.   Right.

8         Q.   Do you claim that Mr. Lawrence should

9    have indefinitely authorized your LWOP

10   regardless of the Family Medical Leave Act

11   requirements?

12        A.   No.

13        Q.   So you agree with this statement?

14        A.   Yes.

15        Q.   Now, Mr. Lawrence also tells you that

16   if you're unable to come back, that the

17   Department of Education will look into giving

18   you a different job, right?

19        A.   Yes.

20        Q.   And that under the regulations, that

21   has to be the equivalent or a lower paying job,

22   right?

1        A.    Correct.

2        Q.    And in order to help them do that, to

3    help the Department of Education do that and

4    to -- for them to work towards getting you back

5    to work, he asked you for some specific

6    information, right?  Look at the third paragraph

7    from the bottom, beginning:  "In carrying out

8    this search."

9        A.    Yeah.

10        Q.    Did you ever provide that information

11    to Mr. Lawrence?

12        A.    No.

13        Q.    Did you ever provide that information

14    to anyone at the Department of Education?

15        A.    No.

16        Q.    So here is Mr. Lawrence telling you,

17    Hey, we can work to try to get you back to a

18    position at the Department of Education if you

19    just provide us this information, and you

20    refused to provide that, right?

21        A.    But my note has said that I couldn't

22    come back to work.

1      Q.    Okay.

2      A.    So that's -- I mean, that was why I

3   didn't respond to it.  I couldn't come back.

4      Q.    Did you respond to this January 16,

5   2004 letter in any way?

6      A.    No.

7      Q.    So where he says "please provide this

8   information by February 6, 2004 or it says if

9   you need an extension of time," just let him

10   know, you didn't respond by February 6, and you

11   never said, I need an extension of time, did

12   you?

13      A.    No.

14      Q.    Now, Mr. Lawrence also says that:  "You

15   can look at the EdHIRES to look for job

16   vacancies on your own, right?  Did you ever do

17   that?

18      A.    No, you have to do this ConnectEd is on

19   their -- I didn't have -- I didn't have the

20   ability to get to that EdHIRES.

21      Q.    Okay.  Did you ever ask your husband or

22   anyone else to look into other possible

1    positions at the Department of Education?

2        A.   No, I wasn't able to get back to work

3    at all, and I had a note saying that.

4        Q.   Now, do you allege -- in fact you do

5    allege that this January 16, 2004 letter is

6    retaliatory, right?

7        A.   Yes, I do.

8        Q.   What about it is retaliatory, ma'am?

9        A.   The fact that it kind of threatens me

10   that they're going to fire me.

11       Q.   Where does it tell you you will be

12   fired, ma'am?

13       A.   Well, it doesn't say they're going to

14   fire me but it --

15       Q.   Ma'am, in fact what it does do is tell

16   you that unfortunately Mr. Lawrence cannot

17   continue to grant you absences after your FMLA

18   12 weeks expires, right?

19       A.   Right.

20       Q.   And that if you want to or can come

21   back, we will help you find a new position,

22   right?

```
1          A.    It doesn't say if you want to or can

2     come back.   It says if you are coming back.

3          Q.    So what is retaliatory about this

4     letter?  We started off by you saying it was

5     threatening to fire you, but we've already

6     established that in fact it does not say you

7     will be fired, so what else is retaliatory about

8     this letter, ma'am?

9          A.    Well, when I got it, I thought I was

10    going to be fired, so it's the way I was looking

11    at it.

12         Q.    But will you acknowledge now that's not

13    actually what the letter says?

14         A.    Yeah, it doesn't --

15         Q.    So do you think maybe your claim about

16    the January 16, 2004 letter may be misplaced?

17         A.    Yes.

18              MR. HENAULT:   Let's mark this next

19    exhibit, please, number 17 I think.

20              (Johnson Deposition Exhibit Number 17

21    was marked for identification.)

22              BY MR. HENAULT:
```

1          Q.   Ma'am, please take a second to read

2      through this.

3          A.   Now I know what was retaliatory.

4      Reassigning me into vacant position at the

5      current grade or lower level was to me

6      retaliatory.

7          Q.   We're talking about this January 16,

8      2004 letter?  Okay.

9               MR. JOHNSON:  What's the pending

10     question?  Should the stenographer read it back

11     or do you want to repeat it?

12              MR. HENAULT:  There isn't a pending

13     question, sir.

14              MR. VALENTIC:  You did ask one.  You

15     interrupted her.

16              BY MR. HENAULT:

17         Q.   What has been marked as Exhibit 17 is a

18     March 3, 2004 memorandum from you to Mack

19     Lawrence, subject, reasonable accommodation,

20     correct?

21         A.   Uh-huh.

22         Q.   This letter is a follow-up to the

1    January 16, 2004 letter, right?

2        A.    Right.

3        Q.    And you received this memo, correct?

4        A.    Right.

5        Q.    Did you receive it at home?

6        A.    Yeah, I received it at home.

7        Q.    How was it transmitted to you, do you

8    remember?

9        A.    It might have been Fed Express.

10        Q.    And if you look at the bottom of

11    paragraph 1 in this letter, Mr. Lawrence says

12    that you were asked to provide certain

13    information by February 6, 2004 and you didn't

14    respond by that date, correct?

15        A.    Right.

16        Q.    That's a correct statement of fact,

17    right?  We've already talked about that?

18        A.    Right.

19        Q.    And in this memo --

20        A.    Oh, the other reason why I think it's

21    retaliatory is it's coming from the supervisor I

22    think is discriminating against me, so how can

1    he help me find another position if he's

2    discriminating against me in my current

3    position?

4         Q.    Okay.  So then let's go back to Johnson

5    16 real quick because you've given me two

6    reasons now that you think this letter is

7    discriminatory.

8         A.    Right.

9         Q.    One is the fact that it comes from Mack

10   Lawrence, and two is the fact that he talks

11   about the possibility of reassigning you to

12   another position at your current or lower pay

13   grade as a reasonable accommodation, right?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.

17        Q.    And that's because he had been told

18   that you were unable to return to your current

19   position, correct?

20        A.    No, I was unable to return to work, not

21   to my current position.

22        Q.    To any job at the Department of

1    Education?

2       A.   Right, at any job at the Department of

3    Education.

4       Q.   Let's turn back to Johnson 17, ma'am.

5    Mr. Lawrence is telling you that nonetheless, he

6    thinks it's important for them to be helpful or

7    that your input will be important and helpful in

8    their efforts to assist you, so he's given you

9    an additional opportunity to provide

10    supplemental information to the Department of

11    Education about the possibility of you coming

12    back, right?

13    A.   Yes.

14       Q.   You never responded to this March 3,

15    2004 memo, did you?

16       A.   No, because I was not going to return

17    to work at the Department of Education at all.

18       Q.   Why didn't you submit your resignation,

19    ma'am?

20       A.   Because I thought my claim for EEOC

21    would not go through if I resigned.

22       Q.   So you wanted to be fired in fact

1    rather than resign, didn't you?

2        A.   Well, no.  I wanted -- I didn't want to

3    be fired.

4        Q.   But you knew you weren't going back?

5        A.   Right.

6        Q.   But you didn't want to resign because

7    you were afraid of the impact that would have on

8    your EEO claim.  Did you just expect that they

9    should keep you on the rolls indefinitely?

10       A.   No, I didn't expect that.

11       Q.   Did you expect that your employment

12   would at some point come to an end?

13       A.   Yes.

14       Q.   The only possible way if you weren't

15   going to resign was being terminated, correct?

16       A.   Right.

17       Q.   So based on your refusal to go back to

18   work, you expected to be terminated?

19       A.   Right.

20       Q.   I'm sorry, please, go ahead.

21       A.   No, I expected to be terminated.

22       Q.   And given your refusal to go back to

1    work, that's actually appropriate, isn't it?

2        A.    Well, no, because I couldn't go back

3    because of my medical condition, so I think they

4    should have asked for me to resign.

5        Q.    They should have come to you and said,

6    Please resign?

7        A.    Yeah.

8        Q.    But you weren't willing to submit a

9    resignation, ma'am.  You just told me you

10   wouldn't resign because you were afraid of the

11   impacts a resignation would have on your EEO

12   claim?

13       A.    Yeah, but if they would have asked me

14   to, I would have resigned.

15       Q.    That would have still been a

16   resignation from you, correct?

17       A.    Yeah.

18       Q.    What impact --

19       A.    So --

20       Q.    You just told me you wouldn't resign?

21       A.    I said --

22       Q.    So now is it your testimony that you

1      would in fact resign but only if they had asked

2      you?

3          A.    Yeah.

4          Q.    Did you ever tell them that?

5          A.    No.

6          Q.    Why not?

7          A.    Because I thought they would know that

8      I didn't want to be terminated, that I just

9      wanted to resign.

10         Q.    But you didn't want to resign, ma,

11     because you were afraid of the impacts that

12     would have on your EEO claim?  I'm confused

13     here.

14         A.    No.  If it came from them that they

15     wanted me to resign, I would have resigned, but

16     I wasn't sure if I could return to work even

17     though I had a note saying I couldn't return to

18     work, and so I didn't want to totally be off the

19     records, and so I would have resigned had they

20     said -- if they said, We'll terminate or you

21     resign, I would have resigned.

22         Q.    You never told them that, right?

1      A.   No.

2      Q.   You never told that to anyone at the

3  Department of Education?

4      A.   No, but that's what I wanted.  If it

5  came to terminated or resigned, I would have

6  resigned.

7      Q.   They had no way of knowing that, did

8  they?  They being the Department of Education

9  and your supervisors had no way of knowing that,

10  did they?

11      A.   No.

12      Q.   So this March 3, 2004 memorandum -- let

13  me back up for a second.  You said at this time

14  you knew you weren't going back to work at the

15  Department of Education.  When did you make that

16  decision personally?

17      A.   That I knew?  No, I said I wasn't sure

18  whether I was going to be going back to work.

19      Q.   At this time, roughly the beginning of

20  2004, did you believe there was a possibility

21  that you would go back to work at the Department

22  of Education?

1       A.    There was a slight possibility, very

2    slim.

3       Q.    What would have to happen to make that

4    possible?

5       A.    I would have to have a different

6    supervisor and -- well, I probably couldn't go

7    back to work.  I think it was just hopeful

8    thinking that I might be able to go back.

9       Q.    But in hindsight you don't think you

10   could have gone back?

11      A.    No.

12      Q.    Now, I want to turn back to Johnson 17,

13   the March 3, 2004 reasonable accommodation

14   letter.  One of the final things this discusses,

15   the third paragraph from the end, is that Mr.

16   Lawrence is reminding you that your Family

17   Medical Leave Act authorized absence ends on

18   April 5, 2004, right?

19      A.    The third paragraph?

20      Q.    From the bottom.  "Please note your

21   entitlement," second sentence in the paragraph

22   that begins "we would like to utilize."

1        A.    Okay.

2        Q.    "Please note entitlement to LWOP under

3    the FLMA ends April 5."

4        A.    Right.

5        Q.    So here again you're on notice that as

6    of April 5, 2004 you're supposed to return to

7    work, right?  Correct?

8        A.    Uh-huh.

9        Q.    Yes?

10        A.    Yes.

11        Q.    And the next paragraph down says:  "If

12    you're unable to return, you may submit

13    additional medical information for

14    consideration," right?

15        A.    Right.

16        Q.    Did you provide any additional medical

17    information, ma'am?

18        A.    No.

19        Q.    And you did not return to work on April

20    5, 2004?

21        A.    No.

22        Q.    And in fact you didn't call work at all

1     on April 5, 2004, did you?

2         A.    No.

3         Q.    You just didn't show up?

4         A.    Right.

5         Q.    Correct?

6         A.    Uh-huh.

7         Q.    Yes or no, ma'am?

8         A.    Yes.

9         Q.    So you didn't call, didn't show up,

10    just didn't do anything, right?

11        A.    Right.

12        Q.    And actually the memo also advises you

13    that if you do not come back to work and do not

14    provide additional medical documentation, you

15    may be designated as AWOL or absent without

16    leave, right?

17        A.    Uh-huh.

18        Q.    Yes or no, please.

19        A.    Yes.

20        Q.    And that although AWOL itself isn't

21    disciplinary, AWOL can lead to disciplinary

22    action, correct?

1      A.    Right.

2          Q.    And that can include things up to

3      termination, correct?

4          A.    It doesn't say that.  Oh, may include

5      or lead to your removal from department rolls,

6      yeah, okay.

7          Q.    So Mr. Lawrence was telling you all

8      that, right?

9          A.    Right.

10         Q.    So as of March 3, 2004, you are aware

11     that if you do not return to work or submit

12     medical documentation by April 5, 2004, you will

13     be designated as AWOL, and AWOL can lead to

14     disciplinary action including removal from

15     employment, right?  Yes or no, please?

16         A.    Yes.

17         Q.    And we've already discussed you did not

18     return to work.  You did not submit additional

19     medical documentation, correct?

20         A.    Correct.

21         Q.    Do you allege that this March 3, 2004

22     letter was harassing or retaliatory in any way?

1    A.    Well, the fact that it came from Mack

2    Lawrence and the fact that it says something

3    about reassigning me to a vacant position at a

4    current grade or a lower level is retaliatory.

5    Q.    Okay.  Ma'am, are you aware whether or

6    not the Department of Education has regulations

7    or guidelines for dealing with employees with

8    disabilities?

9    A.    Yeah, I'm aware of that.

10    Q.    Have you ever seen them?

11    A.    Yeah, I have.

12    Q.    Are you aware whether or not or do you

13    know whether or not one of the guidelines or

14    regulations is that if an employee is unable to

15    return to their current position, the department

16    has an obligation to find them a new position at

17    the same or lower grade level?  Have you ever

18    seen that?

19    A.    Yeah, I think I have.

20    Q.    So you're aware that under Department

21    of Education guidelines, if you can't return to

22    your accountant position, then the Department of

1    Education has an obligation to find you a new

2    position at the same or lower level so they have

3    an obligations to reassign you, don't they,

4    ma'am?

5         A.    Yes.

6         Q.    So how is them complying with

7    guidelines or regulations regarding dealing with

8    employees with disabilities retaliatory or

9    discriminatory?

10        A.    Well, the person reassigning me is the

11   person discriminating against me so that's --

12   that doesn't work.  I mean, he would be the one

13   trying to get me the job.

14        Q.    Do you know who would do the job

15   search?

16        A.    I don't know but he's the one in charge

17   of it.

18        Q.    So just the fact that Mack Lawrence is

19   involved?

20        A.    Right.

21        Q.    That is the discriminatory or

22   retaliatory part of it?

1        A.    Right.

2        Q.    Anything else?

3        A.    No.

4        Q.    So your complaint about the March 3 and

5    January 16, 2004 letters comes down to the fact

6    that it is from Mack Lawrence and nothing else?

7        A.    Yes.

8              MR. HENAULT:  Let's mark this as the

9    next exhibit, please.  Let's take a five minute

10   break before we get into this.

11             (Johnson Deposition Exhibit Number 18

12   was marked for identification.)

13             (Whereupon, a brief recess was taken.)

14             BY MR. HENAULT:

15       Q.    Ma'am, what has been marked as Johnson

16   Exhibit 18 is a March 25, 2004 memorandum from

17   Mack Lawrence to you, correct?

18       A.    Right.

19       Q.    And subject, termination of Family

20   Medical Leave Act benefits, correct?

21       A.    Uh-huh.

22       Q.    And the purpose of this memo is to

1    inform you that your entitlement to FMLA expires

2    on April 5, 2004, correct?

3        A.    Correct.

4        Q.    And at that time you're expecting to

5    return to work?

6        A.    Correct.

7        Q.    You had already been made aware of this

8    fact from the other memos, right?

9        A.    Right.

10       Q.    And much like the March 3, 2004

11   memorandum, this one also informs you that if

12   you do not return to work or provide additional

13   medical documentation, you'll be designated as

14   AWOL, correct?

15       A.    Right.

16       Q.    And the same thing as previously,

17   although AWOL itself is not disciplinary, AWOL

18   can lead to disciplinary actions, correct?

19       A.    Right.

20       Q.    Potentially including your removal?

21       A.    Right.

22       Q.    You didn't respond to this March 25,

1    2004 memo, did you?

2        A.    No.

3        Q.    You didn't report to work on April 5,

4    did you?

5        A.    No.

6        Q.    You didn't provide any additional

7    medical documentation after receiving this memo,

8    did you?

9        A.    No.

10       Q.    Do you also believe this memo is

11   harassing or retaliatory or discriminatory?

12       A.    Just the fact that Mack was the one

13   sent the letter.

14       Q.    So much like the other two letters,

15   it's solely because it was sent by Mr. Lawrence?

16       A.    Yeah.

17       Q.    Now, I want to make sure I get this

18   right because we talked about your claim that

19   you were retaliated against by supervisors who

20   used coercion, intimidation and threats, that

21   claim is based solely on these exchanges of

22   letters plus the proposal to remove and your --

1    the actual removal, correct?

2        A.   Right.

3        Q.   Okay.  So other than the May 27, 2004

4    notice of proposal to remove, we haven't gone

5    over it yet, and the July 21, 2004 notice of

6    decision to remove, we've discussed everything

7    else that makes up that claim, correct?

8        A.   Right.

9            MR. HENAULT:  Let's mark this as the

10   next exhibit, please.

11           (Johnson Deposition Exhibit Number 19

12   was marked for identification.)

13           BY MR. HENAULT:

14       Q.   Ma'am, what has been marked as -- let

15   me back up.  Johnson 18, the March 25, 2004

16   memorandum, you received that, correct?

17       A.   Yes, I did.

18       Q.   You received that at home?

19       A.   At home.

20       Q.   Do you remember how long after March 25

21   you received it?

22       A.   No.

1    Q.    Okay.  What has been marked as Exhibit

2    19 is a May 27, 2004 memorandum subject notice

3    of proposal to remove to you from Mack Lawrence,

4    correct?

5    A.    Uh-huh.

6    Q.    Yes or no, please, ma'am.

7    A.    Yes.

8    Q.    And you received this, right?

9    A.    Yes.

10    Q.    How did you receive this?

11    A.    I don't remember.

12    Q.    Do you know when you received it?

13    A.    No.

14    Q.    No?  The purpose of this memo is to

15    notify you that Mr. Lawrence is proposing that

16    you be removed as an employee of the Department

17    of Education, correct?

18    A.    Right.

19    Q.    It sets forth the reasons for that

20    proposal, right?

21    A.    Right.

22    Q.    And the main reason is that you were

1    supposed to return to work on April 5, 2004 and

2    did not return, correct?

3        A.    Right.

4        Q.    And as we've already discussed, you did

5    not submit any additional medical documentation,

6    correct?

7        A.    Correct.

8        Q.    And you did not call the department or

9    your managers and say, I'm not going to be able

10   to come back to work, correct, after April 5?

11       A.    No.

12       Q.    You just didn't show up?

13       A.    Right.

14       Q.    There are 38 specifications set forth

15   in this letter, correct?

16       A.    Yeah.

17       Q.    Are they accurate?  Let's start with

18   specification 1.  Specification 1 says on April

19   5, 2004 you failed to call in to request leave

20   and you failed to come to work despite being

21   scheduled to be on duty, correct?

22       A.    Correct.

1      Q.    Is that accurate?

2      A.    Well, but I wasn't going to come into

3  the Department of Education since the note from

4  November my doctor stating that I'm not coming

5  back to work.

6      Q.    Yes, ma'am, and you were also advised

7  that after April 5, 2004, you -- your

8  entitlement to leave without pay ends, so you

9  need to either return to work or submit

10  additional medical documentation, correct?

11      A.    Correct.

12      Q.    And you did not do either of those,

13  correct?

14      A.    Right, correct.

15      Q.    So on April 5 you failed to call in to

16  work to request leave, and you failed to come to

17  work despite being scheduled to be on duty,

18  correct?

19      A.    Correct.

20      Q.    Specification 2, on April 6 you failed

21  to call into request leave, and you failed to

22  come to work despite being scheduled to be on

1    duty, correct?

2        A.   Right.

3        Q.   That's accurate, correct?

4        A.   Okay, all the 38 are correct.

5        Q.   Okay.

6        A.   38 specifications.

7        Q.   And then if you look at charge 2,

8    absent without leave, all 38 specifications

9    there are accurate also, aren't they?

10       A.   Yes.

11       Q.   So then this memo goes on to inform you

12   that in accordance with the MSPB's holding in

13   Douglas v. Veterans Administration, Mr. Lawrence

14   has done an analysis and based on his conclusion

15   is proposing that you be removed from federal

16   service, correct?

17       A.   Right.

18       Q.   This letter informs you that you have a

19   right to appeal that proposal, right?  Look at

20   the second to the last page, ma'am, reply

21   rights?

22       A.   Oh, okay.  It does.

```
 1        Q.   Did you ever submit -- your reply

 2    rights are to submit affidavits, evidence orally

 3    or in writing or both to -- within ten days

 4    after receipt of this proposal to Mr. Terry

 5    Bowie, right?

 6        A.   But he's one of the people that was

 7    discriminating against me or that I feel was

 8    discriminating against me.

 9        Q.   Okay, ma'am.  This letter informs you

10    that you have ten days from receipt to submit

11    evidence either orally or in writing to Mr.

12    Terry Bowie, right?  That's what it says,

13    correct?

14        A.   Yeah, but like I said if he was one of

15    the ones discriminating against, me so how could

16    he be a deciding official?

17        Q.   Ma'am, my only question is:  That's

18    what this letter says, right?

19        A.   Okay.

20        Q.   And that's accurate, correct?

21        A.   Right.

22        Q.   Did you ever send Mr. Bowie any
```

1    information?

2        A.    No.

3        Q.    Did you ever request an oral hearing?

4        A.    No.

5        Q.    Did you ever submit any evidence at all

6    to Mr. Bowie?

7        A.    No.

8        Q.    You submitted nothing to Mr. Bowie,

9    right?

10        A.    Right.

11        Q.    Now, actually here on May 27, 2004,

12    you're being told that we're proposing that you

13    be removed.  Why didn't you say to Mr. Bowie,

14    don't remove me, ask me to resign and I will if

15    that's what you real wanted?

16        A.    I don't -- I don't know, but that's

17    what I wanted was resign, not termination.

18        Q.    Why didn't you resign then after

19    receiving this letter, ma'am?

20        A.    I don't know.

21        Q.    Isn't the real reason you didn't resign

22    is because you were afraid of the effect it

1    would have on your EEO claim?

2        A.    Yeah, it is.

3        Q.    When you read this May 27, 2004 letter

4    you knew you were likely to be terminated,

5    right?

6        A.    Yes.

7        Q.    And in fact don't you agree that there

8    is -- the reasons set forth in here are enough

9    to terminate someone from federal employment?

10       A.    Yes.

11       Q.    So you knew you were going to be

12   terminated?

13       A.    But I still didn't expect it when it

14   happened.

15       Q.    So you knew it was going to happen, but

16   you just didn't expect it when it actually did?

17       A.    Yeah.

18       Q.    This tells you you have ten days from

19   set, and receipt is presumed to be June 4, 2004,

20   right?

21       A.    Okay.

22       Q.    So you knew potentially any time after

1    June 14 you could be terminated, right?

2        A.    I don't think I really read this too

3    well when I got it.

4        Q.    In what way?

5        A.    That -- I don't think I read it in its

6    entirety when I got it.

7        Q.    And is your failure to read it in its

8    entirety the reason you didn't file a response

9    to it?

10       A.    Yeah.

11       Q.    Did you file anything with anyone after

12   the receipt of this?

13       A.    No.

14       Q.    Did you file a new EEO claim about it?

15       A.    No.

16             MR. HENAULT:    Can we mark this as the

17   next exhibit?

18             (Johnson Deposition Exhibit Number 20

19   was marked for identification.)

20             BY MR. HENAULT:

21       Q.    Ma'am, before we get into Exhibit 20,

22   at the time you received the May 27, 2004

1    memorandum, the notice of proposed removal, were

2    you represented by counsel?

3        A.    Was I represented by counsel?

4        Q.    Yes, ma'am.

5        A.    I don't know if I was or wasn't at that

6    time.

7        Q.    I'm not going to ask you about the

8    specifics of your conversations with your

9    father, who is your lawyer, but I'm going to

10    ask:  After receipt of the May 27, 2004 letter

11    did you, and all I want is a yes or no, consult

12    with any attorney?

13        A.    Well, I talked to my father about it.

14        Q.    I don't want to know what you talked

15    about, but you did consult with your father?

16        A.    Right.

17        Q.    Who is your attorney now?

18        A.    Right.

19        Q.    When did you retain your father as an

20    attorney, as your attorney?

21        A.    We actually retained him in the EEOC

22    case.

1       Q.   When was that, ma'am?

2       A.   I can't look to you for the answer, can

3   I?

4       Q.   No, ma'am.  If you give me a rough time

5   frame.

6       A.   Well, the EEOC thing started September

7   2002, so sometime after September 2002.

8       Q.   But before or after the May 2004, do

9   you remember?

10      A.   Before.

11      Q.   Okay.  What has been marked as Johnson

12  20 is a July 21, 2004 memorandum to you from

13  Terry Bowie, subject, notice of decision to

14  remove, correct?

15      A.   Yes.

16      Q.   You received this, right?

17      A.   I must have.  I don't remember it.

18      Q.   You don't remember receiving this,

19  ma'am?

20      A.   No.

21      Q.   How did you -- how do you recall

22  finding out that you had been removed from the

1    Department of Education as an employee?

2        A.   Oh, I guess I must have received this

3    then.  Oh, yeah effective on August 6, 2004.

4        Q.   Ma'am, look at the -- take a look at

5    the specifications in here, specifically the

6    failure to follow proper leave procedures,

7    number 1 on the second page.  That's accurate,

8    isn't it?

9        A.   Yes, that's accurate.

10       Q.   I want to look -- see the two indented

11   paragraphs above that, beginning "you have been

12   carried in the leave without pay status for most

13   of the 2003 leave year"?

14       A.   Wait a minute, what page?

15       Q.   That page, the indented paragraph.

16       A.   Okay.  I wasn't on that page.

17       Q.   Take a look at that, please, and I'm

18   going to ask you some questions specifically

19   about those two indented paragraphs.  It tells

20   that in pay period one to five of 2003, you used

21   254 of leave without pay; is that accurate?

22       A.   Pay period one to five I used 254 hours

1    of leave without pay?  It doesn't seem right.

2    It's only five pay periods, 80 times five is --

3    wait a minute.

4        Q.   Is 400, ma'am.

5        A.   Yeah.  Wait a minute.  I guess it's

6    accurate.  I don't know.

7        Q.   Do you have any evidence that it's

8    inaccurate?

9        A.   No.

10       Q.   So for the first five pay periods of

11   2003 which would be 400 hours of work time, you

12   were leave without pay for more than half,

13   correct?

14       A.   Right.

15       Q.   Beginning in pay period six to pay

16   period 26, which are the remaining pay periods

17   in year 2003, you used 80 hours of leave without

18   pay for each pay period, correct?

19       A.   Right.

20       Q.   And then for 2004 in pay period one to

21   pay period eight you were -- excuse me, you used

22   80 hours of leave without pay for each pay

1    period, right?

2         A.    Uh-huh.

3         Q.    Yes?

4         A.    Yes.

5         Q.    And that included your 12 weeks of

6    absences under the Family Medical Leave Act?

7         A.    Right.

8         Q.    And then on March 25, you were told to

9    return to the office on April 5.  You didn't do

10   that, right?

11        A.    Uh-huh.

12        Q.    Yes?

13        A.    I didn't do that.

14        Q.    All right.  Alternatively you were told

15   to submit additional medical information.  You

16   didn't do that, correct?

17        A.    Correct.

18        Q.    And thereafter you were charged AWOL

19   since April 5, 2004?

20        A.    Right.

21        Q.    Correct?

22        A.    Correct.

1    Q.   Do you allege that the removal is

2    discriminatory or retaliatory?

3    A.   Yes, I do.

4    Q.   Why?

5    A.   Because I don't think they would have

6    removed me if I had -- if I had not had a

7    disability.  I believe they would have given me

8    more opportunities.

9    Q.   More opportunities, ma'am?  How many

10   times did they need to tell you that effective

11   April 5, you needed to either come back to work

12   or if you were unable to come to work, give us

13   more medical documentation?  How many

14   opportunities did they give you to do that?

15   We've just been through how many letters?

16   A.   Four.

17   Q.   So you had minimum four opportunities

18   to do that, right?

19   A.   Yeah.

20   Q.   You didn't, correct?

21   A.   Right.

22   Q.   How many opportunities should they have

1    given you?

2        A.    I don't know.

3        Q.    Well, you're the one telling me that

4    they didn't give you enough opportunity.   What

5    other opportunities should they have provided to

6    you, ma'am?

7        A.    Right.   They should have offered me the

8    ability to resign before I was terminated.

9        Q.    That's an opportunity you had at your

10   disposal every single day, correct?

11       A.    I didn't think I had it at my disposal.

12       Q.    You didn't think you could resign?

13       A.    No.

14       Q.    Why?

15       A.    I don't know.   I just didn't think I

16   could resign.

17       Q.    You didn't think you could resign

18   because you didn't know what effect it would

19   have on your EEO claim, right?

20       A.    Right.

21       Q.    Other than that, other than the unknown

22   effect on your EEO claim, you knew you could

1    submit a resignation any time you wanted, right?

2        A.    Right.

3        Q.    But you didn't do it, correct?

4        A.    Correct.

5        Q.    So the opportunity to resign was an

6    opportunity that you had, correct?

7        A.    Yes.

8        Q.    That you didn't exercise, correct?

9        A.    Right.

10       Q.    That you didn't take that opportunity?

11       A.    Right.

12       Q.    So what other opportunities should the

13   Department of Education have given you, ma'am?

14       A.    I don't know.

15       Q.    In fact, you can't think of any other

16   opportunities, can you?

17       A.    No, I can't.

18       Q.    They had given you every opportunity

19   available, didn't they?

20       A.    As far as I know.

21       Q.    The only opportunity left to the

22   Department of Education is to terminate you, to

1    remove you from employment, right?

2        A.    Right.

3        Q.    And that's what they did?

4        A.    Yes.

5        Q.    And that was actually justified by your

6    failure to come back to work and failure to

7    provide medical documentation, wasn't it?

8        A.    Yeah, but my note -- well, my note that

9    I wasn't coming back should have been enough.

10        Q.    Okay, ma'am.  From the last note you

11    provided, which was following your November 9,

12    2003 letter from Dr. James that you provided to

13    the Department of Education, did you provide any

14    other notes?

15        A.    No.

16        Q.    Okay.  Through the four letters we've

17    just discussed, the Department of Education was

18    saying to you if you have a medical reason, give

19    us documentation.  They were telling you, Give

20    us documentation, right?

21        A.    Yes.

22        Q.    Saying if you're unable to come back to

1    work because of your medical condition, give us

2    documents?

3        A.    Right.

4        Q.    And you didn't do that, correct?

5        A.    Right.

6        Q.    So how is it that that November 9

7    letter was enough?

8        A.    Because it says I wasn't coming back to

9    the Department of Education.

10       Q.    Yes, ma'am, but what that November 9

11   letter also says is, I'm going to read verbatim:

12   "Let me make it clear that Ms. Johnson's

13   underlying depression and anxiety are not

14   conditions that preclude her from returning to

15   work at the Department of Education."

16       A.    But it also says I'm not coming back.

17       Q.    It does say you're not coming back,

18   you're absolutely correct, ma'am.  But it says

19   that your depression and anxiety are not

20   conditions that preclude you from coming back.

21   Right?

22       A.    But the end of it is that I'm not

1    coming back.

2        Q.    Okay.   Now, you were actually -- you

3    were in fact removed from the Department of

4    Education as an employee on August 6, 2004,

5    correct?

6        A.    Uh-huh.

7        Q.    Yes?

8        A.    Yes.

9            MR. HENAULT:   Let's mark this.

10            (Johnson Deposition Exhibit Number 21

11    was marked for identification.)

12            BY MR. HENAULT:

13        Q.    Ma'am, what has been marked as Exhibit

14    21 is an SF 50 notification of personnel action

15    effective 8/6/2004 removing you from employment

16    with the Department of Education, correct?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    Now, one of your claims also in this

21    action was that you were subject to a hostile

22    work environment because of your disabilities,

1    correct?

2        A.    Correct yes.

3        Q.    We've talked about your other claims

4    today.  We're talked about the credit hours, the

5    request or requirement that you get preapproval

6    for credit hours.

7        A.    Right.

8        Q.    We've talked about the 72 hours leave

9    without pay.

10       A.    Right.

11       Q.    We've talked about your career ladder

12   promotions.

13       A.    Right.

14       Q.    We have talked about the letters in

15   2004 that you claim are harassing, coercive and

16   retaliatory.  Are there any other actions that

17   you allege comprise a hostile work environment?

18       A.    No.

19       Q.    Ma'am, August 12, 2002 is the first

20   time a claim, an informal complaint or claim of

21   discrimination was made with the EEO office on

22   your behalf, right?

1        A.    August 12?

2        Q.    Yes, ma'am.

3        A.    No, I don't think -- I thought it was

4    August 8, 2002.

5        Q.    Okay.   Maybe I have the wrong date, but

6    it was either -- in early August 2002 was the

7    first time anyone -- you or anyone on your

8    behalf went to the EEO office to seek counseling

9    complaining about potential discrimination,

10   right?

11       A.    Right.

12       Q.    You didn't go to the EEO counselor in

13   August of 2001, did you?

14       A.    No, my husband did it for me.

15       Q.    Why?

16       A.    Because I was -- because I wasn't

17   feeling too great, and I needed some help with

18   it.

19       Q.    What specific actions gave rise to you

20   deciding to go to the EEO office?   When I say

21   that I mean to have your husband go on your

22   behalf.

1      A.   I talked to Mack Lawrence and he denied

2   or he -- I talked to him about my promotion and

3   also my accommodation, and he had stonewalled me

4   about them.

5      Q.   Okay.  Let me stop you there for a

6   second.

7           MR. VALENTIC:  I don't think she was

8   done though.

9           MR. HENAULT:  I know.  Let me stop you

10  there for a second, please.

11          THE WITNESS:  Okay.

12          BY MR. HENAULT:

13     Q.   You talked to Mack Lawrence about the

14  accommodation, the credit hours and the career

15  ladder promotion.

16     A.   Right.

17     Q.   When did you talk to Mack Lawrence

18  about the credit hours that then led you to go

19  seek informal counseling with the EEO office?

20     A.   Well, the specific dates are in the

21  investigative filings.  I don't have the

22  specific date.

1    Q.    Okay.   What about same question for

2    your career ladder promotion?

3    A.    It was -- it was the same day.

4    Q.    Okay.

5    A.    But I don't know the specific date.

6    Q.    Okay.   Now, and I interrupted you

7    because I wanted to follow-up on that question,

8    but the question you were answering was:   What

9    specific actions led to you -- led you to seek

10   counseling or have your husband seek counseling

11   on your behalf.

12        You gave me a conversation with Mack

13   Lawrence about your accommodation and your

14   career ladder promotion.   Anything else?

15   A.    No.   I then talked to Jeannie Johnson

16   as somebody that knows a lot about human

17   resources, and she wasn't there the first --

18   when I first talked to Mack, so it was the next

19   day that I talked to her, and then my husband

20   filed for me at that point.

21   Q.    Okay.   Now, Jeannie Johnson, she wasn't

22   involved other than when you worked with her

1    doing unclassified duties.  You didn't work with

2    her, right?

3        A.    No.

4        Q.    She was never involved in the decisions

5    about any accommodations or any actions about

6    you?

7        A.    She talked to Mack Lawrence about my

8    promotion.  She tried to talk to Mack Lawrence

9    about my promotion.

10        Q.    Go ahead.

11        A.    And he didn't really answer her, so she

12    didn't have anything to go on.

13        Q.    Did you request that she talk to Mack

14    Lawrence about your promotion?

15        A.    Yes, I did.

16        Q.    So basically Ms. Johnson's -- Ms.

17    Jeannie Johnson's knowledge of your complaints

18    and the facts giving rise to your complaints

19    come from you, right?  You told her what was

20    going on?

21        A.    Right.

22        Q.    She wasn't personally involved in any

1    of it?

2         A.   No.

3         Q.   Okay.  Now, your complaint in this

4    matter demands $2.8 million in damages, correct?

5         A.   Correct.

6         Q.   How did you get that number?

7         A.   That's front pay, medical expenses,

8    back pay and I think that's about it.

9         Q.   Okay.

10             MR. HENAULT:  Let me mark this as the

11   next exhibit, please.

12             (Johnson Deposition Exhibit Number 22

13   was marked for identification.)

14             BY MR. HENAULT:

15        Q.   Ma'am, what has been marked as Exhibit

16   22 is captioned plaintiff's, Susan E. Johnson,

17   supplement response to request 12 in the

18   defendant's first request for production of

19   documents.  Do you see that?

20        A.   Uh-huh.

21        Q.   And this was served on me by your

22   counsel on December 5, 2006.  Have you ever seen

1    this before?  Maybe not the form, but look at

2    the charts.  See those?

3         A.    Oh, yeah.

4         Q.    Did you have any involvement in

5    preparing these?

6         A.    Yes, I did.

7         Q.    What was your involvement?

8         A.    I helped put together the information

9    on the spreadsheet.

10        Q.    Who actually did the calculations?

11        A.    Well, I did it with my husband, Paul,

12   and my dad's help.

13        Q.    Did anyone -- anyone else independently

14   have any involvement in preparing this?

15        A.    No.

16        Q.    And a different accountant or economist

17   or no one else had any involvement in preparing

18   this?

19        A.    No.

20        Q.    Do you know what was used to determine

21   that present value?

22        A.    That's one that's better -- the net

1    present value, is that what you're talking

2    about?

3        Q.   Yes, ma'am.

4        A.   There's a table that has net present

5    value that was used.

6        Q.   Who used that table?

7        A.   Well, I used it, but with advice from

8    my husband.

9        Q.   Does your husband have any -- is he an

10   economist?

11       A.   He's an accountant.

12       Q.   Did you -- this material was prepared

13   specifically for this litigation, correct?

14       A.   Yeah.

15       Q.   How was the annual COLA number

16   increased, do you know?

17       A.   That's a better question to ask them.

18       Q.   None of that information is contained

19   in this report, is it?

20       A.   What information?

21       Q.   None of that information about how

22   the -- what documents were considered, what --

1    where the information comes from, what was

2    relied upon.  None of that is contained in this

3    exhibit, is it?

4         A.   I don't know.

5         Q.   Take a look at it, please, ma'am.

6         A.   Well, I guess it needs to be clarified.

7         Q.   Okay.  None of it is contained in

8    there, is it?

9         A.   No, not that I know of.

10        Q.   Ma'am, I understand that it's your

11   testimony that you still suffer from a

12   depressive disorder, and from anxiety disorder,

13   correct?

14        A.   Right.

15        Q.   And that medication makes -- this is

16   estimates, medication makes the depressive

17   disorder roughly about 70 percent better,

18   correct?

19        A.   Right.

20        Q.   And the anxiety disorder roughly about

21   50 percent, better, correct?

22        A.   Right.

1      Q.   Given that, are you capable of working

2   now?

3      A.   No.

4      Q.   Why?

5      A.   I'm too afraid of supervisors now that

6   I don't think I could work with somebody.

7      Q.   So it's your belief that you can't work

8   in any position at all?

9      A.   Yes.

10     Q.   Okay.  Now, on August 1, 2005 you

11   applied for disability retirement, didn't you?

12     A.   Uh-huh.

13     Q.   Yes?

14     A.   Yes.

15     Q.   And you applied for that through the

16   Office of Personnel Management?

17     A.   Yes.

18          (Discussion off the record.)

19          BY MR. HENAULT:

20     Q.   On February 24, 2006 you received your

21   first response from OPM, didn't you, regarding

22   your disability application?

1     A.   Can you say that again?

2     Q.   In February 2006 --

3     A.   I received my first information about

4   it?

5     Q.   You received your first response to

6   your application, didn't you?

7     A.   Yeah.

8     Q.   And in fact they told you that based on

9   your response, you did not meet the criteria for

10   entitlement and are not disabled within the

11   meaning of the retirement law, correct?

12     A.   Right.

13     Q.   So you submitted additional

14   information?

15     A.   No.

16     Q.   No?  What else did you submit?

17   Anything?  They just changed their mind?

18     A.   No, that's OPM.

19     Q.   Right.  That was my question.  Maybe I

20   didn't ask my question clear.

21     A.   No, but OPM said no, but then I went

22   with FURS, and they accepted my disability.

1        Q.    Okay.  Did you have to submit any

2    additional information for that subsequent

3    application other than what you submitted to --

4        A.    Yeah, I did.

5        Q.    Okay.  And the end of my question was

6    other than what you submitted to OPM?  When did

7    your disability retirement benefits begin?

8        A.    In June.

9        Q.    June of what year?

10       A.    This year.  June of this year, yeah,

11   2006.

12       Q.    Between August 2004 and June 2006 did

13   you have any income at all?

14       A.    No.

15       Q.    Do you own your home, ma'am?

16       A.    No, I don't.

17       Q.    Who does?

18       A.    My husband does.

19       Q.    Is it just his name or is your name on

20   it also?

21       A.    I don't know the answer to that.

22       Q.    Fair enough.  Fair enough.

1       A.   It was originally in his name.  I don't

2  know if it's now in both of our names.

3       Q.   Who pays the mortgage?

4       A.   My husband.

5       Q.   Do you have any retirement accounts?

6       A.   I have one retirement account in a T.

7  Rowe Price IRA.

8       Q.   You have a T. Rowe Price?

9       A.   IRA.

10       Q.   When did you open that IRA, do you

11  know?

12       A.   Approximately a year ago.

13       Q.   Prior to --

14       A.   And it was my TSP, the TSP stuff that I

15  got from -- after my removal, I put it into a T.

16  Rowe Price IRA.

17       Q.   And that was approximately a year ago?

18       A.   Uh-huh.

19       Q.   What's the value of that account, do

20  you know?

21       A.   It's $27,000 now.

22       Q.   What was it --

```
 1          A.   But I don't have access to it because

 2     my husband and I put our investments in T. Rowe

 3     Price.  We have some investments in T. Rowe

 4     Price other than my IRA, but my husband and I

 5     have a verbal agreement that I won't access it

 6     unless he dies, and I don't know how to access

 7     it at the current time.

 8          Q.   Okay.  So other than this IRA, you do

 9     have an investment account with T. Rowe Price?

10          A.   Yeah, I do, but I can't access it at

11     this time.

12          Q.   When was that investment account opened

13     roughly?

14          A.   A year ago.

15          Q.   Prior to that, did you have any

16     investment accounts or accounts -- excuse me, or

17     prior to that did you have any investment

18     accounts, other than IRA, TSP account?

19          A.   No.

20          Q.   What's the value of that T. Rowe Price

21     account?

22          A.   I already told you, 27 -- it's the same
```

1    one I'm talking about.

2        Q.   Oh, it's the same account, okay.

3        A.   Oh, were you talking about a different

4    account?

5        Q.   I thought -- I must have been confused.

6    I thought you said that you have the T. Rowe

7    Price IRA that was rolled over from your TSP?

8        A.   Right.

9        Q.   I thought you said you have a separate

10   T. Rowe Price investment account with your

11   husband.

12       A.   No, we have some other investments.

13       Q.   Other than what is in the T. Rowe Price

14   IRA?

15       A.   Right, other than what's in the T. Rowe

16   Price IRA but I don't --

17       Q.   Are those investments also with T. Rowe

18   Price?

19       A.   Yeah.

20       Q.   So there are at least two accounts with

21   T. Rowe Price that we're talking about, one is

22   your IRA?

```
1        A.    Right.

2        Q.    And one is a separate investment

3   account that is owned by both you and your

4   husband?

5        A.    Right.

6        Q.    Okay.

7        A.    But I don't have access to it and I

8   never received any income from it.

9        Q.    Okay.  Your name is on the account?

10        A.    Right.

11        Q.    When was that account opened?

12        A.    I guess that was two years ago.

13        Q.    How much money was deposited into this

14   account to open it?

15        A.    I don't know.

16        Q.    Do you know the value of it right now?

17        A.    The value of it is 170,000.

18        Q.    That's the current value roughly?

19        A.    Roughly.

20        Q.    But you have no idea what the beginning

21   value was two years ago?

22        A.    No.
```

1      Q.    Where did the money come from that was

2    put into that account?

3      A.    It came from my husband.

4      Q.    Okay.

5      A.    That's why it's really his account but

6    I can get it after he dies.

7      Q.    But your name is on there right now,

8    correct?

9      A.    Right.

10     Q.    You are a joint owner of that money

11   legally?

12     A.    Right, but I can't access it.  I don't

13   have access to it.

14     Q.    Because of a verbal agreement that you

15   have with your husband?

16     A.    Right.

17     Q.    But other than that, you are legally

18   you are an owner of that money also, right?

19     A.    Right.

20           MR. HENAULT:  Let's take -- it's ten

21   past right now.  Let's take ten minutes.

22           (Whereupon, a brief recess was taken.)

```
 1              BY MR. HENAULT:

 2        Q.   Just to be clear, that joint investment

 3   account with your husband at T. Rowe Price you

 4   said was opened two years ago, right?

 5        A.   Yes.

 6        Q.   Who is Ora Alger, first name O R A,

 7   last name A L G E R?

 8        A.   She's a friend of mine that knows a lot

 9   about human resources because she had been a

10   union official at one time.

11        Q.   Did you work with her?

12        A.   Yeah, I worked with her when I was

13   doing unclassified duties.

14        Q.   Other than your time as a coworker of

15   hers in unclassified duties, did you work with

16   her in the same section, same unit, whatever?

17        A.   No.

18        Q.   Ms. Alger is someone that you consulted

19   with about human resources issues, correct?

20        A.   Right.

21        Q.   And she was not personally involved in

22   any of the actions other than you consulting
```

1     with her for advise, right?

2          A.    Right.   Right.

3          Q.    So her knowledge of what -- of your

4     claims and the facts giving rise to your claims

5     would be limited to basically what you told her?

6          A.    Right.

7          Q.    She was never a supervisor?

8          A.    No.

9          Q.    Never worked in the same area, other

10    than when you were doing unclassified duties?

11         A.    Right.

12         Q.    Do you have any children, ma'am?

13         A.    No.

14         Q.    Any children, step kids or anything

15    like that?

16         A.    Well, he has a child.   Not a child,

17    she's not a child, she's an adult.

18         Q.    How old?

19         A.    How old is she?

20         Q.    Roughly, roughly.

21         A.    Roughly 31 I think.   So not a young

22    child.

1          MR. HENAULT:  Ma'am, at this time I

2     have no further questions.

3          THE WITNESS:  Okay.

4          MR. JOHNSON:  I only have a few

5     questions.

6                    EXAMINATION

7          BY MR. JOHNSON:

8     Q.    In Deposition Number 3 which the

9     government's counsel discussed at some length

10    that was a chain of Emails with respect to Dr.

11    James in the medical documentation, and he --

12    you went -- that is to say the Assistant U.S.

13    Attorney and yourself went through at some

14    length discussing each of the Emails except

15    selectively he stopped asking questions at the

16    very top there where you sent the last Email,

17    which says:  "Good morning, Mack, since I had an

18    appointment yesterday with Dr. George C. James,

19    my psychiatrist, I asked him about the note that

20    he wrote for me.  He agrees it implies

21    accommodating my hours so I can make up work

22    where I am able and that the note should be

1    sufficient.  If there's a problem he wants to

2    know in addition to my father. "

3              So do you recall --

4       A.   Writing this.

5       Q.   -- sending the Email?

6       A.   Sending the Email, yes.

7              MR. HENAULT:  Object to the form of the

8    question.  You may answer.

9              BY MR. JOHNSON:

10      Q.   This looks like the Email though that

11   you sent?

12      A.   Yes.

13      Q.   Okay.  Do you understand that

14   information about the need for reasonable

15   accommodations can be both informal and formal?

16              MR. HENAULT:  Object to the form of the

17   question.  You may answer.

18              THE WITNESS:  Yes.

19              MR. JOHNSON:  Leading questions are not

20   prohibited questions in deposition.

21              MR. HENAULT:  I can object to the form

22   of a question and that will preclude use of that

1    question and answer later on.

2                 MR. JOHNSON:  That's right.

3                 MR. HENAULT:  So I will object for the

4    record.

5                 MR. JOHNSON:  You're entering it into

6    the record.

7                 MR. HENAULT:  Let me say, ma'am, your

8    attorney is going to ask you questions.  Before

9    you jump in with an answer, just take a second.

10   That way if I have an objection I can state it,

11   and we're not talking over each other for the

12   court remember.  Would you do that, please?

13                THE WITNESS:  Okay.

14                MR. HENAULT:  Thank you.

15                BY MR. JOHNSON:

16        Q.   On deposition number 15?

17        A.   Exhibit Number 15.

18        Q.   Exhibit Number 15, the third paragraph,

19   the first sentence in the third paragraph, could

20   you please read that sentence?

21        A.   What sentence?

22        Q.   The first sentence of the third

1    paragraph.

2         A.    "Let me make it clear that Ms.

3    Johnson's underlying depression and anxiety are

4    not conditions that preclude her from returning

5    to work at the Department of Education."

6         Q.    Does that refer to the office of chief

7    financial officer?

8              MR. HENAULT:    Object to the form of the

9    question.    You may answer.

10             THE WITNESS:    Yes, it does.

11             BY MR. JOHNSON:

12        Q.    No, but I mean it refers to the office

13   you were in.    The workplace, reference to

14   workplace, is that referring to -- what is the

15   reference to that?

16        A.    Oh, it's referring to the whole

17   Department of Education.    It's not referring to

18   OCFO.

19        Q.    Well, what's the reference to work

20   force or workplace where he says -- what's the

21   reference to workplace there where he -- where

22   the letter states that --

1       A.    Where are you going?

2       Q.    Wait a minute.  This must be the other

3    one.  Just a moment.  Let me read it.  I'll

4    withdraw that question.

5             On Exhibit or Johnson Number 16,

6    Johnson Exhibit Number 16, read the -- this is

7    the memo from Mack Lawrence to Susan Johnson,

8    read the second sentence in the first paragraph.

9       A.    "He also states that he has concluded

10   that in his opinion, it would be extremely

11   detrimental to Ms. Johnson's mental health for

12   her to return to the workplace. "

13      Q.    What's the reference to the workplace?

14      A.    That's to Department of Education, CFO

15   grants place.

16      Q.    Okay.  Now, further in that letter,

17   there's a reference to the Family Medical Leave

18   Act, and this occurs in a number of other

19   letters.  Did you request a reasonable

20   accommodation under the Federal Medical Leave

21   Act?

22             MR. HENAULT:  Object to the form of the

1    question.

2            THE WITNESS:  No, I didn't.

3            BY MR. JOHNSON:

4        Q.    Under what legislation, under what

5    statute did you request reasonable

6    accommodations?

7        A.    Under the ADA, the American With

8    Disability Act.

9        Q.    Thank you.  When the letters were sent

10   in Exhibit Number 11 -- I'm sorry, in Exhibit

11   Number 19, 20, and 21.

12       A.    19, 20, and 21.

13       Q.    The letters you received from Mack

14   Lawrence in 2004, were these letters in response

15   to a concern about -- do they respond to the

16   Americans With Disabilities Act?

17       A.    No.

18            MR. HENAULT:  Object to the form of the

19   question.

20            THE WITNESS:  No, they didn't.

21            BY MR. JOHNSON:

22       Q.    Did you receive any response from Mr.

1    Lawrence with respect to that request with

2    request for reasonable accommodations?

3        A.    No, I didn't receive anything dealing

4    with reasonable accommodations from him.

5        Q.    What is your understanding of who makes

6    a decision with respect to removal?

7        A.    That would be the director of FMO that

8    would remove me.

9        Q.    You indicated that you are familiar

10   with the Department of Education in response to

11   Mr. Henault questions -- that you are familiar

12   with Department of Education's guidance, with

13   respect to disabilities?

14       A.    Yeah, yes.

15       Q.    Could you tell me who is supposed to

16   make the decision with regard to a disability

17   complaint, who is authorized to do so?

18       A.    Who was authorized to do so?

19           MR. HENAULT:   Object to the form of the

20   question.

21           THE WITNESS:   Wait a minute.   Can you

22   say that again?

1           BY MR. JOHNSON:

2      Q.   Withdraw the question.  Withdraw it.

3  Do you regard Mr. Lawrence or Mr. Bowie as

4  neutral officials?

5      A.   No, Mr. Bowie and Mr. Lawrence are not

6  neutral officials.

7      Q.   I think there were just one or two

8  others.  Would you look at Exhibit Number 20?

9      A.   Yeah.

10      Q.   On the top of page 2 of that, I

11  guess -- yeah, it's two, page 2 of 9.  It says

12  that the notice of removal was provided.

13           MR. HENAULT:  Where are you reading

14  from, sir?

15           MR. JOHNSON:  Oh, okay.

16           BY MR. JOHNSON:

17      Q.   Instead your local representative

18  retaliation complaint dated July the 9th, 2002

19  which acknowledged receipt of the May the 27th

20  notice of proposed removal.

21           Do you recall that the notice of

22  proposed removal and/or the letters from Mack

1      Lawrence in Exhibits 19, 20 and 21 were provided

2      to the EEOC, the Administrative Law Judge and to

3      the Department of Education?

4             MR. HENAULT:  Object to the form of the

5      question.

6             THE WITNESS:  Yes.

7             MR. JOHNSON:  Thank you.

8             MR. HENAULT:  Are you done?

9             MR. JOHNSON:  Uh-huh.

10                          EXAMINATION

11            BY MR. HENAULT:

12       Q.   Ma'am, you received the notice of

13     decision to remove shortly after July 21, 2004,

14     correct?

15       A.   Yes.

16       Q.   Other than filing a complaint with the

17     EEOC, did you ever seek informal counseling with

18     the EE office, EEO office at the Department of

19     Education within 45 days of this notice?

20       A.   45 days of this notice?  No.

21       Q.   Of your receipt of this notice, ma'am?

22       A.   No.

```
1         Q.    The only action you took was filing a

2   complaint of retaliation with the EEOC, correct?

3         A.    Right.   I thought he wasn't allowed to

4   talk.  Giving little notes is just like talking,

5   isn't it?

6              MR. JOHNSON:  He didn't talk.  He's not

7   on the record.

8              THE WITNESS:  Well, I just know that I

9   can't talk to my husband, so why can he talk to

10  him?

11             BY MR. HENAULT:

12        Q.    Ma'am, he's not the one under oath

13  answering questions.  If we look back, ma'am --

14        A.    Well, neither is he.

15        Q.    -- at the Email, let me find it,

16  please.  Look at Johnson 3, which your counsel

17  asked you about, ma'am, where you say that your

18  doctor agrees that the letter implies

19  accommodating my hours so I can make-up work.

20             We've discussed this already, ma'am,

21  and we're talking about what letter here?  Is

22  that the November 2001 letter?
```

```
1        A.    Yeah.

2        Q.    The only reason that the letter can

3   imply that is because it doesn't actually say

4   that; isn't that right?

5        A.    No.

6        Q.    Okay.  No, it's not right, or no, the

7   letter -- does the letter say that you can make

8   up hours when you're able to?

9        A.    It implies it.

10        Q.    But it does not say it, does it, ma'am?

11        A.    Let's see.  Where is it?  This is it.

12        Q.    Exhibit 4 says nothing about making up

13   hours, does it, ma'am?

14        A.    No.

15        Q.    All right.  Now, the other exhibit that

16   your counsel asked you about was the one that --

17   let me find it real quick, please.  What exhibit

18   is that between -- I've got it.  I've got it.

19   It's Exhibit 16, ma'am.

20        A.    Wait a minute.  Okay.  What about

21   Exhibit 16?

22        Q.    Where this letter says, and your
```

1    counsel asked you about this specific sentence,

2    this last sentence in the first paragraph, he

3    also states that he has:  "Concluded that in his

4    opinion it would be extremely detrimental to Ms.

5    Johnson's mental health for her to return to the

6    workplace."

7            Do you see that?

8        A.    Uh-huh.

9        Q.    The question was what does it say about

10    workplace or what is it referring to, and you

11    answered I believe that it says OCFO or the

12    office of the chief financial officer, grants,

13    right?

14        A.    Right.

15        Q.    That's not what it says, is it, ma'am?

16        A.    Well, the workplace is where I worked,

17    and that's where I worked, CFO, FMNO grants.

18        Q.    Okay, ma'am.  Let's look back at

19    Johnson 15 which is the letter referenced in

20    what we just read.  It doesn't say anything

21    about -- in that entire paragraph about the

22    grant section at OCFO does it?

1      A.   No, but it's the workplace where I

2   worked.

3      Q.   Yes, ma'am.  And I believe your answer

4   was it says office of chief financial grants

5   section?

6      A.   I said that's what it's referring to.

7      Q.   That's your interpretation of it,

8   correct?

9      A.   Right, yes.

10      Q.   But that's not what it says?

11      A.   No, it's what it says.

12      Q.   Correct.  Could you point me where it

13   says anything about OCFO grants, ma'am?

14      A.   Well, it is not -- my doctor does not

15   work at this office place, so he just says

16   workplace.  He doesn't say what office I'm in

17   and all that junk.

18      Q.   I understand that, ma'am.

19      A.   So he said workplace.

20      Q.   Your testimony was that that is what it

21   says.

22      A.   That is what it implies.

1    Q.    Okay.  It's not what it says, correct?

2    A.    Okay.

3    Q.    Is that correct?

4    A.    That's correct.

5    Q.    Very good.  I asked you this question

6    about the notice of removal that you received on

7    July 21, 2004, but after August 6 -- let me find

8    that.  After August 6, 2004 within 45 days of

9    that, when you were officially removed as an

10   employee from the Department of Education, did

11   you seek counseling with the Department of

12   Education's EEO office alleging discrimination

13   in this removal?

14   A.    No.

15   Q.    Okay.

16        MR. HENAULT:  I have no further

17   questions.  Sir, anything else?

18        MR. JOHNSON:  Just one more.

19                    EXAMINATION

20        BY MR. JOHNSON:

21   Q.    Did you believe -- withdrawn.  The

22   letters that -- what was the status of the EEOC

1    process when you received the letters with

2    respect to moving to another position and what

3    you interpret to be the threatening to terminate

4    you?

5            MR. HENAULT:  Object to the form.  You

6    may answer, ma'am.

7            THE WITNESS:  Can you say the question

8    again?

9            BY MR. JOHNSON:

10       Q.   Where in the EEO process were you when

11   you received the -- was your case when you

12   received these letters from Mack Lawrence?

13       A.   I was -- I don't remember.

14       Q.   Okay.  Did you believe that --

15       A.   I think it was -- I think it was in the

16   process of being appealed.

17       Q.   Thank you.  Do you -- did you believe

18   that the department planned to terminate you

19   prior to the receipt of these letters?

20       A.   No.

21           MR. HENAULT:  Object to the form.

22   You've already answered.

1          BY MR. JOHNSON:

2      Q.    In the EEO investigative hearing, which

3   of your supervisors gave testimony?

4      A.    Mack Lawrence and Terry Bowie.

5      Q.    Is it your testimony that the actions

6   that were taken thereafter were retaliatory?

7      A.    Yes.

8      Q.    Okay.

9          MR. JOHNSON:  No further questions.

10         MR. HENAULT:  I have no more questions,

11  ma'am.

12         (Whereupon, at 4:35 p.m. the deposition

13  was concluded.)

14

15

16

17

18

19

20

21

22

1    DISTRICT OF COLUMBIA, to wit:

2

       I, Debra L. Maheux, the officer before
3    whom the foregoing deposition was taken, do
     hereby certify that the within-named witness
4    personally appeared before me at the time and
     place herein set out, and after having been duly
5    sworn by me, according to law, was examined by
     counsel.

6

       I further certify that the examination
7    was recorded stenographically by me and this
     transcript is a true record of the proceedings.

8

       I further certify that I am not of
9    counsel to any of the parties, nor an employee
     of counsel, nor related to any of the parties,
10   nor in any way interested in the outcome of this
     action.

11

       As witness my hand and notarial seal
12   this 27th day of December, 2006.

13

14

15

                    _____
16                        Debra L. Maheux
                          Notary Public

17

18

19   MY COMMISSION EXPIRES:
20                    3/14/08

21

22

```
 1                    I N D E X

 2          DEPOSITION OF SUSAN JOHNSON

 3                DECEMBER 7, 2006

 4

 5     EXAMINATION                        PAGE

 6       MR. HENAULT                      4,300

 7

 8       MR. JOHNSON                      292,

 9                                        311

10

11

12     EXHIBITS MARKED                    PAGE

13       Number 1                           84

14       Number 2                          113

15       Number 3                          128

16       Number 4                          133

17       Number 5                          150

18       Number 6                          162

19       Number 7                          171

20       Number 8                          175

21       Number 9                          179

22       Number 10                         186
```

```
 1        Number 11                        198

 2        Number 12                        205

 3        Number 13                        208

 4        Number 14                        213

 5        Number 15                        220

 6        Number 16                        224

 7        Number 17                        235

 8        Number 18                        250

 9        Number 19                        253

10        Number 20                        261

11        Number 21                        272

12        Number 22                        278

13

14

15

16

17

18

19

20

21

22
```

1            CERTIFICATE OF DEPONENT

2

3

         I hereby certify that I have read and
4    examined the foregoing transcript, and the same
     is a true and accurate record of the testimony
5    given by me.

6            Any additions or corrections that I feel
     are necessary, I will attach on a separate sheet
7    of paper to the original transcript.

8

9

                   _____
10                 SUSAN JOHNSON

11

         I hereby certify that the individual
12   representing himself/herself to be the
     above-named individual, appeared before me this
13
     _____ day of _____, 2006, and
14   executed the above certificate in my presence.

15

16

                   _____
17                 NOTARY PUBLIC IN AND FOR
18                 _____

19

MY COMMISSION EXPIRES:

20

_____

21

22

```
1    WITNESS:  SUSAN JOHNSON

2    DATE:  DECEMBER 7, 2006

3    CASE:  JOHNSON vs. SPELLINGS

4    Please note any errors and the corrections

     thereof on this errata sheet.  The rules require

5    a reason for any change or correction.  It may

     be general, such as "To correct stenographic

6    error," or "To clarify the record," or "To

     conform with the facts."

7

8    PAGE LINE      CORRECTION      REASON FOR CHANGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```